ACCEPTED
03-14-00726-CV
3887778
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/23/2015 6:20:41 PM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00726-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/23/2015 6:20:41 PM
JEFFREY D. KYLE
Clerk

## IN THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

### TEXAS SAN MARCOS TREATMENT CENTER, L.P. d/b/a SAN MARCOS TREATMENT CENTER
*Appellant*

**v.**

### VERONICA PAYTON
*Appellee*

**On Appeal from Hays County, Texas,
428th Judicial District Court
Trial Court Case Number: 13-2658**

## BRIEF FOR APPELLANT

Ryan L. Clement
Texas Bar No. 24036371
SERPE JONES ANDREWS
CALLENDER & BELL, PLLC
2929 Allen Parkway, Suite 1600
Houston, Texas 77019
Telephone: (713) 452-4400
Facsimile:  (713) 452-4499
Email: rclement@serpejones.com

**Attorneys for Appellant,
Texas San Marcos Treatment Center,
L.P. d/b/a San Marcos Treatment Center**

## ORAL ARGUMENT RESPECTFULLY REQUESTED

## IDENTITY OF PARTIES AND COUNSEL

In accordance with Rule 38.1(a) of the Texas Rules of Appellate Procedure, Appellant provides the following complete list of all parties and counsel to the trial court's order that forms the basis of this appeal.

**Trial and Appellate Counsel for Appellant Texas San Marcos Treatment Center, L.P. d/b/a San Marcos Treatment Center:**

Ryan L. Clement
Texas Bar No. 24036371
SERPE JONES ANDREWS
CALLENDER & BELL, PLLC
2929 Allen Parkway, Suite 1600
Houston, Texas 77019
Telephone: (713) 452-4400
Facsimile:  (713) 452-4499
Emails:  rclement@serpejones.com


**Trial and Appellate Counsel for Appellee Veronica Payton:**

Adam S. Ward
Texas Bar No. 00788615
Aaron Allison
Texas Bar No. 24055098
Allison & Ward
2001 N. Lamar Blvd.
Austin, Texas 78705-4907
Telephone: (512) 474-8153
Facsimile: (512) 474-9703
Email: allison-ward@sbcglobal.net
Email: aaron@allisonwardllp.com

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL ........................................................ ii

TABLE OF CONTENTS ................................................................................ iii

TABLE OF AUTHORITIES ...........................................................................v

STATEMENT OF THE CASE ........................................................................2

ISSUES PRESENTED....................................................................................2

STATEMENT OF FACTS .............................................................................3

SUMMARY OF THE ARGUMENT ..............................................................5

ARGUMENT & AUTHORITY .....................................................................6

    I.    STANDARD OF REVIEW ...............................................................6

    II.    The Trial Court Abused Its Discretion When Finding Dr. Reid's Report Satisfied The Requirements Of Chapter 74 And Denying Appellant's Motion To Dismiss. ........................................................7

        A.    Legislative Intent Of Chapter 74..............................................7

        B.    Chapter 74's Expert Report Requirements. ...............................8

        C.    Dr. Reid's Report Does Not Constitute A Good Faith Effort to Comply With Section 74.351................................................12

            1.    Dr. Reid's report provides no facts to support his conclusions and thus does not constitute an expert report under Chapter 74............................................12

            2.    Dr. Reid fails to identify the standard of care applicable to San Marcos Treatment Center ...................................15

iii

3. Dr. Reid fails to explain how San Marcos Treatment Center breached the applicable standard of care. ...........19

4. Dr. Reid's report fails to explain how an alleged breach in the standard of care by San Marcos Treatment Center caused Appellee's injuries. ..............................................23

D. By Serving A Report Like Dr. Reid's, Appellee Effectively Negates The Purpose Of Chapter 74's Expert Report Requirement. ................................................................29

CONCLUSION & PRAYER.................................................................30

CERTIFICATE OF COMPLIANCE....................................................32

CERTIFICATE OF SERVICE .............................................................32

APPENDIX

TRIAL COURT ORDER ...............................................................A

CASES ................................................................B

# TABLE OF AUTHORITIES

Cases

*American Transitional Care Ctrs. of Tex., Inc. v. Palacios*,
  46 S.W.3d 873 (Tex. 2001)................................................................ passim

*Austin Heart, P.A. v. Webb*,
  228 S.W.3d 276 (Tex. App.—Austin 2007, no pet.) ............................... 11, 20, 27

*Baylor All Saints Medical Center v. Martin*,
  340 S.W.3d 529 (Tex. App.-Fort Worth 2011, no pet.).......................... 17, 18, 28

*Bogar v. Esparza*,
  257 S.W.3d 354 (Tex. App.—Austin 2008, no pet.) ..............................................8

*Bowie Mem'l Hosp. v. Wright*,
  79 S.W.3d 48 (Tex. 2002)................................................................ passim

*Earle v. Ratliff*,
  998 S.W.2d 882 (Tex. 1999)................................................................10

*Gray v. CHCA Bayshore L.P.*,
  189 S.W.3d 855 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ................. 11, 20

*Hebert v. Hopkins*,
  395 S.W.3d 884 (Tex. App.—Austin 2013, no pet.) ................................... passim

*Jelinek v. Casas*,
  328 S.W. 3d 526 (Tex. 2010)................................................................ passim

*Jernigan v. Langley*,
  195 S.W.3d 91 (Tex. 2006)................................................................9

*Kingwood Pines Hospital, LLC, v. Gomez*,
  362 S.W.3d 740 (Tex. App.-Houston [14th Dist.] 2011,.............................. passim

*Kocurek v. Colby*,
  No. 03-13-00057-CV, 2014 WL 4179454 –5 (Tex. App.—
  Austin Aug. 22, 2014, no pet.)................................................................24

*Kuykendall v. Dragun*,
   No. 11-05-00230-CV, 2006 WL 728068 (Tex. App.—
   Eastland Mar. 23, 2006, pet. denied) ....................................................................14

*McKenna Memorial Hosp., Inc. v. Quinney*,
   No. 03-06-00119-CV, 2006 WL 3246524 (Tex. App. –
   Austin, Nov. 10, 2006, no pet. h.)................................................................ 10, 27

*Psychiatric Solutions, Inc. v. Palit*,
   414 S.W.3d 724 (Tex. 2013)..................................................................................8

*Regent Care Ctr. of San Antonio II, Ltd. P'ship v. Hargrave*,
   300 S.W.3d 343 (Tex. App.—San Antonio 2009, pet. denied)............................28

*Russ v. Titus Hosp. Dist.*,
   128 S.W.3d 332 (Tex. App. – Texarkana 2004, pet denied) ......................... 10, 11

*Shenoy v. Jean*,
   No. 01-10-01116-CV, 2011 WL 6938538(Tex. App.—
   Houston [1st Dist.] Dec. 29, 2011,.................................................................. 14, 19

*Smith v. Wilson*,
   368 S.W.3d 574 (Tex. App.—Austin 2012, no pet.) ................................... passim

*Strom v. Memorial Hermann Hosp. Sys.*,
   110 S.W.3d 216.......................................................................................... 10, 11, 15

*Taylor v. Fossett*,
   320 S.W.3d 570 (Tex. App.—Dallas 2010, no pet.)..................................... 13, 23

*Texarkana Nursing & Healthcare Center, LLC v. Lyle*,
   388 S.W.3d 314 (Tex. App. – Texarkana, 2012)............................... 10, 17, 25, 28

*Texas West Oaks Hosp., L.P. v. Williams*,
   371 S.W.3d 171 (Tex. 2012)..................................................................................8

*W.B.M. Mgmt. Co. v. Flores*,
   No. 07-14-00008-CV, 2014 WL 1691362 –6 (Tex. App.—
   Amarillo Apr. 25, 2014, no pet.).................................................................... 13, 23

*Wood v. Tice*,
   988 S.W.2d 829 (Tex. App.—San Antonio 1999, pet. denied)..............................7

Statutes

TEX. CIV. PRAC. REM. CODE § 74.351(a)-(c) ...........................................................8

TEX. CIV. PRAC. REM. CODE § 74.351(b)...................................................... 1, 6, 8

TEX. CIV. PRAC. REM. CODE § 74.351(l)................................................................7, 9

TEX. CIV. PRAC. REM. CODE § 74.351(r)(6)..............................................................9

TEX. REV. CIV. STAT. ANN. art. 4590i................................................................7, 30

NO. 03-14-00726-CV

IN THE COURT OF APPEALS FOR THE
THIRD DISTRICT OF TEXAS

TEXAS SAN MARCOS TREATMENT CENTER, L.P. d/b/a
SAN MARCOS TREATMENT CENTER
*Appellant*

**v.**

VERONICA PAYTON
*Appellee*

On Appeal from Hays County, Texas,
428th Judicial District Court
Trial Court Case Number: 13-2658

BRIEF FOR APPELLANT

TO THE HONORABLE JUSTICES OF THE THIRD COURT OF APPEALS:

Appellant Texas San Marcos Treatment Center, L.P. d/b/a San Marcos Treatment Center ("San Marcos Treatment Center" or "Appellant") files this appeal from an order denying its motion to dismiss pursuant to section 74.351(b) of the Texas Civil Practices and Remedies Code in Trial Court Case Number 13-2658; *Veronica Payton v. Texas San Marcos Treatment Center, L.P. d/b/a San Marcos Treatment Center*, in the 428th Judicial District Court of Hays County, Texas, before the Honorable R. Bruce Boyer.

## STATEMENT OF THE CASE

Appellee Veronica Payton ("Ms. Payton" or "Appellee") filed a health care liability claim against Appellant, following the physical assault she experienced by a patient on January 2, 2012. In her petition, Appellee has alleged San Marcos Treatment Center failed to meet the standards of care with regard to patient care and safety and the safety of employees resulting in the assault and her injuries. (CR 4–14). On January 27, 2014, Appellee served a report authored by William H. Reid, M.D., M.P.H. ("Dr. Reid"). (CR 32-39, 89). Appellant timely objected to Dr. Reid's report because it failed to satisfy any of the expert report requirements under Chapter 74. (CR 22-39). Appellee never served any new, supplemental or amended reports. Following the expiration of the statutory deadline to serve expert reports under Chapter 74, Appellant moved to dismiss Appellee's claims in conjunction with the previously filed objections to Dr. Reid's report. (CR 90-91). After a hearing on the matter, the trial court entered an order finding that Dr. Reid's report was adequate and denying Appellant's motion to dismiss. (CR 118). Appellant subsequently filed this interlocutory appeal from that order. (CR 119-126).

## ISSUES PRESENTED

1. Whether the trial court abused its discretion by finding Dr. Reid's report was adequate under Chapter 74 despite the report's lack of sufficient

specificity, use of vague generalizations, and conclusory opinions that do not link the relevant facts to the conclusions.

2.    Whether the trial court abused its discretion in denying Appellant's motion to dismiss pursuant to section 74.351 of the Texas Civil Practices and Remedies Code because Dr. Reid's report does not represent a "good faith" effort.

## STATEMENT OF FACTS

San Marcos Treatment Center is a facility licensed in the State of Texas to provide behavioral health care and treatment to adolescent patients. (CR 5). In 2011, Ms. Payton was an employee of San Marcos Treatment Center. (CR 5). On December 7, 2011, a patient was admitted to San Marcos Treatment Center and was placed on the unit on which Ms. Payton worked. (*Id.*). Since the date of his admission, the patient had been quiet and cooperative. (CR 7). However, on January 2, 2011, the patient assaulted Ms. Payton while she escorted him from the laundry room alone. (*Id.*).

In her petition, Ms. Payton alleges San Marcos Treatment Center failed to adequately staff for patient care and staff and patient safety; failed to provide adequate training to staff; failed to provide staff with adequate notification of the patient's assaultive propensity; failed to meet the applicable standards by admitting the patient or housing the patient without adequate containment and/or supervision;

3

and failed to ameliorate and/or eliminate the risk of danger and protect patients and/or staff. (CR 9-11).

On January 27, 2014, Appellee served San Marcos Treatment Center with a curriculum vitae and report from William H. Reid, M.D., M.P.H. dated December 16, 2013 ("Dr. Reid's report"). (CR 32-89). Dr. Reid's report is the only report served by Appellee.

As addressed more fully below, Dr. Reid's report fails to include relevant facts, if any at all, concerning the staffing on January 2, 2011, the education and training provided to Ms. Payton and other health care staff, the information shared with health care staff concerning the patient's condition and propensities, factual information concerning the admission process at San Marcos Treatment Center and the admission of the patient and placement on the unit, the supervision and monitoring provided, and efforts to reduce the risk of danger and protect patients and/or staff. (CR 32–39).

San Marcos Treatment Center timely objected to Dr. Reid's report. (CR 22-89). In its objections, San Marcos Treatment Center specified that Dr. Reid's report failed to identify the applicable standard of care, failed to identify the alleged acts or omissions by San Marcos Treatment Center that amounted to a breach in the applicable standard of care, and failed to explain the causal relationship between each alleged breach and the injuries alleged. (*Id.*). Despite having knowledge of

4

these objections since February 18, 2014, Appellee has never amended or supplemented Dr. Reid's report at any time.

After the deadline for serving expert reports expired, San Marcos Treatment Center filed its motion to dismiss in conjunction with the previous objections. (CR 90-91). On July 29, 2014, Appellee filed her response to San Marcos Treatment Center's objections and motion to dismiss arguing that Dr. Reid's report was sufficient and also moved for sanctions. (CR 92-107). On September 19, 2014, San Marcos Treatment Center filed its reply to the response and its response to the motion for sanctions. (CR 108-117). On September 22, 2014, the trial court held a hearing on San Marcos Treatment Center's objections and motion to dismiss. (RR 1–26).

On October 30, 2014, the Honorable Judge R. Bruce Boyer issued a letter ruling stating "Having taken the Motion to Exclude medical report under advisement the Court is of the opinion that the motion is denied (over-ruled)." (CR 118). On November 19, 2014, San Marcos Treatment Center timely filed its notice of appeal of the court's order denying the motion to dismiss and this interlocutory appeal ensued. (CR 119-126).

## SUMMARY OF THE ARGUMENT

The trial court abused its discretion in holding that Dr. Reid's report was adequate under Chapter 74 and in denying San Marcos Treatment Center's motion

5

to dismiss under Chapter 74. In his report, Dr. Reid fails to provide sufficient specificity and instead relies on vague generalizations concerning the required statutory elements. Further, Dr. Reid also fails to link relevant facts to his conclusions on any of the required elements of a Chapter 74 expert report. The Texas Supreme Court holds that, when a report lacks any explanation linking the expert's conclusion to the relevant facts, a trial court abuses its discretion if it denies the defendant's motion to dismiss. Because of these deficiencies, Dr. Reid's report fails to identify the standard of care applicable to San Marcos Treatment Center, fails to explain how San Marcos Treatment Center breached the standard of care, and fails to explain the causal link between San Marcos Treatment Center's alleged breach and the injuries alleged by Appellee. Accordingly, Dr. Reid's report does not constitute a good faith effort to comply with the requirements of section 74.351, and the trial court erred in overruling the objections and denying San Marcos Treatment Center's motion to dismiss.

## ARGUMENT & AUTHORITY

### I. STANDARD OF REVIEW

A trial court's ruling on a motion to dismiss for failure to comply with section 74.351(b) of the Texas Civil Practice and Remedies Code is subject to review for abuse of discretion. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). Chapter 74 imposes a mandatory duty

on a trial court to grant a motion challenging the adequacy of an expert report if it appears to the court that the report does not meet the statutory requirements. *Hebert v. Hopkins*, 395 S.W.3d 884, 890 (Tex. App.—Austin 2013, no pet.) (citing to TEX. CIV. PRAC. REM. CODE § 74.351(l)). If an expert report contains only conclusions about the statutory elements in section 74.351, the trial court has "no discretion but to conclude ... that the report does not represent a good-faith effort" to satisfy the statute. *Smith v. Wilson*, 368 S.W.3d 574, 577 (Tex. App.—Austin 2012, no pet.) (citing *Palacios*, 46 S.W.3d at 877, 880).

## II.     The Trial Court Abused Its Discretion When Finding Dr. Reid's Report Satisfied The Requirements Of Chapter 74 And Denying Appellant's Motion To Dismiss.

### A.     Legislative Intent Of Chapter 74.

The Legislature enacted Article 4590i (now codified in Chapter 74), including its expert reporting requirement, for the purpose of deterring frivolous lawsuits against health care providers. TEX. REV. CIV. STAT. ANN. art. 4590i; *Palacios*, 46 S.W.3d at 879 (citing *Wood v. Tice*, 988 S.W.2d 829, 830 (Tex. App.—San Antonio 1999, pet. denied)). "The Legislature has determined that failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that the claim is either frivolous, or at best has been brought prematurely. This is exactly

7

the type of conduct for which sanctions are appropriate." *Bogar v. Esparza, 257 S.W.3d 354, 371 (Tex. App.—Austin 2008, no pet.)*.

As evidenced by this case, the purpose of deterring frivolous lawsuits is effectively negated when a claimant serves an expert report that omits relevant facts, lacks sufficient specificity and relies on vague statements, and reaches conclusory opinions on the required elements of a Chapter 74 expert report.

**B.**     **Chapter 74's Expert Report Requirements.**

Given the nature of Appellee's claims against San Marcos Treatment Center, her claims are health care liability claims and, therefore, are subject to and governed by the provisions of Chapter 74, including the expert report requirements. *Texas West Oaks Hosp., L.P. v. Williams, 371 S.W.3d 171 (Tex. 2012)*; *Psychiatric Solutions, Inc. v. Palit, 414 S.W.3d 724 (Tex. 2013)*.

Chapter 74 requires that, when a claimant asserts a health care liability claim, she must serve each defendant physician or health care provider with one or more expert reports and curriculum vitae of each expert no later than the 120th day after each defendant's original answer is filed. *See* TEX. CIV. PRAC. REM. CODE § 74.351(a)-(c). Chapter 74 further provides that a failure to serve a report within 120 days mandates that the trial court dismiss the case and award attorneys' fees and costs. *Id* at § 74.351(b).

8

In order to comply with Chapter 74, an expert report must represent an objective good faith effort to comply with the definition of an expert report under Chapter 74. *See* TEX. CIV. PRAC. REM. CODE § 74.351(l). The good faith effort standard requires the report to provide an adequate analysis for each of the following elements of a health care liability claim: (1) the applicable standard of care; (2) the manner in which the care rendered by the physician or health care provider failed to meet the standard; and (3) the causal relationship between that failure and the injury, harm or damages claimed. *Id.* at § 74.351(r)(6); *Palacios*, 46 S.W.3d at 879. The Texas Supreme Court holds that a report will not constitute a good faith effort if it omits any of these statutory requirements. *Jernigan v. Langley*, 195 S.W.3d 91, 94 (Tex. 2006). Further, in order to constitute a good faith effort, the report must, at a minimum: (1) inform the defendant of the specific conduct called into question; and (2) provide a basis for the trial court to conclude the claims have merit. *Palacios*, 46 S.W.3d at 879.

The Texas Supreme Court also holds that, while a report need not marshal all of the plaintiff's proof, it must include the expert's opinion on each of the elements identified in section 74.351. *Palacios*, 46 S.W.3d at 878. A report cannot merely state the expert's conclusions about the statutory elements. *Id.* at 879. "Rather, the expert must explain the basis for his statements to link his conclusions to the facts" and not merely state conclusions. *Bowie Mem'l Hosp. v. Wright*, 79

9

S.W.3d 48, 52 (Tex. 2002) (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). It is not enough that the expert report provides "insight" about the plaintiff's claims. *Id.* "A report that merely states the expert's conclusions about the standard or care, breach, and causation does not fulfill the two purposes of a good-faith effort." *Hebert v. Hopkins*, 395 S.W.3d 884, 890 (Tex. App.—Austin 2013, no pet.) (quoting *Jelinek v. Casas*, 328 S.W. 3d 526, 539 (Tex. 2010)).

Whether a defendant healthcare provider breached its duty cannot be determined absent specific information about what the defendant should have done differently. *Russ v. Titus Hosp. Dist.*, 128 S.W.3d 332, 341-42 (Tex. App. – Texarkana 2004, pet denied) (quoting *Palacios, 46 S.W.3d at 880*)). In other words, one must be able to determine from the report what was required by the standard of care, which requires "specific information about what the defendant should have done differently". *Texarkana Nursing & Healthcare Center, LLC v. Lyle, 388 S.W.3d 314 (Tex. App. – Texarkana, 2012)* (quoting *Palacios, 46 S.W.3d at 880*)). Moreover, the standard of care is defined by what an ordinarily prudent health-care provider would have done under the same or similar circumstances. *McKenna Memorial Hosp., Inc. v. Quinney*, No. 03-06-00119-CV, 2006 WL 3246524, *4 (Tex. App. – Austin, Nov. 10, 2006, no pet. h.) (mem. op.) (citing to *Palacios, 46 S.W.3d at 880*; *Strom v. Memorial Hermann Hosp. Sys., 110 S.W.3d 216, 222* (Tex. App. – Houston [1st Dist.] 2003, pet. denied)). Identifying

the standard of care is critical because whether a defendant breached its duty cannot be determined absent specific information about what the defendant should have done differently. *See id*. (citing to *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002) (per curium); *Russ*, 128 S.W.3d at 343).

Additionally, an expert cannot simply opine that the breach caused the injury because such a brief statement would fail to satisfy the second element of *Palacios* and does not provide the trial court with any reasonable basis to conclude the lawsuit has merit. *Jelinek*, 328 S.W. 3d at 539. Without any explanation tying the conclusion to the facts, an expert's conclusion that one event caused another differs little from an *ipse dixit*, which the Supreme Court has consistently criticized. *Id*. Rather, the report must explain how and why the breach caused the injury based on the facts presented. *Id*. at 539-40. Further, the report must include sufficient detail regarding how the breach caused the plaintiff's injuries to allow the trial court to determine if the claim has merit. *Id*. at 540.

Importantly, the only information relevant to determining whether a report complies with the statute is "within the four corners of the document." *Palacios*, 46 S.W.3d at 878. "This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.) (citing *Bowie Mem'l*, 79 S.W.3d at 53; *Gray v. CHCA Bayshore L.P.*, 189

11

S.W.3d 855, 859 (Tex. App.—Houston [1st Dist.] 2006, no pet.)). As this Court recognized, "neither the trial court nor this Court may infer additional opinions or underlying facts to fill in gaps that the report itself leaves open." *Hebert*, 395 S.W.3d at 890.

## C. Dr. Reid's Report Does Not Constitute A Good Faith Effort to Comply With Section 74.351.

In addition to Dr. Reid's failure to provide any facts supporting his conclusions as to each of the required statutory elements, Dr. Reid also failed to make a good faith effort to comply with section 74.351's requirements. For ease of reference, San Marcos Treatment Center provides herein selected paragraphs from Dr. Reid's report that clearly evidence the lack of any factual foundation for his conclusions, an absence of sufficient specificity in his opinions, and the inadequacies of his report. As explained herein, the report fails to satisfy any of the elements of a Chapter 74 expert report as to San Marcos Treatment Center and, therefore, does not constitute an expert report under Chapter 74 and does not represent a good faith effort.

### 1. Dr. Reid's report provides no facts to support his conclusions and thus does not constitute an expert report under Chapter 74.

Before addressing Dr. Reid's specific failures to satisfy the statutory elements of a Chapter 74 expert report, it is important to note that Dr. Reid's report provides no relevant factual information in support of his opinions as to each

12

required element. (CR 32-39). While, Dr. Reid provides a list of items he reviewed, he wholly fails to provide the details of any "factual" information he gleaned from his review of the materials as they may relate to his opinions concerning the required statutory elements. (*Id.*). It is well established that an expert must link his conclusions to the facts in order satisfy Chapter 74's expert report requirement. Recently, the Texas Supreme Court held in *Jelinek v. Casas* that, when the report in question lacked any explanation linking the expert's conclusion to the relevant facts, the trial court abused its discretion in denying the defendant's motion to dismiss and the court of appeals erred by affirming that ruling. 328 S.W.3d at 540 (citing *Bowie Mem'l*, 79 S.W.3d at 52).

Several Texas appellate courts have reached the same conclusion. The appellate courts recognize that an expert's failure to provide any facts in the report to support his or her conclusions on standard of care, breach, and causation prevents the trial court from concluding the plaintiff's claims have merit. *See Taylor v. Fossett*, 320 S.W.3d 570, 578 (Tex. App.—Dallas 2010, no pet.) (finding trial court abused its discretion in denying physician's motion to dismiss since expert report provided only conclusory opinions without supporting facts); *W.B.M. Mgmt. Co. v. Flores*, No. 07-14-00008-CV, 2014 WL 1691362, *5–6 (Tex. App.— Amarillo Apr. 25, 2014, no pet.) (holding that expert report was not a good faith effort to provide a fair summary of his opinions and warranted dismissal since

13

expert failed to provide facts to support his conclusion); *Shenoy v. Jean*, No. 01-10-01116-CV, 2011 WL 6938538, \*6 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, pet. denied) (holding that "an expert report that merely asserts that a defendant physician's breach caused the plaintiff's injury without providing a factual basis does not provide the trial court with the information necessary to evaluate the merits of the plaintiff's claim.").

The failure to set forth facts supporting an expert's opinions on the standard of care, breach, and causation is not an argument based on "semantics." *Kuykendall v. Dragun*, No. 11-05-00230-CV, 2006 WL 728068, \*3 (Tex. App.—Eastland Mar. 23, 2006, pet. denied). Rather, the facts are "vital" in determining whether the plaintiff's claims have merit. *Id.*

Dr. Reid's report omits key facts supporting his conclusions. Instead, Dr. Reid's report simply offers conclusory opinions about the standard of care, breach, and causation. For example, Dr. Reid plainly acknowledges from the outset of his report that "not all the expected records have been available for review, and I have not yet examined Ms. Payton." (CR 32). Dr. Reid further acknowledges, "Specific staffing data from SMTC is no yet available to me." (CR 33). Nonetheless, Dr. Reid offers conclusory opinions relating to these very matters (*i.e.* adequacy of staffing) while omitting key relevant factual information.

Because Dr. Reid failed to provide any relevant facts to support his conclusions, his report does not constitute a good faith effort to comply with section 74.351 of the Texas Civil Practices and Remedies Code. Given the lack of facts to support Dr. Reid's conclusion, the trial court abused its discretion in finding the report was sufficient. *See Smith*, 368 S.W.3d at 577.[1] As a result, San Marcos Treatment Center requests that the Court reverse the trial court's order.

## 2. Dr. Reid fails to identify the standard of care applicable to San Marcos Treatment Center

In his report, Dr. Reid fails to identify the standard of care applicable to San Marcos Treatment Center. The standard of care for a health care provider or a physician is what an ordinarily prudent health care provider or physician would do under the same or similar circumstances. *See Strom*, 110 S.W.3d at 222. Identifying the standard of care is "critical" because "[w]hether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880. From Dr. Reid's report, San Marcos Treatment Center cannot determine what, specifically, was required or what it should have done differently.

As explained above, a good faith report must, at a very minimum: (1) inform the defendant of the specific conduct called into question; and (2) provide a basis

---

[1] Also, without the relevant facts, the trial court either misapplied the law regarding the sufficiency of expert report or inferred additional underlying facts to fill in gaps that the report itself left open. This amounts to an abuse of discretion. *See Hebert*, 395 S.W.3d at 890.

for the trial court to conclude the claims have merit. *Palacios*, 46 S.W.3d at 879. A report cannot merely state the expert's conclusions about the statutory elements. *Id.* at 879. "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie*, 79 S.W.3d at 52. As this Court recognizes, "[a] report that merely states the expert's conclusions about the standard or care, breach, and causation does not fulfill the two purposes of a good-faith effort." *Hebert*, 395 S.W.3d at 890.

In his report, Dr. Reid provides the following conclusory opinions concerning the applicable standard of care.

> Ms. Payton was an employee of San Marcos Treatment Center (hereafter "SMTC") at the time of the incident that gave rise to her alleged damages (January 2, 2012; see below)

> That employer (SMTC), by itself and through its various parts or assigns, had duties to its unit employee Ms. Payton, which included, but may not have been limited to, **(a)** adequate *staffing* and staff support in her work environment (sufficient to meet reasonable levels of staff safety, as well as patient safety and care), **(b)** adequate *training* with regard to recognizing and managing situations that might arise in which her safety could be compromised, **(c)** adequate *notification* of work situations or persons in her work environment that could reasonably present a danger to her or others, **(d)** adequate care in *avoiding or declining admission of patients/clients who are inappropriate* for the unit on which she worked, and **(e)** *elimination or amelioration of reasonably known risks* to her and other staff or patients created by patients/clients who are admitted to and housed on the unit on which she worked.

(CR 32-33). However, Dr. Reid fails to set forth any facts in support of his conclusory opinions concerning the applicable standards of care. Dr. Reid also

16

fails to sufficiently specify the standard of care applicable to San Marcos Treatment Center given the factual circumstances of this case. Dr. Reid's conclusory opinions about the standards of care are nothing more than vague, generalized statements that lack any factual basis and the required specificity. Dr. Reid's vague, generalized statements concerning the standards of care mirror those found in other reports provided in assault cases, wherein those reports were found to be deficient. *E.g. Texarkana Nursing & Healthcare Center, LLC v. Lyle*, 388 S.W.3d 314 (Tex. App. – Texarkana, 2012); *Baylor All Saints Medical Center v. Martin*, 340 S.W.3d 529 (Tex. App.-Fort Worth 2011, no pet.); *Kingwood Pines Hospital, LLC, v. Gomez*, 362 S.W.3d 740 (Tex. App.-Houston [14th Dist.] 2011, no pet.).

In *Baylor All Saints Medical Center*, the expert report contained similar vague, generalized statements concerning the standard of care, which, according to the report, required the hospital employ "a sufficient number of security personnel" and to ensure the "training of staff" to prevent unauthorized persons from committing assaults, and that such standards must be "adequately implemented." *Baylor All Saints Medical Center*, 340 S.W.3d at 534. The report was found to be inadequate because such mere conclusions about the standard of care are insufficient, because the standard of care is what an ordinary prudent hospital would do under the same or similar circumstances, and that even a fair summary

17

must set out what care was expected. *See id.* The report in *[Baylor All Saints Medical Center](#)* failed to satisfy the statutory requirements because, among other things, it did not identify the number of security personnel required or specify the type of training staff should have received and, therefore, lacked sufficient specificity. *See id.* (citing to *[Palacios, 46 S.W.3d at 880](#)*). Dr. Reid's report suffers from the same nature of deficiencies.

Also, in *Kingwood Pines Hosp., LLC*, the two reports examined contained similar conclusory statements regarding the provision of a secure environment, the supervision of patients, and the prevention of harm. Those reports were also found to be deficient because they failed to indicate what an ordinarily prudent health care provider would do under the same of similar circumstances and, therefore, the reports did not meet the requirements of Chapter 74. *[Kingwood Pines Hosp., LLC, 362 S.W.3d at 749. (citing to Palacios, 46 S.W.3d at 880)](#)*. Dr. Reid's report is similarly deficient because the opinions expressed concerning the standard of care are nothing more than the vague, generalized statements disapproved of in the aforementioned cases.

Because Dr. Reid's report is no different than those provided in *Baylor All Saints Medical Center* and *Kingwood Pines Hosp., LLC* it effectively provides no standard of care opinion with regard to San Marcos Treatment Center, and

18

therefore, the trial court abused its discretion in denying Appellant's motion to dismiss.

### 3. Dr. Reid fails to explain how San Marcos Treatment Center breached the applicable standard of care.

Dr. Reid's report also fails to explain how San Marcos Treatment Center allegedly breached the applicable standards of care. The need for sufficient specificity as to the applicable standard of care becomes more obvious when considering the alleged breaches. In other words, without a sufficiently specific standard of care identified any alleged breach simply cannot be determined.

In what appears to be Dr. Reid's opinions concerning the alleged breaches, he states, "The information available to me indicates that evening shift was inadequate on Ms. Payton's unit on January 2, 2012." (CR 33). However, this statement is almost immediately followed by Dr. Reid's admission, "Specific staffing data from SMTC is not yet available to me." (CR 33). The inconsistency of these two statements reveals the lack of any connection between his conclusory opinions and any facts. An expert report that merely asserts a breach without providing a factual basis does not provide the trial court with the information necessary to evaluate the merits of the plaintiff's claim. *Shenoy v. Jean*, No. 01-10-01116-CV, 2011 WL 6938538, *6 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, pet. denied).

The lack of any connection between Dr. Reid's conclusions and relevant facts, combined with vague, generalized statements concerning the standards of care, renders all of Dr. Reid's opinions regarding any alleged breach conclusory.

Under the heading of "adequate training," Dr. Reid's states,

> Review of Ms. Payton's SMTC personnel file and relevant portions of the SMTC Employee Handbook reveals no indication that Ms. Payton received any SMTC training regarding her safety in the workplace, and particularly none related to recognizing potentially dangerous patients, recognizing potentially assaultive patients, or protection herself from patient assault.

(CR 33). However, because Dr. Reid's report never provides sufficiently specific information as to what "adequate training" is, nor does it describe how San Marcos Treatment Center is to provide "adequate training" to its employees, any alleged breach cannot be determined absent a conclusory opinion. Dr. Reid's statement regarding his review of Ms. Payton's personnel file and the "relevant" portions of the Employee Handbook also infers what materials should be present within the files and handbook thereby requiring the court to fill in those gaps. Because of the lack of sufficient specificity, Dr. Reid's conclusory opinion as to this alleged breach relies on inferences and requires the court to fill in the gaps (*i.e.* what constitutes "adequate training" and how that is provided). However, a court is precluded from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *Austin Heart, P.A. v. Webb*, 228 S.W.3d at 279 (citing *Bowie Mem'l*, 79 S.W.3d at 53; *Gray v. CHCA Bayshore L.P.*, 189

20

S.W.3d 855, 859 (Tex. App.—Houston [1st Dist.] 2006, no pet.)). As this Court recognized, "neither the trial court nor this Court may infer additional opinions or underlying facts to fill in gaps that the report itself leaves open. *Hebert*, 395 S.W.3d at 890.

Notably, while he reviewed her personnel file, Dr. Reid omits many relevant facts, such as the fact that Ms. Payton had been employed at San Marcos Treatment Center for over five (5) years, since June of 2006, had worked with many other patients like this patient, and had received throughout those years annual education and training through the Crisis Prevention Institute (CPI) and other programs on how to observe, identify and manage difficult and challenging behavior, utilize verbal de-escalation skills, engage in a physical restraint when necessary, and more.[2]

Again, in *Kingwood Pines Hosp., LLC*, the Court explained that whether a defendant breached the standard of care cannot be determined without specific information about what the defendant should have done differently. 362 S.W.3d at 750 (citing to *Palacios*, 46, S.W.3d at 880). Dr. Reid provides no information as to what San Marcos Treatment Center should have done differently as to training.

---

[2] Appellant includes this information not for the purpose of determining the sufficiency of Dr. Reid's report but to illustrate why an expert is required to provide factual support so that the trial court may assess whether the claims have merit.

The same lack of sufficient specificity and a failure to connect his conclusions to relevant facts renders his additional opinions as to the alleged breaches concerning notification, the admission and placement of patients, and patient supervision and monitoring conclusory as well. Dr. Reid never provides sufficiently specific information as to what San Marcos Treatment Center's methods of informing its staff about patients' behaviors were or should have been, how/when the admission of a patient is determined to be appropriate, or even what constitutes "adequate" containment, supervision, and/or monitoring. Dr. Reid relies on *ipse dixit* and his generalized statements alone to support his conclusory opinions as to breach and, therefore, his report fails to satisfy the requirements under Chapter 74.

Dr. Reid's opinions as to breach are not linked to relevant facts. For example, Dr. Reid's conclusion that Mr. Simon "should have been physically contained and/or supervised by more than one, female, staff person" (CR 34) conflicts with his prior admission that "specific staffing data from SMTC is not yet available to me" (CR 33) revealing a lack of factual foundation for his opinion. Dr. Reid also states, "Many, perhaps all, other patients on the boys' unit were apparently much younger and smaller than Mr. Simon." (CR 34). However, Dr. Reid likewise has not had any access to the other boys' medical records to reach such a conclusion. Dr. Reid's conclusions, combined with his deliberate omissions

22

of relevant facts, should be precluded because they are evidence of the insufficiencies of his report. Dr. Reid's conclusory statements are careful and calculated attempts to mischaracterize the facts by excluding vital information. As explained earlier, Dr. Reid's failure to provide facts to support his opinion mandates dismissal. *Jelinek*, 328 S.W.3d at 540; *Taylor*, 320 S.W.3d at 578; *Flores*, 2014 WL 1691362, *5–6.

Because Dr. Reid's report lacks sufficiently specific information based on relevant facts, the trial court could not have determined whether Appellee's claims have merit. Rather, in order to conclude the report was sufficient as to San Marcos Treatment Center, the trial court needed to draw inferences and fill in gaps with regard to both the standard of care and breach and, therefore, the trial court abused its discretion in drawing inferences and filling in gaps to find the report was sufficient.

> **4.  Dr. Reid's report fails to explain how an alleged breach in the standard of care by San Marcos Treatment Center caused Appellee's injuries.**

Dr. Reid's report completely fails to explain how an alleged breach in the standard of care by San Marcos Treatment Center caused the assault and Appellee's injuries. As the Supreme Court has recognized, "[a]n expert cannot simply opine that the breach caused the injury. … Instead, the expert must go further and explain, to a reasonable degree, how and why the breach caused the

23

injury based on the facts *presented.*" *Jelinek*, 328 S.W.3d at 539–40. (emphasis added). Without this explanation, the trial court cannot conclude the claims have merit. *Id.*; *see also Smith*, 368 S.W.3d at 578 (Austin Court reversing trial court's denial of motion to dismiss after finding report failed to provide facts explaining the causal link between alleged breach and the occurrence or injury); *Kocurek v. Colby*, No. 03-13-00057-CV, 2014 WL 4179454, *4–5 (Tex. App.—Austin Aug. 22, 2014, no pet.). Here, Dr. Reid's report fails to establish a causal link between an alleged breach in the standard of care by San Marcos Treatment Center and Appellee's alleged injuries.

Dr. Reid's opinions under his "Damage and Causation" heading commence with identifying Ms. Payton's injuries as a result of the assault. (CR 34-35). Dr. Reid then offers, "My psychiatry specialty and that fact that I have not examined Ms. Payton preclude detailed opinions about the extent of physical damage." (CR 34). This statement is tantamount to an admission of a lack of qualification to opine on her physical injuries. Nonetheless, Dr. Reid cannot resist opining (again without any factual support) that "significant damage existed, and may still exist." (CR 34). Dr. Reid's bald assertions without factual support, in the face of an admission that he is not qualified to opine on her physical injuries, cannot constitute a good faith effort under Chapter 74's expert report requirements.

24

Further, as to causation, Dr. Reid states, "But for one or more of the breaches by SMTC, summarized in items 2-6, it is more likely than not that the January 2, 2012, assault would not have occurred, and thus the above damages to Ms. Payton, would not have occurred." (CR 035). However, Dr. Reid's causation opinion is purely conclusory because it fails to explain how and why the alleged failures by San Marcos Treatment Center resulted in the assault. *Kingwood Pines Hosp., LLC*, 362 S.W.3d at 750.

In another assault case, it was held that "if the report is not sufficiently detailed in its statement of the standard of care and breach, and thus, fails to advise the defendant of what it should have done differently to provide a safe and secure environment, then it logically follows that causation should be described in terms of the specific shortcomings that created a situation in which assault could occur." *Texarkana Nursing & Healthcare Center, LLC*, 388 S.W.3d at 323. As explained in Section II(C)(1)-(3), Dr. Reid's report is not sufficiently detailed in its statements of the standard of care and breach. Further, Dr. Reid's opinions on causation fail to describe the specific shortcomings, if any, of San Marcos Treatment Center that created the situation in which this assault occurred. Rather, Dr. Reid offers causation opinions focused on what Ms. Payton would have done in a variety of scenarios. (CR 35-36).

Further, as this Court recently noted in *Smith v. Wilson*, an expert must explain, with supporting facts, how the defendant's alleged breach in the standard of care caused the injury in question. 368 S.W.3d at 577–78. A conclusory statement on causation is wholly insufficient. *Id.* Dr. Reid's report offers no explanation, with supporting facts, how San Marcos Treatment Center's alleged breach caused Ms. Payton's injuries, or for that matter, caused her to decide to go to the laundry room with the patient alone.

Dr. Reid's earlier admission that specific staffing data was unavailable to him (CR 33) undermines his conclusory statement that "[i]f staffing had been adequate (that is, at least one more capable staff person on the 17-patient unit), Ms. Payton would not have believed it necessary to accompany Leroy Simon to the laundry alone. (See her statement.) (CR 35) because it, like many other statements in his report, lacks any factual support. Likewise, his opinion that "[i]f there had been adequate male staffing on the boys' unit, Ms. Payton would not have been in the position of being a sole female vulnerable to attack by a physically stronger, younger male" (CR 35) is similarly without factual support when contrasted with his admission that he has no staffing data (CR 33) and, therefore, it too is entirely conclusory. Furthermore, while he refers to a statement of Ms. Payton, nowhere in his report does he provide any details of her statement. Consequently, Dr. Reid's

26

report relies on inference and forces the court to fill in the gaps as to her statement, which is specifically precluded. *Austin Heart, P.A.*, 228 S.W.3d at 279.

Also, Dr. Reid opines Ms. Payton would not have escorted him to the laundry room alone if she had received "adequate training" and been "adequately informed" (CR 35). However, as explained in Section II(C)(1)-(3), neither of these standards or breaches are sufficiently specific so as to apprise San Marcos Treatment Center as to what an ordinarily prudent health-care provider would have done under the same or similar circumstances nor do they provide specific information about what it should have done differently. *McKenna Memorial Hosp., Inc. v. Quinney*, No. 03-06-00119-CV, 2006 WL 3246524, *4. Further, Dr. Reid never describes how "adequate staffing", "adequate training", or "adequate notification", would have prevented the assault. An expert report must explain how taking the suggested measures would have prevented the particular injuries complained of. *Smith*, 368 S.W.3d at 577-578.

Dr. Reid's additional causation opinion that had the patient not been admitted and housed on Ms. Payton's boys' unit she would not have been assaulted (CR 35) not only suffers from the same lack of factual support but clearly does not represent a good faith effort to comply with the requirements of an expert report under Chapter 74. Dr. Reid's report fails to describe in any detail why admission of this patient to San Marcos Treatment Center was inappropriate and how the

27

selection of where he was placed was a breach. Dr. Reid's conclusory opinion that the patient should not have been admitted simply demonstrates his willingness to embrace the many "what if's" (*i.e.* what if Ms. Payton had not worked that day) and provides another example of how his report fails to rely on relevant factual information or provide sufficient specificity to satisfy the requirements of an expert report under Chapter 74.

Dr. Reid's final causation opinion that had the patient been placed on "adequate safety precautions" Ms. Payton would not have escorted him to the laundry alone is akin to those opinions offered in other reports in assault causes where such bare assertions were made and found to be inadequate because they failed to explain what "adequate safety precautions" are. Such bare assertions fail to meet the requirements under Chapter 74. *E.g. Texarkana Nursing & Healthcare Center, LLC v. Lyle*, 388 S.W.3d 314 (Tex. App. – Texarkana, 2012); *Baylor All Saints Medical Center v. Martin*, 340 S.W.3d 529 (Tex. App.-Fort Worth 2011, no pet.); *Kingwood Pines Hospital, LLC, v. Gomez*, 362 S.W.3d 740 (Tex. App.-Houston [14th Dist.] 2011, no pet.). Conclusory statements on causation, like those offered in Dr. Reid's report, will not satisfy Chapter 74's expert report requirements. *See Palacios*, 46 S.W.3d at 875; *Regent Care Ctr. of San Antonio II, Ltd. P'ship v. Hargrave*, 300 S.W.3d 343, 346 (Tex. App.—San Antonio 2009, pet. denied).

Since Dr. Reid only offered conclusory opinions concerning the statutory elements required of an expert report, the trial court had "no discretion but to conclude ... that the report does not represent a good-faith effort" to satisfy the statute. *Smith*, 368 S.W.3d at 577. Nonetheless, the trial court in this case, "Having taken the Motion to Exclude medical report under advisement [was] of the opinion that the motion [was] denied (over-ruled)". (CR 118). The trial court's ruling amounted to an abuse of discretion. *Smith, 368 S.W.3d at 577*. San Marcos Treatment Center requests that this Court reverse the trial court's ruling and remand with an order to grant Appellant's motion to dismiss.

**D.** **By Serving A Report Like Dr. Reid's, Appellee Effectively Negates The Purpose Of Chapter 74's Expert Report Requirement.**

As stated above, the purpose of section 74.351 is to prevent the filing of frivolous lawsuits against physicians and health care providers in Texas. One of the central purposes of the expert report is to provide a basis for the trial court to conclude the claims have merit. *Palacios*, 46 S.W.3d at 879. Stated otherwise, the report should let the trial court know the claims are not frivolous. When an expert report omits relevant facts, or simply has no factual support, and instead provides only conclusory opinions on the three elements of a health care liability claim, a plaintiff effectively negates the purpose of the expert report requirement and circumvents section 74.351.

29

This is precisely what Appellee has done in this case. Dr. Reid's report fails to provide any relevant facts in hopes that his vague, generalized statements and conclusory opinions will be sufficient to circumvent the requirements of Chapter 74. If the trial court's decision is upheld, the purposes behind Chapter 74 will effectively be nullified and claimants would likely use this Court's decision to file frivolous claims against physicians and health care providers by simply ignoring or omitting relevant facts in favor of vague, generalized statements and conclusory opinions. This is certainly not what the Legislature intended when enacting Chapter 74 (formerly article 4590i).

## CONCLUSION & PRAYER

In conclusion, Dr. Reid's report suffers from a number of fatal flaws. Dr. Reid provides absolutely no facts to support his conclusions on the applicable standard of care, breach, and causation. Dr. Reid also fails to inform San Marcos Treatment Center of the specific conduct called into question so as to notify the trial court of what San Marcos Treatment Center should have done differently. Moreover, Dr. Reid's report fails to identify the applicable standard of care, fails to describe any act or omission by San Marcos Treatment Center that amounted to a breach in that standard of care, and fails to show how any alleged breaches by San Marcos Treatment Center caused Appellee's injuries. To the extent Dr. Reid does offer opinions on any of these elements, he only offers baseless conclusions that do

30

not provide sufficiently specific information as to the required statutory elements in connection with any relevant facts. Accordingly, the trial court abused its discretion when holding that Dr. Reid's report was "adequate" under Chapter 74 and denying San Marcos Treatment Center's motion to dismiss.

WHEREFORE, PREMISES CONSIDERED, San Marcos Treatment Center respectfully requests that this Court reverse the trial court's order denying Appellant's Chapter 74 Motion to Dismiss and remand to the trial court with an order that all claims and causes of action asserted by Appellee against San Marcos Treatment Center be dismissed with prejudice and that San Marcos Treatment Center be awarded its reasonably attorneys' fees and costs as allowed by Chapter 74 of the Texas Civil Practices and Remedies Code. San Marcos Treatment Center further prays for such other relief that it may be justly entitled.

Respectfully submitted,

**SERPE, JONES, ANDREWS, CALLENDER & BELL, PLLC**


By: _/s/ Ryan L. Clement_
        Ryan L. Clement
        Texas Bar No. 24036371
        rclement@serpejones.com
America Tower
2929 Allen Parkway, Suite 1600
Houston, Texas 77019
Telephone: (713) 452-4400
Facsimile:  (713) 452-4499

31

**Attorneys for Appellant,
Texas San Marcos Treatment Center,
L.P. d/b/a San Marcos Treatment Center**

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief for Appellant is computer generated, has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes, contains 6,759 words according to word count function of the computer program used to prepare this Brief, excluding any parts exempted by TEX. R. APP. P. 9.4(i)(1), and otherwise complies with Texas Rule of Appellate Procedure 9.4.

*/s/ Ryan L. Clement*
Ryan L. Clement

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to all known counsel of record in accordance with the Texas Rules of Appellate Procedure on this the 23rd day of January, 2015.

Adam S. Ward
Aaron Allison
Allison & Ward
2001 N. Lamar Blvd.
Austin, Texas 78705-4907

*/s/ Ryan L. Clement*
Ryan L. Clement

559152v1

32

# APPENDIX A

TRIAL COURT ORDER

A



FILED

2014 OCT 31 PM 3: 51

*Beverly Crumley*
DISTRICT CLERK
HAYS COUNTY, TEXAS

# R. Bruce Boyer

*Judge, 22nd Judicial District Court*

Hays County Government Center · 712 S. Stagecoach Trail, Ste. 3240 · San Marcos, Texas 78666

October 30, 2014

Mr. Ryan Clement
2929 Allen Parkway
Suite 1600
Houston, Texas 77019

Mr. Adam Ward
2001 N. Lamar Blvd.
Austin, Texas 78705

*Re: Cause No. 13-2658; Veronica Payton vs. Texas San Marcos Treatment Center, L.P. DBA San Marcos Treatment Center*

Counsel,

Having taken the Motion to Exclude medical report under advisement the Court is of the opinion that the motion is denied (over-ruled).

The Motion for Sanctions is denied.

Sincerely,

Honorable R. Bruce Boyer
22nd Judicial District

000118

# APPENDIX B

CASES

46 S.W.3d 873
Supreme Court of Texas.

AMERICAN TRANSITIONAL CARE CENTERS
OF TEXAS, INC. d/b/a American Transitional
Hospital, Petitioner,
v.
Teofilo PALACIOS and Maria Palacios,
individually and a/n/f of Gloria Janeth Palacios
and Rocio Daniela Palacios, minors, Maria
Angelica Palacios, and Sentry Insurance, a mutual
company, Respondents.

No. 99–1311. | Argued Dec. 6, 2000. | Decided May
10, 2001. | Rehearing Overruled June 28, 2001.

Medical malpractice action was brought against hospital to recover for injuries patient allegedly suffered in fall at hospital. The 280th District Court, Harris County, Tony Lindsay, J., dismissed case for failure to file expert report, as required by Medical Liability and Insurance Improvement Act. Patient appealed. The Houston Court of Appeals, First District, reversed and remanded, 4 S.W.3d 857. On petition for review, the Supreme Court, Hankinson, J., held that: (1) trial court's determination about adequacy of expert report under Act is reviewed under abuse-of-discretion standard, and (2) expert's report did not provide fair summary of standard of care and how it was breached.

Court of Appeals' judgment reversed.

**Attorneys and Law Firms**

**\*875** Matthew T. McCracken, John C. Marshall, James C. Marrow, Dee L. Dawson, Marshall & McCraken, Houston, for Petitioner.

D. John Leger, Leger & Coplen, Levon G. Hovnatanian, Martin Disiere & Jefferson, Houston, Mickey C. Shyrock, Law Office of Mickey C. Shyrock, Athens, for Respondents.

**Opinion**

Justice HANKINSON delivered the opinion of the Court.

In this medical-malpractice case we determine the standards for reviewing an expert report under section 13.01 of the Medical Liability and Insurance Improvement Act. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01. The trial court dismissed the Palacioses'

medical-malpractice claims against American Transitional Care Centers, Inc., d/b/a American Transitional Hospital, because it determined that the Palacioses' expert report did not show a good-faith effort to provide a fair summary of the expert's opinions about the standard of care, breach, and causation, as required by section 13.01. See id. § 13.01(d), (e), (l), (r)(6). The court of appeals, after evaluating the trial court's decision as it would a summary-judgment decision, reversed, holding that the report did meet the statutory requirements. 4 S.W.3d 857, 860.

We hold that a trial court's decision to dismiss a case under section 13.01(e) is reviewed for abuse of discretion. We further hold that to constitute a good-faith effort to provide a fair summary of an expert's opinions under section 13.01(l ), an expert report must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. In this case, the trial court did not abuse its discretion in concluding that the challenged report does not meet the statutory requirements and in dismissing with prejudice the claims against American Transitional. Accordingly, we reverse the court of appeals' judgment and dismiss with prejudice the Palacioses' claims.

Teofilo Palacios suffered brain damage and other severe injuries following a two-story fall at work. After almost a year in an intensive rehabilitation program, he was transferred to American Transitional Hospital for further rehabilitation. Although Palacios at that time was able to **\*876** communicate with others and respond to simple commands, he required assistance with most daily tasks. In addition, due to the severity of his brain damage, Palacios' physicians prescribed bed restraints for him. Nevertheless, while a patient at American Transitional, Palacios fell from his bed and required additional medical care for his injuries. His family claims that this fall caused him to sustain further brain injury, which impaired his ability to communicate with others and to assist them in his care.

Palacios and his family sued American Transitional and the treating doctors, respectively, for negligently failing to prevent the fall and negligently treating him after the fall. After ninety days passed from the date the Palacioses filed suit, American Transitional, along with the other defendants, moved to require the Palacioses to file a $7,500 cost bond, as required by section 13.01(b) of the Medical Liability and Insurance Improvement Act. See TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(b) (authorizing a trial court to order a plaintiff to file a

$7,500 cost bond for each defendant physician or health-care provider if the plaintiff has not complied with the expert-report or $5,000 cost-bond requirement in section 13.01(a)); *id.* § 13.01(a) (requiring the plaintiff to file either an expert report or a $5,000 cost bond for each defendant physician or health-care provider within ninety days of filing suit). The trial court granted the motion, and the Palacioses filed a cost bond for each defendant.

After 180 days passed from the date the Palacioses filed suit, American Transitional moved to dismiss the case against it because the Palacioses did not file an expert report and curriculum vitae, or nonsuit the claims against American Transitional, as section 13.01(d) of the Act requires. *Id.* § 13.01(d), (e). The Palacioses moved for an extension of time to file the report, which the trial court granted. *See id.* § 13.01(f), (g). The Palacioses then filed a report prepared by Dr. Catherine F. Bontke, who treated Palacios at the first rehabilitation hospital. American Transitional again moved to dismiss under section 13.01(e), claiming that the report did not satisfy the statutory requirements. *See id.* § 13.01(*l*), (r)(6). The trial court granted the motion, dismissed with prejudice the claims against American Transitional, and severed those claims to make the judgment against American Transitional final. *See id.* § 13.01(e).

The Palacioses appealed, and with one justice dissenting, the court of appeals reversed and remanded after using summary-judgment review standards to evaluate the sufficiency of the expert report. 4 S.W.3d at 860. After indulging every reasonable inference in the Palacioses' favor and eliminating any deference to the trial court's decision, the court of appeals concluded that the trial court erred in dismissing the case because the Palacioses made a good-faith effort to provide a report that met the requirements of section 13.01(r)(6). *Id.* at 862–63. American Transitional petitioned for review challenging both the standard of review applied by the court of appeals and the sufficiency of the Palacioses' report.

[1] Texas courts have long recognized the necessity of expert testimony in medical-malpractice cases. *E.g., Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1965); *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949). "There can be no other guide [than expert testimony], and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury." *Hart,* 399 S.W.2d at 792. Because expert testimony is crucial to a medical-malpractice case, **\*877** knowing what specific conduct the plaintiff's experts have called into question is critical to both the defendant's ability to prepare for trial and the trial court's ability to evaluate the viability of the plaintiff's claims. This makes eliciting an expert's

opinions early in the litigation an obvious place to start in attempting to reduce frivolous lawsuits. *See* HOUSE COMM. ON CIV. PRAC., BILL ANALYSIS, Tex. H.B. 971, 74th Leg., R.S. (1995).

Accordingly, in section 13.01, the Legislature requires medical-malpractice plaintiffs, within 180 days of filing suit, either to provide each defendant physician and health-care provider with an expert report and the expert's curriculum vitae, or to nonsuit the claims. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(d). If the plaintiff fails within the time allowed either to provide the expert reports and curriculum vitae, or to nonsuit the case, the trial court must sanction the plaintiff by dismissing the case with prejudice, awarding costs and attorney's fees to the defendant, and ordering the forfeiture of any applicable cost bond necessary to pay that award. *Id.* § 13.01(e). If the plaintiff does timely file a report, the defendant may move to challenge the adequacy of the report, and the trial court must grant the motion if "it appears to the court ... that the report does not represent a good faith effort to comply with the definition of an expert report." *Id.* § 13.01(*l*). The statute defines an expert report as "a written report by an expert that provides a fair summary of the expert's opinions ... regarding applicable standards of care, the manner in which the care rendered ... failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 13.01(r)(6). If a trial court determines that an expert report does not meet these statutory requirements and the time for filing a report has passed, it must then dismiss with prejudice the claims against the defendant who has challenged the report. *Id.* § 13.01(e).

American Transitional contends that a trial court's determination about the adequacy of an expert report should be reviewed under an abuse-of-discretion standard. The Palacioses respond that whether a report meets the requirements of subsections 13.01(*l*) and (r)(6) is a question of law. They suggest that a trial court's decision on the adequacy of a report should be reviewed as a court would review a summary-judgment decision: that is, by indulging every reasonable inference and resolving any doubts in the nonmovant's favor, and eliminating any deference to the trial court's decision. We agree with American Transitional.

[2] [3] The plain language of section 13.01 leads to the conclusion that abuse of discretion is the proper standard. First, the statute directs the trial court to grant a motion challenging the adequacy of an expert report if it "appears to the court" that the plaintiffs did not make a good-faith effort to meet the statutory requirements. *Id.* § 13.01(*l*). This language plainly vests the trial court with discretion. *See* TEX. GOV'T CODE § 312.002. ("[W]ords shall be

given their ordinary meaning."). Second, the statute states that dismissal under section 13.01(e) is a sanction: If the requirements of section 13.01(d) are not met, the court must "enter an order as sanctions" dismissing the case and granting the defendant its costs and attorneys' fees. TEX.REV.CIV. STAT. ANN .. art. 4590i, § 13.01(e). Sanctions are generally reviewed under an abuse-of-discretion standard. *Koslow's v. Mackie,* 796 S.W.2d 700, 704 (Tex.1990). And we presume the Legislature was aware of the standard of review ordinarily applied in sanctions cases when it explicitly identified a court's dismissal under section 13.01(e) as a sanction. **\*878** *See McBride v. Clayton,* 140 Tex. 71, 166 S.W.2d 125, 128 (1943) ( "All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it.").

Nevertheless, the court of appeals concluded that the usual standard of review for sanctions should not apply here. The court reasoned that the provisions of article 4590i at issue here were intended to discourage frivolous lawsuits, while sanctions, in contrast, are a response to litigation misconduct. We disagree with this distinction.

Filing a frivolous lawsuit can be litigation misconduct subject to sanction. *See* TEX.R. CIV. P. 13 (imposing sanctions for filing groundless motions, pleadings, or other papers in bad faith or for the purposes of harassment). And one purpose of the expert-report requirement is to deter frivolous claims. HOUSE COMM. ON CIV. PRAC., BILL ANALYSIS, Tex. H.B. 971, 74th Leg., R.S. (1995). The Legislature has determined that failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that the claim is either frivolous, or at best has been brought prematurely. *See id.* This is exactly the type of conduct for which sanctions are appropriate. *See TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 918 (Tex.1991) (holding that "death-penalty" sanctions are appropriate when a party's discovery abuse justifies a presumption that its claims lack merit). For these reasons, we hold that an abuse-of-discretion standard of review applies to a trial court's decision to dismiss a case under section 13.01(e).

[4] We next consider whether the trial court abused its discretion in dismissing the Palacioses' claims against American Transitional. The parties disagree about how to determine a report's adequacy under section 13.01(*l* ). American Transitional argues that the trial court must engage in a two-step process: (1) the trial court must determine whether the report constitutes a fair summary of the expert's opinions, TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(6); and (2) if the trial court concludes that the report is not a fair summary, it must

then look outside the report at the plaintiff's conduct to determine whether the plaintiff made a good-faith effort to meet the statutory requirements, *id.* § 13.01(*l* ). The Palacioses, on the other hand, argue that the statute requires only one inquiry—whether the report evidences a good-faith effort to provide a fair summary of the expert's opinions. According to the Palacioses, the trial court does not have to make any factual determinations because the only relevant information is in the report itself. We agree with the Palacioses that a trial court should look no further than the report in conducting a section 13.01(*l* ) inquiry.

The issue for the trial court is whether "the report" represents a good-faith effort to comply with the statutory definition of an expert report. *Id.* § 13.01(*l* ). That definition requires, as to each defendant, a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the claimed injury. *Id.* § 13.01(r)(6). Because the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document.

[5] [6] Under subsections 13.01(*l* ) and (r)(6), the expert report must represent only a good-faith effort to provide a fair summary of the expert's opinions. A report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. *See* **\*879** *Hart v. Wright,* 16 S.W.3d 872, 877 (Tex.App.—Fort Worth 2000, pet. denied). In setting out the expert's opinions on each of those elements, the report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit. *See* 4 S.W.3d at 865 (Taft, J. dissenting); *Wood v. Tice,* 988 S.W.2d 829, 830 (Tex.App.—San Antonio 1999, pet. denied) (noting that one of the purposes of article 4590i is to deter frivolous claims).

[7] [8] [9] [10] A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes. Nor can a report meet these purposes and thus constitute a good-faith effort if it omits any of the statutory requirements. *See, e.g., Hart,* 16 S.W.3d at 877 (holding that a report was inadequate because it stated that the patient had a heart attack and the doctor breached the standard of care, without describing the standard of care); *Wood,* 988 S.W.2d at 831–32 (holding that an expert report did not meet the statutory requirements because it did not name

the defendants, state how the defendants breached the standard of care, demonstrate causation and damages, or include a curriculum vitae). However, to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. *See, e.g.,* TEX.R. CIV. P. 166(f) (setting out the requirements for the form and content of affidavits offered as summary-judgment proof); TEX.R. EVID. 802 (stating that most hearsay is inadmissible).

[11] American Transitional contends that Dr. Bontke's report does not meet the statutory requirements because it does not represent a good-faith effort to provide a fair summary of her opinion on the standard of care and how American Transitional breached that standard. The Palacioses respond that the following parts of Dr. Bontke's report establish these elements:

> Based on the available documentation I was able to conclude that: Mr. Palacios fell from his bed on 5/14/94 while trying to get out of it on his own. The nursing notes document that he was observed by nursing on the hour for two hours prior to the fall. In addition, ten minutes before the fall, the nursing notes documents [sic] the his wrist/vest restraints were on. Yet, at the time of his fall he was found on the floor with his vest/wrist restraints on but not tied to the bed. It is unclear how he could untie all four of the restraints from the bedframe in under ten minutes. Obviously, Mr. Palacios had a habit of trying to undo his restraints and precautions to prevent his fall were not properly utilized.

> ....

> All in all, Mr. Palacios sustained a second brain injury with a left subdural hematoma while he was an inpatient at [the Hospital].... [I]n my opinion, the medical care rendered to Mr. Palacios at the time of his second brain injury was below the accepted and expected standard of care which he could expect to receive. Moreover, this [sic] below the accepted standard of care extends to both the cause of the second injury as well as the subsequent treatment....

The Palacioses rely mostly on one sentence in the report to establish the standard of care: "Mr. Palacios had a habit of **\*880** trying to undo his restraints and precautions to prevent his fall were not properly utilized." They argue that the inference can be made from that sentence, along with the statement that "[i]t is unclear how he could untie all four of the restraints from the bed frame in under ten

minutes," that Dr. Bontke believes American Transitional's staff should have tied the restraints to the bed more securely.

[12] The standard of care for a hospital is what an ordinarily prudent hospital would do under the same or similar circumstances. *See Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 366 (Tex.1987). Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. "While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given." 4 S.W.3d at 865 (Taft, J., dissenting). The statement the Palacioses rely upon—that precautions to prevent Palacios' fall were not properly used—is not a statement of a standard of care. Neither the trial court nor American Transitional would be able to determine from this conclusory statement if Dr. Bontke believes that the standard of care required American Transitional to have monitored Palacios more closely, restrained him more securely, or done something else entirely. "It is not sufficient for an expert to simply state that he or she knows the standard of care and concludes it was [or was not] met." *See Chopra v. Hawryluk,* 892 S.W.2d 229, 233 (Tex.App.—El Paso 1995, writ denied). Knowing only that the expert believes that American Transitional did not take precautions to prevent the fall might be useful if American Transitional had an absolute duty to prevent falls from its hospital beds. But as a general rule, res ipsa loquitur does not apply in medical-malpractice cases. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 7.01 (limiting res ipsa loquitur in medical malpractice to the limited classes of cases to which it applied as of August 29, 1977); *Haddock v. Arnspiger,* 793 S.W.2d 948, 951 (Tex.1990).

When the expert report's conclusory statements do not put the defendant or the trial court on notice of the conduct complained of, section 13.01(*l* ) affords the trial court no discretion but to conclude, as the trial court did here, that the report does not represent a good-faith effort to provide a fair summary of the standard of care and how it was breached, as section 13.01(r)(6) requires. And because the statutory 180 day time period had passed when the trial court here made that determination, section 13.01(e) required the court to dismiss with prejudice the Palacioses' claims against American Transitional. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(e). Accordingly, we reverse the court of appeals' judgment and dismiss with prejudice the Palacioses' claims.

44 Tex. Sup. Ct. J. 720

**Parallel Citations**                                    44 Tex. Sup. Ct. J. 720

End of Document                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

228 S.W.3d 276
Court of Appeals of Texas,
Austin.

AUSTIN HEART, P.A. and David J. Kessler, M.D.,
Appellants,
v.
Christian L. WEBB and Marilou Webb, Appellees.

No. 03–06–00607–CV. | May 9, 2007.

**Synopsis**
**Background:** Patient brought medical malpractice action against physician and physician's professional association alleging that physician failed to diagnose and treat the medical condition which caused patient's severe heart palpitations and other health conditions. Physician and professional association moved to dismiss on the basis that patient's expert report did not identify them as the parties responsible for breaching the standard of care or causing injury to patient. The District Court, 98th Judicial District, Travis County, Paul Davis, P.J., initially granted the motion to dismiss, but, on patient's motion for a rehearing, reversed its ruling to deny the motion to dismiss. Physician and professional association appealed.

**Holdings:** The Court of Appeals, G. Alan Waldrop, J., held that:

[1] patient's expert report was deficient as it did not specifically state that the defendant physician was the physician that breached the relevant standard of care and caused alleged injury to patient, but

[2] patient was entitled to a 30-day extension to cure such deficiencies.

Reversed and remanded.

Jan J. Patterson, J., filed a dissenting opinion.

**Attorneys and Law Firms**

**\*278** Robert L. Hargett, Emily J. Davenport, Davis & Wilkerson, P.C., Austin, for appellant.

James L. Wright, Watts Law Firm, L.L.P., Austin, for appellee.

Before Justices PATTERSON, PEMBERTON and WALDROP.

*OPINION*

G. ALAN WALDROP, Justice.

Austin Heart, P.A. and David J. Kessler, M.D. appeal the district court's order denying their motion to dismiss Christian and Marilou Webb's medical malpractice claims. Austin Heart and Dr. Kessler contend that the expert report served on them pursuant to civil practice and remedies code section 74.351 did not comply with the statute because it did not sufficiently identify either Austin Heart or Dr. Kessler as the parties responsible for the alleged breach of the standard of care or the cause of the alleged injury to Mr. Webb. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (West 2005 & Supp.2006). We agree that the plaintiffs' expert report was deficient and that the district court erred in denying the motion to dismiss. However, we are of the view that the cure provisions of section 74.351(c) are designed to allow the plaintiffs an opportunity to address and correct the defect. Consequently, we reverse the district court's order denying the motion to dismiss and remand this cause to the district court to consider whether a 30–day extension of the deadline for serving the report to allow the plaintiffs to address the deficiency is appropriate.

The Webbs sued Austin Heart and Dr. Kessler in January of 2006 alleging that Dr. Kessler failed to "diagnose and treat the medical condition which caused [Mr. Webb's] severe palpitations and resulting associated health conditions." The palpitations and other symptoms described by the Webbs were related to Mr. Webb's pacemaker. On May 31, 2006, the Webbs filed and served the expert report and curriculum vitae of Dr. Alan E. Cororve pursuant to the requirements of section 74.351 of the civil practice and remedies code setting forth Dr. Cororve's opinions regarding Mr. Webb's treatment for his problems with his pacemaker. Austin Heart and Dr. Kessler filed a motion to dismiss on June 21, 2006, claiming that Dr. Cororve's report did not identify either Dr. Kessler or Austin Heart as the parties responsible for breaching the standard of care or causing Mr. Webb injury and, therefore, the report was not a timely report as to them. In response, the Webbs claimed that the report was sufficient as written and, in the alternative, filed a motion for a 30–day **\*279** extension to cure in the event the court found the report deficient.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works. 1

The district court initially granted the motion to dismiss on August 22, 2006, and did not grant a 30–day extension to allow the plaintiffs to attempt to cure the deficiency. The Webbs filed a motion for rehearing and a motion for new trial on September 15, 2006, arguing that the court had misinterpreted case law relating to what constitutes a sufficient report under section 74.351 and that Dr. Cororve's report was sufficient. They also re-urged their request for a 30–day extension to cure in the event the court denied their motion for rehearing. The district court then reversed its original ruling, granted the motion for rehearing, and entered an order denying the motion to dismiss. This appeal followed.

[1] Section 74.351 requires a claimant pursuing a health care liability claim to serve one or more expert reports on each party no later than the 120th day after the filing of the original petition. *Id.* § 74.351(a). The expert report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). A court shall grant a motion challenging the adequacy of a report only if the report "does not represent an objective good faith effort to comply" with the definition of "expert report" in the statute. *Id.* § 74.351(*l* ). To constitute a good faith effort, the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Bowie Memorial Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (*citing American Transitional Care Ctrs., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001)).

[2] [3] The Texas Supreme Court has also stated that a report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in section 74.351. *Palacios,* 46 S.W.3d at 878. A report cannot merely state the expert's conclusions about the statutory elements. *Id.* at 879. "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Memorial,* 79 S.W.3d at 52 (*quoting Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). In addition, since the statute focuses on what is required in the report, the only information relevant to determining whether a report complies with the statute is "within the four corners of the document." *Palacios,* 46 S.W.3d at 878. This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *See Bowie Memorial,* 79 S.W.3d at 53 ("The report must include the

required information within its four corners."); *see also Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 859 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

[4] We review a district court's ruling on a motion to dismiss under section 74.351 for an abuse of discretion. *Palacios,* 46 S.W.3d at 877–78. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). A trial court does not abuse its discretion simply because it may decide a matter within its discretion differently than an appellate court. *Id.* at 242. However, a trial court has no discretion in determining **\*280** what the law is or applying the law to the facts. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992). A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*

In a single issue, Austin Heart and Dr. Kessler argue that section 74.351(b) mandates dismissal of the Webbs' lawsuit. Their argument is straightforward: Read literally, without any inferences or reliance on information outside of its four corners, Dr. Cororve's report does not identify either Dr. Kessler or Austin Heart as having breached the standard of care or having caused Mr. Webb injury. The Webbs respond that, while the sections of Dr. Cororve's report relating to the breach of the standard of care and causation do not identify any specific physicians, the meaning of the report read as a whole is apparent and reveals that Dr. Cororve is referring to Mr. Webb's treatment by Dr. Kessler.

Dr. Cororve's two and one-half page report is divided into five sections—"Qualifications," "Materials Reviewed and Background," "Standard of Care," "Standard of care not met," and "Causation." In the section titled Materials Reviewed and Background, Dr. Cororve lists the various medical records he reviewed.[1] He then sets out selected portions of these records detailing the relevant aspects of Mr. Webb's history of treatment for a trial fibrillation and palpitations over a period of nearly four years beginning with the placement of his pacemaker in November 2001. This review of Mr. Webb's treatment history includes a number of references to Dr. Kessler's office notes, comments by Dr. Kessler in those notes, complaints by Mr. Webb contained in the notes, a reference to the office notes of a Dr. George Rodgers, an email from Mr. Webb to Dr. Kessler, a response email from Dr. Rodgers,[2] and a general statement that "[Mr. Webb] was seen by various physicians, including several electrophysiological consultations." The background section concludes with the observation that "[f]urther evaluation eventually documented diaphragmatic stimulation and a new right

ventricular lead was placed on September 7, 2005. The patient was subsequently discharged in excellent condition."[3] The background section of the report offers no opinions regarding the appropriateness of the treatment or the responses of the physicians to Mr. Webb's complaints. It is strictly a recitation of historical material contained in the medical records reviewed by Dr. Cororve.

The report then concludes with the following three sections:

### Standard of Care

The standard of care in a patient such as this requires more intensive investigation as to the source of a patient's symptoms and subsequent corrective actions to ameliorate the problem. Attempts at adjusting the ventricular pacing outputs should routinely be attempted and would most likely have pinpointed the problem much earlier. This standard of care was not met.

### Standard of care not met

The diagnostic and corrective action eventually taken, specifically the increase **\*281** in the ventricular pacing output, should have been implemented much sooner.

### Causation

Had the corrective action described occurred, Mr. Webb would not have undergone the physical and mental problem(s) he had and could have continued his normal lifestyle much earlier than he did.

[5] Dr. Kessler and Austin Heart point to these sections and argue that, while they may articulate an opinion on the breach of the standard of care and on causation, the sections do not identify Dr. Kessler as breaching the standard of care or causing injury.[4] The Webbs concede that these sections do not expressly mention Dr. Kessler. They argue, however, that the background section of the report makes it clear Dr. Cororve's opinions relate to Dr. Kessler because it is primarily Dr. Kessler's actions that are noted in the relevant history.[5] Thus, they argue the report should be read to mean that the opinions in the standard of care and causation sections refer to the actions and conduct of Dr. Kessler set out in the background section of the report.

The problem with this argument is that it requires the reader to infer or make an educated guess that Dr.

Cororve is identifying Dr. Kessler as the physician who breached the standard of care and caused injury. Had Dr. Cororve referenced only actions by Dr. Kessler in the background section of his report, the link between Dr. Cororve's opinions and the responsible physician might be more apparent. However, Dr. Cororve also refers to actions taken by Dr. Rodgers and makes a vague reference to Mr. Webb having been "seen by various physicians, including several electrophysiological consultations" after he was treated by Dr. Kessler but before his condition improved.[6] There is nothing *in the report* that links Dr. Kessler to Dr. Cororve's opinions regarding the breach of the standard of care and causation any more than Dr. Rodgers or the other "various physicians" referenced.

The Webbs point out that (1) Dr. Kessler is the only defendant physician and (2) the essence of Dr. Cororve's opinions is that the breach of the standard of care was the failure of the treating physicians, implicitly including Dr. Kessler, to properly adjust the ventricular pacing outputs. **\*282** However, that Dr. Kessler is the only defendant physician is not relevant to an analysis of whether an expert report complies with section 74.351. The fact that he is the only defendant physician and, therefore, very likely to be the subject of the report is outside the four corners of the report. *See Palacios,* 46 S.W.3d at 878. It also does nothing to clarify to whom the opinions of the expert supplying the report apply. The expert's opinions are, of course, confined to the report and must tell the reader not only what conduct breached the standard of care, but whose conduct breached the standard of care. The plaintiffs' allegation that a particular physician was at fault does not substitute for the requirement that they supply an expert report demonstrating that the expert is of the same opinion.

We also do not agree that the substance of Dr. Cororve's opinions could only be associated with the conduct of Dr. Kessler. The essence of Dr. Cororve's opinion is that the physicians who treated Mr. Webb should have adjusted his ventricular pacing outputs sooner and the failure to do so was a breach of the standard of care. This opinion could apply or not apply equally to Dr. Kessler, Dr. Rodgers, or the various unnamed physicians. The report must state, in some manner, who breached the standard of care and who caused the alleged injury, and whether that includes Dr. Kessler. In the words of the supreme court in *Palacios,* "the report must inform the defendant of the specific conduct the plaintiff has called into question." *Palacios,* 46 S.W.3d at 879. This includes informing the defendant of the specific conduct in question *of that defendant. See Palacios,* 46 S.W.3d at 878 (The statute requires, *as to each defendant,* a fair summary of the expert's opinions about the applicable standard of care,

Austin Heart, P.A. v. Webb, 228 S.W.3d 276 (2007)

the manner in which the care failed to meet that standard, and the causal relationship between the failure and the claimed injury).

We are mindful that a report's adequacy under section 74.351 does not depend on whether the expert uses any particular magic words such as "the standard of care was breached *by Dr. Kessler.*" *See Bowie Memorial,* 79 S.W.3d at 53. However, the report must communicate in some fashion—within its four corners—how the care rendered by the physician failed to meet the applicable standard of care and the causal relationship between that failure and the injury suffered by the claimant. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6). We recognize that this information could be communicated in a number of ways and it could be communicated in sections of a report other than sections titled "Standard of Care" or "Causation." The form of the report and the location of the information in the report are not dispositive. However, in this case, Dr. Cororve's report is silent as to whether a single physician, multiple physicians, or all physicians mentioned in the report failed to meet the standard of care and caused injury to Mr. Webb. It simply does not state that the care rendered by Dr. Kessler failed to meet applicable standards and caused injury.

[6] While we are of the view that Dr. Cororve's report is deficient under section 74.351 because it requires the reader to make an educated guess regarding an essential element, we are also aware that the defect might well be curable. The tenor of Dr. Cororve's report, coupled with the fact that there is only one physician defendant, makes it quite likely that Dr. Cororve intended to opine that Dr. Kessler breached the standard of care and caused injury even though the report did not contain that opinion. The report's failure on this point is the kind of defect that the cure provisions of section 74.351(c) were designed **\*283** to address. Since the district court ultimately found the report to be sufficient, the court did not consider whether a 30–day extension of the report deadline to allow the Webbs to attempt to cure a defect would be appropriate. In light of our ruling that the report does contain a defect, we believe consideration by the trial court of the Webbs' request for an extension to attempt to cure the defect is warranted.

Austin Heart and Dr. Kessler argue that *Garcia v. Marichalar,* 185 S.W.3d 70 (Tex.App.-San Antonio 2005, no pet.),* supports the proposition that an expert report that references multiple health care providers but fails to delineate the standard of care, breach and causal connection as to specific, individual defendants is tantamount to no report at all with respect to those defendants. They then posit that since Dr. Cororve's report should be considered no report at all as to Dr.

Kessler, the court has no discretion but to dismiss the plaintiffs' claims with prejudice. *See Jernigan v. Langley,* 195 S.W.3d 91, 94 (Tex.2006); *Marichalar,* 185 S.W.3d at 73–74. This overstates the holding in *Garcia.* The physician in *Garcia* was not mentioned in the report at all. There was literally nothing in the report that related to the physician in any way. Thus, the report was no report as to him. The *Garcia* court then held that this was a situation where no expert report was timely filed with respect to the physician in question, precluding the trial court from considering an extension to cure because there was no timely report to cure. 185 S.W.3d at 74 (trial court had no authority to allow a cure period for a nonexistent report).

A closer case is *Jernigan v. Langley,* 195 S.W.3d 91 (Tex.2006). In *Jernigan,* the supreme court noted that a mere "passing reference" to a physician in a report, without explanation of how the physician breached the standard of care or caused the injury, would not constitute a sufficient report. 195 S.W.3d at 94. The only reference to Dr. Jernigan in the report was "[a]t 4:30 p.m. [John Langley's] case was discussed with Dr. Jernigan and at 4:50 p.m. a lactulose enema was ordered." The expert's opinion on breach of the standard of care had to do with the failure to examine certain x-rays. The report did not link Dr. Jernigan or the referenced discussion with Dr. Jernigan to a breach of the standard of care or to the failure to examine x-rays in any way. It made no other mention of him or what he did at all. The supreme court noted that the single reference to Dr. Jernigan in the report was so oblique that there was no connection at all between the reference to him and the expert's opinions regarding the standard of care and causation. It affirmed the trial court's dismissal of the lawsuit based on the insufficiency of the report, stating that "the trial court had no discretion but to conclude, as it did here, that Langley's claims against Dr. Jernigan must be dismissed." *Id.*

The report in *Jernigan,* as in *Garcia,* amounted to no report at all as to Dr. Jernigan and warranted dismissal for failure to serve a timely report. There was no discretion for the court to grant an extension to cure because there was no timely report—with respect to Dr. Jernigan—to cure.[7] Any attempt by the plaintiffs **\*284** to "cure" the reports in *Jernigan* and *Garcia* would, in effect, have been to create and serve new reports—that did not exist at all within the time period for serving reports—with respect to the physicians in question in each case. This is conceptually no different from the situation where a plaintiff simply missed the deadline for serving a report.

*Jernigan* and *Garcia* differ from this case in crucial respects. Here, a timely report plainly discusses the conduct of the physician in question and the report

discusses opinions on the standard of care and causation that could be linked to the conduct of the physician set out in the report, but simply are not. The report is not deficient because it does not relate to Dr. Kessler at all. It is deficient because the link between Dr. Kessler's conduct and the expert's conclusions is not expressly stated. The report in this case is, therefore, some report as to Dr. Kessler (among others), but it is not sufficient to meet all of the requirements of section 74.531. It is an example of what section 74.351(c) refers to as a report that "has not been served within the [120–day period for serving reports] because elements of the report are found deficient." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c). In such a circumstance, section 74.351(c) grants the trial court discretion to allow a 30–day extension of the deadline "in order to cure the deficiency." *Id. Jernigan* and *Garcia* cannot be read to mean that any deficiency in a report requires dismissal without the possibility of an extension to cure because that would mean section 74.351(c) has no possible application and is superfluous. Section 74.351(c) contemplates that there are circumstances where a timely report will be deficient, but the deficiency can be cured. To be consistent with the statute, *Jernigan* and *Garcia* must be read to allow for at least some situations where a timely report is deficient, but the trial court should consider whether the deficiency is such that it warrants allowing a cure period.[8] *Id.*

**\*285** We are of the opinion that the report in this case falls into that category. It was served timely, it makes more than a passing reference to Dr. Kessler, and it notes conduct by Dr. Kessler that could be linked to the expert's conclusions regarding the breach of the standard of care and causation. It is deficient only because it does not expressly make the link between the expert's conclusions and the referenced conduct by Dr. Kessler. If the expert is of the opinion that Dr. Kessler's conduct breached the standard of care and caused injury, he will not have to generate a new, previously nonexistent report. He will simply have to add the link between his already stated conclusions and the already referenced conduct of Dr. Kessler. Therefore, the circumstances here are not similar to the situation where a plaintiff simply has missed the deadline for serving a report with respect to the conduct of a physician.

We reverse the district court's order denying the motion to dismiss filed by Austin Heart, P.A. and Dr. Kessler and remand this cause for further proceedings.

Dissenting Opinion by Justice PATTERSON.

JAN P. PATTERSON, Justice, dissenting.

While the expert report requirement in medical malpractice cases is designed to weed out frivolous claims, it is not meant to be an insurmountable hurdle. The majority **\*286** raises the bar, however, by requiring a fastidious reading of the report. The expert report proffered by the Webbs may not be a perfect report, but it is clear when viewed as a whole whose conduct is at issue—Dr. Kessler's. I therefore cannot agree that the trial court abused its discretion in finding the report adequate. I would affirm the order of the trial court.

Even assuming the report is merely "some report as to Dr. Kessler (among others)," the remand fashioned by the majority is not appropriate in this case and alters the statutory scheme crafted by the legislature. Austin Heart and Dr. Kessler moved to dismiss the Webbs' lawsuit solely on the ground that the expert report was "no report" and, thus, the trial court had no discretion to consider an extension to cure deficiencies. Having found that the report is indeed some report for which the trial court could have granted an extension, the majority has rejected Austin Heart's and Dr. Kessler's sole ground for dismissal. The appropriate remedy would be a remand to the trial court for the cause to proceed without the need for an extension. For these reasons, I respectfully dissent.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 31, 2006, the Webbs filed suit against Austin Heart and Dr. Kessler, alleging that Dr. Kessler, individually, and Austin Heart, through the actions of Dr. Kessler, negligently failed to diagnose and treat Christian Webb for a medical condition related to his pacemaker that caused him to experience "severe palpitations" and other associated health conditions. On May 31, 2006, the Webbs filed the expert report and curriculum vitae of Dr. Alan Cororve pursuant to section 74.351 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (West Supp.2006). Austin Heart and Dr. Kessler filed a motion to dismiss under section 74.351(b), asserting that the Webbs had failed to file an expert report specifically addressing the standard of care, breach of the standard of care, or causation as to either Austin Heart or Dr. Kessler. *See id.* § 74.351(b). The district court initially granted the motion to dismiss. The Webbs filed a motion for rehearing and motion for new trial, and the district court granted the motions. The district court then denied Austin Heart's and Dr. Kessler's motion to dismiss, and this interlocutory appeal followed.

## ANALYSIS

In their single issue on appeal, Austin Heart and Dr. Kessler argue that dismissal was mandated by section 74.351(b).

### *Abuse of discretion standard*

We review a trial court's ruling on a motion to dismiss under section 74.351(b) for an abuse of discretion. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877–78 (Tex.2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Walker v. Gutierrez,* 111 S.W.3d 56, 63 (Tex.2003).

### *The expert report requirement*

In a health-care liability claim, the claimant must provide each defendant with one or more expert reports, including a curriculum vitae for each expert, within 120 days of filing the original petition. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). An "expert report" is:

> a written report by an expert that provides a fair summary of the expert's **\*287** opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between the failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). Failure to serve an adequate expert report mandates dismissal with prejudice. *Id.* § 74.351(b). A report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. *Palacios,* 46 S.W.3d at 878. To constitute a good faith effort, the report must inform the defendant of the specific conduct called into

question and provide a basis for the trial court to determine that the claims have merit. *Id.* at 879.

The supreme court has stated that "to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* Because the statute focuses on what the report should discuss, the only information relevant to the inquiry is that which appears within the four corners of the document. *Id.* at 878. When examined in its entirety, an expert report may be so deficient as to a particular defendant that it constitutes no report as to that defendant. *See, e.g., Garcia v. Marichalar,* 198 S.W.3d 250, 255 (Tex.App.-San Antonio 2006, no pet.) (*Garcia II*); *Garcia v. Marichalar,* 185 S.W.3d 70, 74 (Tex.App.-San Antonio 2005, no pet.) (*Garcia I* ).

### *Dr. Cororve's report*

To satisfy the expert report requirement, the Webbs served Austin Heart and Dr. Kessler with a two-and-one-half-page report from Dr. Cororve. The report begins by stating that "[a]ny reference in this report to Dr. David J. Kessler, M.D. refers to Dr. Kessler individually, and his employer, Austin Heart, P.A."[1] In a section titled "Materials Reviewed and Background," the first paragraph begins, "My opinions are based upon my review of ...," then lists specific medical records and office notes from four medical facilities and five doctors, and states that "[i]n addition, my opinions are based upon my experience, training, knowledge, and qualifications as a physician." The report next discusses Mr. Webb's treatment history following the implantation of his pacemaker on November 30, 2001:

> Subsequent to that procedure, Mr. Webb complained on various occasions concerning his sensing the pacemaker pacing or being aware of forceful heartbeats. To that extent, Dr. Kessler noted on 01/18/02 "possibly diaphragmatic stimulation intermittently." With the office visit of 03/19/03, Dr. Kessler notes this was the second complaint of abdominal twitching. The pacemaker was reduced to see if abdominal symptoms could be relieved with less frequent pacing. On 04/25/03, Dr. Kessler states the patient was aware of pacing intermittently and was suspicious of diaphragmatic stimulation.

**\*288** Dr. Kessler states he had previously assessed this and had not found it to be present. On that day, he tested the pacemaker with various outputs, the patient was aware of pacing at higher outputs, but the doctor did not believe the patient had true diaphragmatic stimulation.

During a pacemaker check performed on 06/08/03, the patient stated he still had "hiccup" feelings in his abdomen, and Dr. Rodgers' office note of 05/06/04 stated the patient had some feelings of hiccup-like discomfort.

On 12/16/04, Dr. Kessler references the patient's ongoing anxiety, use of Xanax and his request for the PCP's assistance managing the anxiety. Mr. Webb's email to Dr. Kessler on 04/27/05 states how the patient's "been suffering two years." The patient's email of 05/04/05 asks if the pacemaker lead might be in the wrong place, and Dr. Rodgers responded "no."[2] Dr. Kessler's note of 05/27/05 states the patient was complaining of palpitations but "I am reluctant to place a new lead at this time."

Subsequent to these events, Mr. Webb continued to have palpitations and problems with diaphragmatic stimulations. He was seen by various physicians, including several electrophysiological consultations. The persistence of his symptoms significantly impaired his quality of life and ability to concentrate at work. Because of this, he was presecribed an anti-depressant and anti-anxiety medication. Further evaluation eventually documented diaphragmatic stimulation and a new right ventricular lead was placed on September 7, 2005. The patient was subsequently discharged in excellent condition.

The report has three final sections setting out the three statutorily required elements:

### Standard of Care

The standard of care in a patient such as this requires more intensive investigation as to the source of a patient's symptoms and subsequent corrective actions to ameliorate the problem. Attempts at adjusting the ventricular pacing outputs should routinely be attempted and would most likely have pinpointed the problem much earlier. This standard of care was not met.

### Standard of care not met

The diagnostic and corrective action eventually taken, specifically the increase in the ventricular pacing output, should have been implemented much sooner.

### Causation

Had the corrective action described occurred, Mr. Webb would not have undergone the physical and mental problem(s) he had and could have continued his normal lifestyle much earlier than he did.

Austin Heart and Dr. Kessler do not challenge the adequacy of the report's description of these three elements; rather, they assert that it is not clear to which doctor they apply because the report mentions five doctors and four health care institutions, but fails to reference any of the providers in the analysis of standard of care, breach and causation. They urge, **\*289** therefore, that Dr. Cororve's report is essentially "no report" as to Austin Heart and Dr. Kessler.

Because Austin Heart and Dr. Kessler do not contest the adequacy of the report's descriptions of the statutorily required elements, the only question before this Court is whether the trial court abused its discretion in determining that the report sufficiently ties Dr. Kessler to the analysis of the statutory elements. From the context and structure of the report, it is clear that Dr. Cororve's listing of the notes and records of the doctors and health care institutions in the "Materials Reviewed" paragraph of the report was not intended to make the doctors or health care institutions themselves the focus of Dr. Cororve's analysis. Thus, the focus is on the section of the report discussing Mr. Webb's medical treatment and the sections setting out the statutorily required elements. In the medical-treatment discussion, only two doctors are named—Dr. Kessler and Dr. Rodgers—and there is one reference to unnamed "various physicians." No doctor is expressly mentioned in the sections addressing the statutorily required elements.

Austin Heart and Dr. Kessler contend that Dr. Cororve's report did not adequately tie Dr. Kessler to the statutory elements, citing this Court to *Jernigan,* 195 S.W.3d 91, *Garcia II,* 198 S.W.3d 250, *Garcia I,* 185 S.W.3d 70, and *Longino v. Crosswhite ex rel. Crosswhite,* 183 S.W.3d 913 (Tex.App.-Texarkana 2006, no pet.). These cases are distinguishable.

In *Jernigan,* the plaintiff filed suit against a hospital and several physicians including Dr. Jernigan. 195 S.W.3d at 92. The plaintiff served two expert reports; however, the first failed to mention Dr. Jernigan at all, and the second mentioned him in only one sentence: "At 4:30 p.m. [the plaintiff's] case was discussed with Dr. Jernigan...." *Id.* at 93. The supreme court concluded that the report was

inadequate as to Dr. Jernigan, stating that "[t]his passing reference does not identify with specificity any action or inaction by Dr. Jernigan that breached the applicable standard of care. This perfunctory mention alleges no misconduct whatsoever, much less discusses the required elements with 'sufficient specificity' to inform Dr. Jernigan of 'the conduct the plaintiff has called into question.' " *Id.* (quoting *Palacios,* 46 S.W.3d at 875).

In *Longino,* the plaintiffs sued two doctors and a hospital for failing to diagnose their child's bacterial meningitis sooner. 183 S.W.3d at 915. The plaintiffs served a single expert report that did not distinguish between the actions of the two doctors. *Id.* at 917. The report stated that, "[i]n consultation with Dr. James Longino," Dr. Cameron ordered tests and admitted the plaintiffs' child to the hospital, and in the discussion of the standard of care, the report stated that

> Dr. Cameron['s] and Dr. Longino's care of [the plaintiffs' child] fell below the standard of care.... Their failure to either recognize or acknowledge the obvious symptoms of fever, altered mental status, and neck pain; to perform a timely diagnostic lumbar puncture; and to aggressively treat [the child's] bacterial meningitis with an appropriate combination of antibiotics led to an unnecessary exacerbation of his symptoms.

*Id.* The court concluded that the report contained "no specific information concerning how Longino breached the standard of care apart from Cameron's conduct," and therefore did not demonstrate a good-faith effort as to Longino. *Id.*

In the *Garcia* cases, the plaintiff filed suit against three doctors, two nurses, and a hospital. *Garcia II,* 198 S.W.3d at 252. The plaintiff served two expert reports, but neither report mentioned Dr. Garcia at **\*290** all. *Id.* Dr. Garcia filed a motion to dismiss the claims against him asserting that he had not been "served" with a report. *Id.* The trial court initially granted the motion, but later dissolved its order and granted the plaintiff a 30–day extension to cure any deficiencies in the report. *Id.* In *Garcia I,* the appellate court addressed the extension, distinguishing situations in which a deficient report is filed from those in which no report is filed—a trial court has discretion to grant a 30–day extension in the former situation, but not the latter. 185 S.W.3d at 73. Because the reports served by the plaintiff focused on the acts of other defendants and failed to mention Dr. Garcia at all, the court

concluded that Dr. Garcia had not been served with a report and, thus, the trial court did not have authority to grant the extension. *Id.* at 74. In *Garcia II,* the appellate court addressed Dr. Garcia's motion to dismiss. 198 S.W.3d 250. The court concluded that "neither report informed Dr. Garcia of the specific conduct he allegedly performed that [the plaintiff] had called into question," and, thus, the expert reports did not constitute a good-faith effort to comply with the statutory requirements. *Id.* at 255. The court therefore held that the trial court abused its discretion in denying Dr. Garcia's motion to dismiss, and the cause was remanded with instructions to the trial court to render judgment dismissing the claims against Dr. Garcia with prejudice and to award him his reasonable attorney's fees and costs of court. *Id.* at 256 (citing Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b)).

Unlike *Jernigan, Longino,* and *Garcia,* in this case, the Webbs have filed a lawsuit complaining of the actions of only one doctor, Dr. Kessler, and their expert report is not one in which they mentioned him only in passing, in connection only with another doctor, or not at all. Instead, he is the subject of the majority of the report and is named eleven times.[3] The first paragraph, which states that any reference to Dr. Kessler refers to him individually and to his employer, Austin Heart, may be fairly read as signaling that the report is about Dr. Kessler. In addition, Dr. Cororve's description of Mr. Webb's medical history covers five visits with and one e-mail to Dr. Kessler spanning two and one half years in which Dr. Kessler noted the following: "possibly diaphragmatic stimulation intermittently," a second complaint about abdominal twitching, Mr. Webb's awareness of pacing intermittently and suspicion of diaphragmatic stimulation, Mr. Webb's awareness of pacing at higher outputs, disbelief that the patient had true diaphragmatic stimulation, Mr. Webb's ongoing anxiety and request for assistance managing the anxiety, and Mr. Webb's complaining of palpitations, but "I am reluctant to place a new lead at this time." The report's two references to comments from Dr. Rodgers—a notation that the patient had some feelings of hiccup-like discomfort and a response of "no" to Mr. Webb's e-mail asking if the lead might be in the wrong place—as well as the single reference to unnamed "various physicians," do not obscure the report's focus on the actions of Dr. Kessler. In addition, unlike *Longino,* the actions of the two doctors named are distinguishable.

Dr. Cororve's analysis of the statutory elements states that the standard of care required "more intensive investigation," "[a]ttempts at adjusting the ventricular pacing outputs should routinely be attempted," and "[t]he diagnostic and corrective **\*291** action eventually taken, specifically the increase in the ventricular pacing output, should have been implemented much sooner." In the

discussion of Mr. Webb's medical history earlier in the report, it appears that both Dr. Kessler and Dr. Rodgers investigated Mr. Webb's symptoms; however, only Dr. Kessler is named in connection with testing and making adjustments to the pacemaker. In addition, Dr. Kessler's notations contradict what Dr. Cororve states is the standard of care. According to Dr. Cororve's report, Dr. Kessler "did not believe the patient had true diaphragmatic stimulation" however, "[f]urther evaluation eventually documented diaphragmatic stimulation and a new right ventricular lead was placed." Under "Standard of Care," Dr. Cororve states that "[a]ttempts at adjusting the ventricular pacing outputs should routinely be attempted and would most likely have pinpointed the problem much earlier." After reviewing the report in its entirety, I cannot conclude that the trial court abused its discretion in determining that the report represents a good-faith effort to address the actions of Dr. Kessler.

### The Remand

The majority concludes that Dr. Cororve's report is deficient and remands this cause to the district court to consider whether a 30–day extension is appropriate to address the deficiency. This remedy is inappropriate because it provides relief to Austin Heart and Dr. Kessler on a ground not raised in the trial court or on appeal. *See* Tex.R.App. P. 33.1.

Austin Heart and Dr. Kessler challenged Dr. Cororve's report solely on the ground that it was "no report," not that it was a "deficient report."[4] The difference between the two is strategically significant. If the report is "no report," then the trial court *must* dismiss the case with

prejudice and has no discretion to grant a 30–day extension. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b)-(c); *Garcia I,* 185 S.W.3d at 73. Yet, if the report is merely "deficient" (and timely filed, as here), the trial court is not required to immediately dismiss and has discretion to grant a 30–day extension to cure the deficiencies. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c).

Austin Heart and Dr. Kessler elected to move for dismissal solely on the ground that the report was "no report."[5] Having concluded that the report is "some report as to Dr. Kessler (among others)," the majority has rejected the sole ground for dismissal. As such, the appropriate remedy would be a remand to the trial court for the cause to proceed without the need for an extension.

### CONCLUSION

In summary, I disagree with the majority's holding that the trial court abused its **\*292** discretion in finding that the expert report proffered by the Webbs adequately links Dr. Kessler to the elements of standard of care, breach of the standard, and causation. I would affirm the order of the trial court. I further disagree with the remedy fashioned by the majority because it grants relief to Austin Heart and Dr. Kessler on a ground that they did not raise in the trial court or on appeal. For these reasons, I respectfully dissent.

Footnotes

1    These included records of five physicians, three hospitals, and a clinic.

2    In their brief, the Webbs state that the email response was actually by Dr. Kessler rather than Dr. Rodgers and the reference in the report is a typographical error. However, there is no evidence in the record on this point other than Dr. Cororve's report.

3    The report does not mention who was responsible for the diagnosis of diaphragmatic stimulation or placing a new right ventricular lead.

4    Austin Heart, P.A. is alleged to be vicariously liable for the conduct of Dr. Kessler. Dr. Cororve's report notes at the outset that "[a]ny reference in this report to David J. Kessler, M.D. refers to Dr. Kessler individually, and his employer, Austin Heart, P.A." Consequently, for the purposes of this appeal, the report must link Dr. Cororve's opinions to the actions of Dr. Kessler.

5    The Webbs suggest that a tally of the number of times a physician is mentioned in a report is significant. They note that Dr. Kessler's name appears eleven times in Dr. Cororve's report (as opposed to three times for Dr. Rodgers and once for "various physicians"). They argue that this could lead to a reasonable conclusion that the report must be about Dr. Kessler and his actions. However, we are not persuaded that such a tally is relevant to the analysis. A physician may be named in a report any number of times simply because he was intimately involved in the treatment of a patient, yet the complaint may be with the conduct of a physician who saw the patient only once and is mentioned in the report only once. The number of times a physician

is mentioned in a report, by itself, has little bearing on whether the opinions expressed in the report concern that physician. What matters, of course, is how the physician is mentioned and what the report communicates about that physician.

6      It is not clear what the reference to "various physicians" and "electrophysiological consultations" in the report means or is intended to communicate.

7      *Jernigan* interpreted a prior version of the statute that had a different standard for granting an extension to cure. Under the previous iteration of the statute, the trial court could grant an extension only if it found that the failure to comply with the statute was "not intentional or the result of conscious indifference but was the result of an accident or mistake." *See* former Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(g) *repealed by* Acts 2003, 78th Leg., ch. 204, § 10.09, eff. Sept. 1, 2003. The *Jernigan* opinion does not discuss the application of this standard, the trial court's failure to grant an extension under this standard, or whether the trial court could have considered such an extension if it had made such findings. Thus, the *Jernigan* opinion is distinguishable from this case on this basis alone. However, even if the trial court's discretion to dismiss claims under either version of the statute is viewed as the same, the expert report in *Jernigan* would still constitute "no report" for the purposes of dismissal under either version of the statute.

8      The dissent argues that by remanding to allow the trial court to consider whether a section 74.351(c) extension is appropriate we are granting Dr. Kessler and Austin Heart more relief than they requested or are entitled to. The dissent's theory is that there is a distinction under section 74.351 between (1) seeking dismissal on the basis that no report was served and (2) seeking dismissal on the basis that a report was served, but it does not meet the requirements of the statute and is deficient. According to the dissent, if a defendant seeks dismissal only on the basis that no report was served, then dismissal is not appropriate if the court finds that a report, no matter how deficient, was served. There are two problems with this theory.

     First, the dismissal mechanism of section 74.351 does not work the way the dissent suggests. Under section 74.351, a claimant must serve an "expert report," as defined in the statute, or be subject to dismissal. If a claimant does not serve a report that complies with the statutory requirements, then the claimant has not served an "expert report" as defined in the statute. Whether a claimant actually fails to serve a report at all or serves a deficient report the effect under section 74.351(b) is the same—the claimant has failed to serve the required "expert report" and dismissal is the remedy. However, section 74.351(c) provides a potential cure period for situations where the claimant has served a report, but the report does not constitute the required "expert report" because "elements of the report are found deficient." The claimant then has an opportunity to fix the defect in the report that was served. If there is a failure to cure the defect by the extended deadline, then dismissal is mandatory because the claimant has failed to serve an "expert report" as defined in the statute.

     While section 74.351(b) does not distinguish between a complete failure to serve a report and the failure to serve a complying report, there is a distinction between the two for the purposes of 74.351(c). When a claimant fails to serve a report at all, section 74.351(c) does not provide a basis for the trial court to grant any extension of the deadline for serving a report. Consequently, dismissal is mandatory without any cure period. When a claimant serves a report, but it is deficient, section 74.351(c) gives the trial court the discretion to grant an extension to cure. Regardless of whether a claimant has failed to serve a report at all or has served a deficient report, the statutory basis of the motion to dismiss by a defendant is the same—the claimant has failed to serve an "expert report" as required by section 74.351(b). The fact that the claimant who files a deficient report may request and receive an extension of time to cure the deficiencies does not alter the nature of the defendant's motion to dismiss. The motion to dismiss is on the ground that the plaintiff has failed to serve an "expert report."

     Second, the defendants in this case did request dismissal on the basis that, while the Webbs had served a report that mentioned Dr. Kessler, the report "fails to address the standard of care applicable to Dr. Kessler, the breach of the standard or any alleged causal link." This is an allegation that the report served was deficient. The defendants acknowledge that a report was served and that the report addresses conduct of Dr. Kessler, but they claim it is deficient in failing to address the statutorily required elements. They are aware that section 74.351(c) grants the trial court some discretion in allowing an extension to cure certain deficient reports. But, they argue that the report in this case is so deficient that it should be viewed as "no report," requiring dismissal rather than remand for consideration of an extension period. By alleging that the deficiency is severe enough to constitute "no report" the defendants are trying to avoid the possibility of a cure period. They are not altering their claim that the report they received is deficient and will require dismissal if not corrected.

     We have concluded that the report is deficient, but not so deficient as to constitute "no report." Therefore, our options are (1) reverse the trial court order denying the motion to dismiss and render judgment of dismissal or (2) reverse the trial court order and remand for consideration of whether an extension should be granted to give the plaintiffs an opportunity to attempt to cure. Remanding for the case to proceed on its merits, even though we agree with the appellants that the report is deficient, is not an option.

1      While Dr. Cororve's report explicitly mentions Austin Heart, the Dallas court of appeals has held that when a defendant is only alleged to be vicariously liable for the negligence of another defendant, the expert report need not specifically name or address the negligence of the defendant to whom liability will be imputed. *University of Tex. Southwestern Med. Ctr. v. Dale,* 188 S.W.3d 877, 879 (Tex.App.-Dallas 2006, no pet.). What is relevant is that the report specifically identify the person whose conduct the plaintiff is calling into question and show how that person's conduct constituted negligence. *Id.*

2   Earlier in the report, under the materials reviewed section, Dr. Cororve refers to an e-mail from Mr. Webb to Dr. Kessler dated 05/04/05. In their brief on appeal, the Webbs assert that the report erroneously attributes the response to that e-mail as being from Dr. Rodgers when it was actually from Dr. Kessler. There is, however, no evidence in the record indicating who sent the e-mail.

3   While it is true that the number of times a physician is named, by itself, does not indicate the report complains of that physician's conduct, it is more likely that a report discussing mainly the conduct of one physician is about the conduct of that physician.

4   The motion to dismiss clearly distinguishes the two scenarios, stating:

> This is not an occasion in which a report was served on Austin Heart, P.A. or David J. Kessler, M.D. wherein the expert failed to address a requisite element, such as the standard of care, the alleged breach of the standard, or the alleged causal link, thus making the report deficient. Here, the report constitutes no report at all.

Thus, Austin Heart and Dr. Kessler did not, as the majority contends, "argue that the report in this case is so deficient that it should be viewed as 'no report.'"

5   The remand fashioned by the majority grants Austin Heart and Dr. Kessler relief not requested because the majority treats their motion to dismiss as if it were based on two grounds: (1) that the report was "no report" and (2) that even if the report was some report that it was deficient. Austin Heart's and Dr. Kessler's motion, however, was based solely on the first ground. Without a motion to dismiss based on *deficiency,* there is no basis for a finding of deficiency and no need for a 30–day extension "to cure the deficiency." *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c).

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

340 S.W.3d 529
Court of Appeals of Texas,
Fort Worth.

BAYLOR ALL SAINTS MEDICAL CENTER,
Appellant,
v.
Pamela MARTIN and John Martin, Appellees.

No. 02–10–00402–CV. | April 14, 2011.

**Synopsis**
**Background:** Patient sued hospital for negligence based on alleged sexual assault on patient in her hospital room. Hospital objected to sufficiency of patient's expert report, moved to dismiss, and requested attorney fees. Following a hearing, the 17th District Court, Tarrant County, Melody Wilkinson, J., overruled hospital's objections and denied motion and request for attorney fees. Hospital appealed.

**[Holding:]** The Court of Appeals, Bob McCoy, J., held that patient's expert report was deficient in establishing appropriate standard of care for the hospital and the breach of that standard.

Reversed and remanded.

**Attorneys and Law Firms**

**\*531** Cantey Hanger LLP, Stephen L. Tatum, Carol J. Traylor and David Speed, Fort Worth, TX, for Appellant.

King Law Office, P.C. and Russell W. King, Stephenville, TX, for Appellee.

PANEL: LIVINGSTON, C.J.; McCOY and GABRIEL, JJ.

**OPINION**

BOB McCOY, Justice.

## I. Introduction

In one issue, Appellant Baylor All Saints Medical Center asserts that the trial court erred when it determined that the expert report filed by the Appellees Pamela and John Martin met the requirements of section 74.351 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (Vernon 2011). We reverse and remand.

## II. Factual and Procedural History

The Martins sued Baylor for negligence, alleging that Pamela was sexually assaulted in her hospital room as she recovered from surgery. In support of their claim, the Martins served Baylor with Dr. John C. Shershow, M.D.'s expert report and curriculum vitae. Baylor objected to the report's sufficiency, moved to dismiss the Martins' claim, and requested attorney's fees. The trial court overruled Baylor's objections after a hearing and denied Baylor's motion to dismiss and request for attorney's fees. This appeal followed.

## III. Expert Report

Baylor appeals the trial court's order overruling its objections that the Martins' expert witness report does not comply with section 74.351, arguing that the report failed to adequately set forth the standard of care applicable to Baylor and how that standard was breached.

### A. Standard of Review

[1] We review a trial court's denial of a motion to dismiss for an abuse of discretion. *Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); **\*532** *Maris v. Hendricks,* 262 S.W.3d 379, 383 (Tex.App.-Fort Worth 2008, pet. denied); *Ctr. for Neurological Disorders, P.A. v. George,* 261 S.W.3d 285, 290–91 (Tex.App.-Fort Worth 2008, pet. denied). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an

appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.* However, a trial court has no discretion in determining what the law is, or in applying the law to the facts, and thus "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig. proceeding); *Ehrlich v. Miles,* 144 S.W.3d 620, 624 (Tex.App.-Fort Worth 2004, pet. denied).

**B. Applicable Law**
Section 74.351 of the civil practice and remedies code, entitled "Expert Report," provides,

(a) In a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports, ...

....

(c) If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30–day extension to the claimant in order to cure the deficiency....

....

(*l* ) A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).

....

(r) In this section:....

(6) "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

(s) Until a claimant has served the expert report and curriculum vitae as required by Subsection (a), all discovery in a health care liability claim is stayed except for the acquisition by the claimant of information, including medical or hospital records or

other documents or tangible things, related to the patient's health care[.]

Tex. Civ. Prac. & Rem.Code Ann. § 74.351.

[2] [3] The purpose of the expert report requirement is to inform the defendant of the specific conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001)). When a defendant moves to dismiss a plaintiff's claims for failure to provide the required expert report,

> The issue for the trial court is whether "the report" represents a good-faith effort to comply with the statutory definition of an expert report. That definition **\*533** requires, as to each defendant, a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the claimed injury. Because the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document.

*Palacios,* 46 S.W.3d at 878 (citations omitted).

[4] [5] [6] [7] [8] [9] An expert report "need not marshal all the plaintiff's proof." *Id.* at 878–79. While the report must do more than simply state the expert's conclusions about the standard of care, breach, and causation, to avoid dismissal "a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* at 879.

[t]he standard of care for a hospital is what an ordinarily prudent hospital would do under the same or similar circumstances. Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. "While a 'fair summary' is something less than a full statement of the applicable standard of care

and how it was breached, even a fair summary must set out what care was expected, but not given."

*Id.* at 880 (citations omitted). Assaults of the type alleged by the Martins are covered by section 74.351. *See, e.g., Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 853, 855 (Tex.2005) (holding that a patient's claim against a nursing home for negligence in failing to provide sufficient staff and supervision to prevent her sexual assault by another patient is a health care liability claim).

## C. Analysis

[10] Baylor argues that Dr. Shershow's report fails to adequately identify the standard of care and that he does not include specific information about what Baylor should have done differently. Dr. Shershow's report presents the following as Baylor's standard of care under the facts of this case:

*Standard of Care*

A hospital such as Baylor All Saints Medical [C]enter is expected to adhere to specific standards of care in regard to all of its patients. A bedrock principal [sic] in providing care to its patients is the understanding that all of a hospital's patients by nature of their disease or injury are potentially vulnerable and necessarily need to receive treatment in a safe and secure environment. The Joint Commission on Accreditation of Health Care Organizations (JCAHO) has established in its Hospital Standards that all healthcare organizations must have in place policies which safeguard patients from assault by hospital staff and by strangers that enter the hospital. The JCAHO requires that hospitals adequately implement these standards, and monitor this implementation. The JCAHO patient security and safety expectations would require at a minimum that hospitals should employ a sufficient number of security personal [sic] to insure that no unauthorized persons enter patients ['] rooms and physically assault their patients. Additionally, the JCAHO standards would expect that all hospital staff should be trained to identify persons that are not authorized to enter patients['] rooms and should monitor and prevent unauthorized persons from **\*534** having access to patients receiving treatment at the hospital.

The Martins reply that the trial court did not abuse its discretion by denying Baylor's motion to dismiss, claiming that Dr. Shershow's report was adequate. They alternatively argue that the medical records that section 74.351(s) allows them to discover do not contain adequate

information to establish the appropriate standard of care and breach thereof, and hence, further discovery should be allowed.

We observe that the Martins were well aware, as set out in their petition, of the alleged facts of the assault. Hence, it was incumbent upon their expert to articulate the standard of care applicable to the hospital to prevent such an assault, which does not require a factual inquiry into the measures taken by the hospital to meet this standard of care.

Dr. Shershow's report opines (1) that Baylor is expected to adhere to "specific standards of care" for its patients, (2) that there must be policies in place to safeguard patients from assault, including employing "a sufficient number of security personal [sic] to insure that no unauthorized persons assault patients and training staff to identify persons not authorized to enter patients['] rooms and prevent them from doing so," and (3) that these standards must be adequately implemented. These opinions do not establish what specific policies and safeguards should have been in place. For example, the "policies in place to safeguard patients" are not identified; neither are the number of security personnel required nor the training the staff should have received regarding identifying unauthorized persons. *See Wright,* 79 S.W.3d at 52 (stating that the expert must explain the basis of his statements to link his conclusions to the facts).

[11] Keeping in mind that mere conclusions about the standard of care are insufficient, that the standard is "what an ordinary prudent hospital would do under the same or similar circumstances," and that "even a fair summary must set out what care was expected," *see Palacios,* 46 S.W.3d at 880, we cannot agree that Dr. Shershow's report fulfills the required specificity.

[12] And although the Martins specifically complain that section 74.351(s) only allows discovery of medical records and billing records, which do not contain the circumstances surrounding the assault and hence provide no discovery as to whether security standards were met, this is a misreading of the discovery allowed under section 74.351(s). Section 74.351(s) allows discovery "of information, *including* medical or hospital records *or other documents or tangible things,* related to the patient's health care." *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(s) (emphasis added). Furthermore, as assaults of the type here are covered by section 74.351, *see Rubio,* 185 S.W.3d at 851, logically, discovery of the hospital's policies and procedures regarding the protection of patients from assault must be covered by section 74.351(s). *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(s) (stating that all discovery is stayed except for

acquisition by the claimant of information related to the patient's health care); *see also Bogar v. Esparza,* 257 S.W.3d 354, 371–72 (Tex.App.-Austin 2008, no pet.) (op. on reh'g) (noting that the plaintiff has the burden to establish that section 74.351's discovery limitations have in fact prevented her from satisfying the statute's expert report requirements and pursuing her claim). *But cf. Simmons v. Texoma Med. Ctr.,* 329 S.W.3d 163, 174 (Tex.App.-El Paso 2010, no pet. h.) (interpreting section 74.351(s) to preclude "[d]iscovery of issues such as financial information, insurance and indemnity agreements, corporate organization, **\*535** and even bylaws, policies, and procedures" until an expert report is served).

Therefore, we hold that with respect to the establishment of the appropriate standard of care for Baylor and the breach of that standard, the Martins' expert report was

deficient, and the trial court abused its discretion by finding otherwise. We sustain Baylor's sole issue.[1]

## IV. Conclusion

Having sustained Baylor's sole issue, we reverse the trial court's order and remand this case to the trial court to consider whether to grant a thirty-day extension to cure the deficiency. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c); *Leland v. Brandal,* 257 S.W.3d 204, 207 (Tex.2008); *Foster v. Richardson,* 303 S.W.3d 833, 845–46 (Tex.App.-Fort Worth 2009, no pet.).

Footnotes

[1]    Based on our resolution, we do not reach Baylor's other arguments. *See* Tex.R.App. P. 47.1.

---

          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

257 S.W.3d 354
Court of Appeals of Texas,
Austin.

Mark D. BOGAR, M.D., Appellant
v.
Dolores G. ESPARZA, Individually and as
Administrator of the Estate of Katherine G.
Guerrero; Deceased; Fernando Guerrero; Sofia G.
Butschy; Gilberto Guerrero; Antonio Guerrero;
Rosie G. Garza; Benito Guerrero; Josey G. Selvera;
and Frances G. Faz, Appellees.

No. 03–07–00037–CV. | May 16, 2008.

**Synopsis**
**Background:** Survivors of deceased patient brought medical malpractice action against patient's physician and hospital after patient died from post-surgery pharmaceutical drug overdose. Physician and hospital filed a joint motion for dismissal and attorney fees based on survivors' alleged failure to file an expert report that complied with statutory requirements. The Probate Court No. 1, Travis County, Guy S. Herman, J., denied the motion for dismissal. Physician appealed.

**Holdings:** On denial of rehearing, the Court of Appeals, Bob Pemberton, J., held that:

[1] statute allowed physician to file an interlocutory appeal from trial court's denial of the motion to dismiss;

[2] expert report failed to comply with the statutory requirements, entitling physician to sanction;

[3] the expert report constituted "no report" as to physician, such that dismissal of the action against him was required without any opportunity to cure the report; and

[4] discovery limitations set forth in expert-report statute did not deny survivors due process.

Reversed, rendered, and remanded in part.

Jan P. Patterson, J., filed a dissenting opinion and dissented from the denial of en banc reconsideration.

Diane Henson, J., filed dissenting opinion on denial of motion for en banc reconsideration.

**Attorneys and Law Firms**

**\*357** Carla Garcia Connolly, Connolly & Castagna, L.L.P., Austin, for Appellant.

Robert C. Alden, Don L. Davis, Byrd, Davis & Furman LLP, Austin, Stephen B. Pershing, Center for Constitutional Litigation, P.C., Washington, DC, for Appellees.

Before Justices PATTERSON, PEMBERTON and WALDROP.

*OPINION*

BOB PEMBERTON, Justice.

We withdraw our opinion, dissenting opinion and judgment dated June 28, 2007 and substitute the following in its stead. We overrule the Appellees' Motion for Rehearing.

We again address issues arising from the expert report requirements of section 74.351 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (West Supp.2006). Appellant Mark D. Bogar, M.D. appeals the probate court's denial of his motion to dismiss appellees' health care liability claims under section 74.351(b) for failure to serve an expert report. Their appeal requires us to consider (1) whether we have subject-matter jurisdiction to consider it; (2) whether appellees served the required expert report; and, if not, (3) the appropriate appellate remedy. We conclude that we have jurisdiction over Dr. Bogar's interlocutory appeal and that the controlling law and "four corners" of appellees' report leave us no alternative but to reverse and render judgment dismissing appellees' claim and awarding attorney's fees and costs. *See id.* § 74.351(b). In their motion for rehearing and en banc **\*358** reconsideration, appellees have urged that our application of section 74.351 violates due process and due course of law. We disagree, for reasons we will explain herein. We will remand to the probate court to determine the amount of attorney's fees to which Dr. Bogar is entitled.

## BACKGROUND

Appellees sued Dr. Bogar and Healthsouth on May 1, 2006, alleging negligence in connection with medical care provided to Katherine R. Guerrero by Dr. Bogar and the "agents, servants, employees, representatives, and staff" of Healthsouth Rehabilitation Hospital of Austin between December 28, 2004, and January 12, 2005, when Ms. Guerrero died. Appellees alleged that following surgery, Ms. Guerrero was placed under the care of Dr. Bogar and Healthsouth and, in the course of her rehabilitative treatment, was given a fatal overdose of pharmaceutical products. Appellees pleaded that an autopsy report from the Travis County Medical Examiner concluded that Ms. Guerrero "died as a result of an overdose of oxycodone and propoxyphene."

On or around June 6, 2006, Appellees served on Dr. Bogar and Healthsouth an expert report prepared by Dr. Jesse Adame that purported to comply with the requirement of subsection 74.351(a). *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) ("In a health care liability claim, a claimant shall, not later than the 120th day after the date the claim was filed, serve on each party or the party's attorney one or more expert reports ... for each physician or health care provider against whom a liability claim is asserted."). Both defendants timely filed objections to the sufficiency of Dr. Adame's report. *See id.* ("Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived."). Each defendant contended that Dr. Adame's report failed to satisfy the statutory definition of an "expert report" by failing to provide a fair summary of the expert's opinions regarding applicable standards of care, the manner in which the care rendered by each defendant failed to meet the standards, and the causal relationship between such failure and Ms. Guerrero's death. *See id.* § 74.351(a), (*l* ), (r)(6). Further, Dr. Bogar urged that Dr. Adame, a pathologist, had failed to demonstrate that he was an "expert" qualified to render opinions concerning the standards of care applicable to Dr. Bogar, a physical medicine rehabilitation physician. *See id.* § 74.351(r)(5), § 74.401 (West 2005).

Subsequently, after appellees' 120–day deadline for serving their expert reports expired, *see id.* § 74.351(a), Dr. Bogar and Healthsouth filed a joint motion seeking dismissal with prejudice, attorney's fees and costs for failure to file an expert report complying with section 74.351. *See id.* § 74.351(b). Dr. Bogar later filed an amended motion to dismiss adding his earlier challenge to Dr. Adame's qualifications. On January 10, 2007, the probate court denied the dismissal motions.

Both Dr. Bogar and Healthsouth timely filed notices of interlocutory appeal. In the interim, Healthsouth settled with appellees. We accordingly address only the appellate issues presented by Dr. Bogar.

## ANALYSIS

In a single issue, Dr. Bogar argues that the probate court abused its discretion in denying his motion to dismiss and request for attorney's fees and costs. In addition to disputing the merits of this contention, appellees have filed a motion to dismiss **\*359** Dr. Bogar's interlocutory appeal for want of jurisdiction, contending that no statute authorizes him to appeal the order he seeks to challenge.

### Jurisdiction

[1] Appellate courts generally have subject-matter jurisdiction only over appeals from final judgments and have jurisdiction over appeals of interlocutory orders only when that authority is explicitly granted by statute. *Academy of Oriental Med., L.L.C. v. Andra,* 173 S.W.3d 184, 185 (Tex.App.-Austin 2005, no pet) (citing *Stary v. DeBord,* 967 S.W.2d 352, 352–53 (Tex.1998)). Section 51.014(a) of the civil practice and remedies code authorizes an interlocutory appeal from two types of orders regarding expert reports under chapter 74. First, an interlocutory appeal may be taken from an order that "denies all or part of the relief sought by a motion under Section 74.351(b), except that an appeal may not be taken from an order granting an extension under Section 74.351(c)." Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(9) (West Supp.2006). Second, an interlocutory appeal may be taken from an order that "grants relief sought by a motion under Section 74.351(*l* )." *Id.* § 51.014(a)(10).

[2] Appellees assert that the order from which Dr. Bogar seeks to appeal is neither of these. They suggest that "the relief sought by a motion under Section 74.351(b)" is available only where a claimant has failed to timely file an instrument purporting to be an "expert report" by the 120–day deadline of subsection (a), not when a purported "expert report" is timely filed but is found to be inadequate. *See id.* § 74.351(b) ("If ... an expert report has not been served within the period specified by Subsection (a)...."). Here, appellees maintain, there is no dispute that "the expert report of Dr. Adame was served within the required period of time." Appellees further assert that challenges to the adequacy or sufficiency of expert

reports, as contrasted with their absence or timeliness, are governed exclusively by section 74.351(*l* ). Section 74.351(*l* ) states that "[a] court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." *Id.* § 74.351(*l* ). Because Dr. Bogar's motion, in appellees' view, is "a motion under section 74.351(*l* )," they assert that his right of interlocutory appeal is controlled by section 51.014(a)(10) rather than (a)(9), and no appeal is available from the probate court's order denying him relief. *See id.* § 51.014(a)(10) (permitting appeal from an order that "*grants* relief sought by a motion under Section 74.351(*l* )") (emphasis added). They equate this case to *Academy of Oriental Medicine, L.L.C. v. Andra,* where we held that an order denying a motion challenging the sufficiency of an expert report was governed by section 74.351(*l* ) rather than section 74.351(b) and that "[b]ecause this appeal challenges an order that is neither an order denying the relief sought by a motion under § 74.351(b) nor one granting relief sought by a motion under § 74.351(*l* ), we lack jurisdiction to hear it." 173 S.W.3d at 186–89. We disagree with appellees' views of section 74.351 and *Andra.*

[3] Under section 74.351(b), as the supreme court has recently explained, a plaintiff may fail to "serve" an "expert report" within the period specified by Subsection (a) not only by failing to serve any expert report within that deadline (an "absent report"), but also by failing to provide a report within the deadline that satisfies the statutory requirements for "expert reports" (a "deficient report"). *See Ogletree* **\*360** *v. Matthews,* No. 05–0502, — – S.W.3d ——, —— & n. 2, 2007 WL 4216606, at *2–3 & n. 2, 2007 Tex. LEXIS 1028, at *6–8 & n. 2, (Tex. Nov. 30, 2007); *Austin Heart P.A. v. Webb,* 228 S.W.3d 276, 284 (Tex.App.-Austin 2007, no pet.); *Apodaca v. Russo,* 228 S.W.3d 252, 257–58, (Tex.App.-Austin 2007, no pet.); *cf. Walker v. Gutierrez,* 111 S.W.3d 56, 61 (Tex.2003) (dismissal under former article 4590i warranted for "failure to comply" with report deadline by either failure to file or failure to file adequate report). This conclusion is apparent from the text and structure of section 74.351. Subsection (a) requires the claimant to file one or more "expert reports" not later than the 120th day after the date the original petition was filed, and subsection (b) mandates sanctions "[i]f, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a)." "Expert report" is defined within section 74.351 as: "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care

provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6); *see id.* § 74.351(r)(5) (definition of "expert"). Thus, if the report does not comply with subsection (r)'s "expert report" definition, it does not satisfy the claimant's requirement under subsection (a) and exposes the claimant to potential sanctions under (b), including dismissal.

Subsection (c), however, provides that "[i]f an expert report *has not been served* within the period specified by Subsection (a) because *elements of the report are found deficient,*" the trial court is afforded discretion to grant a single 30–day extension "in order to cure the deficiency." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c) (emphases added); *See Ogletree,* 262S.W.3d at ——, 2007 WL 4216606, at *2–3, 2007 Tex. LEXIS 1028, at *7–8 ("the Legislature recognized that not all initial timely served reports would satisfy each of the statutory criteria. As a result, the [2003] amendments explicitly give trial courts discretion [in subsection (c) ] to grant a thirty-day extension so that parties may, where possible, cure deficient reports.... In this important respect, a deficient report differs from an absent report."). Conversely, "[i]f no report is served within the 120–day deadline provided by 74.351(a)—i.e., an 'absent report'—the Legislature denied trial courts the discretion to deny motions to dismiss or grant extensions." *Ogletree,* 262S.W.3d at —— –, 2007 WL 4216606, at *2, 2007 Tex. LEXIS 1028, at *6; *see also id.* at —— & n. 2, 2007 WL 4216606, at *2 & n. 2, at *7 & n. 2 ("section 74.351's language is somewhat confusing, as the statute uses the phrase "has not been served" to refer both to deficient and absent reports.").

The supreme court also reiterated the concept that a report served within the 120–day deadline that fails entirely to implicate the conduct of a defendant is not merely deficient, but is in effect an absent report or no report as to that defendant. *See id.* at —— – ——, 2007 WL 4216606, at *2–3, at *6–8 (citing with approval *Garcia v. Marichalar,* 185 S.W.3d 70, 73 (Tex.App.-San Antonio 2005, no pet.) for the principle that an "expert report" that mentioned other providers but not Garcia was in effect no report as to Garcia and concluding that an extension was, therefore, improper); *cf. Austin Heart,* 228 S.W.3d at 284 (holding that timely report that "plainly discusses the conduct of the physician in question" but was deficient in failing to explicitly link the physician to the **\*361** report's stated opinions regarding standard of care and causation was potentially curable and should be remanded for consideration of whether a subsection (c) extension should be granted).

Recently, the Texas Supreme Court has laid to rest any question as to whether the availability of interlocutory review of an order denying relief under section 74.351(b) differs depending on whether the motion's grounds relate to (1) the absence of any timely-served expert report, (2) a timely expert report that is nonetheless not "served" on a defendant because it is deficient as to one or more statutory criteria, or (3) a timely expert report that is effectively "no report" as to a defendant because it fails to implicate that defendant's conduct. The supreme court concluded, as we did on original submission, that it does not. *See Lewis v. Funderburk,* 253 S.W.3d 204, 207–08 (Tex.2008). A potential limitation on this right to appeal exists, however, where a timely expert report implicates a defendant's conduct: the trial court, in its discretion, may grant an extension under section 74.351(c), in which case the order denying the motion under section 74.351(b) is not appealable. Tex. Civ. Prac. & Rem.Code Ann. §§ 51.014(a)(9), 74.351(b)-(c); *see Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at * 3–4, 2007 Tex. LEXIS 1028, at *6–8 ("If no report is served within the 120 day deadline provided by 74.351(a), the Legislature denied trial courts the discretion to dismiss or grant extensions, and a trial court's refusal to dismiss may be immediately appealed.... [But] even when a report is deemed not served because it is deficient, the trial court retains discretion to grant a thirty-day extension, and the Legislature explicitly stated that such orders are not appealable.... [I]f a deficient report is served and the trial court grants a thirty-day extension, that decision—even if coupled with a denial of a motion to dismiss—is not subject to appellate review."). In other words, an order denying relief under subsection (b) is immediately appealable unless the trial court has discretion under subsection (c) to grant a 30–day extension and actually does so.

Here, Dr. Bogar filed objections to Dr. Adame's expert report within 21 days of service, *see* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a), and a motion, after the 120–day deadline had expired, explicitly invoking subsection (b) and asserting that the probate court should dismiss appellees' claim against him with prejudice and award attorney's fees and costs for failure to file "a statutorily defined expert report" by the deadline. *See id.* § 74.351(b). The probate court denied that motion without granting an 30–day extension. *Id.* § 74.351(b), (c). That order "denies all or part of the relief sought by a motion under Section 74.351(b)," and we have subject-matter jurisdiction to adjudicate Dr. Bogar's appeal from that order. *Id.* § 51.014(a)(9); *see Lewis,* 253 S.W.3d at 207; *Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at *2–3, 2007 Tex. LEXIS 1028, at *6–8; *Andra,* 173 S.W.3d at 186–87. We accordingly deny appellees' motion to dismiss Dr. Bogar's appeal.

**Dr. Adame's report**

We turn now to Dr. Bogar's issue. Dr. Bogar asserts that the probate court abused its discretion in denying his section 74.351(b) motion because appellees failed to "serve" him with an expert report. Specifically, Dr. Bogar urges that (1) Dr. Adame's report did not represent a good faith effort to comply with the statutory requirements for "expert reports" and, in fact, constituted no report as to him; and (2) Dr. Adame, as a pathologist, was not qualified as an "expert" to evaluate Dr. Bogar's performance as a rehabilitative **\*362** medicine specialist. We need not reach the latter contention because we agree that Dr. Adame's report was deficient with regard to the statutory requirements for expert reports.

[4] [5] [6] As noted above, the "expert report" or reports that a health care liability claimant must serve under section 74.351(a) must provide "a fair summary of the expert's opinion as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6). A trial court, again, must grant a motion challenging the adequacy of a report only if the report "does not represent an objective good faith effort to comply" with this definition of "expert report." *Id.* § 74.351(*l*). To constitute a "good faith effort," the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Austin Heart,* 228 S.W.3d at 279 (citing *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002); *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001)). Although a report need not marshal all of a claimant's proof, it must include the expert's opinion on each of the elements identified in section 74.351. *Id.* (citing *Palacios,* 46 S.W.3d at 878). It is not enough for the report merely to state the expert's conclusions about the statutory elements. *Id.* (citing *Palacios,* 46 S.W.3d at 879). "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Id.* (quoting *Bowie Mem'l,* 79 S.W.3d at 52) (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)).

[7] Importantly, because the statute dictates what is required in the report, the only information relevant to determining whether a report complies with the statute is that within "the four corners" of the report. *Id.* (citing

*Palacios,* 46 S.W.3d at 878). This requirement "precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." *Id.* (citing *Bowie Mem'l,* 79 S.W.3d at 53).

[8] We review a trial court's ruling on a section 74.351(b) motion under an abuse of discretion standard. *Palacios,* 46 S.W.3d at 877–78. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241 (Tex.1985). A clear failure by the trial court to analyze or apply the law correctly also constitutes an abuse of discretion. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

The document prepared by Dr. Adame recites his qualifications and concludes that "I am qualified based on my education, training and experience to offer an expert opinion regarding the cause and mechanism of death of Mrs. Katherine Ramirez Guerrero. As a pathologist, I am familiar with the standard of care required of physicians not to prescribe drugs either alone or in combination that will cause a fatal overdose." "Such conduct," Dr. Adame adds, "falls below the standard of care required of physicians."

Dr. Adame then lists the medical records and other materials he had reviewed, and summarizes Ms. Guerrero's medical history. Dr. Adame notes that Ms. Guerrero was 76 years of age, and had a "past medical history of hyperlipidemia, **\*363** osteoarthritis, poorly controlled hypertension, and chronic dizziness." He recounts that Ms. Guerrero had complained of left hip pain following a December 25, 2004 fall and had been "admitted to Seton/Brackenridge Hospital after is was determined that she had a nondisplaced fracture of the left femur," but "[i]t was also determined at that time, that no surgical intervention was needed." Adame then states:

> Her medical problems and rehabilitation were managed by HealthSouth Rehabilitation Hospital of Austin. She was transferred to that facility on December 28, 2004. She was placed on a Duragesic patch at 25 mcg on December 29, 2004. It was increased to 50 mcg on December 30, 2004 because of continued significant pain. She was also given her usual home medications including Doxepin, Norvasc, Zescril, Tenormin, and Imdur. Because of significant drowsiness

with the Duragesic patch, her dose was reduced back to 25 mcg. She was also given Protonix for gastrointestinal prophylaxis. Despite a fairly stable hospital course, her pain increased. On January 7, 2005, after her records were reviewed and she was cleared for surgery, she was taken to the operating room at Seton/Brackenridge Hospital for open reduction and internal fixation of her left femur. Her surgery went well and she was transferred back to HealthSouth Rehabilitation Hospital of Austin on January 8, 2005. She resumed her medical regimen along with physical and occupational therapy. Her pain persisted and she was taken off of Duragesic patch post surgery. OxyContin was added to her therapy, initially at 10 mg and later increased to 20 mg. She had bouts of constipation and loose stool which was medically managed. On January 12, 2005 at 9:34 p.m. she experienced cardiopulmonary arrest. Despite cardiopulmonary resuscitation until 10:13 p.m., she was pronounced dead.

Dr. Adame then summarizes the "significant findings" of the autopsy report from the Travis County Medical Examiner's Office, including "the conclusions ... that Mrs. Guerrero died as a result of an overdose of oxycodone and propoxyphene."

Adame then states his "opinions and conclusions." He begins: "I concur with the autopsy conclusions." He observes that the medical examiners "performed a complete autopsy with toxocological analysis of blood, vitreous humor, and urine," and references certain autopsy findings. Dr. Adame describes the composition and effect of oxycodone and propoxyphene as various dosing levels, including the levels indicative of toxicity and death. Drawing on these observations, he states the following:

Mrs. Guerrero had postmortem blood oxycodone concentration of 0.25 mg/L. This level and the clinical findings of nausea and labored breathing (noted in nursing notes shortly before her death) indicates that the oxycodone was inducing respiratory depression.

.....

Mrs. Guerrero had postmortem blood propoxyphene levels of 1.0 mg/L. This concentration of propoxyphene and the clinical findings of nausea, labored breathing, and cardiac arrest (noted in nursing notes shortly before her death) indicates that the propoxyphene was inducing respiratory depression, cardiac arrhythmia, and circulatory collapse and subsequent death. In addition, the respiratory depression was exacerbated by the high concentrations of oxycodone (see above).

Dr. Adame then concludes:

In summary, Mrs. Guerrero had toxic levels of oxycodone along with lethal levels of propoxyphene which caused her **\*364** demise. The mechanism of death was respiratory depression, cardiac arrhythmia, and circulatory collapse. Additionally, autopsy examination failed to demonstrate an anatomic cause of death.

All of my opinions above are predicated upon a reasonable medical probability.

[9] Dr. Adame's report fails to comply with the requirements of section 74.351. Most notably, it does not identify in any way the person or persons whose conduct is the subject of any of his opinions regarding standard of care, causation, and death. We have held that where a defendant is not identified at least in some manner within the "four corners" of the report, the report is, for that reason alone, deficient as to that defendant because it would require the reader to infer or make an educated guess as to whose actions the expert is complaining. *Austin Heart,* 228 S.W.3d at 281; *Apodaca,* 228 S.W.3d at 257–58; *see Marichalar,* 198 S.W.3d at 255.[1] The report likewise fails to describe the standard of care potentially applicable to Dr. Bogar, other than a broad reference to "the standard of care required of physicians not to prescribe drugs either alone or in combination that will cause a fatal overdose," which he never applies or analyzes in light of specific facts and circumstances. Further, Dr. Adame never describes how Dr. Bogar might have breached a standard of care or link such a breach to Ms. Guerrero's death. *See Jernigan v. Langley,* 195 S.W.3d 91, 93–94 (Tex.2006) (affirming dismissal under former article 4590i where report made only "passing mention" of defendant physician and failed to state how he breached the standard of care or how his alleged breach caused injury); *see also Palacios,* 46 S.W.3d at 879–80 (conclusory statement that "precautions to prevent [patient's] fall were not properly utilized" did not sufficiently apprise physician whether the expert believed that the standard of care required him "to have monitored

[the patient] more closely, restrained him more securely, or done something else entirely"). In essence, Dr. Adame's report is a second autopsy report, opining about the cause of Ms. Guerrero's death without explaining who caused it or how. *See Sherman v. Austin State Hosp.,* No. 03–05–00296–CV, 2006 WL 305300, at \*1, 2006 Tex.App. LEXIS 1115, at \*30–4 (Tex.App.-Austin 2006, pet. denied) (mem.op.)("A report finding only the cause of death does not satisfy the statutory requirements."), *cert. denied,* 549 U.S. 1133, 127 S.Ct. 976, 166 L.Ed.2d 740 (2007). We hold that the probate court abused its discretion in denying Dr. Bogar's motion for sanctions under section 74.351(b). We sustain Dr. Bogar's issue.

**Remedy**

[10] In the probate court, appellees requested that, in the event Dr. Adame's report was found deficient, the court grant them a discretionary 30–day extension under section 74.351(c) to enable them to cure any deficiencies in the report. *See Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c).* Because the probate court held that Dr. Adame's report "is sufficient in meeting the requirements of ... Ch. **\*365** 74," it did not reach the extension issue. As earlier noted, trial courts have discretion to grant extensions under subsection (c) where "an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient." *See id.* § 74.351(c). Conversely, where an expert report has not been "served" as to a defendant within the 120–day period because no report is timely served or a report fails to implicate the defendant's conduct, the trial court has no discretion but to dismiss upon a section 74.351(b) motion. *Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at \*2, 2007 Tex. LEXIS 1028, at \*6 (citing *Marichalar,* 185 S.W.3d at 73). In *Austin Heart,* we discerned from this statutory scheme legislative intent that in "at least some situations where a timely report is deficient [but not entirely absent or no report] ... the trial court should consider whether the deficiency is such that it warrants allowing a cure period." 228 S.W.3d at 284. Because we concluded that the report at issue in the case was deficient as opposed to no report regarding the physician defendant, we deduced that subsection (c) required us to remand to the trial court, in lieu of rendering a judgment of dismissal and sanctions, to afford the court the opportunity to exercise its discretion whether to grant a 30–day extension. *Id.* Appellees urge that the same appellate relief is appropriate here if we reverse the probate court's order denying Dr. Bogar's section 74.351(b) motion.

Our disposition of this question turns on whether the flaws in Dr. Adame's report render it merely deficient

with respect to the statutory criteria or, as Dr. Bogar argues, render the report no report as to him. If we hold the former, we would, under *Austin Heart,* remand to afford the trial court the opportunity to exercise its discretion whether to grant a 30–day extension under section 74.351(c) to cure the deficiency. If we conclude that Dr. Adame provided no report as to Dr. Bogar, we would instead render the judgment the trial court should have rendered—dismissal. *Austin Heart,* 228 S.W.3d at 284; *see Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606 at *3, 2007 Tex. LEXIS 1028, at *8–9 ("If no report is served within the 120 day deadline provided by 74.351(a), the Legislature denied trial courts the discretion to dismiss or grant extensions...."). We accordingly compare Dr. Adame's report to those in other cases under section 74.351 in which the distinction between a timely report constituting no report versus a merely deficient report has been addressed.

In *Marichalar,* the plaintiff asserted claims for medical negligence relating to a sponge that was left in her body during abdominal surgery. She named as defendants three physicians—Prieto, Garcia–Arecha, and Garcia—two nurses, and the hospital. Marichalar timely served an expert report prepared by an obstetrician-gynecologist, Dr. Miller, in which he stated that Prieto, the surgeon, and Garcia–Arecha, the assistant surgeon, deviated from the standard of care because they allowed "the lap sponges not to be counted correctly and then noted in the chart that they were correct" and then "failing to diagnose and remove the laparotomy sponge in a timely manner." However, neither Dr. Miller nor a nurse expert implicated Dr. Garcia, as opposed to the other providers, in their respective reports. *See Garcia v. Marichalar,* 198 S.W.3d 250, 253 (Tex.App.-San Antonio 2006, no pet.). The San Antonio Court of Appeals concluded that "with regard to Garcia, there was no timely served expert report," requiring the trial court to dismiss Marichalar's claims against Garcia and depriving it of any discretion to grant a 30–day extension. *Marichalar,* **\*366** 185 S.W.3d at 73; *Marichalar,* 198 S.W.3d at 252.

In *Austin Heart,* the expert, Dr. Cororve, repeatedly referred in the report's background section to defendant physician Dr. Kessler by name and discussed various acts by him and other identified and unidentified caregivers. However, Dr. Cororve did not explicitly link Dr. Kessler's acts to Cororve's subsequent opinions regarding the applicable standard of care, how it was breached, and how the breach caused injury. *Austin Heart,* 228 S.W.3d at 280–81. We concluded that the report was deficient because "it requires the reader to infer or make an educated guess that Dr. Cororve [the expert] is identifying Dr. Kessler as the physician who breached the standard of care and caused injury" and that "[t]here is nothing *in the*

*report* that links Dr. Kessler to Dr. Cororve's opinions regarding the breach of the standard of care and causation any more than Dr. Rodgers or the other 'various physicians' references." *Id.* at 281. Although we emphasized that "a report's adequacy under section 74.351 does not depend on whether the expert uses any particular magic words such as 'the standard or care was breached *by Dr. Kessler,*' " we observed that "Dr. Cororve's report is silent as to whether a single physician, multiple physicians, or all physicians mentioned in the report failed to meet the standard of care and caused injury to Mr. Webb." *Id.* at 281–82. Nonetheless, we distinguished Dr. Cororve's deficient report from the "no report" found in *Marichalar:*

> Here, a timely report plainly discusses the conduct of the physician in question and the report discusses opinions on the standard of care and causation that could be linked to the conduct of the physician set out in the report, but simply are not. The report is not deficient because it does not relate to Dr. Kessler at all. It is deficient because the link between Dr. Kessler's conduct and the expert's conclusions is not expressly stated. The report in this case is, therefore, some report as to Dr. Kessler (among others), but it is not sufficient to meet all of the requirements of section 74.351. It is an example of what section 74.351(c) refers to as a report that "has not been served within the [120–day period for serving reports] because elements of the report are found deficient."

*Id.* at 284; *see also id.* at 285 (suggesting that "[i]f the expert is of the opinion that Dr. Kessler's conduct breached the standard of care and caused injury, he will not have to generate a new, previously nonexistent report. He will simply have to add the link between his already stated conclusions and the already referenced conduct of Dr. Kessler. Therefore, the circumstances here are not similar to the situation where a plaintiff simply has missed the deadline for serving a report with respect to the conduct of a physician.").

More recently, the supreme court in *Ogletree,* although apparently endorsing the "no report" concept of *Marichalar, see Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at *2, 2007 Tex. LEXIS 1028, at *6 (citing *Marichalar* with approval), also indicated that the omission of a defendant's name would not categorically render a report "no report" as to that defendant. The plaintiffs alleged negligence by Dr. Jan Ogletree, a urologist, in performing a urinary catheterization procedure on John Burke Matthews in a manner causing him injuries and ultimate death. The plaintiff timely served the one-page expert report of Dr. Richard Karsh, which stated, in relevant part:

In my opinion (but I would have to defer to a urologist on this) given the inability of the nursing staff to pass the Foley catheter into the bladder and the necessity **\*367** for the urologist to utilize a stiff metallic "wire" to transverse the urethra, such manipulation and catherization should have been performed under fluoroscopic guidance. Had that been done the perforation might well have been avoided but certainly could have been diagnosed at the outset, with the likelihood of a smaller tear having resulted.

If not recognized in a timely manner, such a tear could lead to long-term problems, including bladder (or, if a urethral tear, urethral) dysfunction, infection, etc. It is apparent that a cystogram was performed shortly after the catherization, although the exact timetable is unclear; nor do I have records to determine whether or not the response of the physician to the tear was appropriate. (Of course, those might be best reviewed by a urologist).

*Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at \*1, 2007 Tex. LEXIS 1028, at \*2–3. Dr. Ogletree complained that Dr. Karsh, as a radiologist, was not qualified to render opinions on a urologist's standard of care. Because of this defect, Ogletree asserted, no "expert report" was "served" within the 120–day deadline, the trial court had no discretion to grant a 30–day extension and its denial of his section 74.351(b) motion should therefore be immediately appealable. The supreme court, however, characterized this type of complaint as a report being "deemed not served because it is deficient," and subject to a discretionary 30–day extension under section 74.351(c). *Id.* at ——, 2007 WL 4216606, at \*3, at \*7–8. It held that "[b]ecause a report that *implicated Dr. Ogletree's conduct* was served and the trial court granted an extension, the court of appeals could not reach the merits of its motion to dismiss." *Id.* at ——, 2007 WL 4216606, at \*4, at \*9 (emphasis added).

Although the supreme court did not squarely address the significance of Dr. Karsh's omission of Dr. Ogletree's name from his report, it characterized the report as "directed solely to Dr. Ogletree's care (although it did not mention him by name)," *id.* at ——, 2007 WL 4216606, at \*1, at \*2, and "implicating" Dr. Ogletree's conduct. *Id.* at ——, 2007 WL 4216606, at \*4, at \*9 ("a report that implicated Dr. Ogletree's conduct"). The supreme court's references to a report "implicating" a provider's conduct appears to allude to section 74.351(a)'s 21–day deadline by which "[e]ach defendant physician or health care provider *whose conduct is implicated in a report* must file and serve any objection to the sufficiency of the report." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (emphasis added). Elsewhere the court distinguishes between cases

"where there is an absence of a report, rather than a report that implicated a provider's conduct but was somehow deficient." *Ogletree,* 262 S.W.3d at —— n. 2, 2007 WL 4216606, at \*7 n. 2, 2007 Tex. LEXIS 1028, at \*7 n. 2. These statements imply that a defendant provider's conduct can be "implicated" by a report even if the provider is not explicitly mentioned by name and that although such an omission might render the report deficient, it would not for that reason alone render the report "no report" as to the provider.[2]

**\*368** [11] Turning to Dr. Adame's report, it is, as noted, essentially a second autopsy report, opining about the cause of Ms. Guerrero's death without explaining who caused it or how. There are only cursory references to the conduct of anyone connected to Ms. Guerrero's care. In the "History" section of his report, Dr. Adame notes that after her fall, Ms. Guerrero's "medical problems and rehabilitation were managed by HealthSouth Rehabilitation Hospital of Austin," where she was later "transferred back ... on January 8, 2005" following her hip surgery at Brackenridge. Adame then recounts:

> She resumed on her medical regimen along with physical and occupational therapy. Her pain persisted and she was taken off of Duragesic patch post surgery. OxyContin was added to her therapy, initially at 10 mg and later increased to 20 mg. She had bouts of constipation and loose stools which were medically managed. On January 12, 2005, at 9:34 p.m., she experienced cardiopulmonary arrest. Despite cardiopulmonary resuscitation until 10:13 p.m., she was pronounced dead.

In his "opinions and conclusions" regarding the cause of death, Dr. Adame does not elaborate on the specific conduct or persons to whom he attributes the overdose other than vaguely alluding to "clinical findings" of "nausea, labored breathing, and cardiac arrest" that, to him, confirmed that the amounts and combination of oxycodone and propoxyphene were inducing respiratory depression, cardiac arrhythmia, circulatory collapse, and subsequent death.

Although the distinction between "no report" and a deficient-but-potentially curable report can be elusive, we conclude that Dr. Adame's report is no report as to Dr. Bogar. Dr. Adame, again, never mentions Dr. Bogar in his report. Although that omission alone may not alone render the report "no report," the report entirely fails to

implicate Dr. Bogar's conduct—if any person's conduct. The report is simply silent regarding how the overdose occurred and who, if anyone, was responsible for it. Dr. Adame does not identify any acts or omissions, by persons identified or unidentified, to which he attributes the overdose. *Cf. Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at *1, 2007 Tex. LEXIS 1028, at *2–4 (report opining that "the urologist" should have performed manipulation and catheterization under fluoroscopic guidance and attributing patient's injuries to same). Nor, even assuming Adame's passing references to Ms. Guerrero's "medical regimen" and receipt of oxycodone could implicate the conduct of any person, would his report implicate *Dr. Bogar's* conduct as opposed to unidentified agents of Healthsouth. *See Marichalar,* 185 S.W.3d at 73; *Marichalar,* 198 S.W.3d at 252. Dr. Adame cannot cure these omissions simply by "add[ing] the link between his already stated conclusions and **\*369** the already referenced conduct" of Dr. Bogar. *See Austin Heart,* 228 S.W.3d at 285. There is nothing in the report regarding Dr. Bogar that could be linked to anything. Consequently, Dr. Adame could "cure" the deficiencies in his report only by "generat[ing] a new, previously nonexistent report" as to Dr. Bogar. *See id.* Such a remedy, as we have explained, is proscribed by section 74.351.[3]

[12] In their motion for rehearing and reconsideration en banc, appellees acknowledge that "[t]he report did not assign blame for the victim's harm to a specific physician or hospital employee by name" and is silent regarding "who exactly did what." They suggest that "Dr. Adame's report shows a fatal overdose of medications given to an inpatient in the hospital, a lapse with all the hallmarks of *res ipsa loquitur* " that "create[s] a powerful presumption that the overdoses were the result specifically of negligence by the treating physician of record." Even assuming *res ipsa loquitur* applied in this case, this evidentiary presumption would not create an exception to section 74.351's expert report requirement. The *Marichalar* court rejected a similar contention in a "sponge case"—surgeons left surgical sponges inside the plaintiff during abdominal surgery. The court explained:

> While section 74.201 allows for the application of res ipsa loquitur, we do not interpret it as an exception to section 74.351's expert report requirement. Res ipsa loquitur is an evidentiary rule. In contrast, section 74.351's expert report requirement establishes a threshold over which a claimant must proceed to continue a lawsuit; it does not establish a requirement for

recovery. It may be that once discovery is complete and the case is tried, there is no need for expert testimony.... But the Legislature envisioned that discovery and the ultimate determination of what issues are submitted to the factfinder should not go forward unless at least one expert has examined the case and opined as to the applicable standard of care, that it was breached, and that there is a causal relationship between that failure to meet the standard of care and the injury, harm, or damages claimed. Thus, because res ipsa loquitur is an evidentiary rule while the expert report is a threshold requirement for bringing a lawsuit, we do not believe that the Legislature intended for section 74.201 to eliminate the procedural requirement of an expert report at the commencement of litigation.

*See Marichalar,* 198 S.W.3d at 255–56. (internal citations and quotes omitted). We find this analysis persuasive. Consequently, even if *res ipsa loquitur* applied to appellees' claims against Dr. Bogar, it would not excuse their failure to serve him with an expert report.

**Constitutional issues**

[13] In their motion for rehearing and for reconsideration *en banc,* appellees attribute their noncompliance to chapter 74's **\*370** limitations on discovery, urging that "the report could not have [complied] without compulsory process, as the precise facts regarding which named individuals administered each dose, failed to comprehend the danger or catch the error, or failed to remedy its effects, were then and remain today in the sole possession of the defendants." Section 74.351(s) provides:

> Until a claimant has served the expert report and curriculum vitae as required by Subsection (a), all discovery in a health care liability claim is stayed except for acquisition by the claimant of information, including medical or hospital records or other documents or tangible things, related to the patient's health care through:
>
> (1) written discovery as defined in Rule 192.7, Texas Rules of Civil Procedure;

(2) depositions on written questions under Rule 200, Texas Rules of Civil Procedure; and

(3) discovery from nonparties under Rule 205, Texas Rules of Civil Procedure.

Tex. Civ. Prac. & Rem.Code Ann. § 74.351(s). "Notwithstanding any other provision of this section, after a claim is filed all claimants, collectively, may take not more than two depositions before the expert report is served as required by Subsection (a)." *Id.* § 74.351(u). These provisions thus bar oral depositions of parties and allow only two oral depositions of non-parties before the expert report is served. They also bar pre-suit depositions to investigate potential claims under rule 202. *In re Jorden,* 249 S.W.3d 416, 420 (Tex.2008).

[14] [15] Appellees urge that their inability to orally depose Dr. Bogar before serving their expert report creates "an intolerable procedural conundrum" or "catch–22" by preventing them from obtaining the very information they need to prepare a sufficient expert report.[4] This "conundrum," appellees assert, imposes an "impossible condition" on medical malpractice claimants' property rights in their causes of action that violates the due process clause of the fourteenth amendment to the United States Constitution and due course of law under article I, section 19 of the Texas Constitution. *See* U.S. Const. amend. XIV; Tex. Const. art. I, § 19.[5] Appellees acknowledge that "Texas courts construe Article I, Section 19, in line with the federal due process guarantees" and that "[s]tandards for Texas constitutional claims regarding access to the courts are the same under due process and open courts." *See University of Tex. Med. Sch. v. Than,* 901 S.W.2d 926, 929 (Tex.1995); *Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983).[6] Appellees stop short of "contend[ing] that the expert report requirement must be invalidated for all cases," but instead urge us to "construe Section 74.351 to avoid a constitutional problem" by either "declar[ing], for cases where medical negligence by one or more defendants **\*371** is clear but where the plaintiff cannot allocate fault among them without discovery, that Section 74.351(s) does not stay the discovery necessary to obtain the fault allocation facts that would perfect the required expert report; or declar[ing] the expert report in such a case sufficient without those facts, since they are unnecessary to demonstrate at the threshold that the case has merit."[7]

[16] [17] [18] [19] We begin with the presumption that section 74.351 is constitutional. *Walker,* 111 S.W.3d at 66. Additionally, the party challenging the constitutionality of a statute bears the burden of establishing that the enactment fails to meet constitutional requirements. *Id.* With regard to restrictions on health care liability claims

in particular, we are mindful of two general principles. First, "there are constitutional limitations upon the power of courts ... to dismiss an action without affording a party the opportunity for a hearing on the merits of his [or her] cause." *Thoyakulathu v. Brennan,* 192 S.W.3d 849, 855 (Tex.App.-Texarkana 2006, no pet.) (*quoting Walker,* 111 S.W.3d at 66 (*quoting TransAmerican Nat. Gas Corp. v. Powell,* 811 S.W.2d 913, 917–18 (Tex.1991))). Second, the filing of a frivolous lawsuit can be misconduct subject to sanction. *Id.* (citing *Palacios,* 46 S.W.3d at 878). "[O]ne purpose of the expert-report requirement is to deter frivolous claims." *Walker,* 111 S.W.3d at 66. "The Legislature has determined that failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that the claim is either frivolous, or at best has been brought prematurely. This is exactly the type of conduct for which sanctions are appropriate." *Palacios,* 46 S.W.3d at 878. Consequently, the supreme court rejected a due-process challenge to former article 4590i's mandatory dismissal of health care liability claims for failure to comply with statutory requirements. *Walker,* 111 S.W.3d at 66 ("The Gutierrezes' failure to file an adequate report thus raised the presumption that their claims were frivolous, or at best, premature.... We do not believe the Constitution requires prior notice that the law is serious about a clearly stated consequence for failing to comply with its terms. The sanction imposed ... was a direct result of their failure to file an expert report that complied with the statutory requirements. Consequently, dismissal was appropriate and did not violate the due process clause, even in the absence of a notice of noncompliance prior to the motion to dismiss."); *see Brennan,* 192 S.W.3d at 855–56 (applying *Walker* to section 74.351).

Turning to appellees' specific challenge, they have the burden of establishing that section 74.351's discovery limitations have in fact prevented them from satisfying the statute's expert-report requirements and pursuing their claim. *See McGlothlin v. Cullington,* 989 S.W.2d 449, 453 (Tex.App.-Austin 1999, pet. denied) (burden on claimant asserting open-courts violation is to provide sufficient evidence that the expert report requirement, and not her own inaction, actually functioned to keep her from pursuing her claim). Appellees suggest in their motion that they were forced to "prepare their report[ ] on medical records alone" and that these records were inadequate, but do not suggest they ever actually pursued the discovery permitted under section 74.351(s) beyond serving requests for disclosures at some unspecified point in **\*372** time.[8] Nor is there any evidence in the record to support such an assertion. We observe that section 74.351(s) and (u) authorize claimants to obtain discovery via not only requests for disclosure, but interrogatories,

requests for production, requests for admissions, and depositions on written questions to parties (i.e., forms of discovery that could have been directed to Dr. Bogar); and rule 205 requests for production, depositions on written questions, and up to two oral depositions of non-parties.[9] The rules further provide mechanisms for enforcing compliance with discovery requests.[10] Appellees dismiss the significance of "[t]he limited written discovery that Section 74.351(a) nominally permits before service of the expert report," asserting that it is "widely understood not to extend beyond the medical records specifically mentioned in that subsection, and defense counsel in health care liability actions uniformly refuse any other written discovery." If that could be so, it is not because of anything the legislature actually provided in section 74.351, nor do appellees present evidence that any such application of section 74.351(s) in fact prevented them from obtaining any necessary discovery they had actually sought. *See Brennan,* 192 S.W.3d at 854 n. 5 (rejecting similar due-process argument "premised on [claimant's] failure to receive discovery from another party" as "ignor[ing] the remedies available to him to enforce lawful discovery requests"); *see also Marichalar,* 198 S.W.3d at 254 n. 1 (observing that "if the medical records are indeed conflicting" as to assistant surgeon's identity, as counsel had orally contended, "Marichalar could have propounded discovery to Dr. Garcia to discovery whether he was the assistant surgeon ... [a]nd if Dr. Garcia failed to timely answer the discovery requests, Marichalar could have moved to compel his answers."). Like the *Brennan* court, "we can certainly imagine a due process deprivation to a health care liability claimant pinned between a firm expert report deadline and a hypothetical absence of discovery tools," but must similarly conclude that appellees have not carried their burden of demonstrating that they were denied due process by such a situation here. *Brennan,* 192 S.W.3d at 856 n. 8; *see McGlothlin,* 989 S.W.2d at 453 (claimant's affidavit made "no mention of any actual attempt to obtain an expert report," in lieu of article 4590i bond requirement, "only some perceived financial barrier").

[20] Appellees also question whether there is a rational relationship between chapter 74's expert-report requirement as applied here and the legislature's goal of discouraging frivolous lawsuits. *See Lucas v. United States,* 757 S.W.2d 687, 691 (Tex.1988) (holding that it was "unreasonable and arbitrary for the legislature to conclude that arbitrary damage caps, applicable to all claimants no matter how seriously injured, will help assure a rational relationship between actual damages and the amounts awarded."). This argument is predicated upon appellees' view that the bare fact Ms. Guerrero died of a drug overdose while in the hospital "create[s] a powerful presumption that the overdoses were the result

specifically of ***373** negligence by the treating physician of record," whom they assert was Dr. Bogar. We disagree that it is irrational, in light of the legislature's goal of curtailing frivolous health care liability claims, for it to require that appellees serve an expert report explaining why or how this outcome was actually caused by the conduct of *Dr. Bogar,* as opposed to some other person or health care provider. *See Walker,* 111 S.W.3d at 66 (explaining that the plaintiffs' failure to comply with the expert-report requirements "raised the presumption that their claims were frivolous, or at best, premature" and dismissal did not violate due process); *Marichalar,* 198 S.W.3d at 254–55 ("Section 74.351(r)(6) requires that an expert report explain how the care *rendered by the physician* failed to meet the applicable standard of care and the causal relationship between that failure and the injury suffered by the claimant."); *see also Brennan,* 192 S.W.3d at 855–56 (applying *Walker* to reject as-applied challenge to expert-report requirement where claimant had attempted to serve report timely, but fax machine failed; "Section 74.351 need not provide an exception geared toward such misfortune in order to provide constitutionally adequate safeguards.").

We accordingly reject appellees contentions that our application of section 74.351 on the present record violates due process or due course of law.

**CONCLUSION**

As the Texas Supreme Court recently acknowledged, the requirements of section 74.351(b) "can lead to seemingly harsh results." *Ogletree,* 262S.W.3d at ——, 2007 WL 4216606, at *3, 2007 Tex. LEXIS 1028, at *3. Here, they require us to render judgment dismissing appellees' claims against Dr. Bogar with prejudice and awarding Dr. Bogar attorney's fees and costs. *See Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b).* Further, our performance of our duty to effectuate these legislative mandates does not, on this record, exceed constitutional limitations. We accordingly reverse and render a judgment of dismissal and remand to the probate court for a determination of the amount of the attorney's fee award.

Dissenting Opinion by Justice PATTERSON.

JAN P. PATTERSON, J., dissenting.

Given the length of time this accelerated interlocutory appeal has been pending, I will adopt my prior dissent with an additional observation, substituting this opinion and dissenting to the denial of appellees' motion for rehearing. In *Palacios,* the supreme court held that (i) a trial court's decision whether to dismiss a case under this statute is reviewed for abuse of discretion, and (ii) to constitute a good-faith effort to provide a fair summary of an expert's opinions, "an expert report must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *American Transitional Care Ctrs. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001) (predecessor statute). In that case, the court found that the trial court did not abuse its discretion in its ruling and reversed the court of appeals. Based upon *Palacios,* I would hold that the trial court did not abuse its discretion here. For these reasons, I respectfully dissent.

The majority has stepped into both shoes of the trial court: (i) overruling its determination that the expert report is sufficient and the litigation should go forward, and (ii) finding the report to be not just deficient, but "no report," thus foreclosing **\*374** an opportunity to cure any asserted deficiency. As the reviewing court, we are admonished that a trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *See Garcia v. Martinez,* 988 S.W.2d 219, 222 (Tex.1999). When reviewing a trial court's decision for an abuse of discretion, we recognize that such discretionary choices are left to a court's judgment, and its judgment is to be guided by sound legal principles. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 416, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (quoting *United States v. Burr,* 25 F. Cas. 30, 35 (CC Va. 1807) (Marshall, C.J.)). We may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). While a trial court's failure to analyze and apply the law correctly would constitute an abuse of discretion, *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992), "[t]he test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action.... [I]t is a question of whether the court acted without reference to any guiding rules and principles." *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Id.* at 242.

The parties agree that Dr. Bogar was the physical medicine rehabilitation doctor in charge of Ms. Esparza's care; he was the only doctor named in the lawsuit. An autopsy established that Ms. Esparza, who was admitted for post-operative hip surgery rehabilitation, died of an overdose of Oxycodone and Vicodin. After a hearing, the trial court expressly found the report to be sufficient and denied the motion to dismiss.[1]

The supreme court has recently held that an expert report that implicates the doctor's conduct, but fails to mention the doctor by name, is merely deficient and subject to the trial court's discretionary power to grant a 30–day extension as allowed under section 74.351(c). *See Ogletree v. Matthews,* No. 05–0502, —— S.W.3d ——, ——, ——, 2007 WL 4216606, at *1, 4, 2007 Tex. LEXIS 1028, at *2, 14 (Tex. Nov. 30, 2007). While the majority recognizes this recent supreme court holding, it fails to apply it to an expert report that plainly implicates appellant's conduct in prescribing a lethal dose of Oxycodone and Vicodin—choosing instead to ignore the statutory discretion imparted to the trial court by the legislature. *See id.*

Although the trial court's determination is not shielded from review, we may not substitute our judgment for that of the trial court charged with a gatekeeping function in the first instance under this statute. Indeed, the trial court is charged not only with exercising its discretion in affirming or denying the motion to dismiss, but the trial court may—in its discretion—grant a 30–day extension to cure any deficiency. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c) (West Supp.2007). Because the trial court here found the report to be sufficient—and not deficient or "no report"—it did not consider whether to grant a discretionary extension to amend the report.

I believe the trial court did not abuse its discretion in concluding that the report was sufficient. Because (i) the standard of review recognizes that there is a range of decisions that are appropriate as long as the trial court does not act in an arbitrary or unreasonable manner or without reference **\*375** to guiding rules and principles, and (ii) the trial court acted in accord with the supreme court's holdings in *Palacios,*[2] I would conclude that the trial court was guided by and employed sound legal principles and properly denied the motion to dismiss. I would affirm the trial court's order.

Alternatively, because the trial court found the report to be sufficient and not deficient or "no report," I would follow this Court's precedent in *Austin Heart, P.A. v. Webb,* 228 S.W.3d 276 (Tex.App.-Austin 2007, no pet.), and remand this cause for further proceedings to allow the trial court to exercise its discretion and determine whether a 30–day extension should be granted.[3]

By cherry-picking language from the supreme court's *Ogletree* opinion to support its admitted "elusive" line between a deficient report and a "nonexistent" report, the majority overlooks the supreme court's common sense approach regarding expert reports that implicate a health provider's conduct: The supreme court reasoned that "while the 2003 amendments were intended to decrease claims, they do not mandate dismissal for deficient, but curable, reports." *Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at *3, 2007 Tex. LEXIS 1028, at *9. In finding this report "no report," we are beyond cherry-picking and into hair-splitting for which the aim is not to seek the statutory mandate nor substantial justice.

I would, therefore, grant the motion for rehearing.

JAN P. PATTERSON, Justice, dissenting.

For the reasons expressed in my dissenting opinion to this Court's disposition of this case on rehearing, I respectfully dissent from the denial of appellee's motion for en banc reconsideration. *See Bogar v. Esparza,* No. 03–07–00037–CV, 257 S.W.3d 354 (Tex.App.-Austin May 16, 2008) (Patterson, J., dissenting).

DIANE HENSON, Justice, dissenting.

The expert reports required by section 74.351 of the civil practice and remedies code "are simply a preliminary method to show a plaintiff has a viable cause of action that is not frivolous or without expert support." *Kelly v. Rendon,* 255 S.W.3d 665, 679 (Tex.App.-Houston [14th Dist.] 2008, no pet. h.). One of the benefits behind the expert-report requirement is that the screening mechanism frees up judicial resources to address non-frivolous claims. *See* House Comm. on Civil Practices, Bill Analysis, Tex. H.B. 971, 74th Leg., R.S. (1995) (noting that predecessor statute to section 74.351 "would help focus judicial resources on legitimate claims"). The present case, which arose after a patient **\*376** suffered a fatal overdose of oxycodone and propoxyphene while receiving post-operative care for hip-replacement surgery, does not appear to be the type of meritless claim that the legislature intended to prevent by imposing the gate-keeping measure of the expert report.

I join Justice Patterson's dissent in holding that the trial court acted within its discretion in finding the expert report sufficient, but write separately to further address the majority's failure to remand this case for a determination of whether, in the discretion afforded to the

trial court under section 74.351(c), the appellees should be given a 30–day extension of time in order to cure any deficiencies in the expert report.[1]

The majority reverses the trial court's determination that Dr. Adame's expert report is sufficient and renders judgment of dismissal, holding that this report constitutes "no report" as to Dr. Bogar and therefore that the trial court did not have discretion to allow a 30–day extension. *See id.* § 74.351(b) (stating that trial court shall dismiss claim if expert report has not been served within 120 days); *Ogletree v. Matthews,* No. 06–0502, ——S.W.3d ———, ——, 2007 WL 4216606, at * 3, 2007 Tex. LEXIS 1028, at *8 (Tex. Nov. 30, 2007) ("If no report is served within the 120 day deadline provided by 74.351(a), the Legislature denied trial courts the discretion to deny motions to dismiss or grant extensions."). If an expert report fails to implicate the conduct of a particular defendant, it is treated as "no report" as to that particular defendant. *See Apodaca v. Russo,* 228 S.W.3d 252, 257 (Tex.App.-Austin 2007, no pet.) (report that described conduct of other doctors and health-care providers but failed to mention appellee at all constituted "no report" as to appellee); *Garcia v. Marichalar,* 185 S.W.3d 70, 72–73 (Tex.App.-San Antonio 2005, no pet.) (report that focused on conduct of other defendants and did not mention appellant at all was considered "no report" as to appellant). However, an expert report that does not fully satisfy the statutory criteria but is not so inadequate as to be deemed "no report" is treated as a deficient report, and trial courts have discretion to allow parties an extension of time in order to cure the deficiencies. *See Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at *3, 2007 Tex. LEXIS 1028, at *10 ("[A] deficient report differs from an absent report. Thus, even when a report is deemed not served because it is deficient, the trial court retains discretion to grant a thirty-day extension.").

While Dr. Adame's report does not mention Dr. Bogar by name, it unambiguously implicates Dr. Bogar's conduct. Unlike the reports in *Apodaca, see* 228 S.W.3d at 257, or *Marichalar, see* 185 S.W.3d at 72–73, the report in the present case does not implicate, identify, or describe the conduct of any physicians or medical professionals other than Dr. Bogar. Furthermore, Dr. Adame's report describes "the standard of care required of *physicians* not to prescribe drugs either alone or in combination that will cause a fatal overdose." (Emphasis **\*377** added). The report states that "[s]uch conduct falls below the standard of care required of physicians," and details how the levels of oxycodone and propoxyphene found in Guerrero's blood exceeded the amounts known to cause death. In light of this language, it is clear from the four corners of the report that Dr. Adame is implicating the conduct of the physician who prescribed oxycodone and

propoxyphene to Guerrero. *See American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001) ("[T]he only information relevant to the inquiry is within the four corners of the document."). *See also Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606 at *1, 2007 Tex. LEXIS 1028, at *2 (where expert report implicated appellant's conduct but did not mention appellant by name, report was merely deficient and subject to extension allowed under section 74.351(c), rather than "no report" as to appellant).

An expert report does not have to meet the same requirements as evidence offered in a summary-judgment proceeding or at trial, but is merely required to "discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question." *Palacios,* 46 S.W.3d at 875, *see also* 879. The trial court, in its discretion, may have reasonably concluded that Dr. Bogar was sufficiently informed of the conduct that the plaintiff in this case was calling into question—prescribing a combination of drugs in amounts that resulted in a fatal overdose.

The majority's holding in the present case conflicts with this Court's holding in *Austin Heart, P.A. v. Webb,* 228 S.W.3d 276 (Tex.App.-Austin 2007, no pet.), in which we held that an expert report's failure to specifically identify a physician as having breached the standard of care or having caused the patient's injury merely results in a deficient report, subject to the cure provisions of section 74.351(c), rather than "no report." *Id.* at 282–83. The report in *Austin Heart* not only discussed the conduct of the appellant without identifying the appellant as having breached the standard of care or caused the injury, but also discussed the conduct of various other physicians without making it clear that the report related to the appellant physician. *Id.* at 280. Despite these omissions, this Court stated:

> While we are of the view that Dr. Cororve's report is deficient under section 74.351 because it requires the reader to make an educated guess regarding an essential element, we are also aware that the defect might well be curable. The tenor of Dr. Cororve's report, coupled with the fact that there is only one physician defendant, makes it quite likely that Dr. Cororve intended to opine that Dr. Kessler breached the standard of care and caused injury even though the report did not contain that

opinion. *The report's failure on this point is the kind of defect that the cure provisions of section 74.351(c) were designed to address.*

*Id.* at 282–83 (emphasis added).

Significantly, the *Austin Heart* opinion also states, "Had Dr. Cororve referenced only actions by Dr. Kessler in the background section of his report, the link between Dr. Cororve's opinions and the responsible physician might be more apparent." *Id.* at 281. The link between Dr. Adame's opinions and Dr. Bogar could not be more apparent in the present case, where no other physicians or health-care professionals are named as defendants or mentioned in the expert report.

Furthermore, the Texas Supreme Court's mandate that only information within the four corners of the expert report **\*378** may be reviewed for sufficiency, *see Palacios,* 46 S.W.3d at 878, does not necessarily preclude the trial court from conducting an independent analysis of the information contained in the report. In *IHS Acquisition No. 140, Inc. v. Travis,* No. 13–07–00481–CV, 2008 WL 1822780, 2008 Tex.App. LEXIS 2950 (Tex.App.-Corpus Christi Apr. 24, 2008, no pet. h.), the appellant argued that the trial court made an improper inference about causation that extended outside of the four corners of the expert report. The report failed to address a one-month gap between treatment of the patient's eye abscess and her death, and the trial court commented that the gap was the time which "causes the abscess to grow in the system and proliferate." *Id.* at * 3, at *24. The court of appeals held that the trial court did not abuse its discretion in making such a comment, noting that expert reports may contain some level of ambiguity "that is subject to the independent analysis of the trial court." *Id.* The court further stated:

> [T]he trial court's explanation was only beyond the 'four corners' of the report in the sense that the trial court explained medical concepts—such as abscess and cardiogenic shock—which Dr. Starer did not explain. The trial court, however, did not propose unique causation theories that were not discussed in the expert report.
>
> We believe that Dr. Starer's report, which explained causation, but which did not explain certain medical concepts that would perhaps need to be explained at trial, was 'less than all the evidence necessary to establish causation at trial,' but still provided a 'fair summary' of causation.... The trial court's comments

were not an improper 'inference' and do not constitute an abuse of discretion.

*Id.* at * 9, at *25 (quoting *Tovar v. Methodist Healthcare Sys. of San Antonio, Ltd., L.L.P.,* 185 S.W.3d 65, 68 (Tex.App.-San Antonio 2005, pet. denied)).

Similarly, the trial court's conclusion that the report implicated the conduct of Dr. Bogar—the only physician named as a defendant—where no other physicians or healthcare providers were implicated in the report can best be characterized as an analysis of the information included in the report, rather than an impermissible venture outside the four corners of the expert report.

Because the trial court found Dr. Adame's report to be sufficient, no 30–day extension was ever required, although the appellees requested an extension in the event that the report was found to be deficient. In light of the majority's ruling that Dr. Adame's expert report fails to

meet the statutory requirements, "consideration by the trial court of [the appellees'] request for an extension to attempt to cure the defect is warranted." *See Austin Heart,* 228 S.W.3d at 283.

I agree with Justice Patterson's dissent that the trial court acted within its discretion in determining that Dr. Adame's report was sufficient. However, assuming that the report was not sufficient, I would hold in the alternative that Dr. Adame's report is merely deficient, rather than "no report" as to Dr. Bogar, and therefore that the proper remedy is a remand to allow the trial court to determine whether to grant a 30–day extension of time under section 74.351(c), giving the appellees an opportunity to cure any deficiencies.[2] As a result, I respectfully join the dissent.

Footnotes

[1]     As we emphasized in *Austin Heart*—and as suggested by the supreme court in *Ogletree,* as we discuss below—this is not a "magic words" test. There may be a number of ways that a defendant may be referenced within the four corners a report so as to comply with the legislature's mandate that the report "provide[ ] a fair summary as of the date of the report regarding applicable standards of care, the manner in which the care *rendered by the physician or health care provider* failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6) (emphasis added).

[2]     In *Apodaca v. Russo,* 228 S.W.3d 252, 255–58 (Tex.App.-Austin 2007, no pet.), this Court affirmed a trial court order dismissing a health care liability suit under section 74.351(b) and refusing to grant a 30–day extension under section 74.351(c). The lone defendant was Dr. Russo, a general surgeon, who was alleged to have acted negligently in failing to implement precautions against pulmonary embolism or stroke. The report described various deviations from the standard of care, including failures to properly address deep venous thrombosis prevention or to insert an IVC filter, but did not identify Dr. Russo by name or otherwise. The panel observed that "[a]lthough appellant has sued only Dr. Russo, other doctors and health-care providers are implicated by the facts set forth in the report. The report references other providers as well as their conduct and refers to another doctor by name, but fails to mention Dr. Russo at all." *Id.* at 257. The panel found the report deficient *and no report,* reasoning that it did not "specifically identify the defendant and apply the statutory elements to that defendant," *id.* at 258, and "[i]f a report fails to address the defendant physician, it constitutes no report as to that defendant, and the trial court may not grant a 30–day extension." *Id.* at 257. We need not consider *Ogletree's* implications for *Apodaca's* analysis of the "no report" issue because it is dicta. *See Ogletree,* 262 S.W.3d at ——, ——, 2007 WL 4216606, at *2–3, 2007 Tex. LEXIS 1028, at *6–8 (emphasizing discretionary nature of 30–day extension when trial court finds expert report deficient).

[3]     The dissent criticizes this holding, suggesting that we could remand to the probate court in the same manner as in *Austin Heart,* 228 S.W.3d at 285 (Patterson, J., dissenting). As the dissent has acknowledged in *Austin Heart* and elsewhere, section 74.351 does not permit such a remedy where, as here, the report constitutes no report. *See Austin Heart,* 228 S.W.3d at 291 (Patterson, J., dissenting) ("[t]he difference between the two is strategically significant. If the report is 'no report,' then the trial court *must* dismiss the case with prejudice and has no discretion to grant a 30–day extension.") (emphasis in original); *Apodaca,* 228 S.W.3d at 257 ("If a report fails to address the defendant physician, it constitutes no report as to that defendant, and the trial court may not grant a 30–day extension.") (citing *Garcia v. Marichalar,* 185 S.W.3d 70, 74 (Tex.App.-San Antonio 2005, no pet.)).

[4]     Appellees similarly suggest that this regime incentivizes medical malpractice defendants to "maintain[ ] silence until the expert report deadline [to] entirely defeat a valid claim that in any other tort case they would each work affirmatively to defect onto a co-defendant as early as possible."

[5]     Dr. Bogar does not dispute that appellees preserved their constitutional arguments in the trial court.

6    However, as appellees further recognize, the open courts guarantee, *see* Tex. Const. art. I, § 13, is not directly implicated in this case because it applies only to common-law causes of action, not their statutory wrongful-death or survival claims.

7    Appellees similarly urge us to "avoid a constitutional confrontation" by remanding the case to afford them the opportunity to amend their expert report.

8    In a footnote in their motion, appellees complain that "Texas courts have never implemented the regime of preliminary disclosures provided in principle in Section 74.352; the plaintiffs had to request disclosures from the defendants, who responded—after the expert report was served—with little or nothing of substance."

9    *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(s), (u); Tex.R. Civ. P. 192.7(a) (defining "written discovery"); *see generally* Tex.R. Civ. P. 194, 196–98, 200–01.

10   *See* Tex.R. Civ. P. 215.

1    The hospital settled and was dismissed from the lawsuit.

2    In *Palacios,* the court faulted the expert report for its conclusory statement that the standard of care required the hospital to have monitored Palacios more closely, restrain him more securely or done something else entirely. The court stated: "Knowing only that the expert believes that American Transitional did not take precautions to prevent the fall might be useful if American Transitional had an absolute duty to prevent falls from its hospital beds." *American Transitional Care Ctrs. v. Palacios,* 46 S.W.3d 873, 880 (Tex.2001). Here, the trial court may have concluded that the standard of care and duty were clear from the report detailing the "toxic levels of oxycodone along with lethal levels of propoxyphene" that caused the death.

3    The majority's criticism of this approach relies on *Apodaca v. Russo,* 228 S.W.3d 252 (Tex.App.-Austin 2007, no pet.), and *Garcia v. Marichalar,* 185 S.W.3d 70 (Tex.App.-San Antonio 2005, no pet.), but those cases are distinguishable in that both involved multiple defendants, whereas here we have only one defendant—Dr. Bogar.

1    I do not take issue with the majority's holding that the appellees, who failed to take full advantage of the discovery tools provided by section 74.351 of the civil practices and remedies code, cannot now argue that the statute imposes an unconstitutional burden by restricting discovery until after expert reports have been served. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(s), (u) (West Supp.2007). However, while the appellees may not have established that section 74.351's discovery limitations prevented them from serving a sufficient expert report, they have also not been given any opportunity to cure deficiencies in Dr. Adame's report, which, until this Court's holding on appeal, had been deemed sufficient as to Dr. Bogar.

2    In addition to arguing that Dr. Adame's report constituted "no report," Dr. Bogar also argues that Dr. Adame, a pathologist, was not qualified to render opinions concerning the standard of care applicable to physical medicine rehabilitation physicians, such as Dr. Bogar. While the majority does not address this contention in light of their holding that the expert report constituted "no report" as to Dr. Bogar, I would hold that even if Dr. Adame is deemed unqualified to render an expert opinion in this case, the appellees should still be afforded the opportunity to request the 30–day extension provided by section 74.351(c).

A similar argument regarding expert qualifications was made in *Ogletree,* in which the appellant asserted that a radiologist was incapable of opining on the standard of care applicable to urologists. *Ogletree v. Matthews,* No. 06–0502, ——— S.W.3d ——— ———, ————, 2007 WL 4216606, at *2, 2007 Tex. LEXIS 1028, at *4 (Tex. Nov. 30, 2007). In a concurring opinion, Justice Willett stated that the defect in the expert report consisted of "designating the wrong type of medical professionals to opine on standard of care," and that using the wrong type of expert "is the type of defect for which a trial court may grant a discretionary section 74.351(c) extension." *Id.* at *6, at *18 (Willett, J., concurring).

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

79 S.W.3d 48
Supreme Court of Texas.

BOWIE MEMORIAL HOSPITAL a/k/a Bowie
Hospital District d/b/a Bowie Hospital District
Authority d/b/a Bowie Memorial Hospital,
Petitioner,
v.
Barbara WRIGHT and P.L. Wright, Respondents.

No. 01–0814. | June 13, 2002.

Patient brought medical malpractice action against hospital, physician, physician's assistant, and others, alleging that failure to timely discover that her foot was fractured led to necessity of two additional surgeries. The 78th District Court, Wichita County, Keith Nelson, J., dismissed patient's claims. Patient appealed. The Fort Worth Court of Appeals, 48 S.W. 3d 443, affirmed in part, reversed in part, and remanded. Upon grant of hospital's petition for review, the Supreme Court held that expert report submitted by patient did not constitute a good-faith effort to summarize causal relationship between hospital's alleged failure to meet applicable standards of care and patient's injury under Medical Liability and Insurance Improvement Act.

Reversed.

**Attorneys and Law Firms**

**\*50** Gregory J. Lensing, Charles T. Frazier, Jr. Cowles & Thompson, Dallas, Susan Irene Nelson, Dallas, for Petitioner.

Britta Jean Gordon, Michael Kevin Queenan, Queenan Law Firm, DeSoto, for Respondents.

**Opinion**

PER CURIAM.

This case involves the Medical Liability and Insurance Improvement Act's ("the Act") expert-report requirements. See TEX.REV.CIV. STAT. art. 4590i, § 13.01. The trial court dismissed the plaintiffs' medical malpractice claims after it determined that their expert report did not satisfy the Act's requirements. The court of appeals concluded that the trial court abused its discretion when it dismissed the plaintiffs' claims, because the expert report represented a good-faith effort to comply with the Act. 48 S.W.3d 443, 448. We disagree.

Accordingly, we reverse the court of appeals' judgment and dismiss with prejudice the Wrights' claims against Bowie Memorial Hospital.

Barbara Wright was admitted to Bowie after she sustained injuries in a car accident. While at Bowie, Michael Layne, a physician's assistant that Bowie employed, x-rayed Barbara's right knee and foot and diagnosed her with a fractured patella. However, Layne allegedly misplaced or misread the foot x-ray and, therefore, did not discover that Barbara had also fractured her right foot in the accident. Shortly after Barbara was admitted to Bowie, Dr. Hodde, Layne's supervisor, recommended that Bowie refer her to an orthopedic surgeon. Barbara was immediately referred to an orthopedic surgeon and transferred to another hospital. Her accompanying medical report, which Layne prepared, only indicated that Barbara had a fractured knee.

Nearly a month after the accident, Barbara's orthopedic surgeon discovered Barbara's fractured foot. By that time, the surgeon had already operated on Barbara's knee. The Wrights claim that the surgeon could have operated on Barbara's foot at the same time if he had known about the injury. Instead, Barbara had two additional surgeries over the next ten months.

Barbara and her husband sued Bowie, Layne, and Dr. Hodde for medical malpractice. The Wrights also sued the orthopedic surgeon, another treating doctor, and three medical clinics not associated with Bowie. The Wrights' allegations pertinent here are that Bowie personnel did not: diagnose Barbara's foot fracture; protect her foot; review diagnostic tests ordered and administered at the hospital; or properly supervise Layne.

The Wrights filed an expert medical report about Bowie's, Dr. Hodde's, and another doctor's alleged negligence. See TEX.REV.CIV. STAT. art. 4590i, § 13.01(d). The expert report states, in part:

> I have reviewed the material you sent me on the above case. I believe that the hospital fell below the appropriate standard of care in not having a defined mechanism in place whereby x-rays taken in the E.R. are read by a physician specialized in interpreting the films in a timely manner (i.e., less than 24 hrs). X-rays taken in the E.R. need to have re-reads performed within 24 hrs and if **\*51** there is a discrepency [sic] in the x-ray readings a system should be in place to inform the patient of this. There did not appear to be any procedure that the hospital has for tracking x-rays. The hospital also doesn't seem to have a system of orienting health care professionals working in the E.R.

nor any form of Q/A for P.A.'s staffing the E.R. There didn't appear to be any organized system or protocols for P.A. supervision in the E.R.

...

I do believe that it is reasonable to believe that if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then Wright would have had the possibility of a better outcome.

Bowie moved to dismiss the Wrights' claims, alleging that the expert report "fails to establish how any act or omission of employees of Bowie Memorial Hospital caused or contributed to Ms. Wright's injuries." Therefore, Bowie argued, the report does not satisfy the Act's requirements.

The trial court held two hearings to determine if the report represents a good-faith effort to meet the Act's requirements. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(*l* ). At the first hearing, the trial court asked about the causal relationship between Bowie's conduct and Barbara's injury. The Wrights explained that if Bowie had diagnosed Barbara's fractured foot earlier, then she "probably would have had a better outcome." They also conceded that the orthopedic specialist Barbara saw immediately after leaving Bowie "had an independent duty to verify" Bowie's medical report. Nevertheless, the Wrights claimed that, if Bowie's report had indicated that Barbara had a broken foot, it would have been "much easier" for the orthopedic doctor to make a proper diagnosis. After the second hearing, the trial court granted Bowie's motion to dismiss. The record indicates that the trial court did not believe the Wrights' claims against Bowie, "the people who transferred [Barbara]," had merit, given that the orthopedic surgeon "could have done his own work."

The court of appeals reversed and remanded, holding that the trial court abused its discretion when it dismissed the Wrights' claims against Bowie. 48 S.W.3d at 448. The court concluded that the report inadequately summarizes the causal relationship between Bowie's alleged negligence and Barbara's injury. However, it determined that the report represents a good-faith effort to comply with the Act, because it raises the possibility that, but for Bowie's breach, Barbara "would have had a better outcome." 48 S.W.3d at 447.

[1] Medical-malpractice plaintiffs must provide each defendant physician and health-care provider an expert report with the expert's curriculum vitae, or they must voluntarily nonsuit the action. *See* TEX.REV.CIV. STAT.

art. 4590i, § 13.01(d); *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). The expert report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6). If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion "*only if* it appears to the court, after hearing, that the report does not represent a *good faith effort* to comply with the definition of an expert report in Subsection (r)(6) of this **\*52** section." TEX.REV.CIV. STAT. art. 4590i, § 13.01(*l* ) (emphasis added).

[2] We recently discussed the Act's expert-report requirement for medical-malpractice cases. *See Palacios,* 46 S.W.3d at 877–80. In *Palacios,* we explained that, when considering a motion to dismiss under section 13.01(*l* ), "[t]he issue for the trial court is whether 'the report' represents a good-faith effort to comply with the statutory definition of an expert report." *Palacios,* 46 S.W.3d at 878. To constitute a "good-faith effort," the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Palacios,* 46 S.W.3d at 879.

[3] [4] [5] The trial court should look no further than the report itself, because all the information relevant to the inquiry is contained within the document's four corners. *Palacios,* 46 S.W.3d at 878. The report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the three elements that the Act identifies: standard of care, breach, and causal relationship. *Palacios,* 46 S.W.3d at 878. A report cannot merely state the expert's conclusions about these elements. *Palacios,* 46 S.W.3d at 879. "[R]ather, the expert must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999).

[6] [7] [8] We review a trial court's order dismissing a claim for failure to comply with section 13.01(d)'s expert-report requirements under an abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 878. A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). When reviewing matters committed to the trial court's discretion, a court of appeals may not

substitute its own judgment for the trial court's judgment. *See Flores v. Fourth Ct. of Appeals,* 777 S.W.2d 38, 41 (Tex.1989).

Here, the parties do not dispute that the expert report fairly summarizes the alleged standard of care, because it states that a hospital should have established procedures to read and interpret x-rays in a timely manner and to inform patients about the results. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6). Also, the parties do not dispute that the report fairly summarizes how Bowie allegedly breached the standard of care, because the report states that Bowie did not have a procedure to track x-rays. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6). Consequently, the parties only contest whether the report constitutes a "good-faith effort" to fairly summarize the causal relationship between Bowie's alleged breach and Barbara's injury. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6); *Palacios,* 46 S.W.3d at 879.

Contrary to the court of appeals' conclusion, it is not enough that the expert report "provided insight" about the plaintiff's claims. *See* 48 S.W.3d at 447. Rather, to constitute a good-faith effort to establish the causal-relationship element, the expert report must fulfill *Palacios* 's two-part test. *See Palacios,* 46 S.W.3d at 879. Thus, under the *Palacios* test, we must determine whether the trial court acted unreasonably and without reference to guiding principles when it dismissed the Wrights' claims against Bowie. *See Downer,* 701 S.W.2d at 241–42.

The Wrights primarily rely on one statement in the report to establish causation: "if the x-rays would have been correctly read and the appropriate medical personnel **\*53** acted upon those findings then Wright would have had the possibility of a better outcome." In their brief to this Court, the Wrights contend that this statement "explains why Petitioners' damages were caused by Bowie Hospital's breach: if the proper medical personnel at Bowie had reviewed the x-rays, [Barbara] would have had a chance of diagnosis and treatment of her foot fracture."

Bowie responds that the report's statement about causation is conclusory, because it does not explain how Bowie's failing to correctly read or act upon the x-rays caused injury to Barbara. Moreover, Bowie asserts, the statement does not even identify the specific injuries Bowie's conduct allegedly caused.

In reviewing the report's adequacy, the court of appeals focused on "whether the report provides a basis to conclude that the claims have merit." 48 S.W.3d at 447 (citing *Palacios,* 46 S.W.3d at 878–79). Although the causation statement recognizes only the "possibility"—

rather than the "reasonable medical probability"—that Barbara might have had a better outcome, the court of appeals concluded that the report's adequacy should not turn "solely upon the claimant's failure to use magical words like 'reasonable probability.' " 48 S.W.3d at 447. Accordingly, the court of appeals held that the report met the good-faith effort test, because it gave the trial court a basis to conclude that the Wrights' claims against Bowie have merit. 48 S.W.3d at 448.

We agree with the court of appeals' conclusion that a report's adequacy does not depend on whether the expert uses any particular "magical words." Nothing in the Act's plain language, or in *Palacios,* suggests that, for these purposes, an expert report must express the causal relationship in terms of "reasonable medical probability." However, we disagree with the court of appeals' conclusion that the trial court abused its discretion in dismissing the Wrights' claims against Bowie. We have held that the only information relevant to whether a report represents a good-faith effort to comply with the statutory requirements is the report itself. *Palacios,* 46 S.W.3d at 878. And, we have held that we review a trial court's decision about whether a report constitutes a good-faith effort to comply with the Act under an abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 878.

After reviewing this report, we conclude that the trial court could have reasonably determined that the report does not represent a good-faith effort to summarize the causal relationship between Bowie's failure to meet the applicable standards of care and Barbara's injury. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6); *Palacios,* 46 S.W.3d at 879. That is because the report simply opines that Barbara might have had "the possibility of a better outcome" without explaining how Bowie's conduct caused injury to Barbara. We cannot infer from this statement, as the Wrights ask us to, that Bowie's alleged breach precluded Barbara from obtaining a quicker diagnosis and treatment for her foot. Rather, the report must include the required information within its four corners. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6); *Palacios,* 46 S.W.3d at 878. Because the report lacks information linking the expert's conclusion (that Barbara might have had a better outcome) to Bowie's alleged breach (that it did not correctly read and act upon the x-rays), the trial court could have reasonably determined that the report was conclusory. *See Palacios,* 46 S.W.3d at 880; *Earle,* 998 S.W.2d at 890. A conclusory report does not meet the Act's requirements, because it does not satisfy the *Palacios* test. *Palacios,* 46 S.W.3d at 879.

**\*54** For these reasons, we hold that the trial court did not abuse its discretion when it concluded that the report did

not represent a good-faith effort to meet the Act's requirements. Therefore, the trial court had no discretion but to dismiss the plaintiffs' claims against Bowie. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(*l* ); *Palacios,* 46 S.W.3d at 880. In reviewing the trial court's order, the court of appeals improperly substituted its own judgment for the trial court's judgment. *See Flores,* 777 S.W.2d at 41. Accordingly, we grant Bowie's petition for review. Without hearing oral argument, we reverse the court of appeals' judgment and dismiss with prejudice the Wrights' claims against Bowie. *See* TEX.R.APP. P. 59.1.

**Parallel Citations**

45 Tex. Sup. Ct. J. 833

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**998 S.W.2d 882**
**Supreme Court of Texas.**

Stephen EARLE, M.D., Petitioner,
v.
Michael RATLIFF and Shirley Ratliff,
Respondents.

No. 98–0115. | Argued April 7, 1999. | Decided July
1, 1999. | Rehearing Overruled Oct. 7, 1999.

Patient sued surgeon who performed two back surgeries
involving metal bone plates and pedicle screws, asserting
medical malpractice and lack of informed consent. The
288th Judicial District Court, Bexar County, David
Peeples, J., granted summary judgment for surgeon on
statute of limitations grounds. Patient appealed. The San
Antonio Court of Appeals, 961 S.W.2d 591, reversed and
remanded. Surgeon filed petition for review. The
Supreme Court, Hecht, J., held that: (1) any negligence by
surgeon concerning initial surgery occurred on or before
date of that surgery, and limitations period thus began to
run on that date rather than when surgeon quit treating
patient; (2) surgeon did not fraudulently conceal known
wrong, so as to toll limitations periods for medical
malpractice claim; (3) open courts provision of state
constitution did not preclude limitations bar of patients'
claims relating to initial back surgery; (4) genuine issue of
material fact existed, precluding summary judgment for
surgeon, on whether he was negligent concerning second
surgical implant of devices in patient's back; (5) surgeon
could not be held negligent concerning disclosure of risks
attendant to second spinal implant surgery, where surgeon
disclosed all risks identified by Texas Medical Disclosure
Panel and thus complied with Medical Liability Insurance
Improvement Act; and (6) Medical Liability and
Insurance Improvement Act barred patient's Deceptive
Trade Practices-Consumer Protection Act (DTPA) claims
that surgeon misrepresented and concealed truth
concerning back surgeries.

Judgment of the Court of Appeals affirmed in part and
reversed in part, and case remanded.

**Attorneys and Law Firms**

***883** George H. Spencer, Sr., Phylis J. Speedlin, San
Antonio, for Petitioner.

Donna J. Bowen, Michael L. Slack, Austin, James A.
Hall, San Antonio, for Respondents.

**Opinion**

***884** Justice HECHT delivered the opinion of the Court.

This medical malpractice case raises several issues, but
our attention centers on whether the plaintiff's claim that
the defendant negligently performed surgery on him is
barred by limitations. The plaintiff contends that
limitations did not begin to run on his claim until his post-
surgical course of treatment by the defendant ended, and
until he became aware that the defendant had fraudulently
concealed from him the truth about the surgery and the
treatment that followed. Further, the plaintiff asserts, to
bar his claim would violate the Open Courts provision of
the Texas Constitution.[1] On each of these matters we
disagree with the plaintiff, but on other claims described
below, we believe the plaintiff is correct. The district
court granted defendant summary judgment on all
plaintiff's claims. The court of appeals reversed summary
judgment on all claims.[2] We partially affirm, and partially
reverse, the judgment of the court of appeals and remand
the case to the district court for further proceedings.

**I**

Michael Ratliff, a thirty-eight-year-old freight handler in
good health, sustained a work-related back injury in June
1991, for which he was treated by Dr. Stephen Earle. On
November 21, 1991, Earle operated on Ratliff, fusing his
lumbar spine at three levels, decompressing nerves at four
levels, and inserting metal bone plates and screws
manufactured by AcroMed Corporation. Unfortunately,
Ratliff's condition gradually worsened. Earle continued to
treat Ratliff, and on November 16, 1993, Earle operated
again to remove and replace the instrumentation
implanted in the first surgery. Following this surgery,
Ratliff's condition deteriorated even further, to the point
where he was in constant pain and unable to walk, talk, or
care for himself. A month later, Ratliff saw a television
report on the risks associated with the AcroMed
instrumentation that had been surgically implanted in him
and removed. Ratliff contends that this was his first
inkling that Earle's treatment had been improper. Ratliff
returned to Earle on January 4, 1994, for a final visit, and
not quite two months later, on February 28, he and his
wife (collectively, "Ratliff") sued Earle and others. We
are concerned only with Ratliff's action against Earle.

Ratliff sued Earle for negligence, fraudulent concealment,
strict liability, and violations of the Deceptive Trade

Practices–Consumer Protection Act.[3] Ratliff alleged that Earle was negligent in:

· misdiagnosing his condition;

· performing unwarranted and unnecessary surgeries on him;

· implanting in his back pedicle devices not approved by the Federal Food and Drug Administration;

· failing to warn him of the risks of the surgery and the causes of his subsequent pain; and

· misrepresenting throughout the entire course of treatment the risks of pedicle instrumentation and the problems experienced by other patients from such a procedure.

Ratliff further alleged that Earle had fraudulently concealed:

· that the surgeries were unwarranted and unnecessary;

· that objective reports did not support Earle's diagnosis and recommendation of surgery;

· that statements Earle made to induce Ratliff to have surgery were incorrect;

· that assurances Earle gave Ratliff about his condition and the reasons **\*885** for his continuing pain were misleading, incomplete, and inaccurate; and

· the risks of using spinal fixation devices, some of which were printed on an insert in the packaging of the instrumentation Earle implanted in Ratliff.

Finally, Ratliff alleged that Earle violated the DTPA by telling him that:

· he needed surgery;

· he would get "95% better" and would be able to return to work;

· the devices implanted in Ratliff were safe, approved for such use, and permanent; and

· the pain he endured was to be expected and would get better.

(Ratliff has dismissed his strict liability claim in order to participate in a settlement reached in *In re Orthopedic Bone Screw Products Liability Litigation (Fanning v. Acromed Corp.)*.[4])

Earle moved for summary judgment on several grounds, including: that Ratliff's claims relating to his 1991 surgery were barred by limitations; that with respect to the 1993 surgery, Earle did not breach the standard of care owed Ratliff or cause him any injury; that Earle obtained from Ratliff the consent to treatment and surgery required by statute;[5] and that Earle did not knowingly make any misrepresentation to Ratliff. In connection with the last ground, Earle argued that Ratliff's health care liability claims could not be recast as DTPA violations. Earle supported his motion with his own affidavit and certain medical records. Ratliff responded, relying on his own affidavit and that of an expert witness, Dr. Vert Mooney, as well as other medical records. The district court granted Earle's motion "on all grounds", and Ratliff appealed.

The court of appeals reversed, holding that Earle was not entitled to summary judgment on any ground raised in his motion.[6] Concerning limitations, the court concluded "that the allegations of this case [involving] elements of both misdiagnosis and mistreatment mak[e] it difficult to ascertain a specific date when the malpractice claim arose."[7] Under the circumstances, the court found that limitations did not begin to run on Ratliff's claims until the date of Earle's last treatment,[8] which, as we have said, was less than two months before Ratliff filed suit.

We granted Earle's petition for review.[9] We first consider whether Ratliff's claims relating to the 1991 surgery are barred by limitations, and then whether Earle was entitled to summary judgment on Ratliff's other claims.

## II

Ratliff's negligence claims are "health care liability claims" within the meaning of the Medical Liability and Insurance Improvement Act.[10] Section 10.01 of the Act provides in pertinent part that

no health care liability claim may be commenced unless the action is filed within two years from the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospitalization **\*886** for which the claim is made is completed....[11]

Thus, under this statute limitations is to run from one of three dates: the date of the breach or tort, the completion

of treatment, or the completion of hospitalization. We have repeatedly held that a plaintiff cannot choose the most favorable of the three dates specified, and that "if the date of the negligence can be ascertained, ... limitations must be measured from the date of the tort."[12]

Ratliff contends, and the court of appeals agreed, that limitations did not begin to run on his claims regarding the 1991 surgery until Earle quit treating him, shortly before he filed suit. Earle asserts that limitations began to run on those claims the date surgery was performed. Ratliff also contends that the running of limitations was suspended by Earle's fraudulent concealment of certain facts about the surgery and his prognosis. Earle responds that Ratliff has failed to raise a genuine issue of material fact on the elements of fraudulent concealment. Finally, Ratliff argues that his claims cannot be barred by limitations without violating the Open Courts provision of the Texas Constitution. Earle responds that Ratliff has failed to raise a fact issue that he did not have a reasonable opportunity to sue, and thus he is not entitled to the protection of the Open Courts provision. We address each of these issues—when limitations began to run, fraudulent concealment, and Open Courts—in turn.

## A

[1] Ratliff neither complains nor offers evidence of any negligence by Earle in the treatment following the 1991 surgery. Ratliff does not contend, for example, that Earle should have done something after the surgery to relieve his pain or improve his back. Ratliff alleges that Earle did not tell him the truth about the surgery, the reasons for his continued pain afterward, or his prognosis, but he does not assert that Earle's alleged post-surgical statements or concealments affected his treatment or his condition.

Rather, Ratliff contends that Earle was negligent in misdiagnosing the need for surgery, in failing to disclose the attendant risks of surgery beforehand, and in performing unwarranted surgery. Assuming Ratliff is correct, Earle's negligence occurred on or before the date he performed surgery, and limitations on Ratliff's claim began to run on that date. We reached the same conclusion in similar circumstances in *Gormley v. Stover*.[13] There, Stover complained that Gormley was negligent in performing skin graft surgery to improve her ability to wear dentures, but she argued that limitations did not begin to run until Gormley quit treating her. We explained:

Gormley's motion for summary judgment stated that the health care of which Stover complained occurred before or during surgery. None of the excerpts of Stover's and her expert witness' deposition testimony, attached to Gormley's motion, mentioned any negligence occurring after surgery. Gormley's affidavit stated that if Stover was injured at all, it was during surgery. Stover's affidavit did not assert that Gormley was negligent following surgery. Her affidavit did assert that Gormley represented to her after her surgery that her pain would shortly subside, but she does not claim that her continued pain was attributable to his post-surgical treatment of her. In short, Gormley's affidavit established as a matter of law that no actionable negligence occurred after surgical treatment was completed, and nothing else in the **\*887** summary judgment record raises a fact issue on the matter. The trial court correctly granted summary judgment for Gormley on Stover's negligence claims in their entirety.[14]

As far as we have been able to determine, the only courts of appeals to consider this issue have reached the same conclusion.[15]

The court of appeals in the present case was concerned about the lingering effects of Earle's alleged misdiagnosis, leading to unnecessary surgery, continued pain and complications, and finally another surgery. But if the running of limitations on negligent surgery were deferred while the patient continued to experience the effects of that surgery, then the first clause of section 10.01 pegging the date of the breach or tort as the beginning of the limitations period would seldom apply to surgery.

Our conclusion does not suggest that limitations is not affected when a physician who can correct a misdiagnosis or lessen its consequences fails to do so. On the contrary, we suggested in *Rowntree v. Hunsucker* that a claim for continued mistreatment is not barred simply because treatment was based on a much earlier misdiagnosis.[16] *Rowntree* did not present such a situation,[17] but *Chambers v. Conaway,*[18] the case on which the court of appeals relied, did. Conaway claimed that Chambers, her family physician, failed to diagnose cancer on two occasions when she complained of a lump in her breast and on several other visits to him for general health care. Based on evidence that Chambers had a duty to follow up on Conaway's complaints each time he saw her, we held that the tort Conaway complained of did not occur, and limitations did not begin to run, until the last time Chambers failed to diagnose her cancer, which was her last visit.[19] We did not apply the course-of-treatment limitations provisions of section 10.01 to allow Conaway to complain of the initial misdiagnosis, but neither did we

allow that first misdiagnosis to bar Conaway's complaints about later visits.

Nor does our conclusion suggest that limitations on claims of post-surgical negligence runs from the date of surgery. If treatment is negligent following surgery, then section 10.01 provides that limitations begins to run from the date of the breach or tort or from the date that treatment was completed. Thus, limitations on a claim that a physician has improperly treated a patient's infection following surgery does not begin to run on the date of surgery merely because the infection would not have occurred but for the surgery.

Ratliff does not allege that Earle misdiagnosed or mistreated his condition after surgery or that he failed to do anything following surgery to rectify or ameliorate his earlier misdiagnosis that surgery was appropriate. Under these circumstances, limitations began to run on Ratliff's complaints concerning the 1991 surgery the date it was performed.

**B**

Although section 10.01 prescribes the limitations period for all health care liability claims "[n]otwithstanding any other **\*888** law,"[20] we held in *Borderlon v. Peck* that the statute "does not abolish fraudulent concealment as an equitable estoppel to the affirmative defense of limitations".[21] Proof of fraudulent concealment, we added, does not prohibit an assertion of limitations altogether, but does suspend the running of limitations until such time as the plaintiff learned of, or should have discovered, the deceitful conduct or the facts giving rise to the cause of action.[22] Ratliff contends that because Earle fraudulently concealed that the 1991 surgery was unnecessary and risky, limitations on claims concerning that surgery did not begin to run until he learned the truth in a television broadcast more than two years later, a few months before he filed suit.

[2] We considered the effect of fraudulent concealment in the medical malpractice context in *Carrell v. Denton.*[23] There the defendant physician had left a gauze sponge in plaintiff's body after surgery. To avoid having his negligence claim barred by limitations, plaintiff asserted fraudulent concealment. We rejected plaintiff's argument, explaining:

> The proposition which lies at the bottom of this contention is to the effect that the relation between a surgeon and his patient involves trust and confidence,

therefore fraudulent concealment is imputed to Dr. Carrell because of his failure to inform the plaintiff that the gauze sponge had been left inside the plaintiff's body. The proposition is essentially unsound. In conducting a surgical operation on his patient, and in respect to any treatment he may administer, a surgeon is under the duty to exercise due care. His failure to discharge this duty constitutes negligence and therefore is wrongful—but the failure does not, of itself, constitute fraud or expose the surgeon to the imputation of fraudulent concealment. Among other essential ingredients, a fraudulent concealment in cases of this sort includes, first, actual knowledge of the fact that a wrong has occurred, and, second a fixed purpose to conceal the wrong from the patient. Neither of these ingredients appears from the allegations of the plaintiff's petition. The trial court did not err in sustaining the special exception in question and in dismissing the suit.[24]

In other words, proof of fraudulent concealment requires more than evidence that the physician failed to use ordinary care; it also requires evidence that the defendant actually knew the plaintiff was in fact wronged, and concealed that fact to deceive the plaintiff.[25]

[3] [4] [5] A person who asserts fraudulent concealment to avoid summary judgment on limitations must raise a genuine issue of material fact that would support his assertion.[26] Of course, fraudulent concealment may be shown by circumstantial evidence as well as direct evidence.[27] We therefore must examine the evidence Ratliff offered to support his claim of fraudulent concealment: Ratliff's affidavit and that of his expert, Dr. Mooney.

Mooney's affidavit focuses on whether Earle was negligent, not whether Earle deliberately concealed facts from Ratliff to deceive him. Mooney states that Earle **\*889** must have known that his recommendation of surgery was negligent because it was contraindicated by the objective test results set out in Ratliff's medical records and because information available to Earle concerning pedicle implementation showed that surgery should not have been attempted. While this evidence certainly shows a difference of opinion between Mooney and Earle and raises a question whether Earle was negligent, it falls short of showing Earle's "actual knowledge of the fact that a wrong ... occurred" necessary for fraudulent concealment. In addition, Mooney refers to portions of Earle's deposition testimony as evidence that Earle knew about, but did not inform Ratliff of, certain serious risks associated with spinal fixation surgery. This testimony, too, reflects a difference of professional opinion and does not show that Earle intended to deceive Ratliff.

Ratliff's affidavit does not show that Earle fraudulently concealed facts from him. Ratliff states that Earle "assur[ed] me that I would be '95 ≠tter'" and would return back to work soon", that Earle "did not inform me that my surgery could make my condition even worse" and "never explained the permanency and severity of my condition", and that Earle "told me the [1993] surgery was necessary because I had four broken screws" when in fact the surgery was necessitated by loose, not broken, screws. But Ratliff offers no evidence, direct or circumstantial, that Earle actually knew these statements were in fact false when he made them, let alone that Earle's purpose in making them was deceit. Earle may have been negligent in what he said to Ratliff, just as he may have been negligent in performing the 1991 surgery, but Ratliff has offered no summary judgment evidence that Earle acted fraudulently by concealing a known wrong.

Because Ratliff has failed to raise an issue of fact concerning fraudulent concealment, we conclude that he cannot thereby avoid the bar of limitations.

## C

[6] [7] The Open Courts provision of the Texas Constitution[28] does not permit a well-established common-law cause of action to be restricted by statute in a way that is unreasonable or arbitrary in view of the statute's purpose.[29] In *Jennings v. Burgess,* we held that the limitations provisions of section 10.01 do not violate the Open Courts guarantee if a plaintiff has had a reasonable opportunity to discover the alleged wrong and bring suit before the limitations period expired.[30] We assumed in *Jennings,* without expressly explaining our reasons, that the plaintiff must raise a fact issue concerning the applicability of the provision to avoid a summary judgment on limitations.[31] We believe that the same rule should apply for asserting the Open Courts guarantee in response to a motion for summary judgment on limitations as is applied in asserting fraudulent concealment.

Ratliff's affidavit establishes that he did not learn of the risks of pedicle implantation until he saw a television broadcast about a month after his second surgery. However, the only evidence Ratliff has offered to show that he could not have learned of the risks sooner consists of statements in Mooney's affidavit that he was justified in trusting Earle and the following statement: "From the information that I have reviewed, there is no evidence that Mr. Ratliff could have known that his care and continued

treatment by Dr. Earle was negligent and had caused the problems he was experiencing until, at the earliest, in December 1993 when he saw the [television broadcast]." The district court correctly struck this latter **\*890** statement as being conclusory. Even if the sentence had not been struck, neither it nor Mooney's broad statements about justified reliance on a physician's advice would support Ratliff's constitutional claim. Mooney's statement that *he* had seen no evidence that Ratliff could have discovered Earle's alleged negligence sooner is not conclusive of the record. Between the 1991 and 1993 surgeries, Ratliff made twenty-four visits to Earle's office. Medical records establish that he repeatedly complained of pain and a lack of improvement in his condition. In his own affidavit, Ratliff reiterates that his pain persisted during that period and that there was little improvement in his condition. Ratliff's condition was not latent, nor does he assert that the risks associated with his surgery were generally unknown to medical practitioners.

The record establishes that Ratliff had an opportunity to learn of any negligence by Earle in performing the 1991 surgery, and the fact that he waited more than two years to do so does not raise constitutional concerns. Accordingly, we conclude that Ratliff's claims concerning the 1991 surgery are barred by limitations.

## III

We now turn to three additional claims Ratliff makes: that Earle was negligent in performing the 1993 surgery, that Earle failed to disclose the risks attendant to that surgery, and that statements Earle made violated the DTPA.

## A

[8] Ratliff claims that Earle was negligent in performing the 1993 surgery. In his affidavit supporting his motion for summary judgment, Earle states that he did not breach the applicable standard of care in performing the 1993 surgery. "Both in 1991 and 1993," Earle's affidavit states, "use of Steffe pedicle screws and plates met the standard of care." Mooney's affidavit states with respect to the 1993 surgery: "Considering the degree of spinal instability created by Mr. Ratliff's first surgery, and the fact that Mr. Ratliff's first set of AcroMed screws and plates resulted in hardware failure with loosening, the insertion of another device was medically unwarranted." The district court struck this statement in Mooney's affidavit as being conclusory, but we do not regard it as

any more conclusory than statements in Earle's affidavit. Mooney's statement raises the question whether, given Ratliff's failure to improve following the first surgical implantation and his increased spinal instability, a second implant was warranted. Earle's affidavit and other summary judgment evidence do not address this issue.

[9] Summary judgment can be granted on the affidavit of an interested expert witness, like Earle, but the affidavit must not be conclusory.[32] An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts.[33] Earle's affidavit does not explain why implantation of additional devices in the 1993 surgery was medically warranted, given Ratliff's history; the affidavit states only the conclusion that Earle met the applicable standard of care.

Accordingly, the court of appeals did not err in reversing summary judgment on this claim.

**B**

[10] Ratliff contends that Earle was negligent in failing to disclose the risks attendant to the 1993 surgery. This claim **\*891** is governed by the Medical Liability and Insurance Improvement Act.[34] The Act creates the Texas Medical Disclosure Panel and gives it the responsibility to "identify and make a thorough examination of all medical treatments and surgical procedures ... to determine which ... do and do not require disclosure of the risks and hazards to the patient".[35] The Panel prepares and publishes two lists, one (List A) of treatments and procedures for which the risks must be disclosed, and the other (List B) of treatments and procedures for which disclosure of risks is not required.[36] For all List A procedures, the Panel must also state what risks must be disclosed and the form in which disclosure must be made.[37] The Act then provides that a physician who discloses to a patient the risks of a List A procedure in the substance and form prescribed by the Panel "shall be considered to have complied" with the Act,[38] and that a patient's consent to a List A procedure obtained as prescribed "shall be considered effective".[39] It is undisputed that both of Ratliff's surgeries were List A procedures.[40] Earle's affidavit states in effect that he disclosed all risks identified by the Texas Medical Disclosure Panel in the manner required, and Ratliff's signed consent form shows that Earle is correct.

[11] The court of appeals held, however, that Earle's affidavit only raised a rebuttable presumption that he was not negligent in disclosing the risks of surgery to Ratliff, a

presumption Ratliff could and did rebut with Mooney's affidavit stating that Earle should have disclosed certain risks beyond those enumerated by the Texas Medical Disclosure Panel.[41] The court relied on another court of appeals' decision, *Penick v. Christensen*,[42] which concluded that a physician who makes disclosure for a List A procedure or treatment as prescribed by the Panel can nevertheless be negligent for failing to make additional disclosures. *Penick* based its conclusion on section 6.07(a)(1) of the Act, which provides that disclosure made as prescribed for a List A procedure "shall create a rebuttable presumption that the requirements of [the Act] have been complied with".[43]

We do not agree that the Act permits a finding that a physician who made disclosures as prescribed by the Panel was negligent for not disclosing other risks and hazards associated with the recommended procedure. Were it so, the Act would afford a physician who complied with Panel directives no protection from liability for nondisclosure if there were any evidence that additional disclosure was appropriate. The entire purpose of the Panel decisions would thus be thwarted. Section 6.07(a)(1) is not entirely clear, but we agree with the weight of scholarly authority that, read in the light of the other provisions of the Act, it permits the presumption of proper disclosure to be rebutted only by showing the **\*892** invalidity of the consent form, such as by proof that the patient's signature was forged, or that the patient lacked capacity to sign.[44]

Ratliff produced no evidence that his written consent was ineffective due to incapacity or was otherwise invalid, and thus he has raised no issue that Earle was negligent in disclosing the risks of surgery. Accordingly, we hold that the court of appeals erred in reversing summary judgment on this claim, and we disapprove *Penick* to the extent its reasoning is contrary to ours.

**C**

[12] Finally, Ratliff claims that Earle misrepresented and concealed the truth concerning both the 1991 and the 1993 surgeries in violation of the DTPA. Section 12.01(a) of the Medical Liability and Insurance Improvement Act precludes application of the DTPA to physicians "with respect to claims for damages for personal injury or death resulting, or alleged to have resulted, from negligence".[45] Ratliff and Earle both argue whether Ratliff's DTPA claims are thus precluded.

In *Sorokolit v. Rhodes,* we held that section 12.01(a) does not preclude a DTPA claim that is not based on a physician's breach of the accepted standard of medical care.[46] We added, however, that "[c]laims that a physician or health care provider was negligent may not be recast as DTPA actions" to avoid the provisions of the Act.[47] We held that a physician's promise that his patient's appearance following cosmetic surgery would be identical to a specific photograph was actionable under the DTPA.[48]

In *Gormley v. Stover,* however, we held that a dentist's statements that he could perform surgery on the plaintiff with no problems, that a skin graft would work as well as a bone graft, that after surgery the plaintiff could wear dentures with no problems, and that her pain and numbness would subside following surgery were not actionable under the DTPA.[49] All these statements, we concluded, related to whether the dentist's choice of surgical procedure and his performance of it met the applicable standard of care.[50] In *Walden v. Jeffery,* we held that a dentist's failure to provide the plaintiff dentures that fit was a negligence claim, not a DTPA claim.[51] More recently, we held in *MacGregor Medical Ass'n v. Campbell* **\*893** that a clinic's statements in its HMO literature that it provided qualified personnel and resources, the best services possible, and emergency service twenty-four hours a day were not actionable under

the DTPA when the plaintiff's complaint was that her deceased husband had been negligently treated.[52]

The representations Ratliff alleges Earle made are all related to Earle's treatment of him and the surgeries performed, as in *Gormley, Walden,* and *MacGregor,* and do not resemble the representations that were possible DTPA violations in *Sorokolit.* The gist of all of Ratliff's claims, variously phrased and labeled, is that Earle did not hold to the applicable standard of care. Such a claim sounds only in negligence. Summary judgment on these claims was therefore proper.

\* \* \* \* \*

Accordingly, the court of appeals' judgment is affirmed in part and reversed in part, and the case is remanded to the district court for further proceedings.

**Parallel Citations**

42 Tex. Sup. Ct. J. 919

Footnotes

[1]  TEX. CONST. art. I, § 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.").

[2]  961 S.W.2d 591.

[3]  TEX. BUS. & COM.CODE §§ 17.41–.63.

[4]  176 F.R.D. 158, 165–166 (E.D.Pa.1997).

[5]  TEX.REV.CIV. STAT. ANN. art. 4590i, §§ 6.05–.06 (Vernon Supp.1999).

[6]  961 S.W.2d 591.

[7]  *Id.* at 597.

[8]  *Id.*

[9]  42 TEX. SUP.CT. J. 335 (Feb. 4, 1999).

[10]  " 'Health care liability claim' means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury to or death of the patient, whether the patient's claim or cause of action sounds in tort or contract." TEX.REV.CIV. STAT. ANN. art. 4590i, § 1.03(4) (Vernon Supp.1999).

11      *Id.* § 10.01.

12      *Husain v. Khatib,* 964 S.W.2d 918, 919 (Tex.1998) (per curiam); *accord Bala v. Maxwell,* 909 S.W.2d 889, 891 (Tex.1995) (per curiam); *Kimball v. Brothers,* 741 S.W.2d 370, 372 (Tex.1987).

13      907 S.W.2d 448 (Tex.1995) (per curiam).

14      *Id.* at 449–450.

15      *See Winkle v. Tullos,* 917 S.W.2d 304, 310 (Tex.App.—Houston [14th Dist.] 1995, writ denied); *Desiga v. Scheffey,* 874 S.W.2d 244, 248–249 (Tex.App.—Houston [14th Dist.] 1994, no writ); *Shook v. Herman,* 759 S.W.2d 743, 745–746 (Tex.App.—Dallas 1988, writ denied). *Cf. Jones v. Cross,* 773 S.W.2d 41, 43 (Tex.App.—Houston [1st Dist.] 1989, writ denied) (holding that limitations began to run from the last date of treatment rather than the date of the last of two eye surgeries because plaintiff alleged negligence in the follow-up treatment).

16      833 S.W.2d 103, 105 (Tex.1992).

17      *Id.* at 108.

18      883 S.W.2d 156 (Tex.1993).

19      *Id.* at 158–159.

20      TEX.REV.CIV. STAT. ANN. art. 4590i, § 10.01 (Vernon Supp.1999).

21      661 S.W.2d 907, 909 (Tex.1983).

22      *Id.; Nichols v. Smith,* 507 S.W.2d 518, 519 (Tex.1974).

23      138 Tex. 145, 157 S.W.2d 878 (1942).

24      *Id.* at 879.

25      *See Borderlon,* 661 S.W.2d at 908 (holding that a physician has a duty to disclose a negligent act or the fact that an injury has occurred).

26      *Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996) (per curiam); *American Petrofina, Inc. v. Allen,* 887 S.W.2d 829, 830 (Tex.1994).

27      *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986).

28      TEX. CONST. art. I, § 13.

29      *See Diaz v. Westphal,* 941 S.W.2d 96, 100 (Tex.1997).

30      917 S.W.2d 790, 794 (Tex.1996).

31      *See id.*

32      *Anderson v. Snider,* 808 S.W.2d 54, 55 (Tex.1991) (per curiam).

33      *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726–727 (Tex.1998) (quoting *General Elec. Co. v. Joiner,* 522 U.S.

136, 146, 118 S.Ct. 512, 523, 139 L.Ed.2d 508 (1997); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711–712 (Tex.1997); *Schaefer v. Texas Employers' Ins. Ass'n,* 612 S.W.2d 199, 202–204 (Tex.1980)).

34   TEX REV. CIV. STAT. ANN. art. 4590i, §§ 6.01–.08 (Vernon Supp.1999).

35   *Id.* § 6.04(a).

36   *Id.* § 6.04(b), (c).

37   *Id.* § 6.04(b).

38   *Id.* § 6.05.

39   *Id.* § 6.06.

40   The Texas Medical Disclosure Panel lists "spine operation" as a procedure requiring written disclosure, and defines the procedure as including "laminectomy, decompression, fusion, internal fixation or procedures for nerve root or spinal cord compression". 25 TEX. ADMIN. CODE § 601.2(m)(3) (1998). The Panel has identified six risks which must be disclosed prior to a spine operation: "pain, numbness or clumsiness", "impaired muscle function", "incontinence or impotence", "unstable spine", "recurrence or continuation of the condition that required the operation", and "injury to major blood vessels". *Id.*

41   961 S.W.2d at 597.

42   912 S.W.2d 276, 285–286 (Tex.App.—Houston [14th Dist.] 1995, writ denied).

43   TEX.REV.CIV. STAT. ANN. art. 4590i, § 6.07(a)(1) (Vernon Supp.1999).

44   *See* Jim M. Perdue, *The Law of Texas Medical Malpractice, Chapter X: Informed Consent,* 22 HOUS. L. REV. 399, 426 n. 190 (1985) (observing "[t]here appears to be no avenue for disputing th[e] presumption" of sections 6.05 and 6.06, that written disclosure of the panel's enumerated risks is sufficient for List A procedures); Frank W. Elliott, *The Impact of the Texas Medical Liability and Insurance Improvement Act on Informed Consent Recovery in Medical Malpractice Litigation,* 10 TEX. TECH L. REV . 381, 387 (1979)("[I]t appears that evidence that could rebut the presumption of disclosure under Section 6.07(a)(1) is evidence that would attack the validity of the consent."); COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—MALPRACTICE, PREMISES & PRODUCTS PJC 51.15, cmt. (1997) ("If the physician has obtained the patient's signature on a consent form ... containing the risks enumerated on list A, the only means by which the patient may recover for failure to obtain informed consent is to prove the invalidity of the form and that the risks had not otherwise been disclosed to him."); *see also Crundwell v. Becker,* 981 S.W.2d 880 (Tex.App.—Houston [1ˢᵗ Dist.] 1998, pet. denied) (holding that the trial court's directed verdict on an informed consent claim was not error when the patient who signed the consent form offered no evidence of incapacity).

45   TEX.REV.CIV. STAT. ANN. art. 4590i, § 12.01(a) (Vernon Supp.1999).

46   889 S.W.2d 239, 242 (Tex.1994).

47   *Id.*

48   *Id.* at 242–243.

49   907 S.W.2d 448, 449–450 (Tex.1995) (per curiam).

50   *Id.* at 450.

51   907 S.W.2d 446, 447–448 (Tex.1995) (per curiam).

52      985 S.W.2d 38, 40–41 (Tex.1998) (per curiam).

---

**End of Document**                                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

189 S.W.3d 855
Court of Appeals of Texas,
Houston (1st Dist.).

Sylvia GRAY, Appellant,
v.
CHCA BAYSHORE L.P. d/b/a Bayshore Medical
Center and Ira H. Rapp, M.D., Appellees.

No. 01–04–00918–CV. | Jan. 26, 2006.

**Synopsis**
**Background:** Patient brought medical malpractice action against hospital and doctor, seeking to recover damages resulting from the injury to her knee during surgical treatment of chronic sinusitis and nasal septal deformity. The 281st District Court, Harris County, David Jorge Bernal, J., dismissed patient's suit, and patient appealed.

**[Holding:]** The Court of Appeals, Evelyn V. Keyes, J., held that expert report did not satisfy statutory requirements of medical liability statute, and thus, dismissal of patient's medical malpractice action was warranted.

Affirmed.

**Attorneys and Law Firms**

**\*856** Michael D. Farmer, Plummer & Farmer, Houston, TX, for Appellant.

Larry D. Thompson and Robert G. Smith, Lorance & Thompson, P.C., Griffin Vincent and Solace Kirkland Southwick, Andrews Kurth LLP, Houston, TX, for Appellees.

Panel consists of Justices NUCHIA, KEYES, and HANKS.

**OPINION**

EVELYN V. KEYES, Justice.

This appeal arises from a medical malpractice claim brought by appellant, Sylvia Gray, against appellees,

CHCA Bayshore L.P. d/b/a Bayshore Medical Center (Bayshore) and Ira H. Rapp, M.D. The trial court dismissed Gray's suit with prejudice after concluding that the expert report she filed failed to satisfy the requirements set forth in section 74.351 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp.2005). In her sole issue on appeal, Gray argues that the trial court erred in finding that her expert report did not comply with the statute.

We affirm.

**BACKGROUND**

In 2001, Gray was admitted to Bayshore for surgical treatment of chronic sinusitis and nasal septal deformity. For the surgery, Gray was administered a general anesthetic by Dr. Rapp. Upon regaining consciousness after the operation, Gray became aware of severe pain in her left knee. Subsequent examination by an orthopedist and a neurologist revealed a dislocation of the knee's patella. Gray, age 39, had no prior history of knee injuries.

In November 2003, Gray brought suit against Bayshore, Dr. Rapp, and Phillip A. Matorin, M.D., seeking to recover damages resulting from the injury to her knee.[1] Gray's suit alleged that the injury was caused by the flexing of her left leg during surgery and that the injury could have **\*857** been prevented had Dr. Rapp and the Bayshore's nursing staff properly monitored Gray's extremities during the operation. In March 2004, Gray filed the report of her medical expert, Dr. Richard F. Toussaint, M.D., as required by section 74.351 of the Texas Civil Practice and Remedies Code. *See id.* Both Bayshore and Dr. Rapp moved to dismiss Gray's suit, arguing that Dr. Toussaint's expert report failed to comply with the requirements of section 74.351. *See id.* The trial court then granted Gray a 30–day extension to cure any deficiencies in her expert report. *See id.* § 74.351(c).

Gray filed her amended expert report in June 2004. The report, again by Dr. Toussaint, reads in pertinent part:

> Ms. Gray was administered a general anesthetic for the sinus surgery by Ira H. Rapp, M.D. During the surgery, Ms. Gray's knees and arms had become flexed, and when she awoke from the anesthetic, she noted severe pain upon attempting to move from a bedpan. She was

noted to have a negative history of knee injury. Ms. Gray was seen by John H. Ownby, M.D., neurologist, and Ronald B. Heisey, M.D., orthopedist, who upon subsequent workup of Ms. Gray's knee pain determined that her left patella had become dislocated.

Based on the forgoing and my education, training, experience, and reasonable medical probability, it is my opinion that Dr. Ira H. Rapp, M.D., Dr. Phillip A. Matorin, M.D., and the nursing staff of Bayshore Medical Center breached the standard of care for failing to properly monitor, treat, and prevent the resultant left knee injury and dislocation of the left patella.

Based on the Texas definitions, Dr. Ira H. Rapp, M.D., Dr. Phillip A. Matorin, M.D., and the Bayshore Medical Center perioperative nursing staff were negligent by failing to properly monitor, treat, and prevent Ms. Gray's left patella dislocation. The negligence was in the following:

1. Dr. Ira H. Rapp, M.D. failed to monitor the positioning of Ms. Gray's left knee to prevent the subsequent dislocation of the patella while under a general anesthetic. The standard of care in this circumstance would be for a physician to monitor the positioning of the patient's extremities to prevent injury during surgery and post operatively.

2. The Bayshore Medical Center perioperative nursing staff failed to monitor the positioning of Ms. Gray's left knee to prevent the subsequent dislocation of the patella while in the operating room. The standard of care in this circumstance would be for the perioperative nursing staff to monitor the positioning of the patient's extremities to prevent injury during surgery and post operatively.

In the above instance, had Dr. Ira H. Rapp, M.D., Dr. Phillip A. Matorin, M.D., and the Bayshore Medical Center perioperative nursing staff monitored and detected the flexing of Ms. Gray's arms and legs during general anesthesia in a timely fashion, then in reasonable medical probability, the pain and suffering experienced by Ms. Gray from the dislocated left patella would not have occurred along with the resultant necessary treatments. The failure to monitor, detect, diagnose, and timely treat a malpositioned left knee during a general anesthetic was negligence and proximately caused the dislocated left patella and subsequent pain and suffering experienced by Ms. Gray on December 5, 2001.

This opinion is based on the available medical records that you have provided for my review. I understand that

negligence is the failure to use ordinary care, **\*858** failure to do what a physician, or operating room nurse, of ordinary prudence would have done under the same or similar circumstances. I also understand that proximate cause is a cause which in a natural and continuous sequence produces an event, and without which, such an event would not have occurred. I also understand that in order to be a proximate cause, an act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom.

Based on these definitions, and on a reasonable degree of medical probability, Dr. Ira H. Rapp, M.D., Dr. Phillip A. Matorin, M.D., and the Bayshore Medical Center perioperative nursing staff failed to meet the standard of care when they neglected to monitor and detect a malpositioned left knee resulting in a dislocated left patella on December 5, 2001. The failure to monitor and detect the malpositioned left knee resulted in a dislocated left patella, severe pain and suffering, and subsequent medical treatment.

After receiving Gray's amended expert report, Bayshore and Dr. Rapp again moved to dismiss the suit, arguing that the report still did not comply with section 74.351. After a hearing, appellees' supplemental motions to dismiss were granted, and Gray timely appealed.

## DISCUSSION

In her sole issue on appeal, Gray contends that the trial court erred in its determination that Dr. Toussaint's report did not comply with section 74.351 of the Civil Practice and Remedies Code. Specifically, she argues that Dr. Toussaint's report constituted an objective good faith effort to comply with the requirements of section 74.351, and thus contends that the trial court acted improperly in dismissing her suit. *See id.* § 74.351(*l* ) (stating that a court shall grant a challenge to an expert report "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort" at compliance).

### Standard of Review

[1] [2] [3] [4] We review all section 74.351 rulings under an abuse of discretion standard. *Am. Transitional Care Ctrs. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *See Garcia v. Martinez,* 988 S.W.2d 219,

222 (Tex.1999). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985).

### Section 74.351 of the Texas Civil Practice and Remedies Code

Pursuant to section 74.351, medical malpractice plaintiffs must provide each defendant physician and health care provider with an expert report or voluntarily nonsuit the action. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351. If a claimant timely furnishes an expert report, a defendant may file a motion challenging the report's adequacy. *See id.* at § 74.351(a). The trial court shall grant the motion only if it appears, after hearing, that the report does not represent a good faith effort to comply with the statutory definition of an expert report. *See id.* § 74.351(*l* ). The statute defines an expert report as a written report by an expert that provides, as to each defendant, a fair summary of the **\*859** expert's opinions as of the date of the report regarding: (1) applicable standards of care; (2) the manner in which the care provided failed to meet the standards; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See id.* § 74.351(r)(6); *Palacios,* 46 S.W.3d at 878–79.

[5] [6] [7] [8] Although the report need not marshal all the plaintiff's proof, it must include the expert's opinions on the three statutory elements—standard of care, breach, and causation. *See Palacios,* 46 S.W.3d at 878–79. In detailing these elements, the report must provide enough information to fulfill two purposes if it is to constitute a good faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. *Id.* at 879. Second, the report must provide a basis for the trial court to conclude that the claims have merit. *Id.* A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these two purposes. *Id.* The expert must explain the basis for his statements and must link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). Furthermore, in assessing the report's sufficiency, the trial court may not draw any inferences, and must instead rely exclusively on the information contained within the report's four corners. *See Palacios,* 46 S.W.3d at 879.

### Dr. Toussaint's Report

Dr. Toussaint's amended report essentially states that, as to both Bayshore and Dr. Rapp: (1) the applicable standard of care required monitoring the positioning of Gray's extremities; (2) appellees failed to monitor the positioning of Gray's left knee; and (3) had appellees monitored the knee's position, Gray, within reasonable medical probability, would not have suffered a dislocated patella. Although the report, at first glance, thus appears to articulate the three statutorily required elements of an expert report, we are compelled, under an abuse of discretion standard, to conclude that the trial court did not act unreasonably in granting appellees' motions to dismiss.

[9] [10] The supreme court held in *Palacios* that medical malpractice plaintiffs must provide an expert report detailing standard of care, breach, and causation as to each defendant. *Id.* Here, the report states, without explanation, that a single standard of care applied to both Bayshore and Dr. Rapp. While it is possible that an identical standard of care regarding limb monitoring during and after surgery attaches to an anesthesiologist (Dr. Rapp) and a perioperative nursing staff (Bayshore), such generic statements, without more, can reasonably be deemed conclusory. Conclusory statements regarding standard of care, breach, or causation, do not constitute a good faith effort to comply with section 74.351 in that they fail to adequately inform each defendant of the specific conduct called into question by the plaintiff's claims. *See id.*

[11] Similar weaknesses undermine Dr. Toussaint's report in regard to how appellees breached the applicable standard of care. Whether a defendant breached the standard of care due a patient cannot be determined without "specific information about what the defendant should have done differently." *See id.* at 880. Here, Dr. Toussaint's report contains only a general statement that appellees failed to monitor Gray's left knee properly. The report provides no specific information concerning what actions appellees should have taken in the event they observed Gray's knee flexing. Indeed, a literal reading of the report's most direct statements concerning breach leads to the conclusion that simply monitoring Gray's extremities, **\*860** and taking no corrective action, would have prevented her injury. In view of such general and conclusory statements concerning breach, we cannot conclude that the trial court abused its discretion in dismissing Gray's suit.[2] *See id.* at 879.

Conclusory statements also plague the report's efforts to satisfy the statutory element of causation. Specifically, Dr. Toussaint's report does not state with any specificity how appellees departure from the stated standard of care

caused Gray's knee injury. Instead, the report provides only the conclusory statement that the failure to monitor caused Gray's injury. By not fleshing out how appellees' failure to monitor Gray's extremities caused her injury, the report does not convincingly tie the alleged departure from the standard of care to specific facts of the case. Such a failure has been found to be a sufficient reason for concluding that an expert report is statutorily inadequate. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 53.

We further note that the report appears to be inconsistent with respect to the relationship among the standard of care, breach, and the cause of Gray's injury. Specific language in the report indicates that the applicable standard of care breached by the defendants was "monitor[ing] the positioning of the patient's extremities." The report then appears to depart from this limited standard of care and breach, stating, "The failure to *monitor, detect, diagnose, and timely treat* a malpositioned left knee during general anesthetic was negligence, and proximately caused the dislocated left patella." (Emphasis added.) The report thus fails to put the appellees on notice as to who had what responsibility and how that person or persons departed from the standard of ordinary medical care of a patient under anesthesia in failing to do some specific act required by a

person in that position, causing damage that would not have happened had ordinary professional care been used. Considering that the trial court is limited to the four corners of the report in making its determination, one could reasonably conclude that the conclusory language in the report, together with the inconsistency as to appellant's complaint, convinced the trial court that the report failed to satisfactorily inform each appellee of the specific conduct being challenged. *Palacios,* 46 S.W.3d at 878–79.

In view of the conclusory, and at times inconsistent, statements within Dr. Toussaint's expert report, we cannot conclude that the trial court abused its discretion in granting appellees' motion for dismissal. We thus overrule Gray's sole issue on appeal.

## CONCLUSION

We affirm the trial court's order of dismissal.

Footnotes

1    Dr. Matorin was the admitting physician. He was non-suited in July 2004.

2    We note that in *Strom v. Mem'l Hermann Hospt. Sys.,* this court upheld a trial court's decision to dismiss a remarkably similar suit due to the filing of an inadequate expert report. 110 S.W.3d 216 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). In *Strom,* the plaintiff similarly alleged that she sustained an injury to her left knee due to improper positioning of her extremities during surgery. *Id.* at 219. The expert report Strom provided contained considerably more detail than Dr. Toussaint's report, referring specifically to the need to properly pad, strap, and place a patient's extremities during surgery. *Id.* at 224.

395 S.W.3d 884
Court of Appeals of Texas,
Austin.

Richard HEBERT and Janet Hebert, Appellants
v.
Timothy E. HOPKINS, M.D., and Shannon Clinic,
Appellees.

No. 03–11–00419–CV. | March 1, 2013.

**Synopsis**
**Background:** Patient filed health care liability claim (HCLC) against neurosurgeon and clinic in connection with spinal-fracture surgery that purportedly rendered patient a quadriparetic. The District Court, Tom Green County, 391st Judicial District, Thomas J. Gossett, J., dismissed claim after concluding patient had failed to serve an expert report meeting statutory requirements. Patient appealed.

**Holdings:** The Court of Appeals, Bob Pemberton, J., held that:

[1] trial court did not abuse its discretion in concluding that patient's expert report did not adequately describe standard of care or alleged breach thereof;

[2] statutory requirements applicable to expert reports in support of HCLCs were rationally related to legitimate state purpose and therefore did not violate equal protection based on disparate treatment of health care liability claimants and other litigants;

[3] those requirements did not violate separation-of-powers principles; and

[4] patient failed to demonstrate that those requirements, as applied to him, violated open-courts provision of Texas constitution.

Affirmed.

J. Woodfin Jones, C.J., filed a dissenting opinion

**Attorneys and Law Firms**

**\*888** Dana D. Banks, Smith Rose Finley, P.C., San Angelo, TX, for appellee.

William E. Zook, Jr., David W. Townend, Ted B. Lyon & Associates, P.C., Mesquite, TX, for appellant.

Before Chief Justice JONES, Justices PEMBERTON and ROSE.

*OPINION*

BOB PEMBERTON, Justice.

Richard Hebert and his wife, Janet Hebert, appeal from a district court judgment dismissing, for failure to serve the expert report required by chapter 74 of the civil practice and remedies code, a health care liability claim they asserted against Timothy Hopkins, M.D., and Shannon Clinic.[1] The Heberts bring two issues, urging respectively that (1) the district court abused its discretion in concluding that they failed to serve an expert report complying with chapter 74; and (2) chapter 74's expert-report requirement violates various constitutional protections. We will overrule these contentions and affirm the district court's judgment.

**BACKGROUND**

The Heberts filed the underlying suit alleging that Dr. Hopkins, a neurosurgeon, committed professional negligence in performing spinal surgery on Richard Hebert at Shannon in September 2008 after Richard broke his neck in a fall. Specifically, they pled that Richard had presented with a fracture of the cervical 6(C6) vertebra that was "very unstable" due to a preexisting condition known as ankylosing spondylitis that had self-fused his spinal vertebrae on either side of the fracture; that the standard of care in such circumstances had required Hopkins to perform "an anterior and posterior fusion surgery" to ensure stability; that Hopkins had performed "an anterior fusion with plates and screws at C4–C7 but took no appropriate surgical measures to stabilize the fusion posteriorly;" and that the anterior-only fusion had subsequently "failed as one or more of the screws had pulled out causing the vertebral segments to move and compress the spinal cord at C4–C7," rendering Richard a quadriparetic (i.e., paralyzed in all four limbs). The Heberts asserted that Shannon was vicariously liable for Hopkins's negligence by virtue of Hopkins's status as a "partner or member" of the clinic.

Within 120 days thereafter, in an attempt to comply with chapter 74's expert-report requirement, the Heberts served a report from P. Merrill White, M.D., along with Dr. White's curriculum vitae.[2] Hopkins **\*889** and Shannon timely objected to the sufficiency of Dr. White's report, asserting that the report had failed to adequately set forth, and was "conclusory" with respect to the underlying factual bases of, opinions regarding the applicable standard of care for Hebert in light of his underlying medical conditions, the manner in which Hopkins's care had failed to meet that standard, or a causal linkage to the fusion failure and Richard's injuries.[3] By now, the 120–day period for serving an "expert report" had expired, so appellees also moved to dismiss the Heberts' suit with prejudice and sought a mandatory award of attorney's fees.[4] Both sides submitted briefing on the merits of appellees' objections. Following a hearing at which the parties presented argument, the district court sustained appellees' objections but granted the Heberts a thirty-day extension to cure any deficiencies.[5]

Within the extension period, the Heberts served a supplemental report from White. Contending that White's supplemental report had failed to cure the deficiencies in his original report, appellees again moved to dismiss the Heberts' suit with prejudice.[6] The Heberts filed a response joining issue regarding the sufficiency of the two reports and also asserting that chapter 74's expert-report requirement violates various protections of the U.S. or Texas constitutions. Following a hearing, the district court granted appellees' motion to dismiss. Subsequently, after hearing evidence, the district court awarded appellees attorney's fees as required by chapter 74,[7] and this order also served to make the court's prior dismissal order final. The Heberts then timely perfected this appeal.

## ANALYSIS

### Sufficiency of expert reports

In their first issue, the Heberts urge that the district court abused its discretion in holding that Dr. White's report, either in its original form or as supplemented, did not represent an objective good faith effort to comply with the statutory definition of an expert report.

[1] [2] The standards governing the contents of the expert report or reports required by chapter 74 are well established. Chapter 74 defines an "expert report" as "a fair summary of the expert's opinion as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care

provider failed to **\*890** meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed."[8] "A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply" with this definition of "expert report."[9] To constitute a "good faith effort," as the Texas Supreme Court has explained, the report must include the expert's opinion on "each of the three main elements: standard of care, breach, and causation," and must provide enough information to fulfill two purposes with respect to each element: (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. *See Jelinek v. Casas,* 328 S.W.3d 526, 538–40 & n. 9 (Tex.2010); *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (per curiam); *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878–79 (Tex.2001). Although these requirements do not require a plaintiff to marshal all of his or her proof or to present expert testimony in a form that would be admissible at trial, *see Jelinek,* 328 S.W.3d at 539–40 & n. 9, they do necessitate that "the expert must explain the basis for his statements to link his conclusions to the facts" and not merely state conclusions. *Id.* (quoting *Wright,* 79 S.W.3d at 52 (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999))); *see also id.* at 539–40 (observing, with respect to the causation element, "the expert must ... explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented"). This is so, in the supreme court's view, because " '[a] report that merely states the expert's conclusions about the standard or care, breach, and causation' does not fulfill the two purposes of a good-faith effort." *Id.* at 539 (quoting *Palacios,* 46 S.W.3d at 879); *see also id.* at 540 (expert "must include sufficient detail" regarding how breach caused plaintiff's injuries "to allow the trial court to determine if the claim has merit").

[3] Importantly, the only information relevant to determining whether an expert report complies with these requirements is that contained within "the four corners" of the report itself. *Palacios,* 46 S.W.3d at 878. Consequently, neither the trial court nor this Court may infer additional opinions or underlying facts to fill in gaps that the report itself leaves open. *See Wright,* 79 S.W.3d at 53; *see also Austin Heart, P.A. v. Webb,* 228 S.W.3d 276, 279 (Tex.App.-Austin 2007, no pet.) (this requirement "precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended" (citing *Wright,* 79 S.W.3d at 53)).

[4] Our standard of review is likewise limited. Chapter 74 imposes a mandatory duty on a trial court to grant a motion challenging the adequacy of an expert report "if it appears to the court" that the report does not meet the above-described requirements. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(*l* ) ("A court *shall* grant a motion challenging the adequacy of an expert report only if it appears to the court ... that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).") (emphasis added). **\*891** Conversely, the trial court is prohibited from granting such a motion unless such noncompliance "appears to the court." *Id.* ("A court shall grant a motion challenging the adequacy of an expert report *only* if it appears to the court ....") (emphasis added). But the linchpin determination that controls which of these two alternative sets of mandatory duties applies—whether "it appears to the court" that the report does not comply with the requirements—has been committed to the trial court's sound discretion by the Legislature. *See Palacios,* 46 S.W.3d at 877–78. Consequently, we review the trial court's determination for abuse of that discretion. *See Wright,* 79 S.W.3d at 52 (citing *Palacios,* 46 S.W.3d at 878).

A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *See id.* (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985)). "When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for the trial court's judgment." *Id.* (citing *Flores v. Fourth Court of Appeals,* 777 S.W.2d 38, 41 (Tex.1989)). We do not, in other words, examine the contents of Dr. White's reports and make our own de novo determination as to whether he has provided sufficient information, with respect to his opinions regarding standard of care, breach, and causation, to (1) inform appellees of the specific conduct the Heberts have called into question; and (2) provide a basis for the district court to conclude that the claims have merit. *See Jelinek,* 328 S.W.3d at 538–40 & n. 9; *Wright,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878–79. Instead, we determine only whether the district court acted arbitrarily, unreasonably, and without reference to guiding rules and principles in determining that the reports failed to provide that information. *See Wright,* 79 S.W.3d at 52; *see also Jelinek,* 328 S.W.3d at 542 (Jefferson, C.J., dissenting) ("The dividing line between a sufficient and an inadequate report is impossible to draw precisely. We have said, therefore, that the determination must be made in the first instance by the trial court, and review of that decision asks not how an appellate court would have resolved that issue, but instead whether the trial court abused its discretion.") (citing *Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); *Walker v. Gutierrez,* 111 S.W.3d 56, 63 (Tex.2003)).

[5] Applying this deferential abuse-of-discretion standard of review, we cannot conclude that the district court acted arbitrarily, unreasonably, and without guiding rules and principles in determining that Dr. White's reports did not supply it sufficient information regarding his opinions concerning standard of care and breach, as they relate to the underlying facts, to enable it to determine whether the Heberts' claims had merit.

In his initial report, White summarized medical records reflecting that Richard Hebert sought treatment at Shannon in the early morning hours of September 7, 2008, following a fall in which he injured his neck, and that Richard was placed under Hopkins's care. According to White, CT scans and other evaluations revealed that Richard had suffered "a trace traumatic subarachnoid hemorrhage" (i.e., bleeding on the brain) and a "fracture through the superior vertebral body of C6 with a fracture extending through the posterior elements of C5–6." The injury "was initially managed in a cervical collar which was changed to a Philadelphia collar and spinal precautions were ordered" within about five hours. That same evening, White indicated, Hopkins performed a surgical procedure in which the neurosurgeon **\*892** fused Richard's C5–C6 vertebrae and implanted "C4 through C7 anterior instrumentation"—a plate over or along the front of Richard's spine, attached by screws to his bone—to provide stability and support while the fracture healed. On the following day, White continued, the medical records indicated that Richard had showed signs of recovery progress and that "[c]ervical collar is discontinued per Dr. Hopkins'[s] order." But four days later, during the afternoon of September 12, Richard had a decline in neurological function and subsequent CT scans "confirm[ed] failure of implant fixation at C6 and C7" and injury to the spinal cord. Although another neurosurgeon, Dr. Duarte, operated on Richard thereafter to remove the failed anterior instrumentation and implement a different type of fixation method, Richard ended up with "increased neurological deficit (quadriparesis)."

The medical records, as summarized by White, additionally reflected that Richard had a history of "coronary artery disease treated with cardiac stints, Plavix, and aspirin; cerebrovascular accident [ (i.e., a stroke) ] on two occasions with residual left hand paraesthesias [ (tingling or prickling sensations) ] treated with Plavix and aspirin; and hypertension," as well as "ankylosing spondylitis," a degenerative condition of the spine that causes both brittleness of bones and self-fusion of vertebrae.

Although he did not indicate whether or how Richard's other medical conditions impacted the standard of care, White emphasized his opinion that a patient with ankylosing spondylitis warranted special precautions when performing surgery to address spinal fracture:

In the surgical treatment of cervical spine fractures complicating ankylosing spondylitis, the prudent spine surgeon must recognize the unstable nature of these fractures. The instability is contributed to by the long level arms cranial and caudal to the fracture site resulting from the multilevel autofusion and poor bone quality associated with ankylosing spondylitis. These two factors result in increased susceptibility to spine fractures as a result of relatively minor trauma, greater instability, and a greater likelihood of neurologic deficit resulting from a cervical fracture than found in patients with cervical spine fractures and otherwise normal spinal anatomy.

The prudent spine surgeon should design a surgical plan of care allowing decompression of the spinal cord, reduction of the traumatic deformity, and immediate stabilization of the spinal column to protect the spinal cord and to facilitate mobilization and nursing care to the patient in the short term and healing of the spinal fusion in the longer term.

As for the standard of care regarding the specific means by which these objectives should be achieved, White initially suggested that anterior-only internal instrumentation was inconsistent with the standard of care and that some form of posterior internal instrumentation, either additionally or as an alternative to anterior instrumentation, would instead be preferable:

Over the recent years, the debate of the spinal community has been in which circumstances fusion with posterior only fixation or fusion with anterior and posterior fixation is appropriate. Anterior instrumentation only is predictably inadequate in a fracture pattern with gross anterior and posterior column instability such as Mr. Hebert's. Adequate treatment of Mr. Herbert's [sic] fracture requires anterior and posterior instrumentation in order to meet the standard of care.

In Mr. Herbert's [sic] situation, the standard of care requires fixation stable **\*893** enough to allow mobilization of the patient without loss of fixation resulting in increased neurological deficits. This goal is more likely to be achieved by multilevel posterior internal fixation in addition to at least single level anterior internal fixation with fusion at appropriate levels.

However, in the next sentence, within the same paragraph, White acknowledged that "clinical situations" could arise in which anterior-only instrumentation, coupled with "supplemental protection" other than posterior implementation, would be consistent with the standard of care:

If the clinical situation in which the surgeon finds himself and the patient allows only inadequate internal fixation, the surgeon is obligated to protect the patient supplementing the internal fixation with external bracing and/or activity limitations. The supplemental protection should continue until the patient can be returned to the operating room for additional internal fixation or the fracture becomes stable through healing.

Following these statements regarding standard of care, White turned to whether or how Hopkins breached an applicable standard. Consistent with the first portion of his explanation of the standard of care, White began by asserting that Hopkins breached the standard by utilizing "anterior only plate/screw fixation":

Dr. Timothy Hopkins'[s] choice of anterior only plate/screw fixation fails to meet the applicable standard of care. Constrained anterior cervical plates function as tension band devices and require relative stability of the posterior elements. In extension these devices resist distraction of the anterior column. These devices do not effectively resist flexion forces and require stable posterior elements to limit deformity resulting from flexion forces. In the absence of adequate posterior stability, anterior plate/screw constructs typically fail in flexion by plate breakage or, as in this case, by screw pullout. Mr. Herbert's [sic] fracture resulted in significant instability of both the anterior and posterior elements at the C5–6 level. Anterior only plate/screw fixation, in this setting, is predictably doomed to failure.

But in the next sentence, White seemed to allude to his previously expressed view that a surgeon could act within the standard of care by "supplementing" otherwise "inadequate internal fixation" with some form of "external bracing and/or activity limitations" as an alternative to posterior surgical fixation:

> The prudent spine surgeon must recognize the limitations of the various internal fixation constructs available and if necessary must compensate for the predictable weaknesses by adequate external bracing and/or activity limitation.

Then White ended his discussion of breach with the following conclusion:

> The standard of care for the surgical treatment of this fracture requires a multilevel posterior fixation and a fusion in conjunction with anterior fixation and fusion with or without supplemental external fixation as was ultimately performed by Dr. Duarte on September 12, 2008.

White then offered the following opinions as to causation, now referencing perceived inadequacies in internal *and* external fixation without elaborating as to the nature or identity of any of the latter category:

> The failure to choose the internal and external fixation construct capable of providing stability to allow mobilization of the patient, prevent spinal displacement, and protect the spinal cord is the proximate cause of Mr. Herbert's [sic] **\*894** increased neurologic deficit (quadriparesis). This occurred as a result of the constrained anterior plate/screw construct's predictable inability to neutralize flexion forces resulting in screw pullout at C6 and C7 levels followed by displacement of the spinal column through the C5–6 fracture/allograft site with subsequent spinal cord injury and deterioration of neurologic function.

Among their objections to the sufficiency of White's initial report, appellees urged that the report did not represent an objective good faith attempt to comply with chapter 74's requirements—i.e., that it discussed the standard of care, breach, and causation with sufficient specificity to (1) inform them of the conduct called into question and (2) provide a basis for the district court to determine that the claims have merit—because it was internally inconsistent as to the standard of care that applied and did not address whether or not Hopkins complied with the standard of care through the use of the "external bracing and/or activity limitation" White had contemplated. And these asserted deficiencies, appellees further suggested, in turn undermined any factual bases underlying White's assertions that the standard of care either required Hopkins's use of anterior-only internal fixation or was breached by his choice not to use posterior interior fixation.

In arguing that the district court abused its discretion in sustaining appellees' objections, the Heberts emphasize the portions of White's initial report focusing on the relative merits of anterior versus posterior internal fixation. But the district court was within its discretion also to consider White's recognition of an apparent exception, qualification, or limitation to his broader criticisms of anterior fixation: "the clinical situation in which the surgeon finds himself and the patient" may "allow[ ] only inadequate internal fixation," in which case the standard of care could be met by "supplementing the internal fixation with external bracing and/or activity limitations." Along with White's recognition of this aspect of the standard of care, the court also could have reasonably considered that White never elaborated on the nature or type of "clinical situation" that would "allow [ ] only inadequate internal fixation" or whether such a situation did or did not exist in regard to Richard, a patient who, as White acknowledged in his report, had a history of coronary artery disease, two strokes, and hypertension, not to mention bleeding on the brain from his fall. The court likewise could reasonably have viewed White's references to "external bracing" or "activity limitations" as an alternative to further internal fixation as begging the question as to whether the unspecified "spinal precautions" Hopkins had ordered, the cervical collar Richard wore following surgery, or other "external bracing" or "activity limitations" Hopkins imposed had or had not satisfied the standard of care.

In short, we cannot conclude that the district court acted arbitrarily, unreasonably, or without regard to guiding principles in determining that White's initial report fell short of describing the applicable standard or care or breach thereof, as applicable to the underlying facts, with sufficient specificity to provide the court a basis to

determine that White's claims have merit. *See Jelinek,* 328 S.W.3d at 538–40 & n. 9; *Wright,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878–79. And in the face of such deficiencies regarding standard of care and breach, the district court would have acted within its discretion in determining that any assertions by White to the effect that anterior-only internal fixation breaches the standard of care or that only posterior internal fixation can suffice lack an underlying factual basis— **\*895** i.e., are "conclusory"—and fail to satisfy chapter 74. *See Wright,* 79 S.W.3d at 52 ("the expert must explain the basis of his statements to link his conclusions to the facts" (quoting *Earle,* 998 S.W.2d at 890)).

The Heberts urge us to indulge a "fair reading" that White's opinions regarding unspecified "clinical situations" refers to a surgeon who is attempting to perform a combined anterior and posterior procedure but gets interrupted by "surgical complications such as delays or blood loss," and that no such complications arose here. The dissent similarly relies on inferences or implications that such "extraordinary circumstances" were not present. But the problem with these arguments is that White never actually says any of this in his initial report, and the established rule is that the report must stand or fall on the contents within its "four corners." *Palacios,* 46 S.W.3d at 878. This requirement, again, "precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." *Austin Heart, P.A.,* 228 S.W.3d at 279 (citing *Wright,* 79 S.W.3d at 53).

Nor did the district court abuse its discretion in holding that such deficiencies were not cured by White's supplemental report. In his supplement, although White reiterates and emphasizes at length his conclusions and assertions regarding anterior versus posterior fixation generally, nowhere does he address the deficiencies concerning the standard of care and breach that the district court could have perceived in his initial report.

We overrule the Heberts' first issue.

### Constitutional claims

[6] [7] In their second issue, the Heberts bring forward constitutional challenges to chapter 74's expert-report requirement. While not appearing to quarrel with the general concept that the Legislature can validly impose some form of threshold report requirement for asserting health care liability claims or other types of civil claims, the Heberts complain about three basic features of chapter 74's expert-report requirement: (1) the fixed deadline of 120 days to serve an expert report, subject to a single 30–

day extension; (2) the requirements focusing judicial analysis of a report's sufficiency solely on the "four corners" of the report and prohibiting courts from considering extrinsic evidence of a claim's merits; and (3) the mandatory requirement that courts dismiss health care liability claims with prejudice for failing to serve an adequate expert report and also award attorney's fees. The Heberts contend that these mechanisms unfairly "single out" health care liability claimants for unconstitutional "disparate treatment," deprive courts of judicial discretion in violation of the separation-of-powers protections of the Texas Constitution, and deprive claimants of access to the courts in violation of due-process or open-courts protections.[10]

**\*896** When reviewing the constitutionality of a statute, we begin with a presumption that it is constitutional. *Herrera v. Seton Nw. Hosp.,* 212 S.W.3d 452, 460–61 (Tex.App.-Austin 2006, no pet.) (citing *Walker,* 111 S.W.3d at 66); *see also* Tex. Gov't Code Ann. § 311.021(1) (West 2005). The wisdom or expediency of the law is the Legislature's prerogative, not ours. *Smith v. Davis,* 426 S.W.2d 827, 831 (Tex.1968). We presume that the Legislature has not acted unreasonably or arbitrarily. *Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983) (quoting *Davis,* 426 S.W.2d at 831). The party challenging a statute's constitutionality has the burden of proving that the statute fails to meet constitutional requirements. *Walker,* 111 S.W.3d at 66. A party must show that a statute is unconstitutional either on its face or as applied to that party. *Texas Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 518 n. 16 (Tex.1995); *see also City of Corpus Christi v. Public Util. Comm'n,* 51 S.W.3d 231, 240–41 (Tex.2001) (per curiam) (Owen, J., concurring). To sustain a facial challenge, the party must show that the statute, by its terms, always operates unconstitutionally. *Garcia,* 893 S.W.2d at 528 n. 16. To sustain an as-applied challenge, the party must show that the statute is unconstitutional when applied to that particular person or set of facts. *Id.*

We note at the outset that the Heberts face an uphill battle because every court that has considered similar challenges to chapter 74's expert-report requirement, including this Court, has rejected them. *See, e.g., Stockton v. Offenbach,* 336 S.W.3d 610, 618 (Tex.2011) (denying open-courts challenge); *Hightower v. Baylor Univ. Med. Ctr.,* 348 S.W.3d 512, 521–22 (Tex.App.-Dallas 2011, pet. denied) (rejecting special-law, vagueness, due-course-of-law, and separation-of-powers challenges); *Broxterman v. Carson,* 309 S.W.3d 154, 159 (Tex.App.-Dallas 2010, pet. denied) (rejecting due-process challenge); *Gulf Coast Med. Ctr., LLC v. Temple,* No. 13–09–00350–CV, 2010 WL 196972, at \*6 (Tex.App.-Corpus Christi Jan.21, 2010, no pet.) (mem. op.) (rejecting due-process and due-course-of-law

challenges); *Bogar v. Esparza,* 257 S.W.3d 354, 372–73 (Tex.App.-Austin 2008, no pet.) (same); *Wilson–Everett v. Christus St. Joseph,* 242 S.W.3d 799, 802–04 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (rejecting separation-of-powers challenge); *Ledesma v. Shashoua,* No. 03–05–00454–CV, 2007 WL 2214650, at *9 (Tex.App.-Austin Aug. 3, 2007, pet. denied) (mem. op.) (rejecting due-process and open-courts challenges); *Thoyakulathu v. Brennan,* 192 S.W.3d 849, 855–56 (Tex.App.-Texarkana 2006, no pet.) (due process does not require "exceptions [to the expert-report requirement] that would encompass any conceivable complication in order to pass constitutional muster"); *Herrera,* 212 S.W.3d at 461–62 (rejecting equal-protection, due-process, due-course-of-law, and open-courts challenges). Texas courts also uniformly rejected constitutional challenges to an expert-report requirement under chapter 74's predecessor statute, article 4590i. *See, e.g., Strom v. Memorial Hermann Hosp. Sys.,* 110 S.W.3d 216, 227 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (rejecting due-process, equal-protection, and jury-trial challenges); *Villa v. Hargrove,* 110 S.W.3d 74, 81 (Tex.App.-San Antonio 2003, pet. denied) (rejecting due-process and equal-protection challenges); *Walker,* 111 S.W.3d at 66 (rejecting due-process challenge); **\*897** *Perry v. Stanley,* 83 S.W.3d 819, 825 (Tex.App.-Texarkana 2002, no pet.) (rejecting open-courts challenge); *Mocega v. Urquhart,* 79 S.W.3d 61, 64 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) (same); *Gill v. Russo,* 39 S.W.3d 717, 718–19 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) (same); *Knie v. Piskun,* 23 S.W.3d 455, 467 (Tex.App.-Amarillo 2000, pet. denied) (rejecting equal-protection, due-process, open-courts and free-speech challenges); *Schorp v. Baptist Mem'l Health Sys.,* 5 S.W.3d 727, 736–38 (Tex.App.-San Antonio 1999, no pet.) (rejecting due-process, open-courts, and jury-trial challenges).[11]

The Heberts acknowledge the constitutional validity of the expert-requirement in chapter 74's predecessor statute, article 4590i, but attempt to distinguish it as "less draconian." *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, sec. 13.01, 1995 Tex. Gen. Laws 985, 985–88, *repealed and recodified as amended* by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, sec. 74.351, 2003 Tex. Gen. Laws 847, 875–77 (amended 2005) (current version at Tex. Civ. Prac. & Rem.Code Ann. § 74.351). They emphasize differences in the deadlines article 4590i imposed for serving expert reports and the extent of discretion vested in trial courts to extend deadlines. Specifically, article 4590i allowed claimants to either serve an expert report within 90 days of filing suit or file a cost bond. *See* former art. 4590i, § 13.01(a). An expert report was required within 180 days of suit, though the court could grant a 30–day extension if the failure to serve was not intentional or the result of conscious indifference,

but was the result of an accident or mistake. *Id.* § 13.01(d), (g).

The Heberts also assert that "4590i did not mandate what had to be included in the contents of the report," and that "there was no requirements or authorization for the court to summarily dismiss the case based on the deficiencies in the language of the report." They also contend that parties opposing an article 4590i expert report had to "satisfy summary judgment procedures to secure a dismissal with prejudice." To the contrary, a court considering the sufficiency of an expert report under article 4590i, as under chapter 74, was limited to the "four corners" of the report. *See Palacios,* 46 S.W.3d at 878. Likewise, if a claimant failed to serve a report, or served a report that the trial court concluded did not represent a good faith effort to comply with the statutory definition of expert report, the trial court was required to dismiss the case with prejudice and award costs and attorney's fees to the opposing party. *See* former art. 4590i, § 13.01(e), (*l* ), (r)(6); *see also Palacios,* 46 S.W.3d at 877.

### *"Disparate treatment "*

[8] The Heberts contend that chapter 74 irrationally singles them out for disparate treatment in violation of their rights to due process and equal protection. The due-course-of-law guarantee of the Texas Constitution provides: "No citizen of this State shall be deprived of liberty, property, privileges or immunities, or in any manner disenfranchised, except by due course of the law of the land." Tex. Const. art. I, § 19. Similarly, the federal due-**\*898** process clause provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law;...." U.S. Const. amend. XIV, § 1. While the Texas Constitution is textually different in that it refers to "due course" rather than "due process," Texas courts regard these terms as without substantive distinction unless and until a party demonstrates otherwise, and the Heberts suggest no reason to construe them differently here. *See University of Tex. Med. Sch. at Houston v. Than,* 901 S.W.2d 926, 929 (Tex.1995) (citing *Mellinger v. City of Houston,* 68 Tex. 37, 3 S.W. 249, 252–53 (1887)).

[9] [10] [11] [12] [13] Under federal and state guarantees of due process, legislation that does not affect a fundamental right or interest is valid if it bears a rational relationship to a legitimate state interest. *Rylander v. B & A Mktg. Co. ex rel. Atl. Richfield Co.,* 997 S.W.2d 326, 333–34 (Tex.App.-Austin 1999, no pet.) (citing *Williamson v. Lee Optical,* 348 U.S. 483, 491, 75 S.Ct. 461, 99 L.Ed. 563

(1955); *Garcia,* 893 S.W.2d at 525). Similarly, the constitutional guarantee of equal protection requires only that disparate treatment of different classifications be rationally related to a legitimate state purpose, unless the classification impinges on the exercise of a fundamental right or distinguishes between people on a "suspect" basis, such as race or national origin.[12] The Heberts have not demonstrated that chapter 74 impinges on a fundamental or important right or a suspect class. By its terms, chapter 74 is facially neutral and applies to any party asserting a health care liability claim. Consequently, in addressing the Heberts' due-process and equal-protection claims, we must determine whether chapter 74 bears a rational relationship to a legitimate state interest and whether the Legislature had a rational basis in differentiating between health care liability claimants and other litigants. "In so doing, we must uphold the law if we can conceive of any rational basis for the Legislature's action." *Owens Corning v. Carter,* 997 S.W.2d 560, 581 (Tex.1999).

In enacting chapter 74, the Legislature made a number of findings about the state of the health care system in Texas. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11, 2003 Tex. Gen. Laws 847, 884–85. Specifically, it found the frequency of claims and the amounts paid out by insurers in judgments and settlements had risen inordinately since 1995, which created a public problem in the availability and affordability of adequate medical professional liability insurance. *Id.* § 10.11(a)(1), (3), (4). This "crisis" increased costs to physicians, hospitals, patients, and the public. *Id.* § 10.11(a)(5), (7). As a result, the Legislature concluded the "adoption of certain modifications in the medical, insurance and legal systems" would "have a positive effect on the rates charged by insurers for medical professional liability insurance." *Id.* § 10.11(a)(12). In enacting various measures, including chapter 74, the Legislature intended to reduce the frequency and severity of health care liability claims, decrease costs of claims, and ensure **\*899** that awards were rationally related to costs, but "do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis." *Id.* § 10.11(b)(1), (2), (3).

In *Smalling v. Gardner,* the Fourteenth Court of Appeals recognized that the "legislature has broad authority to create classifications for legislative purposes, so long as they have a reasonable basis and operate equally on all persons within the class." 203 S.W.3d 354, 371 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (addressing special-law challenge to constitutionality of article 4590i).[13] The expert report is required only for claims against healthcare providers for departures from accepted standards of medical or health care or safety. *Id.*

Accordingly, the expert-report requirement applies equally to all physicians and health care providers and rationally relates to the interests of the State "in ensuring that medical practitioners were not 'being placed in the situation of defending frivolous claims at a high cost' to the health care system." *Id.* (quoting *Schorp,* 5 S.W.3d at 737). Recently, the Dallas Court of Appeals adopted the *Smalling* analysis and applied it to chapter 74. *See Hightower,* 348 S.W.3d at 521.

While *Smalling* and *Hightower* dealt with special-law challenges, we previously rejected an equal-protection challenge to chapter 74's predecessor for similar reasons. *Fields v. Metroplex Hosp. Found.,* No. 03–04–00516–CV, 2006 WL 2089171, at \*4 (Tex.App.-Austin July 28, 2006, no pet.) (mem. op.) ("[T]he legislature determined that medical liability plaintiffs should be treated differently because of the negative effects of the numbers and cost of their lawsuits had on the provision of health care."). In that case, the claimant failed to show article 4590i's expert-report requirement was not rationally or substantially related to the government's interest in reducing the aggregate costs of defending against frivolous costs and reducing the costs of insurance and medical care to all. *Id.; see also Bogar,* 257 S.W.3d at 373 (in addressing due-process challenge to chapter 74: "We disagree that it is irrational, in light of the legislature's goal of curtailing frivolous health care liability claims, for it to require that appellees serve an expert report explaining why or how this outcome was actually caused by the conduct of [the defendant], as opposed to some other person or health care provider.").

The Heberts challenge the Legislature's rationale as "pre-textual, not supported by empirical data and refuted by surveys showing there aren't excessive frivolous medical malpractice suits." They reason that because the Legislature had previously acted to curb frivolous medical malpractice claims by enacting article 4590i, its subsequent enactment of chapter 74 reflects intent to "single out medical malpractice claimants for special and harsh treatment by making it so onerous to file and prosecute [a claim] that they or their counsel will not take the case, or once it is filed, to make it so difficult to prosecute the case that they or their counsel will just give up." The Heberts likewise complain that chapter 74 strips them "of all the rights accorded to other litigants in the Texas Rules of Civil Procedure," but does not place similar restrictions on "major corporations like insurance companies and banks suing for breach of contract, or on individual or corporate clients suing attorneys, **\*900** accountants, bankers and brokers." According to the Heberts, no compelling state interest or rational basis supports this "arbitrary" classification.

**[14] [15]** We find no merit in the Heberts' argument that the Legislature, evaluating the impact of 4590i, could not have rationally concluded that a problem had nonetheless persisted in the cost and availability of health care due to the prevalence of medical-malpractice suits. To the extent the Heberts challenge the underlying policies of chapter 74, it is not our place to question the Legislature's policy decisions when conducting a rational basis review. *See Bell v. Low Income Women of Tex.,* 95 S.W.3d 253, 264 (Tex.2002) ("The restriction clearly serves [the act's] purposes, and it is not for us to second-guess the Legislature's policy choices."). The Heberts fail to demonstrate that the Legislature lacked any rational basis in differentiating between health care liability claimants and other litigants. Accordingly, we reject the Heberts' "disparate treatment" constitutional challenges.

### Separation of powers

**[16] [17]** For similar reasons, the Heberts' other constitutional challenges fail. They claim the Legislature has impermissibly interfered with the judicial branch through chapter 74. The Texas Constitution vests the judicial power of the State in the courts. Tex. Const. art. V, § 1. The separation-of-powers requirement prohibits one branch of government from exercising a power inherently belonging to another branch. *Id.* art. II, § 1; *Wilson–Everett,* 242 S.W.3d at 802 (citing *General Servs. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 600 (Tex.2001)). Only when the executive or legislative branch interferes with the functioning of the judicial process in a field constitutionally committed to the control of the courts does a constitutional problem arise. *Wilson–Everett,* 242 S.W.3d at 802.

Chapter 74's expert report imposes a threshold procedural requirement aimed at filtering out meritless or premature lawsuits from proceeding until a claimant makes a good-faith effort to demonstrate that at least one expert believes that a breach of the applicable standard of care caused the claimed injury. *Id.* at 802–04 (rejecting argument that chapter 74 "interefere[d] with the judiciary's constitutional power to decide when and how to render judgments" (citing *Murphy v. Russell,* 167 S.W.3d 835, 838 (Tex.2005) (per curiam); *Walker,* 111 S.W.3d at 66). Though the Heberts contend chapter 74 "prohibits the courts from using the rules of procedure and directs the courts in every respect," in actuality, the courts retain the judicial power to determine whether a timely served report is adequate in this regard and to render a decision accordingly. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(*l* ), (r)(6); *see also Carrick v. Summers,* 294 S.W.3d 886, 891 (Tex.App.-Beaumont 2009, no pet.) ("[I]mposing a strict, non-discretionary time limit on

serving the expert report does not restrict the trial court's power to hear evidence, determine the facts of a case and the rights of the parties, apply the law to the facts and to enter a judgment appropriate to the case, any more than a statute of limitations does."). The same is true of chapter 74's requirement that courts award attorney's fees upon dismissal. *Hightower,* 348 S.W.3d at 522 (rejecting separation-of-powers challenge based on attorneys' fees provision because "court still retains its constitutional authority to determine the reasonable fees based on the law and the evidence presented by the parties"). The Heberts offer no persuasive authority to the contrary. Accordingly, we reject the **\*901** Heberts' separation-of-powers constitutional challenge.

### Right of access

**[18] [19] [20] [21]** Finally, the Heberts argue chapter 74 violates their right of access to the courts and due course of law. The open-courts provision of the Texas Constitution guarantees litigants the right to redress their grievances. Tex. Const. art. I, § 13; *LeCroy v. Hanlon,* 713 S.W.2d 335, 341 (Tex.1986). It protects a person from having his or her right to sue cut off by a legislative act before the individual has been afforded a reasonable opportunity to discover the wrong and bring suit. *Shah v. Moss,* 67 S.W.3d 836, 842 (Tex.2001). It is premised on the rationale that the Legislature has no power to make a remedy by due course of law contingent upon an impossible condition. *Hightower,* 348 S.W.3d at 522 (citing *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 355 (Tex.1990)); *see also Stockton,* 336 S.W.3d at 618 (rejecting open-courts challenge based on chapter 74's 120–day deadline). To prove that the statute violates the open-courts provision, the Heberts must show that: (1) a cognizable common law cause of action is being restricted, and (2) the restriction is unreasonable or arbitrary when balanced with the statute's purpose and basis. *Sax,* 648 S.W.2d at 666.

**[22]** A claimant bringing an as-applied open-courts challenge to chapter 74 must show that the expert-report requirements actually prevented him from bringing his claims. *Herrera,* 212 S.W.3d at 461; *McGlothlin v. Cullington,* 989 S.W.2d 449, 453 (Tex.App.-Austin 1999, pet. denied). The Heberts failed to prove how the provisions of chapter 74, as opposed to their own failure to provide an adequate report, prevented them from pursuing their claims. *See Ledesma,* 2007 WL 2214650, at \*9 (rejecting open-courts challenge when plaintiff failed to serve sufficient reports); *see also Stockton,* 336 S.W.3d at 618–19 (rejecting as-applied open-courts challenge when plaintiff failed to exercise due diligence in serving expert report on defendant physician).

[23] [24] As discussed above, the Heberts have also failed to show chapter 74 is unreasonable or arbitrary when balanced with the statute's purpose and basis. Health care liability claims require expert testimony at trial. *See Smalling,* 203 S.W.3d at 371. The expert-report requirement " 'does not violate the open-courts provision by requiring an expert report sooner rather than later in the litigation.' " *Id.* (addressing article 4590i (quoting *Mocega,* 79 S.W.3d at 64)); *see also Gill,* 39 S.W.3d at 718–19 (article 4590i expert-report requirement did not violate open-courts provision because plaintiff raising medical negligence claim required to prove claim by competent expert testimony to avoid summary judgment and/or prevail at trial); *Bankhead v. Spence,* 314 S.W.3d 464, 466 (Tex.App.-Waco 2010, pet. denied) ("This Court and others have determined that the expert-report requirement itself does not violate the open-courts guarantee because it 'is rationally related to the purpose of the statute to discourage frivolous malpractice suits.' " (quoting *Powell v. Clements,* 220 S.W.3d 138, 140 (Tex.App.-Waco 2007, pet. denied))); *Fields,* 2006 WL 2089171, at *4 (holding report requirement not so onerous that it "effectively deprived the litigant of access to the court").[14]

**\*902** [25] [26] The Heberts have failed to demonstrate a constitutional defect in chapter 74's expert-report requirement.[15] Accordingly, we overrule their second issue.[16]

## CONCLUSION

Having overruled the Heberts' issues on appeal, we affirm the district court's judgment.

**\*903** Jones, C.J., dissent.

J. WOODFIN JONES, Chief Justice, dissenting.

Because I believe the expert report in this case represents a good-faith effort to comply with the statutory definition of an expert report, I respectfully dissent.

The three significant Texas Supreme Court opinions that address the issue of determining the adequacy of an expert report are *American Transitional Care Centers of Texas, Inc. v. Palacios,* 46 S.W.3d 873 (Tex.2001); *Bowie Memorial Hospital v. Wright,* 79 S.W.3d 48 (Tex.2002);

and *Jelinek v. Casas,* 328 S.W.3d 526 (Tex.2010). Together, those three cases describe and clarify the standards by which courts are to evaluate an expert report. Because those standards are appropriately set forth in the majority opinion, I will not repeat them all. But it is crucial to remember that all that is necessary to avoid dismissal is that the report represent a "good faith effort" to comply with the statutory definition of an expert report, which in turn requires only that the report provide "a fair summary of the expert's opinions" regarding standard of care, breach, and causation. Most important, the supreme court has defined "good faith effort" as "one that provides information sufficient to (1) 'inform the defendant of the specific conduct the plaintiff has called into question,' and (2) 'provide a basis for the trial court to conclude that the claims have merit.' " *Jelinek,* 328 S.W.3d at 539 (quoting *Wright,* 79 S.W.3d at 52). I believe the report in the present case easily meets that test.

The first prong of the good-faith test is that the report must "inform the defendant of the specific conduct the plaintiff has called into question." In this regard, the expert report in this case could not be clearer: the standard of care requires that a spinal fracture complicated by pre-existing ankylosing spondylitis must be treated by posterior internal fixation, either alone or in combination with anterior internal fixation, ***not*** by anterior fixation alone, as was done by the defendant physician here. By my count, the medical expert's report contains no less than nine separate statements and/or explanations of this requirement, four in his original report and five more in his supplemental report.

- "Anterior instrumentation only is predictably inadequate in a fracture pattern with gross anterior and posterior column instability such as Mr. Hebert's. Adequate treatment of Mr. Herbert's fracture requires anterior and posterior instrumentation in order to meet the standard of care."

- "Dr. Timothy Hopkins' choice of anterior only plate/screw fixation fails to meet the applicable standard of care."

- "In the absence of adequate posterior stability, anterior plate/screw constructs typically fail in flexion by plate breakage or, as in this case, by screw pullout.... Anterior only plate/screw fixation, in this setting, is predictably doomed to failure."

- "The standard of care for the surgical treatment of this fracture requires a multilevel posterior fixation and a fusion in conjunction with anterior fixation and

fusion with or without supplemental external fixation...."

• "Dr. Hopkins performed an anterior (front) only plate and screw fixation.... The standards of care governing a prudent surgeon require that he not perform anterior only fixation with plate and screws...."

• "The standards of care governing a prudent surgeon require that he perform a multilevel posterior instrumented fusion alone or in conjunction with an anterior instrumented fusion...."

**\*904** • "My opinion is that Dr. Hopkins breached the standard of care by performing a multi-level anterior only fusion and fixation with plate/screws without also performing a multi-level posterior fusion and fixation with instrumentation."

• "The factual basis for this opinion is that a prudent surgeon following the standards of care would not have performed an anterior only fusion with instrumentation to attempt to stabilize this very unstable fracture but would have performed an anterior instrumented fusion with plates/screws and a multilevel posterior instrumented fusion or a multilevel posterior instrumented fusion alone."

• "[P]erforming an anterior only fusion with instrumentation without also performing the posterior fusion and fixation was a breach of the standard of care because the standards of care require performing both procedures to adequately stabilize the very unstable fracture and anterior only surgery was doomed to fail...."

There can be no doubt what conduct is being called into question.

The second prong of the supreme court's good-faith definition is that the report must "provide a basis for the trial court to conclude that the claims have merit." Here, the expert report goes into great detail in explaining the standard of care, why the actions of the defendant physician constituted a breach of the standard, and "how and why the breach caused the injury based on the facts presented." *Jelinek,* 328 S.W.3d at 539–40. The report does not contain mere conclusions of the expert. Quite the contrary. As to causation, for example, the report explains at length the process by which the breach of the standard of care resulted in the plaintiff's paralysis:

> My opinion is that performing an anterior only fusion with instrumentation without also

performing a multilevel posterior instrumented fusion caused permanent and irreversible spinal cord injury when the screw predictably pulled out in the post perioperative period.... When the screw pulled out of the vertebral segments of C–6 and C–7, the C–5 vertebral body was allowed to move on C–6 resulting in cord compression. The screw predictably failed because the anterior only approach was insufficient in the absence of inherent or surgically created posterior element stability, to stabilize the fracture and resist deformation due to flexion forces. When the screws failed, the vertebral segments moved resulting in cord compression. As a result, Mr. Hebert is now a quadraparetic, meaning he is nearly completely paralyzed from the chest down. If, instead of the anterior only surgery, Dr. Hopkins had performed an anterior and posterior instrumented fusion, like Dr. Duarte did on 9/12/08, it is highly probable the anterior implants would not have failed as they did, the resulting cord compression would have been avoided and Mr. Hebert would not have sustained his spinal cord injury and paralysis.

In the face of the expert report's highly detailed explanation of all of the elements required by *Palacios, Wright,* and *Jelinek,* the majority holds that a single sentence from the original report was so "internally inconsistent" as to the applicable standard of care that all of the report's detailed explanations and opinions were vitiated:

> If the clinical situation in which the surgeon finds himself and the patient allows only inadequate internal fixation, the surgeon is obligated to protect the patient supplementing the internal fixation **\*905** with external bracing and/or activity limitations.

There are several things to note about this sentence. First, it does not say that anterior only internal fixation could

*ever* meet the standard of care in treating a patient with the conditions existing here. Indeed, the sentence does not explicitly reference anterior internal fixation at all. It is simply a general reference to a hypothetical situation in which "inadequate internal fixation" is, temporarily, the only available option under some presumably extraordinary circumstances. Second, whatever the general references to "clinical situation" and "inadequate internal fixation" mean, the report goes on to specify that the defendant breached the standard of care in *this case,* as to *this patient.* This is an implicit statement that, to the best of the expert's knowledge, there were no extraordinary circumstances in this case. Third, and perhaps most important, the possible existence of extraordinary circumstances that might—or might not— justify the defendant physician's temporary use of anterior only internal fixation is a matter to be fleshed out

during discovery and possibly trial, not as part of a gatekeeper effort to deter frivolous lawsuits. This is especially true in light of the fact that the medical records available to the expert in preparing his report may not have reflected whether any such extraordinary circumstances existed at the time of the surgery.[1] To require a report to negate possible defenses at this stage of the litigation creates an extra-statutory burden and is unfair to both the plaintiff and the medical expert.

I believe the expert report in this case constituted a good-faith effort to comply with the definition of an expert report, as required by the applicable statutes and supreme court precedent. Accordingly, I respectfully dissent.

Footnotes

[1]     The parties have advised us that Richard Hebert died shortly after the Heberts perfected their appeal. As contemplated by rule 7.1 of the rules of appellate procedure, the parties have proceeded on appeal as if all parties are alive, and so have we. *See* Tex.R.App. P. 7.1(a)(1).

[2]     *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (West 2011) ("In a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted.").
        In the absence of material intervening substantive changes, we have cited the current version of chapter 74 for convenience.

[3]     *See id.* ("Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived.").

[4]     *See id.* § 74.351(b) ("If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall ... enter an order that: (1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and (2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim."); *see also id.* § 74.351(c) (recognizing that "an expert report has not been served within the period specified by Subsection (a)" when "elements of the report are found deficient").

[5]     *See id.* § 74.351(c).

[6]     *See id.* § 74.351(b), (c).

[7]     *See id.* § 74.351(b)(1).

[8]     *See id.* § 74.351(r)(6). Chapter 74 also imposes requirements regarding the qualifications of the "expert" who may prepare an "expert report," *see id.* § 74.351(r)(5), but appellees have not disputed that White meets those standards here.

[9]     *Id.* § 74.351(*l* ).

[10]    The Heberts acknowledge that Richard's death during the pendency of this appeal may have terminated his open-courts claim. "[W]rongful-death and survival claimants cannot establish an open-courts violation because they 'have no common law right to bring either.' " *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 903 (Tex.2000) (quoting *Bala v. Maxwell,* 909 S.W.2d 889, 893 (Tex.1995)). The Texas Supreme Court also has declined to rule on an open-courts argument in a similar situation when the claimant died during the pendency of the appeal. *Kallam v. Boyd,* 232 S.W.3d 774, 776 (Tex.2007) (per curiam).

While we have similar reservations, we will address the Heberts' open-courts argument to the extent its substance implicates due-process and due-course-of-law protections they have also raised. *See, e.g., Bogar v. Esparza,* 257 S.W.3d 354, 370 n. 6 (Tex.App.-Austin 2008, no pet.) (noting open-court protections not directly implicated in statutory wrongful-death and survivor action before conducting similar due-process analysis).

11    In their reply brief, the Heberts attempt to distinguish some of these cases on the basis that they involved "a complete failure to file an expert report," instead of "addressing the legislature's restriction placed on the courts in deciding the issue" of a report's sufficiency. However, Texas courts, including this Court, have rejected constitutional challenges where, as here, an expert report was served, but found deficient. *See, e.g., Hightower v. Baylor Univ. Med. Ctr.,* 348 S.W.3d 512, 520 (Tex. App.-Dallas 2011, pet. denied) (upholding dismissal of deficient reports); *Ledesma v. Shashoua,* No. 03–05–00454–CV, 2007 WL 2214650, at *7–8 (Tex.App.-Austin Aug. 3, 2007, pet. denied) (mem. op.) (same).

12    Classifications that impinge upon the exercise of a fundamental right or distinguish between people on a suspect basis (i.e., race, national origin, and alienage) "are subject[ ] to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne v. Cleburne Living Ctr. Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (plurality opinion). When a statute burdens a sensitive class or impinges on an important right, the statute is subject to an intermediate level of scrutiny, which requires a showing that the statute is substantially related to an important state interest. *Id.* at 440–41, 105 S.Ct. 3249.

13    Though the Heberts did not explicitly claim chapter 74 was an unconstitutional special law prohibited by the Texas Constitution, many of their complaints track arguments raised by parties who have raised such claims. Accordingly, we find cases addressing special-law challenges instructive.

14    The Heberts also argue that chapter 74 "effectively revives the general demurrer practice which permitted judges to dismiss cases on the pleadings." They argue that summary judgment is the preferred method for defendants to obtain a dismissal on the merits. Our rules of procedure prohibit the use of general demurrers. Tex.R. Civ. P. 90. However, "[w]hen a rule of procedure conflicts with a statute, the statute prevails unless the rule has been passed subsequent to the statute and repeals the statute...." *Johnstone v. State,* 22 S.W.3d 408, 409 (Tex.2000) (per curiam). The current version of chapter 74 was passed in 2003 and amended in 2005; rule 90 was approved in 1940 and amended in 1980. Thus, to the extent chapter 74 and rule 90 conflict, chapter 74 controls. *See Mitchell v. Berry,* No. 05–06–01328–CV, 2007 WL 4111923, at *4 (Tex.App.-Dallas Nov. 20, 2007, pet. denied) (mem. op.) (rejecting argument Tex. Civ. Prac. & Rem.Code Ann. § 13.001 allowing for dismissal in inability-to-pay cases was a general demurrer in contravention of Rule 90); *see also Smalling v. Gardner,* 203 S.W.3d 354, 367 n. 8 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (distinguishing dismissal under general demurrer from dismissal for failure to serve expert report).

15    The Heberts make passing reference to infringement of their right to trial by jury, but provide no authority or argument in support of any challenge based on that provision that is distinct from their other arguments. To the extent the Heberts intended to advance a distinct challenge based on their right to jury trial, it too would fail. The right to a jury trial is not an absolute right in civil cases, but is subject to certain procedural rules. *Schorp v. Baptist Mem'l Health Sys.,* 5 S.W.3d 727, 738 (Tex.App.-San Antonio 1999, no pet.) (citing *Wooten v. Dallas Hunting & Fishing Club, Inc.,* 427 S.W.2d 344, 346 (Tex.Civ.App.-Dallas 1968, no writ)). "Imposing the requirement to file an expert report and the failure to meet that requirement allows the trial court to dismiss the case. This dismissal is not based on the merits, but merely operates to dismiss the case on a procedural requirement which is directly related to the statute's purpose of limiting the number of frivolous suits." *Id.* (addressing article 4590i (citing *Buckholts Indep. Sch. Dist. v. Glaser,* 632 S.W.2d 146, 149 (Tex.1982) (holding that failure of plaintiff to fulfill bonding requirement for challenging school board election did not deny taxpayer right to jury trial on merits))).

16    The Heberts point to decisions from other jurisdictions that, in their view, struck down expert-report requirements similar to chapter 74 based on constitutional provisions analogous to the protections on which they rely here. *See, e.g., Putman v. Wenatchee Valley Med. Ctr.,* 166 Wash.2d 974, 216 P.3d 374, 378–79 (2009) (law requiring certificate of merit from expert at time of filing violated separation of powers and right of access as it cut off rights of discovery and abrogated pleading requirements in rules of procedure); *Wimley v. Reid,* 991 So.2d 135, 138 (Miss.2008) (law requiring certificate of merit violated separation of powers); *Summerville v. Thrower,* 369 Ark. 231, 253 S.W.3d 415, 421 (2007) (law requiring expert affidavit within 30 days of suit violated separation of powers); *Zeier v. Zimmer, Inc.* 152 P.3d 861, 873 (Okla.2006) (law requiring affidavit of merit with petition barred right of access). They also acknowledge that courts in at least two jurisdictions upheld laws similar to chapter 74. *See McAlister v. Schick,* 147 Ill.2d 84, 167 Ill.Dec. 1021, 588 N.E.2d 1151, 1157–58 (1992); *Mahoney v. Doerhoff Surgical Servs. Inc.,* 807 S.W.2d 503, 512–13 (Mo.1991). Additionally, they favorably cite cases from other jurisdictions that upheld similar laws "so long as the Legislature [does] not direct[ ] the Courts how to decide the legitimacy of the case." Texas decisions regarding chapter 74 are consistent with that reasoning. *See, e.g., Wilson–Everett v. Christus St. Joseph,* 242 S.W.3d 799, 803 (Tex.App.-Houston [1st Dist.] 2007, pet. denied) (rejecting argument that chapter 74 "interfere[d] with the judiciary's constitutional power to decide when and how to render judgments"). In any event, cases from other jurisdictions have no precedential value for this Court. Instead, we are bound to follow the Supreme Court of Texas and

our own precedent, as well as the persuasive cases of our sister courts. Texas authorities have consistently rejected constitutional challenges similar to those advanced by the Heberts.

[1]      Medical issues, like legal ones, are seldom black and white. One can imagine a hypothetical conversation between a plaintiff's attorney and the plaintiff's medical expert, in which the expert says something like, "In the overwhelming majority of cases like this, the standard of care is X. But I have to be candid: in a very small percentage of such cases, extraordinary circumstances may call for a different treatment approach. Nothing in the medical records I have seen indicates that such extraordinary circumstances existed in this case, but I would not be completely honest if I did not at least mention that possibility."

---

**End of Document**                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

328 S.W.3d 526
Supreme Court of Texas.

Michael T. JELINEK, M.D. and Columbia Rio
Grande Healthcare, L.P. d/b/a Rio Grande
Regional Hospital, Petitioners,
v.
Francisco CASAS and Alfredo DeLeon, Jr., as
Personal Representatives of the Estate of Eloisa
Casas, Deceased, Respondents.

No. 08–1066. | Argued Feb. 18, 2010. | Decided Dec.
3, 2010.

**Synopsis**
**Background:** Patient's surviving family members
brought medical malpractice action against hospital and
physician, arising out of treatment of patient at hospital.
Following non-suiting of physician, and following jury
trial, the 275th District Court, Hidalgo County, Juan R.
Partida, J., entered judgment for family members.
Hospital and physician appealed. The Corpus Christi
Court of Appeals, 2008 WL 2894889, affirmed. Hospital
and physician petitioned for review.

**Holdings:** The Supreme Court, Guzman, J., held that:

[1] lay testimony of family members did not present some
evidence in support of finding that hospital's alleged
negligence caused patient's additional pain and suffering;

[2] expert testimony did not present some evidence in
support of finding that hospital's alleged negligence
caused patient's additional pain and suffering; and

[3] expert report was conclusory with regard to causation
and, thus, was deficient.

Reversed and rendered in part; reversed and remanded in
part.

Jefferson, C.J., dissented in part, and filed opinion in
which Green and Lehrmann, JJ., joined.

Lehrmann, J., filed opinion dissenting in part.

**Attorneys and Law Firms**

**\*529** Ronald G. Hole, Ida Cecilia Garza, Hole & Alvarez,
L.L.P., McAllen, for Michael T. Jelinek, M.D.

John N. Mastin, San Antonio, Francisco J. Rodriguez,
Rodriguez Tovar & Lopez, LLP, McAllen, for Francisco
Casas.

Mike A. Hatchell, Sarah B. Duncan, Elissa Gail
Underwood, Locke Lord Bissell & Liddell, LLP, Austin,
Raul Javier Guerra, Green, DuBois & Guerra, San
Antonio, Susan A. Kidwell, Locke Lord Bissell &
Liddell, LLP, Austin, for Columbia Rio Grande
Healthcare, L.P.

**Opinion**

Justice GUZMAN delivered the opinion of the Court, in
which Justice HECHT, Justice WAINWRIGHT, Justice
MEDINA, Justice JOHNSON, and Justice WILLETT
joined, and in which Chief Justice JEFFERSON, Justice
GREEN, and Justice LEHRMANN joined as to Parts I
and II.A.

When circumstantial evidence is consistent with several
possible medical conclusions, only one of which
establishes that the defendant's negligence caused the
plaintiff's injury, an expert witness must explain why,
based on the particular facts of the case, that conclusion is
medically superior to the others. If the expert fails to give
any reason beyond an unsupported opinion, the expert's
testimony is legally insufficient evidence of causation. In
this case, we determine whether legally sufficient
evidence supports the jury's verdict in favor of the estate
of Eloisa Casas[1] against Rio Grande Regional Hospital
(the Hospital).[2] Following her admission to the Hospital
with abdominal pain, doctors placed Casas on antibiotics
used to treat and prevent certain intra-abdominal
infections. Two days later she underwent major
abdominal surgery and continued on the antibiotics for
another five days, but the Hospital allowed the
prescriptions to lapse for four-and-a-half days. The
Hospital admits it should have continued the antibiotics
but denies that the lapse caused Casas any additional pain.
We hold that the Casases failed to present legally
sufficient evidence that Casas suffered from an infection
the omitted antibiotics would have treated. Accordingly,
we reverse the court of appeals' judgment and render
judgment that the Casases take nothing.[3]

In a separate petition, Dr. Michael Jelinek, one of Casas's
treating physicians sued by the Casases, argues that the
trial court should have granted his motion for sanctions
and dismissal because the Casases' expert report was
deficient. We agree and hold that an award of attorney's

fees is proper. Therefore, we reverse and remand to the trial court for an award of attorney's fees and costs.

## *530 I. Background

In 2000, Eloisa Casas was diagnosed with colon cancer and underwent surgery, radiation, and chemotherapy. A year later, doctors told her that the cancer appeared to be in remission, and she thought she was cured. But on July 10, 2001, she was admitted to the Hospital with abdominal pains; she also had a fever and a mildly elevated white-blood-cell count, potentially indicating an infection. To treat this possible infection, her surgeon and primary physician, Dr. Carlos Garcia–Cantu, consulted with an infectious disease specialist at the Hospital, Dr. Michael Jelinek, who on July 11 prescribed two medications, Maxipime (a broad-spectrum antibiotic), and Flagyl (an antibiotic used to treat anaerobic bacteria).

The Hospital performed several diagnostic tests, which revealed abnormal collections of fluid in Casas's abdomen. On July 13, she underwent major abdominal surgery during which Dr. Garcia–Cantu discovered that "fairly extensive" metastatic cancer had perforated Casas's colon and allowed material to leak into her abdominal cavity, causing an intra-abdominal abscess. Dr. Garcia–Cantu drained the abscess, repaired Casas's colon, and inserted a Jackson–Pratt drain to prevent further problems. Following the surgery, Dr. Garcia–Cantu continued the Maxipime and Flagyl prescriptions, and a culture of the removed abscess revealed an E. coli infection, which is effectively treated with Maxipime. Casas received Maxipime and Flagyl for another five days, but hospital staff inadvertently failed to place a prescription renewal form on Casas's chart, resulting in a four-and-a-half-day period between July 18 and 23 during which Casas did not receive either medication. Even so, Casas never tested positive for E. coli again and a culture of the incision site on July 18 instead grew Candida (a fungus) for which Diflucan (an antifungal) was prescribed. Then, on July 21, a second culture from a blood sample grew coagulase-negative staph, for which Vancomycin was prescribed.[4] Neither Maxipime nor Flagyl would have treated the Candida or coagulase-negative staph infection.

On July 23, Dr. Garcia–Cantu noted an abscess in the wound, which he drained by removing the staples and opening the wound. The next day, records indicate that a foul smell was emanating from the wound site, and hospital staff brought fans into the room to dissipate the odor. When Dr. Jelinek learned of the lapsed prescription on July 23, he informed Casas and then prescribed different antibiotics, Levaquin and Vancomycin. On July 25, after a CAT scan showed no abscess, Dr. Garcia–Cantu removed the drain. Casas left the Hospital on August 23, but she returned in early September and died two months later.

In May 2003, several members of Casas's family, including her husband and son, filed suit against the Hospital, Dr. Garcia–Cantu, and Dr. Jelinek. The plaintiffs claimed that the defendants' negligence caused Eloisa Casas to "suffer grievous embarrassment and humiliation, as well as excruciating pain the remainder of her life which she would not have suffered to such degree or extent if properly diagnosed, treated and cared for." The plaintiffs sought to recover damages for Casas's injuries and mental anguish. They twice amended their petition, ultimately leaving the Casases as the sole plaintiffs.

*531 As required by former article 4590i § 13.01 of the Medical Liability and Insurance Improvement Act, *see* TEX.REV.CIV. STAT. art. 4590i § 13.01,[5] the Casases filed an expert report within 180 days of filing the original petition. In the report, Dr. John Daller opined that Dr. Garcia–Cantu and Dr. Jelinek were negligent in failing to discover that the antibiotics were not being given to Casas and that within "reasonable medical probability" this negligence resulted in a prolonged hospital stay and increased pain and suffering. Dr. Jelinek later filed a motion for sanctions and dismissal under article 4590i § 13.01(e), alleging that the expert report was deficient because, among other things, it failed to explain any causal connection between the negligence and the purported injury. The trial court denied the motion. Before trial began, however, the Casases nonsuited Dr. Jelinek and Dr. Garcia–Cantu.

At trial, Dr. Daller testified as the Casases' medical expert. During direct examination, he analyzed the Hospital's daily patient notes regarding Casas and identified the significant events. He noted changes in Casas's vital signs on July 21 and 22, such as increased heart rate and temperature, inflammation, and tenderness of the surgery site. Dr. Daller stated that "in medical probability" there was an infection in the abdomen, but on cross-examination he admitted that "there was no objective evidence present to demonstrate that intra-abdominal infection." When reviewing the patient notes for July 24, which noted the presence of a foul smell, he suggested that the smell was consistent with an anaerobic infection that would be difficult to culture because anaerobic bacteria die when exposed to air. Dr. Carl Berkowitz, the Hospital's expert, offered several other

explanations for the smell, such as the Candida infection or dying tissue.

The Casases also called Casas's relatives to testify about her condition. Consistent with Dr. Daller's testimony, Casas's son linked the smell with the opening of the wound to drain the abscess: "The odor that I noticed was after they had taken out the staples on her incision, and one day that I went to see her as soon as they opened the door the whiff of this putrid smell just engulfed me." He also testified that Casas was upset upon learning that she had not received the antibiotics but was even more upset when the incision had to be opened and drained: "Well, after she was told and I was told that she wasn't getting antibiotics, like I said, she was upset. What really upset her more was when they had to—they had to take out the staples out of her incision, and they had to open her incision up again." Casas's husband testified that, while she was upset and did not trust the nurses or doctors after learning of the lapsed prescription, "she was still fighting. She ... wanted to beat this cancer she had." The son testified that Casas did not lose hope until she witnessed the events of September 11, 2001, following her re-admission to the Hospital: "That's why I remember that day so vividly in my mind because that was the turning point in my mom. She seemed to just give up, not fight, not want to fight anymore like she used to. And that was a very, very sad day."

**\*532** The jury found that the negligence of the Hospital, Dr. Jelinek, and Dr. Garcia–Cantu proximately caused Casas's injury. The jury apportioned ninety percent of the negligence to the Hospital, five percent to Dr. Jelinek, and five percent to Dr. Garcia–Cantu. It awarded $250,000 in damages to the Casases as compensation for Casas's pain and mental anguish.

The Hospital appealed, arguing that the evidence was legally and factually insufficient to prove causation or damages for mental anguish. Dr. Jelinek also appealed, challenging the trial court's denial of his motion for sanctions and dismissal. The court of appeals affirmed on all issues. —— S.W.3d ——.

## II. Analysis

We address in turn the two issues raised in this appeal: the legal sufficiency of the causation evidence and the sufficiency of the Casases' expert report.

## A. Sufficiency of the Evidence

[1] The facts of this case are unfortunate: a woman with advanced colon cancer underwent surgery to repair her cancer-perforated and infected colon, and in the course of treatment for her many symptoms the Hospital failed to renew her antibiotic prescriptions for a four-and-a-half-day period. The Hospital admits it should have continued the antibiotics. Even so, the plaintiff bears the burden to prove that the negligence caused an injury: "[A]t trial the plaintiff must establish two causal nexuses in order to be entitled to recovery: (a) a causal nexus between the defendant's conduct and the event sued upon; and (b) a causal nexus between the event sued upon and the plaintiff's injuries." *Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 731 (Tex.1984). Only the second nexus is at issue here.

[2] [3] [4] In *City of Keller v. Wilson,* we considered at length the parameters of legal sufficiency review, quoting with approval Chief Justice Calvert's seminal article on the topic:

> "No evidence" points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.

168 S.W.3d 802, 810 (Tex.2005) (quoting Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960)). "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). The same is true when the evidence equally supports two alternatives: " 'When the circumstances are equally consistent with either of two facts, neither fact may be inferred.' " *City of Keller,* 168 S.W.3d at 813 (quoting *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.,* 819 S.W.2d 801, 805 (Tex.1991)). When considering such cases, "we must 'view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances,' " *id.* at 813–14 (quoting *Lozano v. Lozano,* 52 S.W.3d 141, 167 (Tex.2001) (per curiam)),

and we "must consider not just favorable but all the circumstantial evidence, and competing inferences as well." *Id.* at 814.

[5] To meet the legal sufficiency standard in medical malpractice cases "plaintiffs are required to adduce evidence of a **\*533** 'reasonable medical probability' or 'reasonable probability' that their injuries were caused by the negligence of one or more defendants, meaning simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 399–400 (Tex.1993) (citations omitted). Thus, we examine the record to determine if the Casases presented legally sufficient evidence that "in reasonable medical probability" the Hospital's negligence caused Casas additional pain and suffering.

When distilled to its essence, the Casases' claim is predicated on the presence of an infection—treatable by the lapsed antibiotics—that caused Casas pain and mental anguish above and beyond that caused by the cancer, the surgery, and the other known infections. The absence of an infection treatable by Maxipime and Flagyl would undermine the Casases' claim, for then the prescription lapse would amount to an unfortunate, but harmless, occurrence. The Hospital argues that the Casases presented no evidence that the Hospital's negligence caused such an infection. The Casases' expert admitted there is no direct evidence of an anaerobic infection, leaving the jury to consider the circumstantial evidence and make proper inferences from it. In reviewing the record, we initially decide if jurors can determine causation under these facts unaided by expert testimony— that is, whether lay testimony regarding causation is legally sufficient.

## 1. Lay Testimony of Causation

[6] [7] [8] [9] Lay testimony may be used as evidence of causation in certain circumstances, but "[w]hen expert testimony is required, lay evidence supporting liability is legally insufficient." *City of Keller,* 168 S.W.3d at 812. In medical malpractice cases, expert testimony regarding causation is the norm: "The general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Guevara v. Ferrer,* 247 S.W.3d 662, 665 (Tex.2007); *see also Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949) ("It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or

recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries."). We have allowed lay evidence to establish causation "in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition." *Morgan,* 675 S.W.2d at 733 (citing *Lenger v. Physician's Gen. Hosp., Inc.,* 455 S.W.2d 703, 706 (Tex.1970)). Care must be taken to avoid the *post hoc ergo propter hoc* fallacy, that is, finding an earlier event caused a later event merely because it occurred first. Stated simply, correlation does not necessarily imply causation. As we noted in *Guevara,* "[e]vidence of an event followed closely by manifestation of or treatment for conditions which did not appear before the event raises suspicion that the event at issue caused the conditions. But suspicion has not been and is not legally sufficient to support a finding of legal causation." 247 S.W.3d at 668.

[10] When lay testimony is credited as evidence of causation, it usually highlights a connection between two events that is apparent to a casual observer. In *Morgan,* for example, a previously healthy employee, upon exposure to leaking chemicals, suffered watering of the eyes, blurred **\*534** vision, headaches, and swelling of the breathing passages. 675 S.W.2d at 733. In such a circumstance, lay testimony sufficed to connect the specific injury to the negligence with no evidence of causation beyond the leaking chemicals. *Id.* Likewise in *Guevara,* we stated that determining causation of "certain types of pain, bone fractures, and similar basic conditions" following an automobile accident was within the competence of lay jurors. 247 S.W.3d at 668. But we held that expert testimony was required to prove that a patient's medical expenses resulted from the accident, noting that "[p]atients in hospitals are often treated for more than one condition brought on by causes independent of each other." *Id.* at 669. These cases illustrate this basic premise: "[N]on-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence." *Id.* at 668.

The present case does not fall within this rule. Unlike in *Morgan,* an otherwise healthy person did not suddenly experience health difficulties following the defendant's negligent conduct when the plaintiff's symptoms were reasonably attributable to the negligence and to nothing else. Rather, a patient with terminal colon cancer did not

receive antibiotics for four-and-a-half days following major abdominal surgery and after having received the medications for eight days. There is no direct evidence that she suffered from an infection treatable by the omitted antibiotics, but there is evidence that she had two other infections that accounted for all of her symptoms during that time. Given Casas's medical condition, expert testimony was crucial to link the prescription lapse to an infection causing additional pain and suffering beyond what she would otherwise have experienced. *See Kaster v. Woodson,* 123 S.W.2d 981, 983 (Tex.Civ.App.-Austin 1938, writ ref'd) ("What is an infection and from whence did it come are matters determinable only by medical experts."); *see also Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1966) ("In determining negligence in a case such as this, which concerns the highly specialized art of treating disease, the court and jury must be dependent on expert testimony. There can be no other guide, and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury.").

The Casases point to testimony by Casas's husband and son to support their argument that she deteriorated rapidly after discovering she did not receive the antibiotics. But this characterization overstates the evidence. While Casas's husband testified she was upset and did not trust her doctors following the discovery, she was still determined to fight her cancer. The son also observed Casas's anger and lack of trust but testified that the opening of her wound, which occurred the same day she learned of the lapse, upset her even more. As Dr. Daller admitted, Candida likely caused the abscess that required Dr. Garcia–Cantu to drain the wound. Further, based on his experience at Casas's bedside, her son pinpointed the tragic events of September 11, 2001, and their effect on his mother as the turning point in her mental state. The latter event was some seven weeks after discovery of the lapsed prescriptions and after Casas's discharge from and re-admission to the Hospital. This evidence does not bear out the Casases' claim of a marked shift in Casas's mental resilience following the omission of the medications.

**\*535** More importantly, Casas's husband and son were unable to precisely identify the cause of her suffering. While they could accurately describe her discomfort, they were unable to say if it was the cancer, the surgery, the other infections, or the lapse that caused it. Even testimony that Casas suffered after learning of the omission raises no more than a mere suspicion of causation, and that is not enough, *see Guevara,* 247 S.W.3d at 668, particularly in light of the evidence that Casas thought she was cured of cancer before the surgery and then learned that not only was it "back with a vengeance," it was terminal. The testimony of Casas's

husband and son is evidence of her suffering, but not of its cause. Thus, we hold that the lay testimony presented by the Casases is legally insufficient to establish that the Hospital's negligence caused Casas additional pain and suffering.

## 2. Expert Testimony

[11] The Casases also presented expert testimony regarding causation. The Casases' expert, Dr. Daller, testified that the Hospital's negligence "in medical probability" caused Casas additional pain and suffering. He based this opinion on the presence of an intra-abdominal infection that could have been treated using Maxipime and Flagyl. Admitting that no direct evidence indicated such an infection, Dr. Daller pointed to various circumstantial indicators that suggested an infection. These indicators were primarily Casas's changed vital signs, such as fever and increased heart rate: "Well, given the fact that two to three days after the antibiotics had been mistakingly [sic] stopped her fever curve went up and her heart rate went up, to me that suggests the presence of on going [sic] infection."[6] But on cross-examination, he conceded these data were equally consistent with two other infections cultured from Casas's incision and blood—Candida and coagulase—negative staph—neither of which is treatable by Maxipime or Flagyl:

> Q. Now, Candida, infection of a wound like this, they can cause high temperatures. Correct?
>
> A. Fungal infections can cause a high temperature, yes.
>
> Q. It can cause increased heart rate?
>
> A. That is correct.
>
> Q. And inflammation?
>
> A. That is correct.
>
> Q. Pain?
>
> A. That is correct.
>
> Q. How about an abscess?
>
> A. It caused or is part of the abscess in that wound that was present, that wound infection that needed to be opened.

Q. So when Doctor Garcia went in on 7/23 ... and drained that wound at bedside that abscess was within a reasonable degree of medical probability caused by the Candida?

**\*536** A. That was one of the organisms that was there. It was the organism that was cultured. That is correct.

....

Q. ... This coagulase negative staph causes fever?

A. Correct.

Q. Increased heart rate?

A. The fever will cause increased heart rate.

....

Q. It can cause pain?

A. Depending upon the site. Correct.

Q. Okay. All of these things can be caused by coagulase negative staph and Candida, which we know were present 7/18 through 7/23, the time period she did not get antibiotics?

A. That's correct.

Q. Neither one would have been killed by Maxipime or Flagyl?

A. That's correct.

[12] [13] It is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury. The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury. We have rejected expert opinions not grounded in a sound evidentiary basis: "[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection. '[A] claim will not stand or fall on the mere *ipse dixit* of a credentialed witness.' " *City of San Antonio v. Pollock,* 284 S.W.3d 809, 818 (Tex.2009) (quoting *Burrow v. Arce,* 997 S.W.2d 229, 235 (Tex.1999)); *see also Whirlpool Corp. v. Camacho,* 298 S.W.3d 631, 637 (Tex.2009) ( "Conclusory or speculative opinion testimony is not relevant evidence because it does not tend to make the existence of material facts more probable or less probable."). When the only evidence of a vital fact is circumstantial, the expert cannot merely draw possible inferences from the evidence and state that "in medical probability" the injury was caused by the defendant's negligence. The expert must explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts. Thus, when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion. *See Lenger,* 455 S.W.2d at 707 ("[E]xpert testimony that the event is a possible cause of the condition cannot ordinarily be treated as evidence of reasonable medical probability except when, in the absence of other reasonable causal explanations, it becomes more likely than not that the condition did result from the event."); *Hart,* 399 S.W.2d at 792 ("The burden of proof is on the plaintiff to show that the injury was negligently caused by the defendant and it is not enough to show the injury together with the expert opinion that it might have occurred from the doctor's negligence and from other causes not the fault of the doctor. Such evidence has no tendency to show that negligence did cause the injury.").

By conceding that Casas's symptoms were consistent with infections not treatable by Maxipime or Flagyl, Dr. Daller undermined his conclusion that an undetected infection was also present. While it is possible that Casas did have such an infection, its presence can only be inferred from facts that are equally consistent with the Candida and coagulase-negative staph infections. " 'When the circumstances are **\*537** equally consistent with either of two facts, neither fact may be inferred.' " *City of Keller,* 168 S.W.3d at 813 (quoting *Tubelite,* 819 S.W.2d at 805). Here, objective data—the cultures—support the Candida and staph infections but not the supposed anaerobic infection.[7]

[14] [15] Based on the record evidence, an anaerobic infection cannot be proved or disproved. It is equally plausible that Casas had such an infection or that she did not. Dr. Daller opined that she did, but he did not explain why that opinion was superior to the opposite view. Such evidence raises no more than a possibility of causation, which is insufficient. As we said in *Bowles v. Bourdon,* " '[t]he proof must establish causal connection beyond the point of conjecture. It must show more than a possibility. Verdicts must rest upon reasonable certainty of proof. Where the proof discloses that a given result may have occurred by reason of more than one proximate cause, and the jury can do no more than guess or speculate as to which was, in fact, the efficient cause, the submission of such choice to the jury has been consistently condemned by this court and by other courts.' " 219 S.W.2d at 785 (quoting *Ramberg v. Morgan,* 209 Iowa 474, 218 N.W. 492, 498–99 (1928)).

The Casases argue that the foul smell, which is consistent with an anaerobic infection, is strong evidence of such an infection. Looking at the patient notes for July 24, Dr. Daller commented on the smell:

A. The text says something about drainage to the abdomen with moderate amount of drainage. And it says that it is foul smelling.

....

Q. The [previous notes] that I remember that we have gone over didn't say anything about foul smelling?

A. That's correct. They were just described as I recall as being purulent and looking like puss [sic].

Q. What does that mean when it says "foul smelling"?

A. When you have foul smelling, it suggests that the organism is an anaerobe. In other words, one of those bacteria that didn't need oxygen in order to grow that, for example, Flagyl would treat.

Q. Okay. Does that give you clinical evidence that had she been continued on Maxipime and Flagyl that they would have had some effect with regards to the condition as we see it on the 24th?

A. Well, like I said, most anaerobes are sensitive or susceptible to Flagyl. And she had previously been on Flagyl and at this time she is not. So I would have expected that that would be an appropriate antibiotic that would have covered the organism that's causing that foul smell.

Dr. Berkowitz, the Hospital's expert, offered several other explanations for the smell, including necrotic tissue, dead cancer tissue, and the Candida infection.[8] As **538** noted, Casas's son noticed the smell after the incision was opened to drain the abscess, which Dr. Daller admitted was likely caused by Candida.

[16] [17] Here again, there are competing explanations for the smell, which amounts to no more than circumstantial evidence of some kind of infection or possibly dying tissue. Because there is no direct evidence of the infection and the circumstantial evidence is meager, we "must consider not just favorable but all the circumstantial evidence, and competing inferences as well." *City of Keller,* 168 S.W.3d at 814. Courts should not usurp the jury's role as fact finder, nor should they question the jury's right to believe one witness over another. But when reviewing a verdict for sufficiency of the evidence, courts need not—indeed, must not—defer to the jury's findings

when those findings are not supported by credible evidence. When the evidence compels the jury to guess if a vital fact exists, a reviewing court does not undermine the jury's role by sustaining a no-evidence challenge. The evidence in this case—being consistent with an anaerobic infection that was treatable by Flagyl, a fungal infection that was not, or even with dying tissue, cancerous or otherwise—did not provide the jury a reasoned basis from which to infer the presence of a negligence—induced infection. Because the jury could not reasonably infer an infection caused by the Hospital's negligence, we agree with the Hospital that no evidence supports the jury's verdict.

We understand the Casas family's predicament and frustration at the Hospital's conduct, and we recognize the difficulty of proving that the lapsed prescriptions caused a painful infection. But the Casases shouldered that burden and must prove the causal link with reasonable certainty. In that quest, the Casases offered the testimony of Dr. Daller, but he did not explain why an undetected, anaerobic infection is medically more probable than one based on the known infections and the dying tissue, leaving the jury to guess if the lapsed prescriptions caused additional pain and suffering. Without probative medical testimony that the lapse caused—by means of an infection treatable by Maxipime and Flagyl—more pain than the cancer, the surgery, and the other infections already inflicted, there is no legally sufficient evidence of causation. Dr. Daller did not provide that causal link; accordingly, we hold that his testimony is legally insufficient to support the jury's verdict. Because the Casases failed to prove causation, we reverse the judgment of the court of appeals and render judgment that the Casases take nothing.

**B. Adequacy of the Expert Report**

[18] [19] In his petition, Dr. Jelinek raises a single issue: whether the trial court abused its discretion by denying his motion for sanctions and dismissal because the Casases' expert report was deficient under former article 4590i § 13.01, the statute in effect at the time. *See* TEX.REV.CIV. STAT. art. 4590i § 13.01. Article 4590i required the report to provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that **539** failure and the injury, harm, or damages claimed." *Id.* § 13.01(r)(6). "If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion '*only if* it appears to the court, after hearing, that

the report does not represent a *good faith effort* to comply with the definition of an expert report in Subsection (r)(6) of this section.' " *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 51–52 (Tex.2002) (per curiam) (quoting § 13.01(*l* )). Dismissal for failure to serve an adequate expert report also carried mandatory sanctions, requiring an award to the defendant of his costs and attorney's fees against the plaintiff or the plaintiff's attorney. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001) (citing § 13.01(e)).

[20] [21] We have defined a "good-faith effort" as one that provides information sufficient to (1) "inform the defendant of the specific conduct the plaintiff has called into question," and (2) "provide a basis for the trial court to conclude that the claims have merit." *Wright,* 79 S.W.3d at 52 (citing *Palacios,* 46 S.W.3d at 879). All information needed for this inquiry is found within the four corners of the expert report, which need not "marshal all the plaintiff's proof" but must include the expert's opinion on each of the three main elements: standard of care, breach, and causation. *Id.* Importantly for this case, the "report cannot merely state the expert's conclusions about these elements," but " 'the expert must explain the basis of his statements to link his conclusions to the facts.' " *Id.* (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). "A report that merely states the expert's conclusions about the standard of care, breach, and causation" does not fulfill the two purposes of a good-faith effort. *Palacios,* 46 S.W.3d at 879.

[22] [23] We review the trial court's grant or denial of a motion for sanctions and dismissal under the abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 877–78. A district court "abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Wright,* 79 S.W.3d at 52 (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985)).

Dr. Jelinek argues that the Casases' report is deficient in two ways, failing (1) to state the applicable standard of care, and (2) to provide more than conclusory statements of causation. We focus on the latter. Dr. Daller's report concluded that Dr. Jelinek's breach of the appropriate standard of care in "reasonable medical probability, resulted in a prolonged hospital course and increased pain and suffering being experienced by Ms. Casas." Aside from repeating essentially the same phrase twice more, the report says nothing more regarding causation. The Casases argue this statement is sufficient to meet the good-faith requirement. We disagree.

An expert cannot simply opine that the breach caused the injury. Stated so briefly, the report fails the second

*Palacios* element—it does not give the trial court any reasonable basis for concluding that the lawsuit has merit. *See* 46 S.W.3d at 879. An expert's conclusion that "in medical probability" one event caused another differs little, without an explanation tying the conclusion to the facts, from an *ipse dixit,* which we have consistently criticized. *See Pollock,* 284 S.W.3d at 818 (citing *Burrow,* 997 S.W.2d at 235); *Earle,* 998 S.W.2d at 890 ("An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts."). Instead, the expert must go further and explain, to a reasonable degree, **\*540** how and why the breach caused the injury based on the facts presented. While we have said that no "magical words" need be used to meet the good-faith requirement, mere invocation of the phrase "medical probability" is likewise no guarantee that the report will be found adequate. *See Wright,* 79 S.W.3d at 53.

Under these standards, the Casases' report is conclusory on causation. It offers no more than a bare assertion that Dr. Jelinek's breach resulted in increased pain and suffering and a prolonged hospital stay. Beyond that statement, the report offers no explanation of how the breach caused the injury. Again, the plaintiff need not marshal all of his proof in the report, but he must include sufficient detail to allow the trial court to determine if the claim has merit. Because the Casases' report lacks any explanation linking the expert's conclusion to the relevant facts, we hold that the trial court abused its discretion by denying Dr. Jelinek's motion and the court of appeals erred by affirming that ruling.[9] *See id.* at 52. Accordingly, we remand the case to the trial court for an award of attorney's fees and costs[10] under former article 4590i § 13.01(e) against the Casases and their counsel.[11]

**\*541 III. Conclusion**

For the foregoing reasons, we reverse the court of appeals' judgment, render judgment that the Casases take nothing, and remand to the trial court for an award of Dr. Jelinek's attorney's fees and costs consistent with this opinion.

Chief Justice JEFFERSON filed an opinion, dissenting in part, in which Justice GREEN and Justice LEHRMANN joined.

Justice LEHRMANN filed an opinion, dissenting in part.

Chief Justice JEFFERSON, joined by Justice GREEN and Justice LEHRMANN, dissenting in part.

We must decide whether an expert report gave a "fair summary" of the expert's opinions regarding standard of care, failure to meet the standard, and the link between that failure and the patient's damages. We must consider the expert's opinions "as of the date of the report." TEX.REV.CIV. STAT. art. 4590i § 13.01(r)(6) (repealed 2003). To do so, we must disregard today's holding that, at trial, there was no evidence linking the discontinuation of antibiotics to increased suffering by Casas. The expert report submitted in this case gave fair notice of a meritorious claim—that the doctor failed to ensure that his patient received antibiotics, thereby increasing her pain and suffering. I would affirm the court of appeals' judgment with respect to the doctor.

## I. Background

Eloisa Casas, a patient recently diagnosed with colon cancer, was admitted to Rio Grande Hospital for abdominal pain. The cancer had perforated her colon, the contents of which leaked into her abdominal cavity, causing an abscess. After the doctor drained and surgically removed the abscess, he discovered that Casas had an E. coli infection, for which the doctor prescribed two antibiotics. Although those prescriptions were supposed to have been renewed five days later, they lapsed. Casas contends this mistake occurred because the doctor failed to ensure that hospital staff complied with his renewal order. During the four days after the prescriptions expired, Casas's surgical incision began to emit a putrid odor. She developed several infections in addition to E. coli, exacerbating her pain and extending her stay in the hospital. Casas died two months after she was discharged.

Casas's estate sued the Hospital and two of the treating doctors, Dr. Garcia–Cantu and Dr. Jelinek, for negligently causing Mrs. Casas "grievous embarrassment and humiliation, as well as excruciating pain the remainder of her life which she would not have suffered to such degree if properly diagnosed, treated and cared for...." The trial court denied Dr. Jelinek's motion to dismiss the case against him. Nevertheless, the estate nonsuited both doctors more than a year before Casas's claim against the Hospital was tried to a jury. At that trial, the jury found the hospital 90% negligent, and each doctor 5% negligent. The trial court rendered judgment against the hospital, and the court's order non-suiting Dr. Jelinek "with prejudice" merged into that final judgment.

Dr. Jelinek and the hospital appealed the trial court's judgment. The hospital complained that the evidence was legally insufficient to support the verdict. Dr. Jelinek complained that the trial court improperly denied him attorney's fees, as the expert report was not a good faith effort to comply with statutory requirements. The court of appeals affirmed, 2008 WL 2894889, *9–*10, 2008 Tex.App. LEXIS 5647, *28–*29 (Tex.App.-Corpus Christi July 29, 2008), and the appellants below are now petitioners here. I fully join the **\*542** Court's rendition of judgment for the hospital. I disagree with the Court's holding as to the doctor.

## II. Good faith effort; fair summary

Former article 4590i provided that "[a] court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in [the statute]." TEX.REV.CIV. STAT. art. 4590i § 13.01(l ). "That definition requires, as to each defendant, a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the claimed injury." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001) (citing TEX.REV.CIV. STAT. art. 4590i § 13.01(r)(6)). Because an expert report is filed long before discovery is complete, we cannot judge it according to what subsequent discovery reveals or how the evidence develops at trial. The question is whether the report fairly summarizes the malpractice elements before the case is tested in a full adversary process. For that reason, "to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* at 879.

The report must also give the defendant notice of the conduct the plaintiff challenges, and the trial court must have a basis to determine whether the claim has merit. *Id.* The dividing line between a sufficient and an inadequate report is impossible to draw precisely. We have said, therefore, that the determination must be made in the first instance by the trial court, and review of that decision asks not how an appellate court would have resolved the issue, but instead whether the trial court abused its discretion. *See, e.g., Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); *Walker v. Gutierrez,* 111 S.W.3d 56, 63 (Tex.2003).

### III. Dr. Daller's report

Dr. Daller is a physician and an expert on intra-abdominal abscesses and infection. His report states that a doctor treating a patient like Casas must ensure that the antibiotics he prescribes are actually administered. Despite that standard, Dr. Daller states that antibiotics prescribed for Ms. Casas were not administered from July 17 through July 23, even though "[t]here [wa]s no order to discontinue the antibiotic therapy." He concluded that Dr. Jelinek breached the standard of care by his "failure to recognize that the antibiotics were not being administered as ordered." Dr. Daller concludes that "[t]his breach in the standard of care ..., within reasonable medical probability, resulted in a prolonged hospital course and increased pain and suffering...."

### IV. Dr. Daller gave a "fair summary" of the required standard of care and how the allegedly inadequate care fell below that standard.

The Court concludes that Dr. Daller's report lacks the detail necessary to conclude that the estate's lawsuit has merit. But the cases it cites as support involve situations in which a hindsight view is entirely appropriate. *Earle v. Ratliff,* for example, is a summary judgment case; it presents the higher evidentiary standard that *Palacios* rejected for expert reports. *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999) ("Summary judgment can be granted on the affidavit of an interested expert **\*543** witness, ... but the affidavit must not be conclusory.... [R]ather, the expert must explain the basis of his statements to link his conclusions to the facts."). Similarly, the standard employed in *City of San Antonio v. Pollock,* 284 S.W.3d 809, 817–18 (Tex.2009), also cited by the Court, is inapplicable here, since it examined an expert report under the "no evidence" standard of review. *See* ⸺ S.W.3d at ⸺.

In *Palacios* we held that an expert report that failed to articulate a standard of care or explain how the defendant hospital breached that standard was not a good faith effort to comply with the statutory requirements. *Palacios,* 46 S.W.3d at 880. The expert in that case blamed the hospital for taking no action to prevent a patient from falling out of his bed, even though the patient "had a habit of trying to undo his restraints." *Id.* at 879–880. The report, as such, was not a fair summary of the evidence because it neglected to articulate what actions the hospital *should* have taken that it did not. *Id.* at 880. Thus, the trial court

did not abuse its discretion by dismissing the plaintiff's claim for lack of a good faith effort to summarize the expert's opinions.

Subsequently, in *Bowie Memorial Hospital v. Wright,* we held that the trial court did not abuse its discretion in concluding that an expert report failed to comply with the statute, as the report did not "establish how any act or omission of employees of Bowie Memorial Hospital caused or contributed to [the patient's] injuries." *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 51–53 (Tex.2002) (quoting the expert in that case as speculating, "I do believe that it is reasonable to believe that if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then [the plaintiff] would have had the possibility of a better outcome."). We observed that a report must satisfy *Palacios*'s two-part test. *Id.* at 52. Because the report "lack[ed] information linking the expert's conclusion (that [the plaintiff] might have had a better outcome) to [the defendant's] alleged breach (that it did not correctly read and act upon the x-rays), the trial court could have reasonably determined that the report was conclusory." *Id.* at 53.

In each of those cases, the trial court could not have evaluated the claim's merit without speculating about actions the defendant could have taken to prevent injury. No such speculation is required here. Dr. Daller states that had the antibiotics been administered from July 17 through July 23, Eloisa Casas would have suffered less. Dr. Daller could have stated that conclusion in greater detail, of course, but "[a] report need not marshal all the plaintiff's proof." *Palacios,* 46 S.W.3d at 878. Daller's report includes his opinions on (1) the applicable standard of care (to maintain vigilance over a patient's treatment), (2) the manner in which the care failed to meet that standard (failing to ensure the treatment he ordered was actually administered), and (3) the causal connection between the failure and the claimed injury (without the antibiotics, the patient's pain and suffering increased and she required additional hospitalization).

A "good faith effort" does not require that the report "meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial"; therefore, an expert report does not fail the good faith effort test merely because it may not later prove legally sufficient to support a judgment. *Id.* at 879. So, here, whether the Casas estate ultimately amassed sufficient proof in an adversarial trial is beside the point; the claim itself was far from frivolous. *See id.* at 878 (noting that "one purpose of the expert-report requirement is to deter frivolous **\*544** claims"). The law imposes a penalty for filing a frivolous suit. Only by today's decree does it also punish a claimant for failing

to win an arguably meritorious case. *Cf. TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 918 (1991) (holding that "sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the ... process justifies a presumption that its claims or defenses lack merit.").

I agree with the Court that the Estate failed to prove causation at trial; I disagree that, as to Dr. Jelinek, the expert report was not a good faith attempt to comply with the statute. I respectfully dissent in part from the Court's judgment.

Justice LEHRMANN, dissenting in part.

I fully join Chief Justice Jefferson's dissent. I write separately, however, to highlight the incongruity inherent in the Court's decision to remand the case for an award of attorney's fees and costs under former article 4590i § 13.01(e), given this case's circumstances. *See* TEX.REV.CIV. STAT. art. 4590i § 13.01(e) (repealed 2003)[1]. The Court presumes that Dr. Michael Jelinek is entitled to attorney's fees because the expert report filed by Eloisa Casas's estate[2] was, on appeal, determined to be insufficient. But, after a pre-trial hearing was held on the defendant's motion to dismiss the lawsuit, the trial court rejected Dr. Jelinek's contention that the report was inadequate; consequently, the Casases had no opportunity to rectify any deficiencies as the statute and our precedent would have allowed.

Section 13.01(e) of article 4590i provided for an order awarding attorney's fees and costs if a health care claimant failed to supply an expert report within the time required under subsection (d)—180 days. But the statute provided several avenues for health care claimants to obtain an extension of the 180–day deadline, including section 13.01(g). That provision required the trial court to grant a thirty-day extension of the statutory deadline if a claimant's failure to provide an expert report was not intentional or the result of conscious indifference. And we have expressly held that "a party who files a timely but inadequate expert report may seek relief under the grace

period provisions of section 13.01(g)." *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003). Thus, health care claimants could receive an opportunity to rectify deficiencies in a report if they could show that they did not intentionally, or with conscious indifference, submit an inadequate report.

Here, the Casases never had the chance to request an opportunity to cure any deficiencies in their report because the trial court determined that the report adequately complied with section 13.01(d). In *Gutierrez,* we were guided by our recognition that it would be "perverse" to allow a claimant who filed no report a second chance to comply with the statute's expert report requirement, while "punishing those who attempt to comply with the statute but fail." *Id.* In this case, perversely, the Casases may have been in a better position **\*545** than they are now if the trial court had found that the report was inadequate; they might have had an opportunity to eliminate any deficiencies.

I agree fully with Chief Justice Jefferson that the report represents a good-faith effort to comply with section 13.01. Even if it did not, however, I would remand the case to allow the Casases an opportunity to show that their failure to present an adequate report was not intentional or the result of conscious indifference. *See City of DeSoto v. White,* 288 S.W.3d 389, 401 (Tex.2009) (remanding in the interest of justice *sua sponte* to allow police officer "to make an appellate election with full knowledge of his appellate rights and with knowledge of" the guidance provided in Court's opinion). In my view, the Casases should not be assessed attorney's fees and costs if they can make the showing section 13.01(g) requires and then submit a report complying with the statute. For these reasons, as well as those expressed by Chief Justice Jefferson, I respectfully dissent in part.

**Parallel Citations**

54 Tex. Sup. Ct. J. 272

Footnotes

[1]    Francisco Casas and Alfredo DeLeon Jr., Casas's husband and son, respectively, serve as personal representatives of her estate. We refer to them collectively as "the Casases."

[2]    Columbia Rio Grande Regional Healthcare, L.P., d/b/a/ Rio Grande Regional Hospital.

[3]    Because we conclude legally insufficient evidence supports the jury's verdict, we do not reach the Hospital's second issue— whether the Hospital preserved error regarding its proposed unavoidable accident instruction.

4    There was a several-day lag between taking the culture and ordering the prescription, presumably to allow the culture to grow and to transmit the results to the treating physicians. Thus, the Diflucan was prescribed on July 21 and the Vancomycin on July 23.

5    *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986, *amending* the Medical Liability and Insurance Improvement Act of Texas, Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. Former article 4590i § 13.01 was replaced by Texas Civil Practice and Remedies Code § 74.351, as amended.

6    When asked if the lapsed prescriptions affected Casas's hospital stay, Dr. Daller equivocated:
     A. I think that it certainly did impact it. However, I cannot quantitate that because there are multiple variables that are present in a clinical condition. Whether it lengthened her stay by one day, two days, three days, I cannot say that. What I would say from a scientific standpoint is that for four and a half days she did not receive appropriate therapy. Had she received the appropriate therapy then *you would expect* her length of stay to be shortened somewhat. To quantitate that, I could not do that.
     ....
     A. Obviously, not receiving antibiotics is not going to shorten your stay. Therefore, *if it impacted the stay* it must have lengthened it. (emphases added).

7    Admittedly, anaerobic bacteria are hard to culture because they are averse to oxygen.

8    Dr. Berkowitz testified:
     I think that there are a number of things that can cause things smelling bad besides just infection. Tissue that dies doesn't smell good. There's bacteria and products released by the dead tissue that don't smell good.
     And we know based on the pathology report of the cancer that they took out of her abdomen, that this had grown enough that it was dying. In other words, it was probably outgrowing it's [sic] blood supply and was starting to die. That in and of itself can smell bad. Then you have a wound that is infected; although Candida itself does not typically smell bad, not like something dead. It smells funky and people don't like the way it smells. The wound itself when it wasn't healing was probably having some necrotic tissue, as well, or dead tissue that is in the wound. I'm sure that smelled bad, as well. And they were never able to completely get rid of all that dead cancer tissue that was in her abdomen.
     I think there's a number of reasons why she would have had a bad smell, none of which can be explained by four or five days of not getting Flagyl [or] Maxipime.

9    In his dissent, CHIEF JUSTICE JEFFERSON argues that an expert report need not meet the legal sufficiency requirements necessary to support a judgment and suggests that we hold it must. We agree that an expert report need not "meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios,* 46 S.W.3d at 879. But, as we stated earlier, the report must provide more than conclusory statements concerning applicable standards of care, breach of those standards, and causation. *See id.* An expert report must instead, within its four corners, provide some explanation as to each of these elements. TEX.REV.CIV. STAT. art. 4590i § 13.01(r)(6); *Wright,* 79 S.W.3d at 52. The report here offered only a conclusory statement concerning causation with no explanation as to how the lapse in antibiotic treatment resulted in longer hospitalization, increased pain and suffering, or ultimately Casas's death.

10   In her dissent, JUSTICE LEHRMANN indicates that (1) she would remand the case to allow the Casases an opportunity to show that their failure to present an adequate report was not intentional or the result of conscious indifference, and (2) Dr. Jelinek should not be entitled to attorney's fees and costs if the Casases can make this showing and submit an adequate report. We note that the Casases did not request a remand of this nature, nor brief the attorney's fees issue. *See State v. Brown,* 262 S.W.3d 365, 370 (Tex.2008) (observing that "[a] party generally is not entitled to relief it does not seek" and refusing to sua sponte grant relief that was not sought); *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 410 (Tex.1997) (noting that ordinarily, failure to brief an argument waives error on appeal); TEX.R.APP. P. 38.1(h).

11   We briefly note that under former article 4590i a trial court's order denying a motion to dismiss premised on an inadequate expert report was not immediately appealable, as it now is under Texas Civil Practice and Remedies Code §§ 51.014 and 74.351. Nor did we definitively say that mandamus review was appropriate for such orders until almost four years after the trial court denied Dr. Jelinek's motion for dismissal and sanctions. *See In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 461–62 (Tex.2008). Thus, we do not fault Dr. Jelinek for waiting until final judgment to seek review of the trial court's order. *See Hernandez v. Ebrom,* 289 S.W.3d 316, 318 (Tex.2009) ("Generally, appeals may only be taken from final judgments...."). We mention this point because we have since cautioned that a defendant—having foregone the interlocutory appeal now available—risks losing the right to appeal following final judgment if, after a trial on the merits, the jury finds the defendant liable. *See id.* at 321. Even if the present statute applied here, this caution would not bar Dr. Jelinek's appeal because he was not a party at trial, having been nonsuited earlier. We will not bar a nonsuited defendant's appeal after final judgment because the jury finds him liable at a former codefendant's trial. Such a defendant did not call or cross-examine witnesses, present

evidence, or otherwise participate at trial and should not be bound by what happens there.

[1]     *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986, *amending* the Medical Liability and Insurance Improvement Act of Texas, Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. For ease of reference, I will refer to the relevant provisions as they were identified in article 4590i.

[2]     I refer to the estate, which was represented by Casas's husband and son, as "the Casases."

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

195 S.W.3d 91
Supreme Court of Texas.

Floyd E. JERNIGAN, M.D., Petitioner,
v.
Marie LANGLEY, Individually and as
Representative of the Estate of John Langley and
Mariah Langley, a Minor, Respondent.

No. 05–0299. | June 9, 2006.

**Synopsis**
**Background:** Wife of patient who died two days after emergency surgery brought medical malpractice action against attending physician and others. The 19th District Court, McLennan County, Ralph Strother, J., dismissed action against attending physician for failure to provide an expert report that satisfied the requirements of the Medical Liability and Insurance Improvement Act. Wife appealed. The Court of Appeals, 76 S.W.3d 752, reversed. Attending physician petitioned for further review. The Supreme Court, 111 S.W.3d 153, reversed. On remand, the Court of Appeals initially affirmed the district court's dismissal, but upon grant of wife's motion for rehearing, the Court of Appeals, 2005 WL 486759, reversed. Attending physician petitioned for review.

**Holdings:** The Supreme Court held that:

[1] expert reports failed to identify with specificity any action or inaction by attending physician that breached the applicable standard of care, and thus reports failed to comply with the Act, and

[2] expert reports could not constitute a good faith effort to comply with the Act, and thus trial court had no discretion but to dismiss claims against attending physician.

Judgment of Court of Appeals reversed.

**Attorneys and Law Firms**

**\*92** Greg White, Nancy Napier Morrison, Waco, Bob Burleson, Naman, Howell, Smith & Lee, L.L.P., Temple, for Petitioner.

Thomas B. Cowart, Law Offices of Windle Turley, P.C., Dallas, for Respondent.

**Opinion**

PER CURIAM.

The issue in this medical malpractice case is whether the plaintiff's expert reports meet the specificity requirements of section 13.01 of the Medical Liability and Insurance Improvement Act (the "MLIIA"). Former TEX. REV. CIV. STAT. art. 4590i, § 13.01.[1]

In September 1998, Marie Langley brought suit alleging that the death of her 46–year–old husband, John Langley, resulted from the negligence of Providence Hospital in Waco and several physicians, including Dr. Floyd Jernigan. The trial court dismissed Langley's suit against Dr. Jernigan for failure to provide an expert report that satisfied the requirements of section 13.01 of the MLIIA. The court of appeals reversed the trial court's dismissal. We reverse the judgment of the court of appeals and dismiss with prejudice Langley's claims against Dr. Jernigan.

On the morning of October 6, 1996, John Langley went to Providence Hospital complaining of stomach pain. An abdominal x-ray was performed, and John was diagnosed with fecal impaction. He was given a gallon of GoLYTELY to drink at home and was instructed to return that evening. He returned a few hours later in acute pain and was admitted to the hospital. John's condition worsened, and he underwent emergency surgery that evening. He fared poorly overnight and was operated on again the following day. John died the next morning, October 8, 1996.

Marie Langley filed this suit in September 1998, and filed two timely expert reports thereafter. In June 2000, Dr. Jernigan filed a motion to dismiss with prejudice under section 13.01(e) of the MLIIA based on alleged deficiencies in Langley's expert reports. At the hearing on the motion to dismiss, Langley argued that Dr. Jernigan had waived his statutory right to seek dismissal because he had waited more than 600 days to challenge the reports. Langley also moved for an extension of time to allow the late filing of a third expert report. The trial court denied Langley's motion for an extension of time, and then severed and dismissed Langley's claims against Dr. Jernigan. The court of appeals reversed, holding that Dr. Jernigan had impliedly waived his rights under section 13.01. 76 S.W.3d 752 (Tex.App.—Waco 2002). This Court disagreed, reversing and remanding the case back to the court of appeals. 111 S.W.3d 153 (Tex.2003).

On remand, the court of appeals initially affirmed the trial court's dismissal, **\*93** No. 10–00–00373–CV, 2004 WL 1211607, 2004 Tex.App. LEXIS 4972 (June 2, 2004), but nine months later issued a new opinion holding that Langley's reports were adequate under section 13.01, and therefore the trial court abused its discretion in dismissing Langley's claims against Dr. Jernigan, 2005 WL 486759, 2005 Tex.App. LEXIS 1687 (Mar. 2, 2005). Alternatively, the court concluded that the trial court abused its discretion in refusing to grant Langley a 30–day grace period under section 13.01(g) because Langley's failure to comply was not intentional or the result of conscious indifference. Id. 2005 WL 486759, at *5, 2005 Tex.App. LEXIS 1687 at *10–18.

[1] Under section 13.01(d)(1) of the MLIIA, a plaintiff bringing a health care liability claim must furnish an expert report within 180 days of filing suit. Former TEX. REV. CIV. STAT. art. 4590i, § 13.01(d)(1). The expert report need not marshal every bit of the plaintiff's evidence, but it must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm or damages claimed." Id. § 13.01(r)(6). If a claimant fails to file an adequate expert report timely, the trial court must dismiss a claimant's suit with prejudice upon motion by the defendant. Id. § 13.01(e). The trial court must grant a motion challenging the adequacy of an expert report only if the report does not represent a good faith effort to comply with section 13.01(r)(6)'s definition of an expert report. Id. § 13.01(1). Finally, upon timely motion, the trial court must grant the claimant a 30–day grace period to comply with the statute if the trial court finds that the claimant's failure to comply was "not intentional or the result of conscious indifference but was the result of an accident or mistake." Id. § 13.01(g).

[2] [3] A trial court's decision to dismiss under section 13.01(e) is reviewed for abuse of discretion. Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 877–78 (Tex.2001). Denial of a section 13.01(g) grace period is also reviewed for abuse of discretion. Walker v. Gutierrez, 111 S.W.3d 56, 63 (Tex.2003).

We held in Palacios that in order to constitute a good-faith effort under section 13.01(1), an expert report must "discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." 46 S.W.3d at 875.

[4] Limiting our section 13.01(1) adequacy analysis to the four corners of Langley's two timely-filed expert reports, id. at 878, it is notable that one report does not mention Dr. Jernigan at all, and the other report only mentions him in this single sentence: "At 4:30 p.m. [John Langley's] case was discussed with Dr. Jernigan and at 4:50 p.m. a lactulose enema was ordered."

Dr. Jernigan appears in only one line of one report. This passing reference does not identify with specificity any action or inaction by Dr. Jernigan that breached the applicable standard of care. This perfunctory mention alleges no misconduct whatsoever, much less discusses the required elements with "sufficient specificity" to inform Dr. Jernigan of "the conduct the plaintiff has called into question." Id. at 875.

As to the standard of care applicable to Dr. Jernigan, the court of appeals found that the following stand-alone statement in one of the reports captured the standard **\*94** of care for each defendant-physician: "surgical consultation should have been obtained once the x-rays demonstrated obstruction." 2005 WL 486759, at *2, 2005 Tex.App. LEXIS 1687 at *8–9. Even assuming *arguendo* that the standard of care applicable to every doctor reviewing such x-ray results is to obtain an immediate surgical consult, neither of Langley's expert reports asserts that Dr. Jernigan was ever provided with the x-ray results or had any independent duty to review them. Instead, the court of appeals indulges multiple inferences that are simply unsupported by the scant reports.

Moreover, according to the reports, the x-rays were taken on John Langley's first visit to Providence Hospital at 6:40 a.m. on October 6, 1996, whereas Dr. Jernigan did not become involved in John's treatment until the case was "discussed" with him at 4:30 p.m., nearly ten hours later. The expert reports state that the surgeons were called at 6:40 p.m., but do not assert that Dr. Jernigan personally failed to order a surgical consult prior to that time or that the roughly two-hour gap between when the surgeons were called and when they arrived at 8:30 p.m. was attributable to Dr. Jernigan.

We agree with the dissent below that Langley's expert reports failed to comply with section 13.01 because "[e]ven if we assume that the reports address the standard of care with respect to each doctor, ... neither report addresses how *Dr. Jernigan* breached the standard or how his unstated breach of duty caused John's death with sufficient specificity for the trial court, and Jernigan, to determine that the allegations against Jernigan had any merit." 2005 WL 486759, at *14, 2005 Tex.App. LEXIS 1687 at *51–52 (Gray, C.J., dissenting). A glancing

statement that John's case was "discussed" with Dr. Jernigan sheds no light whatsoever on what Dr. Jernigan allegedly did wrong, much less how his alleged error(s) proximately caused John's death. Thus, we conclude that the reports omitted statutory elements of Marie Langley's claim against Dr. Jernigan.

[5] Because Langley's expert reports omit at least one of the three specifically enumerated requirements of section 13.01(r)(6), they cannot constitute a good faith effort to meet the statutory requirements. *Palacios,* 46 S.W.3d at 879. Accordingly, the trial court had no discretion but to conclude, as it did here, that Langley's claims against Dr. Jernigan must be dismissed. *Id.* at 880.

The trial court did not abuse its discretion in dismissing Langley's claims against Dr. Jernigan. Accordingly, without hearing oral argument, we reverse the court of appeals' judgment and dismiss with prejudice Langley's claims against Dr. Jernigan. TEX. R. APP. P. 59.1.

**Parallel Citations**

49 Tex. Sup. Ct. J. 717

Footnotes

[1]     Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 985–87 (adding expert report requirement, at former TEX. REV. CIV. STAT. art. 4590i, § 13.01(d)), *repealed and recodified as amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.09, 23.02(a), (d), 2003 Tex. Gen. Laws 847, 864, 884, 898–99 ("House Bill 4") (adopting chapter 74 of the Texas Civil Practice and Remedies Code, applicable only to actions filed on or after September 1, 2003, and continuing prior law in effect for actions filed before that date) (current version at TEX. CIV. PRAC. & REM CODE § 74.351).

**End of Document**                                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

362 S.W.3d 740
Court of Appeals of Texas,
Houston (14th Dist.).

KINGWOOD PINES HOSPITAL, LLC, Horizon
Health Corporation, Psychiatric Solutions, Inc.
and Yolanda Bassett, Appellants,
v.
R. GOMEZ, Individually and a/n/f of V.G.,
Appellee.

No. 14–11–00050–CV. | Nov. 22, 2011.

**Synopsis**
**Background:** Mother, individually and as next friend of her daughter, brought negligence, aiding and abetting assault, assisting or encouraging assault and medical malpractice action against physician, counselor and hospital, where daughter was being evaluated for a psychiatric condition following a history of sexual abuse, after daughter was molested by another patient. The 127th District Court, Harris County, R.K. Sandill, J., denied defendants' motion to dismiss based on an inadequate expert report. Defendants filed interlocutory appeal.

**Holdings:** The Court of Appeals, Martha Hill Jamison, J., held that:

[1] trial court did not abuse its discretion by finding that mother's expert was qualified to give an opinion; but

[2] expert report did not adequately set forth the standards of care and how those standards were breached;

[3] expert report did not adequately describe the causal relationship between defendants' failure to meet the standards of care and daughter's injury; and

[4] doctrine of res ipsa loquitur did not apply.

Reversed and remanded.

**Attorneys and Law Firms**

**\*743** Ryan Lee Clement, Houston, for appellants.

David K. Mestemaker, Norman Louis Straub, Jonathan Brian Zumwalt, Houston, for appellee.

Panel consists of Justices FROST, SEYMORE, and JAMISON.

**OPINION**

MARTHA HILL JAMISON, Justice.

This is a health care liability case governed by the Medical Liability Act.[1] Appellants bring an interlocutory appeal from the trial court's order denying appellants' motions to dismiss based on the asserted inadequacy of an expert report served by appellee R. Gomez, individually and as next friend of her daughter V.G. We reverse the trial court's order denying the motions to dismiss and remand this cause to the trial court to consider whether a 30–day extension of the deadline for serving the report to allow Gomez to address deficiencies is appropriate.

*Background*

V.G., a minor, was admitted into Kingwood Pines Hospital for evaluation of a psychiatric condition relating to her past history of being raped and subjected to sexual molestation in two separate incidents. As alleged, while in the care of Kingwood Pines Hospital, V.G. was molested by another female patient.[2] According to Gomez's expert, Dr. Mark Blotcky, Gomez asserted in an affidavit that hospital staff knew the other patient was aggressive, had been sexually abused, and had sexually molested others, but allowed the two patients to share a room and, accordingly, **\*744** did not prevent the other patient from having physical access to V.G.[3]

Gomez filed suit on February 24, 2010, against appellants and others,[4] alleging that they failed to provide a reasonably safe environment for V.G. and the other patient by allowing them to share a room. Gomez asserted claims against appellants for negligence, aiding and abetting assault, assisting or encouraging assault, and medical malpractice. She seeks actual and special damages.

On May 28, 2010, Gomez served an expert report and curriculum vitae prepared by Dr. Mark Blotcky, a board certified psychiatrist, in support of her claims. After appellants objected to the adequacy of the report, Gomez served a supplemental expert report.[5] Appellants objected

to the adequacy of the supplemental report on the same grounds as their former objections and moved to dismiss the claims with prejudice pursuant to the Act.[6] *See* Tex. Civ. Prac. & Rem.Code § 74.351(b). Appellants contended that the initial report was inadequate because Blotcky (1) did not establish his qualifications to opine regarding the standards of care for the admission, treatment, and care of patients in a psychiatric facility; (2) failed to articulate a fair summary of his opinions regarding the applicable standards of care, the manner in which those standards were breached by appellants, and the causal relationship between any breach and the injury and damages claimed; and (3) attempted to apply a single standard of care to multiple health care providers. After considering appellants' challenges to the expert report and supplemental report and hearing arguments of the parties, the trial court entered an order denying appellants' motions to dismiss.

### *Discussion*

In two issues, appellants contend the trial court abused its discretion in denying appellants' motions to dismiss because the expert and supplemental reports neither establish Blotcky's qualifications to render an opinion regarding licensed professional counselors, nursing staff, and hospital personnel nor include a fair summary of Blotcky's opinions in connection with the statutory elements required by section 74.351—the applicable standards of care, the manner in which the care rendered failed to meet those standards, and the causal relationship between the failure and the injury, harm, or damages claimed. *See id.* Gomez contends the reports meet the standards required by section 74.351, but even if they do not, an expert report was not required because the doctrine of *res ipsa loquitur* applies.

**\*745 A.** *Standard of Review and Applicable Law*
[1] [2] The Act entitles a defendant to dismissal of a health care liability claim if he is not served with an expert report showing that the claim has merit within 120 days of the date suit was filed. Tex. Civ. Prac. & Rem.Code § 74.351(b); *Scoresby v. Santillan,* 346 S.W.3d 546, 549 (Tex.2011). The trial court's refusal to dismiss may be immediately appealed. Tex. Civ. Prac. & Rem.Code § 51.014(a)(9); *Scoresby,* 346 S.W.3d at 549. We review a trial court's denial of a motion to dismiss under section 74.351 for abuse of discretion. *Jelinek v. Casas,* 328 S.W.3d 526, 539 (Tex.2010); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875, 878

(Tex.2001); *Group v. Vicento,* 164 S.W.3d 724, 727 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). Similarly, we review a trial court's determination of whether a physician is qualified to opine in a health care liability case under an abuse of discretion standard. *Larson v. Downing,* 197 S.W.3d 303, 304–05 (Tex.2006) (per curiam); *Mem'l Hermann Healthcare Sys. v. Burrell,* 230 S.W.3d 755, 757 (Tex.App.-Houston [14th Dist.] 2007, no pet.). A trial court abuses its discretion if it acts in an unreasonable or arbitrary manner or without reference to any guiding rules or principles. *Larson,* 197 S.W.3d at 304–05; *see also Jelinek,* 328 S.W.3d at 539.

[3] [4] The Act specifies requirements for an adequate report and mandates "an objective good faith effort to comply" with the requirements. Tex. Civ. Prac. & Rem.Code § 74.351(*l* ), (r)(6); *Scoresby,* 346 S.W.3d at 549. It also authorizes a trial court to give a plaintiff who meets the 120–day deadline an additional 30 days to cure any deficiencies in the report. Tex. Civ. Prac. & Rem.Code § 74.351(c); *Scoresby,* 346 S.W.3d at 549. The trial court should err on the side of granting the extension and must grant it if the deficiencies are curable. *Scoresby,* 346 S.W.3d at 549. When determining if a good faith effort has been made, the trial court is limited to the four corners of the report and cannot consider extrinsic evidence. *See Jelinek,* 328 S.W.3d at 539; *Palacios,* 46 S.W.3d at 878.

[5] [6] [7] [8] [9] [10] [11] An expert must establish that he is qualified to provide an acceptable report. Tex. Civ. Prac. & Rem.Code § 74.351(r)(5)(B). Qualifications must appear in the expert report and cannot be inferred. *Baylor Coll. of Med. v. Pokluda,* 283 S.W.3d 110, 117 (Tex.App.-Houston [14th Dist.] 2009, no pet.). Additionally, an expert report must provide a fair summary of the expert's opinions regarding (1) the applicable standard of care; (2) the manner in which the care provided failed to meet that standard; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See* Tex. Civ. Prac. & Rem.Code § 74.351(r)(6); *Palacios,* 46 S.W.3d at 879. In compliance with these standards, the expert report must incorporate sufficient information to inform the defendant of the specific conduct the plaintiff has called into question and provide a basis for the trial court to conclude the claims have merit. *Patel v. Williams,* 237 S.W.3d 901, 904 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (citing *Palacios,* 46 S.W.3d at 879). A report may not merely contain the expert's conclusions about these elements. *Jelinek,* 328 S.W.3d at 539; *Palacios,* 46 S.W.3d at 879. The expert must explain the basis for his statements and must link his conclusions to the facts. *Jelinek,* 328 S.W.3d at 539. However, a plaintiff need not present all the evidence necessary to litigate the merits of his case.

*Palacios,* 46 S.W.3d at 879; *Patel,* 237 S.W.3d at 904. The report may be informal in that the information need not **\*746** fulfill the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Palacios,* 46 S.W.3d at 879; *Patel,* 237 S.W.3d at 904.

**B.** *Dr. Blotcky's Qualifications*
Within their second issue, appellants argue that the expert and supplemental reports do not establish that Blotcky was qualified to render an opinion regarding a licensed professional counselor[7] or nursing staff and hospital personnel.

To be qualified to provide opinion testimony regarding whether a health care provider departed from the accepted standard of health care, an expert must satisfy section 74.402. *See* Tex. Civ. Prac. & Rem.Code § 74.351(r)(5)(B). Section 74.402 lists three specific qualifications an expert witness must possess to provide opinion testimony on how a health care provider departed from accepted standards of health care. The expert must:

(1) [be] *practicing health care* in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) [have] knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) [be] *qualified on the basis of training or experience* to offer an expert opinion regarding those accepted standards of health care.

*Id.* § 74.402(b) (emphases added).

The above emphasized terms are specifically defined in subsections (a) and (c) of section 74.402. "Practicing health care" includes:

(1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or

(2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.

*Id.* § 74.402(a). To determine whether an expert is "qualified on the basis of training or experience," a court must consider whether the expert:

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2) is actively practicing health care in rendering health care services relevant to the claim.

*Id.* § 74.402(c).

[12] Blotcky has been a licensed physician for 40 years and has practiced psychiatry for almost 35 years. He also has been a clinical professor in the Department of Psychiatry of The University of Texas Southwestern Medical Center at Dallas for almost 35 years. He is board certified in child and adolescent psychiatry and general psychiatry. When the expert report was served, he maintained a private practice, and approximately 66% of his patients were children and adolescents.[8] He previously served on the managing board of directors of a psychiatric hospital, was director of the hospital's Child and Adolescent Psychiatry Residency Program, and clinical director of the hospital. He examined **\*747** child psychiatrists for certification by the American Board of Psychiatry and Neurology for over ten years and served as Chair of the Committee for Certification of Child and Adolescent Psychiatry for that board.

Based on Blotcky's education, training, and experience in treating patients similarly situated to V.G.—an adolescent who was seeking treatment for her psychiatric conditions—and in working in a hospital setting, the trial court acted within its discretion in concluding that Blotcky is qualified to render an opinion on the standard of care at issue in this case. *See Pokluda,* 283 S.W.3d at 120. Similarly, Blotcky's hospital experience qualifies him to opine on the standards of care required for nursing staff and hospital personnel. *See* Tex. Civ. Prac. & Rem.Code § 74.402(c)(2); *see also Pokluda,* 283 S.W.3d at 118–19 ("The test is whether the report and curriculum vitae establish the witness's knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject.").

We hold that the trial court acted within its discretion by denying appellants' motions to dismiss as to Blotcky's qualifications, and we overrule that portion of appellants' second issue attacking the expert and supplemental reports on that basis.

## C. *Standard of Care and Breach*

[13] In both issues, appellants contend that the expert and supplemental reports do not adequately address each element required by subsection 74.351(r)(6) (standards of care, breach, causation and damages) because the reports are conclusory as to each element and do not represent an objective good faith effort to comply with the statutory definition of an expert report. We first address whether the reports set forth the applicable standards of care and how appellants breached these standards. We conclude that they do not.

As set forth above, the two-fold purpose of an expert report under section 74.351 is to inform the defendants of the specific conduct the plaintiff has called into question and to provide the trial court with a basis to determine whether or not the plaintiff's claims have merit. *Kelly v. Rendon,* 255 S.W.3d 665, 679 (Tex.App.-Houston [14th Dist.] 2008, no pet.). A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes. *Palacios,* 46 S.W.3d at 879. Rather, the expert must explain the basis of his statements to link his conclusions to the facts. *Jelinek,* 328 S.W.3d at 539; *see also Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999) ("An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts."); *Davis v. Spring Branch Med. Ctr.,* 171 S.W.3d 400, 406 (Tex.App.-Houston [14th Dist.] 2005, no pet.) ("[T]he expert report has to set out, in nonconclusory language, the expert's opinion about [the] three [statutorily required] elements of the claim.").

[14] [15] [16] [17] [18] Standard of care is defined by what an ordinarily prudent health care provider or physician would have done under the same or similar circumstances. *Palacios,* 46 S.W.3d at 880; *Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216, 222 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). Identifying the standard of care is critical: whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Palacios,* 46 S.W.3d at 880. While a "fair summary" is something less than a full statement of the applicable standard of care and how it was **\*748** breached, even a fair summary must set out what care was expected, but not given. *Id.* When a plaintiff sues more than one defendant, the expert report must set forth the standard of care for each defendant and explain the causal relationship between each defendant's individual acts and the injury. *CHCA Mainland L.P. v.*

*Burkhalter,* 227 S.W.3d 221, 227 (Tex.App.-Houston [1st Dist.] 2007, no pet.). While it is possible that a single standard of care may apply to several defendants, generic statements that the same standard of care attaches to each defendant without further explanation are conclusory. *See Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 859 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *see also Tenet Hosps. Ltd. v. Love,* 347 S.W.3d 743, 753 (Tex.App.-El Paso 2011, no pet.) ("If the standard of care is the same for each defendant, then the report must state so.").

[19] Blotcky's expert report addresses standards of care and breach as follows:

• Kingwood Pines Hospital was required to "supervise[ ] closely and house [ ] safely" any "aggressive [or] sexually aggressive 14 year old girl with a history of being both sexually molested and perpetrating sexual molestation herself so she could not harm another patient"[9] and provide treatment of patients such as V.G. "in a safe environment." The hospital staff "breached both these standards of care—effective, careful supervision of a predator and careful, effective protection of a molestation victim."

• Dr. Torres[10] and Bassett were required "to ensure that there were appropriately trained and adequate staffing and milieu structure" so that a "young" patient "would not be sexually molested." They breached "their duties to [V.G.]" by failing to do so.

The supplemental report further addresses these issues as follows:

• While they "may each have different standards of care in some areas," Kingwood Pines Hospital, Torres, and Bassett "share the most rudimentary responsibility for the safety and security of their patients ... in whatever therapeutic milieu their patient is being treated. The safety and security of any patient is always a most basic element in the standard of care." The "treating team" must "provide additional supervision" to patients with histories "of hurting themselves and being vulnerable to being hurt by others." Kingwood Pines Hospital, Torres, and Bassett breached this standard of care, as "[V.G.] was not afforded the most basic supervision under their care."

• Kingwood Pines Hospital must not "allow any harm to occur to any of its patients." The standard of care for the hospital "is to supervise the behavior **\*749** of each and every patient." "Based on the facts contained in the medical records," the hospital

breached its standard of care by failing to provide "a safe and secure environment" and "allowing" V.G. "to be molested by another patient."

• Bassett was required to "do anything necessary" to "insure that any patient she treats in [the] hospital ... has been admitted to a safe and secure milieu" by "be[ing] aware of the treatment milieu, patient population, and the structure and safety measures" in place. She breached the standard of care by failing to "insur[e] her patient's basic safety using any number of measures available."

Appellants complain that Blotcky's articulation of the applicable standards of care is deficient in two regards, first, that Blotcky improperly applies a single standard of care to multiple health care providers and second, that his articulation of the standard is conclusory.

***Single Standard of Care Applied to Multiple Health Care Providers.*** In the expert report, Blotcky applies a standard of care to Kingwood Pines Hospital separate from the standard he applies to Bassett and Torres. He states that the hospital was required to supervise known sexually aggressive patients and protect molestation victims from aggressive patients. By contrast, he applies a single standard of care to Torres and Bassett—to insure that the hospital had properly trained and adequate staffing so that a patient would not be molested. In the supplemental report, Blotcky clarifies that, although "they may have different standards of care in some areas," the hospital, Torres, and Bassett all shared the same responsibility for the safety and security of their patients. He further articulates the standard as to each party. The hospital was required to supervise every patient. Torres was required to "admit patients only to ... facilit[ies] that provide[ ] a safe and secure environment," "work with the treatment team to understand his patient's treatment and other needs," "consult with ... staff to insure ... his orders are understood and followed" and "know the inpatient program and how it implements a safe structure for patients who have been either victims or perpetrators of sexual assault." Similarly, Bassett was required to insure her patients are being treated in a safe and secure environment by being aware of the environment, patient population, and safety measures taken by the hospital.

We conclude that Blotcky articulates a standard of care for each appellant, although conclusorily, as set forth below. In the supplemental report, he adequately explains why the standards of care overlap as to the parties, which cures any deficiencies with regard to his applying the same standard to Torres and Bassett in the expert report. *See Tenet,* 347 S.W.3d at 753. We thus find without merit

appellants' argument that Blotcky improperly applies the same standard of care to multiple health care providers.

***Conclusory Articulation of Standard of Care.*** Other than containing conclusory statements regarding the provision of a secure environment, the supervision of patients, and the prevention of harm to patients, the reports do not indicate what an ordinarily prudent health care provider would do under the same or similar circumstances. *See Palacios,* 46 S.W.3d at 880. They merely include Blotcky's conclusion that appellants did not provide a safe and secure environment for V.G., but do not specify how this should have been accomplished. They are thus deficient in this regard. *See id.*

**\*750** ***Breach of the Standard of Care.*** Blotcky's statements regarding breach of the standard of care, such as Bassett's "failing to ensure that there were appropriately trained and adequate staffing and milieu structure such that a young girl (about whom they were forewarned was vulnerable) would not be sexually molested" and "breach[ing] the standard of care by not insuring her patient's safety using *any of the number of measures available* " and appellants' failing to "provide additional supervision" and "not afford[ing] [V.G.] ... *the most basic supervision* " are similarly conclusory. (Emphases added.) Whether a defendant breached the standard of care cannot be determined without "specific information about what the defendant should have done differently." *Id.* For example, the reports do not provide information about how Bassett was to insure that hospital staff were appropriately trained and adequately staffed or what "measures" were available to her to insure her patient's safety. Nor do the reports indicate what kind of supervision by the hospital or Bassett was necessary or "basic" to provide a secure environment for V.G.[11] Blotcky, moreover, states that the hospital breached its standard of care "[b]ased on the facts contained in the medical records," but does not indicate on what "facts" he relies to reach that conclusion.

We conclude that Blotcky's reports are deficient because they do not adequately describe applicable standards of care or breaches of those standards by each appellant.

### D. *Causation*

[20] Conclusory statements also plague Blotcky's efforts to satisfy the statutory element of causation. In the expert report, he simply states, "In medical probability, V.G. would be expected to suffer significant psychological damage especially from sexual molestation occurring to her in a treatment setting. The proximate cause of this was the hospital's failure as well as that of ... Ms. Bassett to

meet the standard of care." Likewise, he states in the supplemental report that appellants' breaches of the standards of care caused V.G.'s damages and "[h]ad [V.G.] and the other patients been properly supervised, [V.G.] would not have been assaulted."

These reports do not adequately describe the causal relationship between appellants' failures to meet the standards of care and V.G.'s injury: Blotcky provided no explanation regarding how and why these failures resulted in the alleged molestation. Rather, he provided bare assertions that appellants' failure to "properly supervise" the patients resulted in V.G.'s damages. He did not attempt to explain what constitutes proper supervision. Because the reports do not contain this required information, they are deficient. *See Jelinek,* 328 S.W.3d at 539–40; *Palacios,* 46 S.W.3d at 879 (holding reports that merely state expert's conclusions about causation are deficient).

### E. *Res Ipsa Loquitur*
Gomez also contends she was not required to serve expert reports because the **\*751** negligence alleged in this case rises to the level of *res ipsa loquitur.*

[21] [22] [23] *Res ipsa loquitur* is not a cause of action separate from negligence; rather, it is a rule of evidence by which the jury may infer negligence. *Losier v. Ravi,* 362 S.W.3d 639, 642–43 (Tex.App.-Houston [14th Dist.] 2009, no pet.). It applies to situations in which two factors are present: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence, and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant. *Id.* Further, the doctrine applies only when the nature of the alleged malpractice and injuries are plainly within the common knowledge of laypersons, requiring no expert testimony. *Id.*

[24] The legislature limited the applicability of *res ipsa loquitur* in health care claims only to those instances in which the doctrine had been applied by Texas appellate courts as of August 29, 1977. *See* Tex. Civ. Prac. & Rem.Code § 74.201. The three recognized areas in which *res ipsa loquitur* applies to health care claims are negligence in the use of mechanical instruments, operating on the wrong body part, and leaving surgical instruments or sponges inside the body. *Losier,* 362 S.W.3d at 642–43 (citing *Haddock v. Arnspiger,* 793 S.W.2d 948, 951 (Tex.1990)); *Hector v. Christus Health Gulf Coast,* 175 S.W.3d 832, 837 (Tex.App.-Houston [14th Dist.] 2005, pet. denied).

[25] While the nature of Gomez's claims of malpractice and V.G.'s alleged injuries may be plainly within the common knowledge of laypersons, Gomez would still have to show that her claim fell within one of the pre–1977 categories of cases in order for *res ipsa loquitur* to apply. *See Losier,* 362 S.W.3d at 642–43; *Hector,* 175 S.W.3d at 837. Because it does not, we find without merit Gomez's argument that she was not required to serve an expert report.

We hold that the trial court abused its discretion by denying the motions to dismiss because they do not adequately describe the elements required by subsection 74.351(r)(6). We thus sustain that portion of appellants' issues attacking the adequacy of the expert and supplemental reports because they are deficient.

### F. *Opportunity to Cure*
[26] In their second issue, appellants assert that because of the reports' deficiencies, no "expert report" has been timely served and this case should be dismissed. As discussed above, Gomez's reports are deficient. But even with these deficiencies, the trial court still has discretion to grant Gomez a thirty-day extension under section 74.351(c). *See* Tex. Civ. Prac. & Rem.Code § 74.351(c); *Scoresby,* 346 S.W.3d at 554. Gomez requested such an extension in the trial court, and the trial court has not ruled on this request. The appellants have not shown that Gomez is not entitled to a ruling on her request for a thirty-day extension under section 74.351(c).[12] *See* Tex. Civ. Prac. & Rem.Code § 74.351(c); *Scoresby,* 346 S.W.3d at 554. Therefore, while we agree with appellants that the reports are deficient, we conclude that this case should be remanded for the trial court to consider granting a 30–day extension to cure the reports' deficiencies under **\*752** section 74.351(c). Accordingly, we overrule appellants' second issue.

### Conclusion

We reverse the trial court's order denying the motions to dismiss filed by appellants and remand this cause to the trial court to consider whether a 30–day extension to allow Gomez to address the deficiencies in the reports is appropriate.

Footnotes

1    Tex. Civ. Prac. & Rem.Code §§ 74.001–.507. All references to the Act are to these provisions.

2    The other patient, also a minor, allegedly got into bed with V.G., "made out with her," touched her private parts, left visual marks (hickeys) on her, and threatened to beat her up if she told anyone.

3    The affidavit is not in the record, but the expert reported prepared by Dr. Mark Blotcky describes the affidavit and states that Blotcky relied on the affidavit in reaching his conclusions.

4    Gomez sued Kingwood Pines Hospital, LLC; Horizon Health Corporation; Psychiatric Solutions, Inc.; Psychiatric Solutions, P.C.; Fernando Guillermo Torres, M.D. and Yolanda Bassett. Gomez alleged that Kingwood Pines Hospital is owned by the other corporate defendants. Only Kingwood Pines Hospital, Horizon Health Corporation, Psychiatric Solutions, Inc., and Bassett filed this appeal.

5    The supplemental report was served on June 24, 2010, the 120th day after Gomez filed suit, so both reports were timely under the Act. *See* Tex. Civ. Prac. & Rem.Code § 74.351(a).

6    Kingwood Pines Hospital, Horizon Health Corporation, and Psychiatric Solutions, Inc. jointly filed their objections and motion to dismiss, and Bassett filed her objections and motion to dismiss separately. All of appellants' objections were based on the same grounds.

7    Bassett is a licensed professional counselor.

8    We assume this is still the case, but the record reflects only Blotcky's qualifications when the report was served.

9    We note that Blotcky bases his opinion on Gomez's affidavit stating that the patient who allegedly molested V.G. "was known by the hospital staff to be aggressive, to have been sexually abused and to be a sexual molester." We assume without deciding the accuracy of this allegation because we are confined to the four corners of the expert report in our consideration of its adequacy. *See Palacios,* 46 S.W.3d at 878. While an expert may rely on a statement that otherwise would not be admissible in evidence in formulating his opinions, *see Gannon v. Wyche,* 321 S.W.3d 881, 890–91 (Tex.App.-Houston [14th Dist.] 2010, pet. denied), it is unclear how Gomez obtained this information. *Cf. id.* at 892 ("[A]ll that is required is that [the] expert report informs the defendants of the specific conduct the plaintiffs have called into question and provides a basis for the trial court to conclude that the claims have merit.").

10    As set forth above, Torres is a defendant in the underlying case, but not an appellant.

11    Gomez argues that this case is akin to *Russ v. Titus Hospital District,* 128 S.W.3d 332 (Tex.App.-Texarkana 2004, pet. denied), which held that an expert report was sufficient relating to a claim filed by a mentally ill patient who was allowed access to an unsecured window out of which she fell. *Id.* at 344. But the expert report in that case specifically outlined that the standard of care required a suicidal patient not to be placed in a room with unlocked windows and what steps the hospital, doctors, and nurses should have taken to secure the windows, *id.* at 342, whereas the reports in this case merely state that V.G. should have been placed in a secure environment where patients were supervised, without specifying how this should have been accomplished.

12    Even if appellants had argued that Gomez's reports amount to no report at all and even if it were appropriate to address that argument at this juncture, we would still conclude that the reports satisfy the minimal standard in *Scoresby. See Scoresby,* 346 S.W.3d at 557.

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4179454
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

*MEMORANDUM OPINION*
Court of Appeals of Texas,
Austin.

Kristen KOCUREK, M.D., and Texas MedClinic,
Appellants
v.
Anthony D. COLBY, Appellee.

No. 03–13–00057–CV. | Aug. 22, 2014.

From the District Court of Travis County, 419th Judicial
District No. D–1–GN–12–000186, Tim Sulak, Judge
Presiding.

**Attorneys and Law Firms**

Anthony D. Colby, Austin, TX, pro se appellee.

Laura A. Macom, George F. Evans Jr., Brett B. Rowe,
Evans & Rowe, PC, San Antonio, TX, for appellant.

Before Chief Justice JONES, Justices GOODWIN and
FIELD.

*MEMORANDUM OPINION*

SCOTT K. FIELD, Justice.

**\*1** Appellants Kristen Kocurek, M.D., and Texas
MedClinic appeal from the trial court's denial of their
motion to dismiss appellee Anthony D. Colby's[1] suit for
medical malpractice based on Colby's alleged failure to
provide an adequate expert report as required by chapter
74 of the Texas Civil Practice and Remedies Code. *See*
Tex. Civ. Prac. & Rem.Code § 74.351. We will reverse
the trial court's judgment and remand for dismissal and a
determination of attorneys' fees.

**FACTUAL AND PROCEDURAL BACKGROUND**

Colby was under Kocurek's care for approximately two
months after sustaining injuries on the job; his primary
medical complaints were numbness and pain in his left
hip and tingling in his right hand. According to Colby,
Kocurek performed no physical examination on him and
instead had only oral conferences with him. Further,
Kocurek indicated to him orally that she would refer him
to a specialist, but never did.

After receiving treatment from Kocurek, Colby moved
out of state and transferred his care to an orthopedic
specialist there. Shortly thereafter, however, Colby
returned to see Kocurek, claiming new symptoms.
According to Colby's petition, at that visit Kocurek again
failed to examine him physically, ignored his symptoms,
and displayed an inappropriate demeanor toward him.

Colby filed suit against Kocurek and Texas MedClinic,[2]
alleging departures from accepted standards of medical
care that proximately resulted in injuries to him. Colby
alleged that Kocurek failed to meet the applicable
standards of care in failing to (1) perform a thorough
examination of him; (2) secure appropriate treatment for
him; (3) properly diagnose and treat him; (4) refer him to
or consult with a specialist; and (5) monitor his condition.
Colby also made a claim for fraudulent
misrepresentation/common-law fraud relating to
Kocurek's documentation of his injuries and treatment. In
addition, Colby claimed that Kocurek's actions caused (1)
a pinched nerve in his right hand to become entrapped, (2)
his left hip to develop bursitis and soft-tissue nerve
damage, (3) limited range of motion in his hip, as well as
constant pain and nerve damage that will worsen with
age, and (4) a need for surgery in his right hand due to
numbness, tingling, and serious pain.

After filing suit, Colby served appellants with the expert
report of Dr. Ronald Devere, a neurologist, to comply
with the expert-report requirement of section 74.351 of
the Texas Civil Practice and Remedies Code. *See id.*
Appellants then filed a motion to dismiss the suit,
claiming that Devere's expert report failed to satisfy the
statutory elements under section 74.351. After a hearing,
the trial court agreed with appellants that Devere's expert
report was deficient, but granted Colby a 30–day
extension to cure the deficiencies. In response to the trial
court's ruling, Colby served appellants with an amended
report from Devere. Appellants again filed a motion to
dismiss, contending that Devere's amended report
remained deficient. After a hearing, the trial court denied
appellants' motion to dismiss.[3] Appellants then filed this
interlocutory appeal. *See id.* § 51.014(a)(9).

## ANALYSIS

### Jurisdiction

**\*2** In response to appellants' appeal, Colby contends that this Court lacks jurisdiction over the appeal. Colby appears to argue that once a trial court grants a 30–day extension for a plaintiff to file an amended report and the plaintiff files an amended report, no appeal may be taken with regard to the trial court's ruling on the adequacy of the amended report. Colby argues that, in any event, a party may not appeal the denial of a motion to dismiss relating to the *adequacy* of the expert report. In support of his argument, Colby relies on this Court's opinion in *Academy of Oriental Med., L.L.C. v. Andra,* 173 S.W.3d 184 (Tex.App.-Austin 2005, no pet.). Our opinion in *Andra,* however, does not support Colby's position. In *Andra,* the defendant filed an interlocutory appeal of a denial of a motion to strike an expert report, not a motion to dismiss as in this case. *Id.* at 186. Because of the unique procedural posture in the *Andra* case, we concluded that the motion for relief was a motion under section 74.351(*l* ), for which there is no provision for an interlocutory appeal when denied. *Id.* at 189; *see* Tex. Civ. Prac. & Rem.Code § 51.014(a)(10) (allowing interlocutory appeal of order granting relief under section 74.351(*l* )). That is not the type of motion appellants filed in this case.

Appellants filed a motion to dismiss and request for attorneys' fees under section 74.351(b). *See* Tex. Civ. Prac. & Rem.Code § 74.351(b) (providing that physician provider may move to dismiss when sufficient expert report not served and 120–day deadline has expired). The denial of a motion to dismiss and request for attorneys' fees under section 74.351(b) is subject to interlocutory appeal under section 51.014(a)(9) of the Texas Civil Practice and Remedies Code. *Lewis v. Funderburk,* 253 S.W.3d 204, 208 (Tex.2008). Colby's jurisdictional complaint is overruled, and we now turn to the merits of this appeal.

### Sufficiency of Expert Report

In a health-care-liability claim, a claimant must provide each defendant with an expert report and curriculum vitae for each expert within 120 days of filing suit. Tex. Civ. Prac. & Rem.Code § 74.351(a). The expert report must summarize the expert's opinions "regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). After an expert report is filed, the defendant may object to the sufficiency of the report and move to dismiss the plaintiff's claims. *See id.* § 74.351(a), (b). In two appellate issues, appellants contend that the trial court abused its discretion in denying their motion to dismiss because (1) Devere is not a qualified expert to provide a report in this case, and (2) Devere's report is conclusory with regard to the element of causation. We will begin with analysis of whether Devere's report adequately demonstrates causation.

**\*3** When a party challenges the adequacy of an expert report, the trial court should sustain the objection only if it determines that the report does not represent an "objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(*l* ). To constitute a good-faith effort, the report must inform the defendant of the specific conduct called into question and provide a basis for the trial court to determine whether the claims have merit. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001). A report does not fulfill these purposes if it fails to address the standard of care, breach of the standard of care, and causation, or if it merely states the expert's conclusions regarding these elements. *Id.* The expert must link his conclusions to the facts of the case. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). We review a trial court's denial of a motion to dismiss under section 74.351 under an abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 878. However, "if an expert report contains only conclusions about the statutory elements, the trial court has 'no discretion but to conclude ... that the report does not represent a good-faith effort' to satisfy the statute." *Smith v. Wilson,* 368 S.W.3d 574, 577 (Tex.App.-Austin 2012, no pet.) (quoting *Palacios,* 46 S.W.3d at 877, 880). To perform its review, the trial court must look only to the four corners of the report itself. *Palacios,* 46 S.W.3d at 878.

Devere's eight-page report contains a paragraph on his qualifications, lists the issues he is reviewing and the materials used in that review, and states the background facts. The report then turns to a discussion of the standards of care for Kocurek's treatment of Colby and a discussion applying those standards of care to the facts presented. Finally, it contains a conclusion section. The report contains some detail of Colby's complaints, the standards of care applicable to those complaints, and an opinion as to whether Kocurek breached the applicable standards of care. Devere's report, however, contains nearly no discussion of causation to link Colby's alleged harm to Kocurek's actions.

Looking only to the four corners of the report, the following are the only statements from Devere's report that could potentially be considered as touching on causation:

• "Based on Dr. Kocurek's failure to act, secure treatment and properly execute a referral for Mr. Colby, his condition has worsened and he has suffered tremendously and unnecessarily." (from Background Facts section of report)

• "By not making this referral [to a specialist], Defendant, Dr. Kocurek, deceived Mr. Colby, created anxiety in Mr. Colby by making him think that a referral to a specialist was coming when it was not and resulted in a delay in Mr. Colby receiving any needed care, treatment or therapy that might have been recommended by a specialist, if that referral had been made." (from Application of Standard of Care section)

**\*4** • "In my expert opinion, the Defendant violated the applicable standard of care for physician's [sic] operating in the State of Texas based on the reasons mentioned above. Based on her actions or failures to act, Mr. Colby suffered and her actions or failures to act were a direct cause of worsening pain and numbness to Mr. Colby. Her violations of the standard of care resulted in a delay of Mr. Colby receiving appropriate care for his injuries, and the worsening of his symptoms." (from the Conclusion section)

• "Based on these worsening injuries, Mr. Colby has endured and will continue to endure significant pain, numbness and incapacity until he can receive the appropriate treatment to correct these conditions." (from the Conclusion section)

The issue is whether these statements, which appear to be the only attempts made at establishing causation in Devere's report, are sufficient to meet the requirements of section 74.351. We conclude they are not.

The problem with Devere's report is that it fails to show, within its four corners, what specific actions Kocurek did or did not take, or could have taken, that would have prevented Colby's symptoms or injuries. *See* Tex. Civ. Prac. & Rem.Code § 74.351(r)(5) (expert report must include "fair summary" or expert's opinion as to "causal relationship" between medical defendant's failure to meet standard of care and injury). Nowhere in the report does Devere actually state what specific violation of which standard of care led to a particular health problem of Colby's. The report lists five standards of care that Kocurek allegedly violated in her treatment of Colby and the specific ways Devere believes Kocurek violated those standards of care. Devere, however, did not provide facts that would explain a causal link between any of those

alleged breaches of the standards of care to any one of Colby's injuries.

An expert report must explain, to a reasonable degree, how and why the alleged breach caused the injury based on the facts presented. *See Jelinek v. Casas,* 328 S.W.3d 526, 539–40 (Tex.2010). The closest Devere's report comes to providing a causal link is in his statement that "[b]ased on [Kocurek's] actions or failures to act, Mr. Colby suffered and [Kocurek's] actions or failures to act were a direct cause of worsening pain and numbness to Mr. Colby. Her violations of the standard of care resulted in a delay of Mr. Colby receiving appropriate care for his injuries, and the worsening of his symptoms." This statement, however, never identifies which breach of which standard of care by Kocurek led to a worsening of Colby's pain and numbness. Further, the statement fails to identify how any specific injury sustained by Colby would have been prevented or lessened had he received "appropriate care" sooner. Devere's statement that referring Colby to a specialist might have made a difference in Colby's condition—"treatment or therapy that might have been recommended by a specialist, if that referral had been made"—amounts to nothing more than speculation. *See id.* at 539 (concluding that statement in expert report that breach of standard of care "in reasonable medical probability resulted in [injury]" was insufficient). The report does not explain what treatment or therapy a specialist would have provided had Colby been referred earlier or how such treatment or therapy would have prevented Colby's injuries. As a result, the statements in Devere's report regarding causation amount to "no more than a bare assertion that [Kocurek's] breach resulted in increased pain and suffering." *See id.* at 540.

**\*5** This Court has consistently required more than what Devere has provided in terms of expert testimony on causation in the context of section 74.351. *See Smith,* 368 S.W.3d at 577–78 (holding that expert report failed to show how doctor's alleged breach of standard of care caused patient to commit suicide); *Constancio v. Bray,* 266 S.W.3d 149, 157–58 (Tex.App.-Austin 2008, no pet.) (holding that expert report that alleged that breach of standard of care by doctor caused patient's death is insufficient when report did not explain how increased monitoring of patient, detection of hypoxemia, and other actions would have prevented patient's death); *Perez v. Daughters of Charity Health Servs. of Austin,* No. 03–08–00200–CV, 2008 WL 4531558, at \*4 (Tex.App.-Austin Oct. 10, 2008, no pet.) (mem.op.) (concluding expert report insufficient on causation because it did not link hospital's actions to patient's death or any cause of death and did not identify any specific injury that would have been prevented had hospital complied with standard of care). To find Devere's report sufficient on causation, we

would have to make inferences from beyond the four corners of his report; this we are not allowed to do.

Based on the record before us and the four corners of the expert report, we are left with no choice but to conclude that the report does not provide an adequate causal link between Kocurek's alleged shortcomings and Colby's symptoms or injuries. Because the report is insufficient as to Kocurek, it is also insufficient as to Texas MedClinic, which Colby sued solely on the basis of its alleged vicarious liability for Kocurek's actions. *See Smith,* 368 S.W.3d at 579. Accordingly, we sustain the appellants' second issue on appeal.[4]

**CONCLUSION**

We reverse the trial court's order denying appellants' motion to dismiss. We remand the cause to the trial court for a determination of attorneys' fees, *see* Tex. Civ. Prac. & Rem.Code § 74.351(b), and for entry of a final order dismissing Colby's claims against appellants.

Footnotes

[1]    Colby represents himself in this appeal as he did in the trial court proceedings.

[2]    Colby's claims against Texas MedClinic were solely for vicarious liability arising from Kocurek's actions.

[3]    The trial judge who denied appellants' motion to dismiss Devere's amended expert report was not the same trial judge who ruled that Devere's expert report was deficient in the context of appellants' first motion to dismiss.

[4]    Because appellants' second issue is dispositive of this appeal, we need not reach appellants' first appellate issue challenging the trial court's conclusion that the expert report adequately demonstrated Devere's qualifications as an expert.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 728068
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Eastland.

Kelly KUYKENDALL and Husband, Terry
Kuykendall, Appellants
v.
Michael J. DRAGUN, M.D. and West Texas
Urology, Appellees.

No. 11-05-00230-CV. | March 23, 2006.

**Synopsis**
**Background:** Patient filed medical malpractice action against surgeon who was brought in during surgery to address complications from perforation of patient's bladder. The 142nd District Court, Midland County, granted surgeon's motion to dismiss. Patient appealed.

**Holdings:** The Court of Appeals, Rick Strange, J., held that

[1] expert report submitted by patient did not satisfy statutory requirements, and

[2] trial court did not abuse its discretion when it denied patient's request for a 30-day grace period to amend report.

Affirmed.

On Appeal from the 142nd District Court, Midland County, Texas, Trial Court Cause No. CV45114.

**Attorneys and Law Firms**

Rick Dunbar, for Appellants.

Jack Tidwell, for Appellees.

Panel consists of WRIGHT, C.J., and McCALL, J., and STRANGE, J.

**MEMORANDUM OPINION**

RICK STRANGE, Justice.

**\*1** This is a medical malpractice action. Michael J. Dragun, M.D. and West Texas Urology filed a motion to dismiss contending that Kelly and Terry Kuykendall's expert report did not satisfy the requirements of TEX.REV.CIV. STAT. art. 4590i, § 13.01 (2001).[1] The trial court granted appellees' motion to dismiss and denied appellants' request for an extension of time to file an amended report. We find no error and affirm.

*Facts*

Kelly Kuykendall underwent a bilateral salphingo-oophorectomy and a laparoscopic-assisted vaginal hysterectomy on June 24, 2002. The surgery was performed by Dr. Brady Locke. Kelly's bladder was perforated during the surgery. Dr. Dragun was contacted and was asked to repair the injury. He performed a laparotomy and was assisted in the procedure by Dr. Locke.

The original surgery was scheduled for two hours. Because of the bladder complication, the surgery lasted six hours. Appellants allege that Kelly's peripheral nerves were damaged during the extended surgery.

Appellants filed a medical malpractice action against Dr. Dragun and other health care providers on May 29, 2003. They timely filed the expert report and curriculum vitae of Dr. Mearl A. Naponic. Appellees filed a motion to dismiss, contending the expert report did not satisfy the requirements of Article 4590i, section 13.01. Appellants responded that Dr. Naponic's expert report was sufficient and, alternatively, requested an Article 4590i, section 13.01(g) thirty-day extension. The trial court conducted a hearing and granted appellees' motion to dismiss and denied appellants' request for an extension.

*Issues*

In two issues, appellants contend that their expert report satisfies the requirements of

or, alternatively, that the trial court abused its discretion by denying their request for an Article 4590i, section 13.01(g) thirty-day grace period to amend their report.

### Standard of Review

A trial court's decision to dismiss a lawsuit because of an inadequate expert report is reviewed under an abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). A trial court's decision to grant or deny an Article 4590i, section 13.01(g) grace period is also reviewed under an abuse of discretion standard. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003).

A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.1985). A reviewing court is not allowed to substitute its judgment for that of the trial court when reviewing a discretionary decision. *Flores v. Fourth Court of Appeals,* 777 S.W.2d 38, 41-42 (Tex.1989). The mere fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate court in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer,* 701 S.W.2d at 241-42.

### Does Dr. Naponic's Report Satisfy Article 4590i?

**\*2** [1] In *Palacios,* 46 S.W.3d at 878-79, the supreme court outlined the criteria for evaluating the efficiency of expert reports. Specifically, the court wrote:

> [T]he expert report must represent only a good-faith effort to provide a fair summary of the expert's opinions. A report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. In setting out the expert's opinions on each of those elements, the report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit.

> A report that merely states the expert's conclusions about the standard of care, breach, and causation does

not fulfill these two purposes. Nor can a report meet these purposes and thus constitute a good-faith effort if it omits any of the statutory requirements. However, to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. (citations omitted)

Courts have identified additional considerations when multiple defendants are sued. In that instance, the expert report must provide an explanation of how each defendant specifically breached the applicable standard of care and how that breach caused or contributed to the cause of injury. *Taylor v. Christus Spohn Health Sys. Corp.,* 169 S.W.3d 241, 244 (Tex.App.-Corpus Christi 2004, no pet.).

That portion of Dr. Naponic's expert report which addressed Dr. Dragun's actions contained the following language:

> On June 24, 2002, Kelly Kuykendall underwent bilateral salphingo-oophorectomy, as well as a laparoscopic assisted vaginal hysterectomy. Theses [sic] surgical treatments were performed in an effort to relieve pre-operative symptoms of pelvic pain, dysmenorrhea and menorrhagia and failed medical management of same. The initial procedure scheduled for two hours was performed by Dr. Brady Locke and was complicated by an intra-operative injury to the bladder. The perforation of the bladder necessitated surgical repair; and, thus this two hour surgery evolved into a six hour surgery, involving a laparotomy to repair an incision into the bladder of approximately eight to nine centimeters. This second surgery was performed by Dr. Michael Dragun and assisted by Dr. Brady Locke.

> The standard of care for such procedures as described above, necessarily require[s] that the peripheral nerves in and adjacent to the operative site be identified and protected. This is particularly true when a self-retaining retractor is used and the length of the surgery is prolonged. Complications, including nerve injuries, from self-retaining retractors are well-known and well-described in the relevant literature. Failing to properly pad the self-retaining retractor, failure to adequately position the patient and/or leaning on the patient during this prolonged surgery are the most likely cause of the intra-operative injuries and complications suffered by Kelly Kuykendall and are below the accepted standard of care for these procedures. As both Dr. Locke and Dr. Dragun performed the bladder repair, they shared the

responsibility to protect Kelly Kuykendall against this injury.

**\*3** A fair summary is something less than a full statement of the applicable standard of care and how it was breached. A fair summary must set out what care was expected but not given. *Palacios,* 46 S.W.3d at 880 ("[w]hether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently"). An expert report must show causation beyond mere conjecture. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). Knowing what specific conduct the plaintiff's expert has called into question is critical to both the defendant's ability to prepare for trial and the trial court's ability to evaluate the viability of the plaintiff's claims. *Palacios,* 46 S.W.3d at 876-77. Dr. Naponic's report does not provide this level of information because his analysis is premised on several assumptions and because he fails to distinguish between the actions of Dr. Locke and Dr. Dragun.

Dr. Naponic's analysis is similar to a res ipsa approach. Because Kelly suffered from peripheral nerve damage and because the relevant literature documents a connection between that injury and the failure to properly pad self-retaining retractors, improperly positioning the patient, or leaning on the patient, Dr. Naponic assumes that these are the "most likely" causes of her injury. He assumes further that Dr. Locke and Dr. Dragun are collectively responsible for one or more of these actions.[2]

There are several problems with this approach. First, Dr. Naponic's report does not document that a self-retaining retractor was even used or, if so, by whom. This is not a question of mere semantics. Dr. Dragun cannot be held responsible for any actions taken before he arrived in the operating room, nor can he be held responsible for improperly using equipment that was never utilized. Knowing what Dr. Naponic alleges Dr. Locke did during the initial portion of the procedure and what Dr. Naponic alleges happened during Dr. Dragun's portion of the procedure are vital.

Second, even assuming Dr. Dragun used a self-retaining retractor, Dr. Naponic did not document how it was padded or how it should have been padded. Third, the report does not document how Kelly was positioned at any point in time during her surgical procedure, nor how she should have been positioned during Dr. Dragun's procedure. Finally, the report provides no support for his hypothesis that Dr. Dragun leaned on Kelly beyond his contention that this is frequently the cause of her type of injury.

The supreme court's holding in *Palacios,* 46 S.W.3d at 873, that a trial court's decision to grant a motion to dismiss is subject to an abuse of discretion review, mandates that we provide trial courts with some deference when determining what constitutes a good faith effort to comply with the statute in a particular case. Because Dr. Naponic's report failed to provide specific information concerning Dr. Dragun's conduct, because he assumed the two doctors were equally responsible for Kelly's injury, and because Dr. Naponic relied upon assumptions to determine the "most likely" cause of her injury, we hold the trial court did not abuse its discretion when it granted appellees' motion to dismiss. Appellants' first issue is overruled.

### *Were Appellants Entitled To A Thirty-Day Extension To Amend Their Report?*

**\*4** [2] Article 4590i, section 13.01(d) required claimants to furnish an expert report within 180 days after the claim was filed. Article 4590i, section 13.01(g) gave trial courts the discretion to provide a thirty-day grace period to file an amended report if the failure to timely file an adequate report "was not intentional or the result of conscious indifference but was the result of an accident or mistake."

In their response to appellees' motion to dismiss, appellants included an alternative request for a thirty-day extension based upon their belief that Dr. Naponic's report was adequate and, if not, contended that their failure to provide an adequate report was due to accident or mistake and not an intentional act or conscious indifference. Appellants' request was supported by the testimony of their trial counsel who stated that he contacted Dr. Naponic based upon the referral of a general surgeon, that he provided Dr. Naponic with the relevant records and caselaw, that they discussed this case, that Dr. Naponic indicated that it would be difficult to distinguish from the medical records which defendant caused the intraoperative injuries absent an admission, but that Dr. Naponic informed him that all the health care providers shared a duty to protect Kelly. Counsel testified that he relied upon Dr. Naponic, who was a board-certified obstetrician and gynecologist, to provide him with a sufficient report and that he believed Dr. Naponic had done so.

The Texas Supreme Court faced a similar situation in *Walker,* 111 S.W.3d at 56. There, as here, claimant's counsel mistakenly believed that his expert's report was sufficient. The supreme court comprehensively reviewed intermediate court decisions on

13.01(g) extensions, finding that some courts were erroneously holding that any mistake of law was sufficient to support an extension while others were impermissibly applying a standard that precluded an extension because of a mistake of law. *Id.* at 63-64. According to the supreme court, some-but not all-mistakes of law may negate a finding of intentional conduct or conscious indifference and, therefore, support an extension. The distinction turns on the knowledge and acts of the claimant. *Id.* at 64.

The supreme court concluded that counsel's belief that his expert's report was sufficient, despite clear statutory requirement to the contrary, "does not establish a 'sufficient excuse' necessary to support a finding that a party made a mistake of law." *Id.* at 64-65. This follows because a medical malpractice claimant is charged with knowledge of Article 4590i, section 13.01 and its requirements. *Id.* Appellants distinguish *Walker* by alleging it involved a report which was absent the relevant standard of care and how the defendants breached that standard. Appellants contend that, if their report is inadequate, it is not because of the absence of a critical element but simply insufficient information.

**\*5** The trial court is best positioned to assess what appellants knew and to evaluate their actions. The extent and quality of the information available to a medical-malpractice claimant will vary from case to case. That information directly impacts the report a good faith effort will produce. We have found that the trial court did not abuse its discretion when it held Dr. Naponic's report was insufficient because Dr. Naponic failed to distinguish between the actions of the two doctors and because his analysis relies heavily on assumption. During oral argument, appellants' counsel pointed out that physicians are unlikely to admit to errors in their medical records and, therefore, that one cannot expect doctors to affirmatively state that they leaned on their patient during surgery. Even if we accept this as true, the medical

records would contain information on the surgical equipment utilized, the manner in which the patient was positioned, and the surgery conducted. Because two different doctors operated on Kelly, their respective records would provide information unique to each doctor and their procedures. The trial court could have reasonably concluded that in this case appellants had the ability to distinguish between the actions of the two doctors and determine what surgical equipment and procedures were utilized and that their failure to do so precluded a thirty-day grace period.

The cases decided since *Walker* indicate that the trial court's decision to grant or deny a thirty-day grace period when counsel argues that his mistaken belief that a report was sufficient constitutes a mistake of law, are afforded great deference due to their individual factual patterns. *Compare In re Zimmerman,* 148 S.W.3d 214, 217 (Tex.App.-Texarkana 2004, orig. pro-ceeding) (affirming the trial court's decision to grant a thirty-day grace period based upon mistake of law) *with Sandles v. Howerton,* 163 S.W.3d 829, 838 (Tex.App.-Dallas 2005, no pet.)(affirming the trial court's decision to not grant a thirty-day grace period based upon a mistake of law).

We cannot say that the trial court abused its discretion when it denied appellants' request for a thirty-day grace period. Appellants' second issue is overruled.

### *Conclusion*

The trial court did not abuse its discretion when it granted appellees' motion to dismiss and denied appellants' request for a thirty-day grace period. The trial court's judgment is affirmed.

Footnotes

[1]  Although applicable to this case, Article 4590i was repealed effective September 1, 2003; and the subject matter is now governed by TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp.2005).

[2]  In *Palacios,* the supreme court noted that, as a general rule, *res ipsa loquitur* does not apply in medical malpractice cases. 46 S.W.3d at 880. Consequently, an expert report must do more than simply assume that a health care provider is responsible for any surgical complication.

---

**End of Document**                                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 3246524
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

*MEMORANDUM OPINION*
Court of Appeals of Texas,
Austin.

McKENNA MEMORIAL HOSPITAL, INC.; and
Robert Donovan Butter, D.O., Appellants
v.
Sandra QUINNEY, Appellee.

No. 03-06-00119-CV. | Nov. 10, 2006.

**Synopsis**
**Background:** Patient brought health care liability action against emergency care physician and hospital alleging that physician negligently failed to diagnosis her infection. Physician and hospital moved to dismiss the action based on patient's alleged failure to provide a sufficient expert report. The District Court, 207th Judicial District, Comal County, Charles R. Ramsay, P.J., denied the motion. Physician and hospital brought an accelerated interlocutory appeal.

**Holding:** The Court of Appeals, Jan P. Patterson, J., held that the expert report offered by patient did not set forth the applicable standard of care, as required by statute.

Reversed and remanded.

From the District Court of Comal County, 207th Judicial District, No. C2005-1102B, Charles R. Ramsay, Judge Presiding.

**Attorneys and Law Firms**

Rebecca A. Copeland and Stephanie S. Bascon, for McKenna Memorial Hospital, Inc.

Susan Cooley and Dena B. Mastrogiovanni, for Robert Donovan Butter.

Kevin B. Miller and Mark A. Cevallos, for Sandra Quinney.

J. Truscott Jones, for Katharina A. Klouda, M.D.

Before Chief Justice LAW, Justices PATTERSON and PEMBERTON.

*MEMORANDUM OPINION*

JAN P. PATTERSON, Justice.

**\*1** This accelerated interlocutory appeal arises out of a health-care liability claim. Appellants McKenna Memorial Hospital, Inc., and Robert Donovan Butter, D.O., appeal the trial court's denial of their motions to dismiss appellee Sandra Quinney's lawsuit. They urge that she failed to provide a sufficient expert report as required by section 74.351 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (West Supp.2006). Because we conclude that the trial court abused its discretion by finding that the expert report was sufficient, we reverse the trial court's orders and remand for proceedings consistent with this opinion.

**FACTUAL AND PROCEDURAL BACKGROUND**

On February 23, 2003, two weeks after giving birth, appellee Quinney visited McKenna's emergency room. The intake form filled out by the triage nurse noted that Quinney complained of a two-day history of hip pain radiating down both legs. The report filled out by Dr. Butter, the emergency room treating physician, noted the chief complaint as "LBP" (low back pain), and "radiation" was circled under the report's musculoskeletal section. Dr. Butter diagnosed Quinney with radiculopathy, a disease of the spinal nerve roots, gave her prescriptions for Motrin and a muscle relaxer, and discharged her the same day.

On February 28, 2003, Quinney returned to McKenna's emergency room, where she was diagnosed with a methicillin-resistant *Staphylococcus aureus* (MRSA) infection. She was admitted to the intensive care unit that day and discharged from the hospital on March 11, 2003.

Quinney filed suit on February 14, 2005, alleging that McKenna and Dr. Butter were negligent in failing to diagnose and treat her MRSA infection during her first visit to McKenna's emergency room.[1] She alleges that as a result of the defendants' negligence she has suffered damages, including "mitral valve problems." In support of

her claims and in order to comply with section 74.351 of the civil practice and remedies code, *see id.,* Quinney proffered a report by Robert J. Lowry, M.D., which included Dr. Lowry's curriculum vitae. McKenna and Dr. Butter objected to the report and moved to dismiss Quinney's lawsuit pursuant to section 74.351. *See id.* Specifically, McKenna and Dr. Butter argued that the report failed to state the standard of care and the causal relationship between the alleged breach of the standard of care and Quinney's damages. McKenna also contended that Dr. Lowry, as a physician, was not qualified to render an expert opinion as to nursing care. The trial court determined that the report was sufficient and denied McKenna's and Dr. Butter's motions to dismiss. This accelerated interlocutory appeal followed.

## ANALYSIS

On appeal, McKenna and Dr. Butter urge that the trial court erred in determining the report was sufficient because the report does not discuss the standard of care and the causal relationship between the alleged breach of the standard and Quinney's damages. McKenna also argues that the trial court erred in accepting the report because Dr. Lowry is not qualified to give an expert opinion on nursing care.

### Requirements for expert reports

**\*2** In a health-care liability claim, the claimant must provide each defendant with one or more expert reports and include a curriculum vitae for each expert. *Id.* § 74.351(a). An "expert report" is defined as:

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between the failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). A court must grant a motion challenging the adequacy of the report "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(*l* ).

Because the statute focuses on what the report should discuss, the only information relevant to the inquiry is within the four corners of the document. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). A report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. *Id.* To constitute a good faith effort, the report must inform the defendant of the specific conduct called into question and provide a basis for the trial court to determine that the claims have merit. *Id.* at 879. A report does not fulfill these two purposes if it fails to address the standard of care, breach of the standard, and causation, or if it only states the expert's conclusions regarding these elements. *Id.*

Failure to serve an adequate expert report mandates dismissal with prejudice. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b). However, if an expert report cannot be considered served because elements of the report are found to be deficient, the trial court has discretion to grant one thirty-day extension to the claimant to cure the deficiency. *Id.* § 74.351(c).

### Standard of review

We review a trial court's ruling on a motion to dismiss under section 74.351(*l* ) for an abuse of discretion. *Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006) (per curiam) (citing *Palacios,* 46 S.W.3d at 877-78). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.1985). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Walker v. Gutierrez,* 111 S.W.3d 56, 63 (Tex.2003).

### Report of Dr. Lowry

In Dr. Lowry's three-and-one-half-page report, he opines that the problems in the health care Quinney received began with the nursing care during Quinney's first emergency room visit. In discussing how the triage nurse filled out the intake form, he states:

> **\*3** The interesting concern about how this page was filled out, is that despite the fact that this patient was two-weeks post-partum, and she was having pain anywhere near the pelvis, with a mild fever to boot, the GU, the GYN, and the Abdomen sections of the form

were checked-off as "N/A" (not applicable). These areas should have been at the top of the concern here. It appears to me that the triage nurse got stuck on the idea that this was a musculoskeletal issue and did not even consider that there was a potential post-partum medical issue at hand, despite the prompting via the pre-printed form.

....

The exam by the triage nurse totally dismisses an OB/Gyn possibility here, which becomes one of the early mistakes in my opinion.

After discussing the performance of the triage nurse, Dr. Lowry reviews Dr. Butter's examination of Quinney:

Here I see a few problems and the following bullet points will set-through my thinking here:

1. The patient presents and thus is known to have pain around the low back, hip, and down into the lower extremities;

2. She gave a history of being 2-weeks post partum;

3. a mild fever was noted at triage time, and her pulse is 123bpm;

With just that information above, most doctors I know would automatically be thinking a Gyn/Ob issue is possibly going on here and the "hip" or low-back pain may be being caused by this. There is also the chance that she truly has a direct low-back pain issue from a musculoskeletal standpoint given she has recently delivered a child. Both possibilities needed to be evaluated.

....

[W]hen the physician (Dr. Don Butler?) performs his history, he does not inquire about the noted (and already given) history of the 2-weeks post-partum issue, or of fevers, or anything else down that pathway, but just writes a brief note of the LBP. It appears he had already made his diagnoses before even seeing the patient. Worse yet, his exam was not one which was inclusive enough to actually have been examining for the cause of the LBP (essentially no orthopedic tests were listed as being performed). So although he came up with a diagnoses of "radiculopathy", his exam notes do not reflect such findings (no SLR test even being done, no neuro deficits found in the lower extremities, etc.) sufficient enough to lead anyone to come up with that diagnoses. Also, the intake form listed "hip" pain, he listed LBP (low back pain) as the chief complaint.

Although these two areas (hip and low back) [sic], the situation is such that the pain was apparently not specific enough to pinpoint one small spot and should have further lead the doctor to investigate the nature of the pain further. There is no listed characterization, or investigation of the nature of the pain listed in the history. So he did not take a thorough enough history, and failed to perform a thorough enough exam to even justify the "radiculopathy" diagnoses, let alone an ER visit for (any) pain, in a woman who also has a fever, and rapid pulse and being 2-weeks post partum. Furthermore, with what little he did do for an exam, his findings actually go away from a true radiculopathy-which again should have led him to investigate things further. The worst thing is that he neglected to do a thorough history (and thus missed the OB issue completely), and then did not examine the patient to the extent that the history (at least the one written down by the triage nurse) should have had him delve into the possibility of an OB etiology-and most of those options on the differential would be extremely life-threatening. He didn't even take any labs (from a person complaining of pain anywhere close to the pelvis, and two weeks out from a delivery!)-any one of several would have likely pointed towards the presence of a significant problem.

**\*4** Dr. Lowry then discusses Quinney's second visit to the McKenna emergency room, identifying as a mistake that Quinney was released even though "she was noted to have a fever just a few hours before release." He states that "she should not have been released unless she was afebrile for at least a whole uninterrupted 24 hours immediately prior to release."

In summarizing his comments, Dr. Lowry states, in part:

> [I]t appears to me that the Triage nurse for the ER visit of 2/23 was provided [sic] sub-par treatment/care (for not at least recognizing the possibility of a Ob/gyn problem existing and evaluating and recording such), and certainly for the ER doc that day who clearly didn't recognize the significant potential of an OB/gyn issue being at the root of the visit, and also for performing a sub-standard evaluation for the history presented by the patient to the ER, and even for a radiculopathy for that matter. Likely, had the source of the problem actually been looked for (simple labs and a

minimally complete physical exam) at this visit, the answers would have been staring them right in the eye and she would have been admitted that day, and undergone a much less exhaustive course the next couple months.

### Standard of care

In health-care liability claims, the standard of care is defined by what an ordinarily prudent health-care provider or physician would have done under the same or similar circumstances. *Palacios,* 46 S.W.3d at 880; *Strom v. Memorial Hermann Hosp. Sys.,* 110 S.W.3d 216, 222 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). "Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Palacios,* 46 S.W.3d at 880. The required statutory elements must be present within the four corners of the report and, thus, the courts will not make inferences to supply omitted elements. *See, e.g., Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002) (per curiam) (stating that court could not infer causation where expert report stated that plaintiff might have had "the possibility of a better outcome," but did not explain how the defendant's conduct caused the injury); *Russ v. Titus Hosp. Dist.,* 128 S.W.3d 332, 343 (Tex.App.-Texarkana 2004, pet. denied) (stating that it was not an abuse of discretion for the trial court to dismiss a suit against some parties where ascertaining the standard of care as to them required an inference; expert report detailed omissions of two nurses but did not address what conduct was necessary or required).

In *Palacios,* a case involving a patient's fall from a bed, the plaintiffs relied mainly on one statement in the expert report to establish the standard of care: "Mr. Palacios had a habit of trying to undo his restraints and precautions to prevent his fall were not properly utilized." 46 S.W.3d at 879-80. Holding that this statement was not a statement of a standard of care, the supreme court reasoned that neither the trial court nor the defendant would be able to tell from this conclusory statement whether the expert believed that the standard of care required the defendant "to have monitored Palacios more closely, restrained him more securely, or done something else entirely." *Id.* at 880.

**\*5** Dr. Lowry's report includes conclusory statements similar to the statement in *Palacios.* He states that on the intake form the triage nurse checked off as "N/A (not applicable)" three areas that "should have been at the top of the concern here," but he does not state what the triage nurse should have done differently in filling out the form. Dr. Lowry's report criticizes Dr. Butter for not conducting a "thorough enough history," for failing to perform a "thorough enough exam to even justify the 'radiculopathy' diagnoses," for not "delv[ing] into the possibility of an OB etiology," and for not taking any labs or x-rays. While in hindsight it may be possible to point out additional steps that could have been taken to diagnose Quinney's MRSA infection, Dr. Lowry's report does not explain what steps an ordinarily prudent physician would have been required to take. Dr. Lowry does reference other doctors in his report when he states that "most doctors I know would automatically be thinking a Gyn/Ob issue is possibly going on here and the 'hip' or low-back pain may be being caused by this." This comment falls short of invoking an appropriate standard of care, which inquires as to what an *ordinarily prudent doctor* would have *done* under the same or similar circumstances. *See Palacios,* 46 S.W.3d at 880.

Dr. Lowry's assessment of Quinney's second visit when, according to his report, she was released just a few hours after showing a fever is also deficient. While Dr. Lowry states that Quinney "should not have been released unless she was afebrile for at least a whole uninterrupted 24 hours prior to release," it is not clear that the standard of care required McKenna's staff to wait 24 hours. To the extent that the report states what an ordinarily prudent health-care provider or physician would *not* have done, it is addressing a breach of the standard of care rather than the applicable standard of care itself. *Strom,* 110 S.W.3d at 223.

### CONCLUSION

Because Dr. Lowry's report does not provide enough information to inform McKenna or Dr. Butter of the specific conduct Quinney has called into question or to allow the trial court to determine that Quinney's claims have merit, *see Palacios,* 46 S.W.3d at 878, it was an abuse of discretion for the trial court to find that Dr. Lowry's report was sufficient under the statute. We therefore reverse the trial court's orders denying the defendants' motions to dismiss and remand for further proceedings consistent with this opinion.[2]

Footnotes

1    Quinney also brought suit against her obstetrician and the hospital where she delivered her baby, but she non-suited claims against both of those parties.

2    Because the expert report, although deficient, was timely filed, the trial court has discretion to grant Quinney an extension of time to cure the deficiency. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c) (West Supp.2006); *Wells v. Ashmore,* No. 07-06-0232-CV, 2006 Tex.App. LEXIS 8182, at *8 n. 1 (Tex.App.-Amarillo Sept.15, 2006, no pet. h.); *Longino v. Crosswhite ex rel. Crosswhite,* 183 S.W.3d 913, 917 n. 2 (Tex.App.-Texarkana 2006, no pet.).

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

414 S.W.3d 724
Supreme Court of Texas.

PSYCHIATRIC SOLUTIONS, INC. and Mission
Vista Behavioral Health Services, Inc. d/b/a
Mission Vista Behavioral Health Center,
Petitioners,
v.
Kenneth PALIT, Respondent.

No. 12–0388. | Aug. 23, 2013.

**Synopsis**
**Background:** Mental health professional brought negligence action against employer stemming from injuries sustained while physically restraining a psychiatric patient during a behavioral emergency. The 166th Judicial District Court, Bexar County, Solomon Casseb, III, J., denied employer's motion to dismiss. Employer appealed. The San Antonio Court of Appeals, 415 S.W.3d 9, affirmed. Employer petitioned for further review, which was granted.

**Holding:** The Supreme Court, Guzman, J., held that mental health professional's negligence claim against employer was health care liability claim (HCLC) that required expert report.

Reversed and remanded with instructions.

Boyd, J., filed concurring opinion in which Lehrmann, J., joined.

**Attorneys and Law Firms**

**\*724** Ryan Lee Clement, Sepe Jones Andrews Callender & Bell, Houston, TX, for Petitioners Psychiatric Solutions, Inc.

Mark A. Cevallos, Kevin B. Miller, Law Offices of Miller & Bicklein, San Antonio, TX, for Respondent Kenneth Palit.

**Opinion**

Justice GUZMAN delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice GREEN, Justice JOHNSON, Justice WILLETT, and Justice DEVINE joined.

In *Texas West Oaks Hospital, LP v. Williams,* we held that a mental health professional employee's claims against his employer, a mental health hospital, alleging inadequate security and training were health care liability claims (HCLC) based on the 2003 amendments to the Texas Medical Liability Act (TMLA).[1] Here, we consider the claims of an employee health care provider against his employer, also a health care provider. The employee's claims arise from an incident similar to that in *West Oaks,* and we thus determine whether the employee's claim that the employer provided improper security of a **\*725** psychiatric patient and inadequate safety for the employee is an HCLC under the TMLA. As in *West Oaks,* we conclude here that the employee's claim is an HCLC, the employee is a claimant, and his failure to serve the defendant with an expert report within the TMLA's 120–day deadline mandates dismissal of his suit. Because the court of appeals concluded otherwise, we reverse its judgment.

## I. Background

Kenneth Palit was employed as a psychiatric nurse at Mission Vista Behavioral Health Center, operated by Psychiatric Solutions, Inc., and Mission Vista Behavioral Health Services, Inc. (collectively "Mission Vista"). On April 2, 2008, he was injured at work while physically restraining a psychiatric patient during a behavioral emergency. Palit subsequently filed suit asserting a cause of action for negligence against Mission Vista, seeking damages for personal injuries.

Over 120 days later, Mission Vista moved to dismiss Palit's suit, claiming the suit alleged an HCLC and must be dismissed because Palit failed to serve an expert report as required by section 74.351 of the TMLA. The trial court denied the motion to dismiss, and the court of appeals affirmed. 415 S.W.3d 9, 10.

## II. Discussion

Under the TMLA, a claimant is "a person ... seeking or who has sought recovery of damages in a health care liability claim." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(2). When a claimant asserts an HCLC, the claimant must comply with the TMLA's requirements, one of which is to serve an expert report within 120 days of filing suit. *Id.* § 74.351. Palit, is a claimant under the

TMLA if his suit is seeking damages in an HCLC. *Tex. W. Oaks Hosp., LP v. Williams,* 371 S.W.3d 171, 179 (Tex.2012) (holding the change from "patient" to "claimant" in the 2003 amendment to the HCLC definition in the TMLA now includes an employee of a health care provider who brings an HCLC). We must therefore determine whether Palit's claim is an HCLC to resolve whether Palit's suit must be dismissed for failing to comply with the TMLA's expert-report requirement.

In *West Oaks,* we held that a mental health professional employee's claims against his employer mental health hospital regarding inadequate security and training were HCLCs based on the 2003 amendments to the TMLA. *Id.* at 181. The 2003 Legislation amended the definition of an HCLC to mean:

> a *cause of action against a health care provider* or physician for ... claimed departure from accepted standards of medical care, *or health care, or safety* or professional or administrative services directly related to health care, which proximately results in injury to or death of a *claimant,* whether the claimant's claim or cause of action sounds in tort or contract.

Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 865 (current version at TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13)) (emphases added).

We explained in *West Oaks* that an HCLC has three basic elements:

> (1) a physician or health care provider must be a defendant; (2) the claim or claims at issue must concern treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's act or omission complained of must proximately cause the injury to the claimant.

**\*726** 371 S.W.3d at 179–80. The parties only dispute the second element here.

We addressed the second element in *West Oaks,* which involved a negligence claim by a mental health professional against his mental health hospital employer for injuries sustained in a physical altercation with a patient. *Id.* at 174–75. We reasoned that a "health care facility's 'training and staffing policies and supervision and protection of [a patient] and other residents are integral components of [the facility's] rendition of health care services.' " *Id.* at 181 (quoting *Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 850 (Tex.2005)) (alterations in original). Importantly, "by specific statutory directive[,] health care claims must involve a patient-physician relationship," and claims involving employee supervision of a patient at a mental health care facility can still qualify as a health care claim because the patient's presence at the facility is due to their patient-physician relationship. *Id.* Thus, because appropriate supervision and security of patients and "providing a safe workplace ... [for] caregiver[s] at a psychiatric facility are integral to the patient's care and confinement," those acts or omissions constitute "health care" under section 74.001(a)(10) of the TMLA. *Id.* at 182.

Following the 2003 amendments, HCLCs now include "departure[s] from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). Of these types of claims, safety is the only term not defined in the TMLA. *See, e.g., id.* § 74.001(a)(10), (a)(19), (a)(24) (defining "health care," "medical care," and "professional or administrative services"). Because "safety" is not defined, it is construed "according to its common meaning as being secure from danger, harm or loss." *Tex. W. Oaks,* 371 S.W.3d at 184.

Here, Palit's claim alleges he was injured "as a result of improper security of a dangerous psychiatric patient" because Mission Vista "failed to provide a safe working environment and failed to make sufficient precautions for [his] safety." As in *West Oaks,* these allegations fall under both the safety and health care components of an HCLC, indicating both an alleged departure from the accepted standards of safety, *see id.* at 186, and that Palit's health care provider employer violated the standard of health care owed to its psychiatric patients, *id.* at 182. In *West Oaks* we noted that Texas mental health statutes and regulations require that inpatient mental health facilities " 'provide adequate medical and psychiatric care and treatment to every patient in accordance with the *highest standards accepted in medical practice,*' " *id.* at 181 (quoting TEX. HEALTH & SAFETY CODE § 576.022(a)) (emphasis added), and that "[i]t would blink reality to conclude that no professional mental health judgment is required to decide what those [standards]

should be, and whether they were in place at the time of [the] injury," *id.* at 182. As such, we have held "that if expert medical or health care testimony is necessary to prove or refute the merits of a claim against a physician or health care provider, the claim is a health care liability claim." *Id.* Thus, because Palit's allegations implicate a standard of care that requires expert testimony to prove or refute it, his claim is an HCLC. *See id.*[2]

## *727 III. Conclusion

In sum, Palit's suit claims that Mission Vista departed from the accepted standards of safety and health care, which requires the use of expert health care testimony to support or refute the allegations. *Id.* at 182, 193. Thus, the claim is an HCLC. *Id.* at 182. As a person seeking recovery of damages in an HCLC, Palit is a claimant and was required to serve an expert report within 120 days of filing suit. TEX. CIV. PRAC. & REM.CODE § 74.351(a). Because he failed to serve an expert report, Mission Vista is entitled to a dismissal of the claim and reasonable attorney's fees and costs. *Id.* § 74.351(b). Mission Vista requested its attorney's fees and costs in the trial court pursuant to section 74.351(b)(1) of the TMLA. Accordingly, without hearing oral argument, TEX.R.APP. P. 59.1, we grant the petition for review, reverse the court of appeals' judgment, and remand to the trial court with instructions to dismiss Palit's claim against Mission Vista and consider Mission Vista's request for attorney's fees and costs. *Tex. W. Oaks,* 371 S.W.3d at 193.

Justice BOYD filed a concurring opinion, in which Justice LEHRMANN joined.

Justice BOYD, joined by Justice LEHRMANN, concurring.

I agree with the Court's conclusion that Palit's claims are health care liability claims subject to the Texas Medical Liability Act (TMLA), and I agree with the Court's disposition of those claims, which is consistent with the Court's prior decision in *Texas West Oaks Hospital, L.P. v. Williams,* 371 S.W.3d 171 (Tex.2012). I do not agree, however, with the *West Oaks* majority's broad construction of the "safety standards" component of the TMLA's definition of a "health care liability claim." Although this disagreement does not alter the proper disposition of this case, it relates to an important issue that I anticipate the Court will face again in future cases. I

therefore concur in the Court's judgment, but write separately to express and explain the nature of my disagreement.

The Texas Legislature has defined a "health care liability claim" to mean "a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). Prior to 2003, this definition included only "claimed departure [s] from accepted standards of medical care, or health care, or safety"—that is, it did not include the language "or professional or administrative services directly related to health care." Act of May 30, 1977, 65th Leg., R. S., ch. 817, § 1.03(a)(4), 1977 TEX. GEN. LAWS 2039, 2041 (former TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4)), *repealed by* Act of June 2, 2003, 78th Leg., R. S., ch. 204, § 10.09, 2003 TEX. GEN. LAWS 847, 884.

This Court has struggled to reach a consensus on the meaning of the word "safety," as used in both the prior and current versions of the statute. Under the prior version, a five-member majority of the Court first held that the Legislature's inclusion of the reference to "safety" standards "expands the scope of the statute *728 beyond what it would be if it only covered medical and health care," and thus includes "[p]rofessional supervision, monitoring, and protection of the patient population." *Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 855 (Tex.2005) (Wainwright, J., joined by Hecht, Medina, Johnson, and Willett, JJ., joined by Jefferson, C.J. as to Part III.B.3 ("Safety")). Chief Justice Jefferson joined the Court's discussion of "safety" and concluded in his concurring and dissenting opinion that the "statute's plain text" and "plain meaning" did not limit safety claims only to those that "involve health care" or "safety as it relates to the provision of health care." *Id.* at 860–61 (Jefferson, C.J., concurring in part and dissenting in part). Dissenting from the judgment, three Justices disagreed with Chief Justice Jefferson and agreed instead "with the Court" that the Act encompassed "safety" claims only "when those claims are directly related to the provision of health care." *Id.* at 866 (O'Neill, J., dissenting, joined by Brister and Green, JJ.).

The Court addressed the prior version of the statute again in *Marks v. St. Luke's Episcopal Hospital,* 319 S.W.3d 658 (Tex.2010). There, two members of the Court concluded that a cause of action alleging departures from accepted safety standards is a health care liability claim

only if the safety standards are "an inseparable or integral part of the patient's care or treatment," and held that the plaintiff's claims did, in fact, involve "an integral and inseparable part of the health care services provided" to him. *Id.* at 664 (Medina, J., joined by Hecht, J.).[1] Four Justices disagreed that the plaintiff's claims involved an integral component of his treatment, but noted that the claims would have satisfied the broader construction of the "safety" that Chief Justice Jefferson advocated in *Diversicare,* which the Court had rejected. *Id.* at 675–76 (Jefferson, C.J., joined by Green, Guzman, and Lehrmann, JJ., concurring in part and dissenting in part). Two other Justices separately concurred and expressly agreed with Chief Justice Jefferson's broader construction of the "safety" component in *Diversicare. Id.* at 672–74 (Johnson, J., joined by Willett, J., concurring).[2] One Justice declined to join any of the others' constructions of "safety" because "it is not necessary in this case, as it was not in *Diversicare,* to define the precise scope of 'safety' under the [Act]." *Id.* at 667 (Wainwright, J., concurring).

More recently, in *West Oaks,* the Court addressed the statute's current definition of a "health care liability claim," and a six-member majority held that "the safety component of [health care liability claims] need not be directly related to the provision of health care." *West Oaks,* 371 S.W.3d at 186. The Court concluded, *inter alia,* that the Legislature intended that the new phrase "directly related to health care" modify only the newly-added terms "professional or administrative services," and not the previously-existing term "safety." *Id.* at 185. The Court thus construed the statute to mean that any cause of action against a health care provider or physician claiming departure from accepted standards of "safety" is a health care liability claim, even if the safety standards are not "directly related to health care." *Id.* at 186. Three Justices dissented in *West Oaks,* concluding that, in adopting the 2003 amendments, the Legislature intended that the new phrase "directly related to health care" modify the term "safety" **\*729** as well as the terms "professional or administrative services." *See id.* at 198–99 (Lehrmann, J., joined by Medina and Willett, JJ., dissenting). They read the statute to mean that a cause of action claiming departure from accepted standards of "safety" is a health care liability claim only if it "arise[s] from a breach of a health care provider's duty to adequately ensure a patient's safety in providing health care services." *Id.* at 198.

As in *West Oaks,* the current statutory definition of a "health care liability claim" governs this case. I agree with the Justices who dissented in that case. For three primary reasons, I conclude that the Legislature intended the phrase "directly related to health care" to modify the term "safety" as well as the terms "professional or

administrative services," and thus claims asserting a departure from accepted safety standards are health care liability claims only if the safety standards are "directly related to health care."

First, I believe this construction is required in light of the statutory context and under the principle of ejusdem generis. *See Marks,* 319 S.W.3d at 663 (observing that "the principle of ejusdem generis warns against expansive interpretations of broad language that immediately follows narrow and specific terms, and counsels us to construe the broad in light of the narrow"). Even before the Legislature added the phrase "directly related to health care," some Justices on this Court concluded that, for this reason and others, the statute's reference to safety standards included only those standards related to patient care or treatment. *See Marks,* 319 S.W.3d at 663–64 (plurality op.); *Diversicare,* 185 S.W.3d at 866 (O'Neill, J., joined by Brister and Green, JJ., dissenting). Several of these Justices concluded that the Legislature's later addition of the phrase "or professional or administrative services directly related to health care" after the term "safety" indicates the Legislature's agreement with the narrower construction of the term "safety." *See Diversicare,* 185 S.W.3d at 867 (O'Neill, J., joined by Brister and Green, JJ., dissenting). Reading the statutory language in context, I agree that the most appropriate conclusion is that the Legislature added the phrase "directly related to health care" to modify the term "safety" as well as the terms "professional or administrative services."

Second, I believe we must attribute meaning to the Legislature's choice not to insert a comma after the word "safety" when it inserted the phrase "or professional or administrative services directly related to health care." Although I acknowledge the debate over usage of the Oxford or "serial" comma,[3] I necessarily attribute meaning to the lack of such usage in this instance. By inserting a comma after "safety," the Legislature would have clearly indicated its intent to separate that term from the newly-added language, so that health care liability claims would include claims alleging a departure from accepted standards of:

1. medical care, or

2. health care, or

3. safety, or

**\*730** 4. professional or administrative services directly related to health care ...

By choosing not to insert the comma, the Legislature instead tied the term "safety" to the new language, so that health care liability claims include claims alleging a departure from accepted standards of:

1. medical care, or

2. health care, or

3. safety or professional or administrative services directly related to health care ...

In my view, we must read the Legislature's choice not to insert a comma after "safety" as an indication of its intent that "safety" be included with "professional or administrative services," and thus modified by the requirement that the claim be "directly related to health care."

Finally, as other Justices have noted, this construction is most consistent with the purposes of the TMLA. *See id.; Marks,* 319 S.W.3d at 663–64. The Legislature enacted the TMLA's predecessor statute in 1977 for the express purpose of relieving a "crisis [having] a material adverse effect on the delivery of medical and health care in Texas." *West Oaks,* 371 S.W.3d at 177 (quoting Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(6), 1977 TEX. GEN. LAWS 2039, 2040 (repealed 2003)); *Marks,* 319 S.W.3d at 663 (same). In 2003, when the Legislature codified the TMLA and amended the definition of a health care liability claim, it noted that the State was "facing another 'medical malpractice insurance crisis' and a corresponding 'inordinate[ ]' increase in the frequency of [health care liability claims] filed since 1995." *West Oaks,* 371 S.W.3d at 177 (quoting Act of June 2, 2003, 78th Leg., R. S., ch. 204, § 10.11(a), 2003 TEX. GEN. LAWS 847, 884); *Marks,* 319 S.W.3d at 663 (same). The purpose of both the original statute and the 2003 amendments was to address crises affecting "medical and health care" and "medical malpractice insurance."

As Justice Medina observed in *Marks,* "given the object of the statute and the Legislature's express concern, it is apparent that the Legislature did not intend for standards of safety to extend to every negligent injury that might befall a patient." *Marks,* 319 S.W.3d at 664. Construing section 74.001(a)(13) to encompass all "safety" claims takes the statute far beyond the Legislature's stated purpose. For example, if a hospital visitor who is assaulted at night in the hospital's parking lot sues the hospital alleging that the hospital failed to provide adequate lighting and security, the visitor's claim would

be a health care liability claim under the Court's holding *West Oaks.* Unless I assume that the Legislature intentionally avoids the use of the Oxford comma, I am aware of nothing in the TMLA that indicates their intent to accomplish something so far outside the stated purpose of the statute and its amendments. I cannot attribute such great weight to such an assumption.

So far, the Court's disagreements over the construction of the statute have been of little consequence, because each time we have held that a claim satisfied the "safety" component we have also held the claim satisfied the "health care" component or that the safety standards were directly related to health care. *See West Oaks,* 371 S.W.3d at 181 (holding that hospital caregiver injured by mental health patient under his supervision asserted health care liability claims "based on claimed departures from accepted standards of health care"); *Marks,* 319 S.W.3d at 666 (holding that claim of recovering surgical patient injured when hospital bed footboard collapsed was a health care liability claim "[b]ecause the provision of a safe hospital **\*731** bed was an inseparable part of the health care services provided during [the patient's] convalescence from back surgery"); *Diversicare,* 185 S.W.3d at 849 (concluding that claims against nursing home for failing to prevent sexual assault by another patient were "claims for breaches of the standard of care for a health care provider because the supervision of Rubio and the patient who assaulted her and the protection of Rubio are inseparable from the health care and nursing services provided to her").

Here too, Palit alleges that Mission Vista departed from safety standards that, in my view, are "directly related to health care," so these claims are health care liability claims under section 74.001(a)(13).[4] Thus, although I disagree with the Court's construction of the statute, I concur in the Court's judgment. In light of the difficulty that the Court has had in reaching a consensus about the meaning of this statute, and because I anticipate that the Court will one day be required to address claims based on safety standards that are not directly related to health care, I write separately to express and explain my disagreement with the Court's construction.

**Parallel Citations**

56 Tex. Sup. Ct. J. 946

Footnotes

1    371 S.W.3d 171, 179 (Tex.2012).

[2] The concurrence believes that the Legislature's 2003 amendments to the TMLA indicate that claims alleging a departure from the accepted standards of safety must be directly related to health care to qualify as HCLCs. 415 S.W.3d 9, 11 (Boyd, J., concurring). Because the concurrence itself concedes that the claim here directly relates to health care, the opinion is advisory at best. *See Heckman v. Williamson Cnty.,* 369 S.W.3d 137, 147 (Tex.2012).

[1] Justices Wainwright, Johnson, and Willett joined other parts of Justice Medina's opinion, including the disposition.

[2] Justices Hecht and Wainwright joined other parts of Justice Johnson's concurring opinion.

[3] *See Omaha Healthcare Ctr., L.L.C. v. Johnson,* 246 S.W.3d 278, 282 (Tex.App.–Texarkana 2008) (discussing use of serial comma and debate), *rev'd on other grounds* 344 S.W.3d 392 (Tex.2011) and *abrogated by Tex. W. Oaks Hosp., LP v. Williams,* 371 S.W.3d 171 (Tex.2012); *see also* Lynne Truss, EATS, SHOOTS & LEAVES: THE ZERO TOLERANCE APPROACH TO PUNCTUATION (Gotham 2004) ("There are people who embrace the Oxford comma, and people who don't, and I'll just say this: *never* get between these people when drink has been taken.").

[4] As the Court agrees, Palit's claims "arise from an incident similar to that in *West Oaks,*" ante at 724, and "[a]s in *West Oaks,* [Palit's] allegations fall under both the safety and health care components of [a health care liability claim]." *Ante* at 726. As to the safety claims issue, this case is essentially identical to *West Oaks,* and it was as unnecessary to address the issue in *West Oaks* as it is to do so here; or, alternatively, it is as necessary to do so here as it was to do so there. If addressing the issue here constitutes an "advisory" opinion, then the Court's addressing of the issue in *West Oaks* was also an advisory opinion and the issue remains unresolved, which is exactly why I have addressed it here.

---

**End of Document**                                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

300 S.W.3d 343
Court of Appeals of Texas,
San Antonio.

REGENT CARE CENTER OF SAN ANTONIO II,
LTD. PARTNERSHIP d/b/a Regent Care Center of
Oakwell Farms and RCCSA II, Inc., Appellant,
v.
Barbara HARGRAVE, Individually and as
Executrix of the Estate of Dorothy Montgomery,
and Vernon Lloyd Pierce, Individually, Appellees.

No. 04–05–00274–CV. | Aug. 31, 2009.

**Synopsis**
**Background:** Executrix of nursing home resident's estate
filed medical malpractice action against hospital. Hospital
motioned to dismiss based on inadequate expert report.
The 150th Judicial District Court, Bexar County, Lori
Massey, J., denied hospital's motion. Hospital appealed.

**[Holding:]** The Court of Appeals, Rebecca Simmons, J.,
held that expert report did not contain necessary elements
of causation.

Reversed and remanded.

Opinion, 2009 WL 902233, superseded.

See also 251 S.W.3d 517.

**Attorneys and Law Firms**

***344** D. Ann Comerio, Law Offices of Ann Comerio, San
Antonio, TX, for Appellant.

Alex M. Miller, Mikal C. Watts, Francisco Guerra, IV,
Watts Guerra Craft LLP, San Antonio, TX, for Appellee.

Sitting: Chief Justice ALMA L. LÓPEZ[1], SANDEE
BRYAN MARION, Justice, REBECCA SIMMONS,
Justice.

**OPINION**

**ON APPELLEES' MOTION FOR REHEARING**

Opinion by: REBECCA SIMMONS, Justice.

The motion for rehearing filed by appellees Barbara
Hargrave, Individually and as Executrix of the Estate of
Dorothy Montgomery, and Vernon Lloyd Pierce,
Individually, is denied. This court's opinion and judgment
dated April 3, 2009, are withdrawn, and this opinion and
judgment are substituted.

This case is on remand from the Texas Supreme Court.
*See Regent Care Ctr. of San Antonio II, Ltd. P'ship v.
Hargrave,* 251 S.W.3d 517 (Tex.2008). On original
submission, we dismissed the appeal for lack of
jurisdiction holding that this Court lacked subject matter
jurisdiction to review the denial of the motion to dismiss
and for sanctions which was rendered moot by the trial
court's subsequent nonsuit. This court, however, never
reached the merits of the appeal. On remand, the sole
remaining issue is the adequacy of the expert report.

Appellants Regent Care Centers of San Antonio II,
Limited Partnership d/b/a Regent Care Center of Oakwell
Farms and RCCSA II, Inc. (Regent Care) appeal the ***345**
trial court's denial of its motion to dismiss based on an
inadequate expert report under former article 4590i of the
Texas Revised Civil Statutes. Appellees Barbara
Hargrave, Individually and as Executrix of the Estate of
Dorothy Montgomery and Vernon Lloyd Pierce,
Individually (collectively Hargrave) contend that the
expert report, taken in its entirety, provided sufficient
information for the trial court to determine that the
allegations against Regent Care had merit. On remand, we
hold the trial court erred in denying Regent Care's motion
to dismiss in accordance with the requirements set forth in
article 4590i. *See* Act of May 30, 1977, 65th Leg., R.S.,
ch. 817, § 1, sec. 13.01(d), 1995 Tex. Gen. Laws 985,
986, repealed by Act of June 2, 2003, 78th Leg., R.S., ch.
204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

**FACTUAL BACKGROUND**

On November 15, 2000, Dr. Rafael Parra performed back
surgery on seventy-two year old Dorothy Montgomery.
Approximately six days later, Mrs. Montgomery was
discharged for rehabilitation into the custody of Regent
Care. On December 18, 2000, Mrs. Montgomery was
transferred from Regent Care back to the hospital with
acute renal failure. By the time of her transfer, Mrs.
Montgomery was suffering from a staphylococci infection

and was septic due to an open and draining surgical wound on her back. Mrs. Montgomery was transferred back and forth between the hospital and Regent Care several times before her death on February 18, 2001.

Hargrave filed a medical malpractice lawsuit against two physicians and Regent Care. In order to comply with the Texas Medical Liability and Insurance Improvement Act (the Act), Hargrave timely filed an expert report prepared by Dr. Christopher M. Davey. *See id.*[2] Regent Care subsequently moved to dismiss the lawsuit, with prejudice, claiming the report did not comply with the statutory requirements. *See id.* sec. 13.01(e), (*l* ), (r)(6), 1995 Tex. Gen. Laws 985, 986–87. The trial court denied Regent Care's motions to dismiss, and this appeal followed.

## ADEQUACY OF EXPERT REPORT

Regent Care asserts that the trial court abused its discretion in denying Regent Care's Motion to Dismiss with Prejudice and for Statutory Sanctions and the motion to reconsider the same because the expert report inadequately explains causation. Hargrave contends the expert report contains sufficient information regarding causation for the court to have reasonably concluded the claims against Regent Care had merit.

### A. Standard of Review
[1] The standard of review of a trial court's order either dismissing or refusing to dismiss a medical malpractice claim for failure to comply with the expert report provisions of section 13.01(d) of article 4590i is abuse of discretion. *See Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). An abuse of discretion occurs when a trial court acts arbitrarily or unreasonably and "without reference to any guiding rules or principles." *Walker,* 111 S.W.3d at 62. A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Baylor Univ. Med.* **\*346** *Ctr. v. Biggs,* 237 S.W.3d 909, 916 (Tex.App.-Dallas 2007, pet. denied).

### B. Sufficiency of the Expert Report
[2] The Act defines an expert report as a written report by an expert that provides a fair summary of the expert's opinions regarding: (1) applicable standards of care, (2) the manner in which the care rendered failed to meet the standards, and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See* Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1, sec. 13.01(r)(6), 1995 Tex. Gen. Laws 985, 987 (repealed 2003). If a plaintiff fails to comply with section 13.01(d), a defendant may seek sanctions pursuant to section 13.01(e) and the trial court shall grant the motion to dismiss with prejudice and award costs and attorneys' fees to the defendant. *See id.* sec. 13.01(e), (f), 1995 Tex. Gen. Laws 985, 986. The dispositive question is whether the expert report represents a good-faith effort to comply with section 13.01(r)(6). *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 51–52 (Tex.2002) (citing Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1, sec. 13.01(r)(6), 1995 Tex. Gen. Laws 985, 987 (repealed 2003)).

[3] [4] [5] [6] [7] To constitute a good-faith effort to establish the causal relationship element under the Act, the expert "report need not marshal all the plaintiff's proof," or present evidence as if the plaintiff was actually litigating the merits. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 52–53; *accord Palacios,* 46 S.W.3d at 878. No magic words such as "reasonable medical probability" are required for the report to comply with the Act. *Bowie Mem'l Hosp.,* 79 S.W.3d at 53. The report must (1) "inform the defendant of the specific conduct the plaintiff has called into question," and (2) "provide a basis for the trial court to conclude that the claims have merit." *Palacios,* 46 S.W.3d at 879. A report that merely sets forth the expert's conclusions is insufficient to satisfy these two purposes. *Bowie Mem'l Hosp.,* 79 S.W.3d at 53. In assessing the adequacy of the report, the trial court may not make inferences and is confined to the four corners of the report. *Id.*

### C. Causation
Regent Care argues that the expert report filed by Dr. Davey is inadequate and, consequently, dismissal was mandatory. Regent Care challenges only the causation element of the report, and contends the report does not meet the statutory requirements because it is conclusory and based upon mere conjecture and possibility.[3] In particular, Regent Care complains that Dr. Davey's report: (1) contains conclusory statements as to causation and fails to link the alleged breaches to the injuries and damages alleged, and (2) fails to address the numerous allegations contained in the First Amended Original Petition. *See* Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1, sec. 13.01(*l* ), 1995 Tex. Gen. Laws 985, 987 (repealed 2003).

[8] [9] As to causation, in the concluding paragraph, Dr. Davey opines "the Breach of the Standard of Care as set

forth for each Physician and[/]or Nursing Home in this report was a proximate cause of the death of Dorothy Montgomery." Regent Care argues that the one sentence conclusion on causation is insufficient to satisfy article 4590i. We agree. While a claimant is not required to conclusively prove her case through a preliminary expert report, the report may not merely state conclusions **\*347** about any of the elements. *Palacios,* 46 S.W.3d at 879. " '[T]he expert must explain the basis of his statements to link his conclusions to the facts.' " *Bowie Mem'l Hosp.,* 79 S.W.3d at 52 (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). *Bowie* cautions that no " 'magical words' " are required to establish the necessary causal link. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 53. But, to avoid being conclusory, "the expert must explain the basis of his statements to link his conclusions to the **facts.**" *Bowie,* 79 S.W.3d at 52 (emphasis added) (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)).

Hargrave responds that the report provides "several statements about causation of Mrs. Montgomery's injuries (renal failure and sepsis) and eventual death, and provides factual information to allow the court to understand his causation opinions." Specifically Hargrave identifies the following two standards of care breached by Regent Care:

> (i) The nursing home staff did not adequately and timely inform the physician of the increasing amount of drainage from her back incision in December 2000, which reasonable staff in a similar situation would do[, and;]

> (ii) The nursing home allowed [Mrs. Montgomery] to become so dehydrated that she actually went into renal failure by 12/18/00. Her initial lab results indicate severe dehydration, which most likely occurred over several days and should have been physically apparent—i.e., not taking fluids, dry tongue, increasing lethargy. A reasonable nursing home in a similar situation would have noted her decline and alerted the physician much earlier.

In essence, Hargrave criticizes the nursing staff for failing to inform the doctors about Mrs. Montgomery's increased drainage and for allowing her to become dehydrated.

Dr. Davey's report provides that: "the cause of the renal failure was most likely dehydration, as it **resolved** just with fluid replacement" (emphasis added) thereby refuting dehydration as the cause of Mrs. Montgomery's death. Additionally, he fails to link Regent Care's failure to timely inform a physician of increased drainage in December 2000 to Mrs. Montgomery's subsequent death in February 2001 due to sepsis.[4] This is particularly true considering Mrs. Montgomery's admission to the hospital

and care provided by Dr. Wilcox in December. *See Costello v. Christus Santa Rosa Health Care Corp.,* 141 S.W.3d 245, 247 (Tex.App.–San Antonio 2004, no pet.) (criticizing the expert report as insufficient because it does not "explain the causal connection between [the hospital's] claimed omissions (failed to appropriately triage and evaluate) and [the patient's] death"). Dr. Davey's opinion fails to articulate facts connecting the criticized deviations from the standard of care by Regent Care with Mrs. Montgomery's dehydration, sepsis, or death.

*Bowie* cautions that no " 'magical words' " are required to establish the necessary causal link. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 53. But, to avoid being conclusory, "the expert must explain the basis of his statements to link his conclusions to the **facts.**" *Bowie,* 79 S.W.3d at 52 (emphasis added) (quoting **\*348** *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). Dr. Davey's opinion contains no information about the cause of Mrs. Montgomery's dehydration; we are, therefore, left to infer that because Mrs. Montgomery presented at the hospital with severe dehydration, Regent Care violated a standard that caused the dehydration. *See Villa v. Hargrove,* 110 S.W.3d 74, 79 (Tex.App.–San Antonio 2003, pet. denied) (noting that the expert report's statement that defendants should have " 'recognized' imminent sepsis and 'hospitalized' [plaintiff] does not explain how each failed to meet the explicable standard of care" and is conclusory). Accordingly, we conclude that Dr. Davey's expert report fails to establish a causal relationship between the alleged departure from a standard of care and Mrs. Montgomery's dehydration, sepsis, or death.

Dr. Davey's expert report required the trial court to infer causation, and under the four corners rule, the trial court is prohibited from doing so. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 52. It, therefore, follows that Dr. Davey's report was deficient as to causation and "the report does not represent a good-faith effort to comply with the [statutory requirements]." *See id.* at 51. Because we hold the expert report was inadequate as to causation, we need not address the allegations concerning negligence. *See* TEX.R.APP. P. 47.1 (requiring concise opinions addressing only those issues "necessary to find disposition of the appeal").

## CONCLUSION

The expert report fails to link Regent Care to Mrs. Montgomery's dehydration, sepsis, or subsequent death; thus, it does not contain the necessary elements of

causation. Accordingly, because the expert report is inadequate, the trial court abused its discretion in failing to dismiss the case against Regent Care, with prejudice, and award reasonable attorney fees. *See* Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1, sec. 13.01(e), (*l* ), 1995 Tex. Gen. Laws 985, 986–87 (repealed 2003). We, therefore, reverse the order of the trial court and remand this matter to the trial court for further proceedings consistent with this opinion.

Footnotes

[1]    Chief Justice Alma L. López, retired, not participating.

[2]    All health care liability claims filed before September 1, 2003, must comply with section 13.01(d) of article 4590i. *See* Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1, sec. 13.01(d), 1995 Tex. Gen. Laws 985, 986, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

[3]    Because Regent Care does not dispute that the expert report fairly summarizes the elements of applicable standard of care and breach, we review Dr. Davey's report as to the causation element only.

[4]    Although Hargrave suggests that Dr. Davey's report includes several statements regarding causation of "Mrs. Montgomery's injuries (renal failure and sepsis) and eventual death," the report clearly provides that Mrs. Montgomery "died of sepsis under palliative Hospice care 2/18/01."

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

128 S.W.3d 332
Court of Appeals of Texas,
Texarkana.

Robin Gwynne RUSS, Appellant,
v.
TITUS HOSPITAL DISTRICT, d/b/a Titus
Regional Medical Center, Peggy Burge, R.N.,
Rachel Meyers, R.N., and Dr. Mark E. Quiring,
Appellees.

No. 06–03–00032–CV. | Submitted Jan. 22, 2004. |
Decided Feb. 3, 2004.

### Synopsis

**Background:** Patient brought medical malpractice action against hospital, nurses, and doctor regarding her fall out a hospital window. The 76th Judicial District Court, Titus County, Jimmy L. White, J., dismissed complaint for untimely , inadequate expert's report. Patient appealed.

**Holdings:** The Court of Appeals, Carter, J., held that:

[1] trial court abused its discretion in refusing to grant 30-day extension to file report;

[2] expert's report was timely provided;

[3] expert's report met statutory requirements as to hospital and physician;

[4] expert's report failed to meet statutory requirements as to nurses; and

[5] physician was qualified to render expert opinions.

Affirmed in part, reversed in part, and remanded.

### Attorneys and Law Firms

**\*335** Paul D. Hoover, Paul D. Hoover & Associates, Texarkana, for appellant.

C. Victor Haley, John L. Price, Fairchild, Price, et al., Nacogdoches, A. Craig Carter, Davis & Davis, PC, Austin, for appellees.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice CARTER.

Robin Gwynne Russ appeals from a judgment dismissing her medical malpractice suit against Titus Hospital District, d/b/a Titus Regional Medical Center (the Hospital); Peggy Burge, R.N.; Rachel Meyers, R.N.; and Dr. Mark E. Quiring (collectively referred to as Appellees). Russ sustained injuries from a fall out of a hospital window. According to her allegations, the fall resulted from negligence of the various procedures employed by the Appellees while Russ was under their care awaiting transfer to a psychiatric hospital. Appellees moved to dismiss the case alleging the expert report was not timely filed and that it did not comply with the statutory requirements for an expert report. The trial court dismissed the suit. We affirm in part, reverse in part, and remand the case to the trial court for further proceedings consistent with this opinion.

Russ raises two issues on appeal. First, she argues the trial court abused its discretion in failing to allow an additional thirty days in which to file an expert report. Second, she contends the trial court erred in granting the motion to dismiss because the report was sufficient under Article 4590i.

On or about December 3, 1999, Russ sustained injuries from a fall out of a window. Russ filed suit against numerous parties, including the Hospital, on November 30, 2001. The petition alleged the Hospital was negligent in its treatment of Russ. Russ failed to file an expert report by May 29, 2002 (180 days after filing suit). On July 1, 2002, Appellees filed a motion to dismiss. On the day of the hearing, July 22, 2002, but before the hearing, Russ filed a motion to extend the deadline until August 15, 2002. The trial court held the hearing, but the record does not contain a ruling on either the motion to dismiss or the motion to extend the deadline. On August 16, 2002, Russ filed a second motion to extend requesting the deadline be extended to August 20, 2002, which was twenty-nine days after the hearing. On August 20, 2002, Russ provided Appellees a copy of the expert report by fax. Appellees filed a motion to exclude Russ' report **\*336** due to failure to comply with the deadline and for failure to meet the requirements of the statute. On October 2, 2002, a hearing was held and the trial court dismissed the lawsuit. Russ now appeals.

***Timeliness of Motion to Extend Time***

[1] [2] [3] [4] In her first point of error, Russ argues the trial court erred in failing to grant an additional thirty days in which to file an expert report. We review the trial court's ruling on a motion for extension of time to file an expert report under an abuse of discretion standard. *See Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003). An abuse of discretion occurs when a trial court acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *See Moore v. Sutherland,* 107 S.W.3d 786, 789 (Tex.App.-Texarkana 2003, pet. denied). A trial court will be deemed to have acted arbitrarily and unreasonably if it could have only reached one decision, yet reached a different decision. *Teixeira v. Hall,* 107 S.W.3d 805, 807 (Tex.App.-Texarkana 2003, no pet.). "[A] clear failure by the trial court to ... apply the law correctly will constitute an abuse of discretion,...." *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

[5] Article 4590i, Section 13.01(d) requires a plaintiff asserting a claim against a healthcare provider or physician to submit an expert report, along with the expert's curriculum vitae, no later than the 180th day after filing suit. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(d).[1] The Act requires an expert report to provide "a fair summary of the expert's opinions ... regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(6) (repealed 2003).

[6] Article 4590i, Section 13.01 provides two methods by which a claimant can receive an extension to the 180–day deadline. Under Section 13.01(f), "[t]he court may, for good cause shown after motion and hearing, extend any time period specified in Subsection (d) of this section for an additional 30 days. Only one extension may be granted under this subsection." TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(f) (repealed 2003). Section 13.01(f) has been interpreted by this Court to be directory rather than mandatory. *Roberts v. Med. City Dallas Hosp., Inc.,* 988 S.W.2d 398, 402 (Tex.App.-Texarkana 1999, pet. denied). Under the second method, found in Section 13.01(g), if "the court finds that the failure of the claimant or the claimant's attorney was not intentional or the result of conscious indifference but was the result of an accident or mistake, the court shall grant a grace period of 30 days to permit the claimant to comply with that subsection." Section 13.01(g) has been interpreted to be mandatory on a finding that the failure was a result of accident or mistake. *Sutherland,* 107 S.W.3d at 789. An extension under Section 13.01(g) can be obtained for either failure to file a report or for an inadequate report, provided the

failure was not intentional or a result of conscious indifference. *In re Morris,* 93 S.W.3d 388, 391 (Tex.App.-Amarillo 2002, no pet.).

**\*337** [7] The Appellees contend the expert report is untimely because the report was not filed within 210 days of the filing of the suit. Russ' first motion for extension of the deadline was filed on July 22, 2002. This motion requested an extension of the deadline until August 15, 2002, and was entitled "MOTION TO EXTEND TIME FOR FILING UNDER 4590(i) SECTION 13.01(F)." An extension under Section 13.01(f) extends the 180–day period described in Section 13.01(d) to 210 days.[2] Although this Court has noted the motion to extend the deadline can be filed at any time, the extension begins running at the end of the original 180–day time period in subsection (d) and lasts until 210 days from the filing of the suit. *See Roberts,* 988 S.W.2d at 402. Under an extension granted pursuant to Section 13.01(f), the expert report would have been required to be furnished to the opposing parties within 210 days of the filing of the suit. If the extension had been requested under Section 13.01(f), the expert report would have been required to be furnished to the Hospital and other defendants by June 28, 2002. The Appellees contend that, because the expert report was not furnished to the opposing parties until August 20, 2002, the expert report was not timely.

Even though the title refers to Section 13.01(f), our conclusion is that the substance of Russ' motion requested the extension under Section 13.01(g). In the motion and at the hearing, the parties recited the standards of Section 13.01(g) instead of Section 13.01(f) to the trial court. In the body of the motion, it is alleged that co-counsel was in trial and that counsel did not realize it was his responsibility to file the expert report. Such a statement is consistent with a showing of accident or mistake. In addition, the body of the motion states, "[t]his motion is timely since filed prior to the hearing on Defendants [sic] motions." This statement asserts the timeliness requirement of Section 13.01(g) rather than Section 13.01(f).

Further, at the hearing on July 22 at which the court considered the first motion to extend, the Hospital and Russ both argued under the standards of Section 13.01(g). Counsel for the Hospital stated:

> I think that the standard is in terms of when a motion like this for an extension is to be granted is when there's a showing of accident or mistake ... I'm not sure that there's any showing of accident or mistake on the part of Mr. Cooksey's part

[sic] ... I think they need to show some sort of accident or mistake on Mr. Cooksey's part to justify an extension....

"Accident or mistake" is the standard for a motion under Section 13.01(g), not Section 13.01(f), which requires "good cause." Shortly thereafter, Russ' counsel made the assertion to the trial court that "a motion to extend time is timely filed if it's filed before the time of the hearing on their motion to dismiss." As discussed above, this is the standard for Section 13.01(g) rather than Section 13.01(f). At this point, the trial court inquired if "the statute uses the language 'accident or mistake.' " The Hospital's counsel responded that the statute says there cannot be "conscious indifference," and Russ' counsel agreed. We not that counsel for Dr. Quiring stated the standard was "good cause," which is the standard under Section 13.01(f).

**\*338** [8] A motion should be construed by its substance to determine the relief sought, not merely by its form or caption. *See Surgitek, Bristol–Myers Corp. v. Abel,* 997 S.W.2d 598, 601 (Tex.1999). Because the motion contained allegations consistent with showing accident or mistake, contained the time standards for Section 13.01(g)—not Section 13.01(f), and at the hearing, it was primarily treated by counsel and the trial court in terms unique to Section 13 .01(g), we find the motion is one for extension under Section 13.01(g).

The next question is whether the first motion to extend was timely filed.[3] The first motion for extension was filed before the hearing. A motion under Section 13.01(g) "shall be considered timely if it is filed before any hearing on a motion by a defendant under Subsection (e) of this section." TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(g) (repealed 2003). A hearing on the Appellees' motion to dismiss under Section 13.01(e) was held on July 22, 2002. On the day of the hearing, July 22, 2002, but before the hearing, Russ filed the first motion to extend. Therefore, the first motion to extend was timely filed under Section 13.01(g).

Next, we must consider whether Russ demonstrated that she was entitled to an extension. Russ had to prove that the failure "was not intentional or the result of conscious indifference but was the result of an accident or mistake." *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(g) (repealed 2003). During the hearing, Russ' counsel offered to testify. The trial court stated he was "an officer of the court," which implied there was no need for counsel to take the stand or to be sworn. No objection was made by either defense counsel. Russ' counsel then explained: "we had some confusion about who was to do

what, and I think Don was relying on me, and I was relying on Don,...." In essence, counsel informed the court the two attorneys representing Russ erred in their communication as to which one of them had the responsibility to file the report.

[9] We note that these statements were not made under oath. The general rule is that an attorney's statements must be under oath to constitute evidence. *Banda v. Garcia,* 955 S.W.2d 270, 272 (Tex.1997). However, such error is waived by failure to object when the opponent knew or should have known an objection was required. *Id.; Sutherland,* 107 S.W.3d at 793; *Knie v. Piskun,* 23 S.W.3d 455, 463 (Tex.App.-Amarillo 2000, pet. denied). Similar to *Banda, Knie,* and *Sutherland,* the evidentiary nature of the statements was obvious, particularly after the attorney had offered to take the witness stand. We conclude the failure of either defense counsel to object waived the requirement that the statement be made under oath.

[10] Further, the statements are evidence of an accident or mistake. The mistake in this case involved a failure of communication between co-counsel, which resulted in the requirement being inadvertently overlooked. As such, the mistake is a mistake of fact which clearly triggers the extension.[4] As we noted in *Sutherland,* **\*339** the accident or mistake need not necessarily be a good excuse, provided the act or omission was, in fact, an accident or mistake. *Sutherland,* 107 S.W.3d at 792. If the failure to file a report resulted from an accident or mistake, even negligence does not defeat a right to an extension. *See id.; Roberts,* 988 S.W.2d at 403.

[11] Russ' counsel offered uncontroverted evidence that he did not act with conscious indifference or intentional disregard and that the failure resulted from an accident or mistake. Testimony by an interested witness may establish a fact as a matter of law if the testimony could be readily contradicted if untrue, and is clear, direct and positive, and there are no circumstances tending to discredit or impeach it. *Lofton v. Tex. Brine Corp.,* 777 S.W.2d 384, 386 (Tex.1989). Since the evidence was uncontroverted, the trial court abused its discretion in not making a finding of accident or mistake.

[12] [13] The final issue under Russ' first point of error is whether the expert report was timely provided to the opposing parties under Section 13.01(g). Section 13.01(g) provides a thirty-day "floating window," which begins to run on a finding of accident or mistake.[5] Because the extension is mandatory once it is established that the failure was not due to intentional or conscious indifference but rather an accident or mistake, the trial court must grant a thirty-day extension.

48 S.W.3d 259, 264 (Tex.App.-San Antonio 2001, pet. denied). Therefore, Russ should have received a thirty-day extension starting on July 22. Since the report was provided to the opposing parties on August 20, the expert report was timely within the thirty-day window.

When presented with uncontroverted evidence, the trial court should have found that the failure was not intentional or the result of conscious indifference, but rather due to accident or mistake. The motion was filed timely, and the expert report was timely provided to the opposing parties.

### Adequacy of Medical Report
[14] In her second point of error, Russ contends the trial court erred in dismissing the suit. Dismissal under Article 4590i, Section 13.01(e) is treated as a sanction and is reviewed for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001).

[15] If a claimant furnishes a report within the time permitted, a defendant may file a motion challenging the report. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(*l* ) (repealed 2003). The trial court shall grant the motion only if it appears to the court, after hearing, that the report does not represent a good-faith effort to comply with the statutory definition of an expert report. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(*l* ); *Palacios,* 46 S.W.3d at 877–78. In determining whether the report represents a good-faith effort, the trial court's inquiry is limited to the four corners of the report. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(6); *Palacios,* 46 S.W.3d at 878.

[16] Although the trial court stated as its reason for dismissing the lawsuit the **\*340** failure to meet "the 25 day extension,"[6] the order granting the dismissal did not specify a reason. A trial court cannot abuse its discretion if it reaches the right result, even for the wrong reason. *See In re Acevedo,* 956 S.W.2d 770, 775 (Tex.App.-San Antonio 1997, no pet.); *Hawthorne v. Guenther,* 917 S.W.2d 924, 931 (Tex.App.-Beaumont 1996, writ denied); *Luxenberg v. Marshall,* 835 S.W.2d 136, 141–42 (Tex.App.-Dallas 1992, no writ). Therefore, we must consider whether the suit should have been dismissed under the Appellees' alternative argument that the expert report was inadequate.

[17] [18] Omission of any of the statutory elements prevents the report from being a good-faith effort. *Palacios,* 46 S.W.3d at 879. A report that merely states the expert's conclusions about the standard of care, breach, and

causation does not meet the statutory requirements. *Id.* These three separate requirements must all be present and described with sufficient specificity.

[19] [20] [21] The expert report must set forth an applicable standard of care. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(6). The standard of care for a physician is what an ordinarily prudent physician would do under the same or similar circumstances. *Palacios,* 46 S.W.3d at 880. Identifying the standard of care is critical: "[w]hether a defendant breached his ... duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Id.* "While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, a fair summary must set out what care was expected, but not given." *Id.* In other words, the report must specify what the defendant should have done.

Second, the expert report must indicate how the defendant breached the standard of care. The report must indicate what actions taken by the defendant deviated from the standard of care. It must be a "fair summary" of the care which was expected, but not given. *Id.*

[22] The expert's report must also contain information on causation. It is not enough for a report to contain conclusory insights about the plaintiff's claims. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002); *Sutherland,* 107 S.W.3d at 790. Rather, the expert must explain the bases of the statements and link his or her conclusions to the facts. *Id.*

Russ presented an expert report in letter form from Mitchell H. Dunn, M.D. The report, in its entirety, states as follows:

It is my opinion, held to a reasonable degree of medical probability, that there were several deviations from the standard of care that directly contributed to the injuries sustained by Robin Russ on the evening of December 3, 1999.

Dr. Quiring deviated from the standard of care by failing to fully evaluate Ms. Russ' suicidal ideation and plans, and failing to inquire about the reason for her excessive serum Dilantin level. There is no evidence that he ever performed a mental status examination. It is evident that he believed the overdose was purposeful as his progress note read "Attention getting ? v. suicidal attempts." Also, it is clear that Ms. Russ was being held in the hospital awaiting transfer to a psychiatric hospital, indicating that she required further care in a psychiatric hospital setting. Dr. Quiring was aware of this and should have been aware of the MHMR

representative's concern that "client may try suicide **\*341** again." He further deviated from the standard of care by failing to order one-to-one observation of Ms. Russ. Her numerous episodes of attempting to get out of bed unsupervised, her very unsteady gait, and her history of impulsive, potentially life-threatening behaviors necessitated either one-to-one observation or restraints that were escape-proof. Either one of these interventions would have prevented Ms. Russ' injuries.

The hospital deviated from the standard of care by placing a patient with potential suicidal ideation and recent suicidal behavior in a fourth floor room with unlocked windows. It is the standard of care that windows either be secured with metal screens that only staff can open, or be locked. If the patient has access to the window, a special difficult to break glass or Plexiglass should be used. It is simply unacceptable that patients of that type could have access to an open window. Obviously, if there was no access to an open window, Ms. Russ' injuries would not have occurred.

The nursing staff at Titus Regional Medical Center also deviated from the standard of care by failing to pass on critical information regarding Ms. Russ' ICU behavior, including the fact that her dilantin toxicity was purposeful, her degree of agitation, her multiple attempts to get out of bed unsupervised, and her need for one-to-one supervision. Then, even after witnessing her agitation, her unsteady gait, and the fact that "Patient almost went over other side of bed head first," the nurses on the med.-surg. floor failed to restrain Ms. Russ or pursue a higher degree of supervision for her. If they had, Ms. Russ' injuries would not have occurred. In addition, the nurses' notes reflect knowledge that Ms. Russ had cigarettes but would not give them up when the staff requested that she do so. If they had obtained a doctor's order to confiscate Ms. Russ' cigarettes, perhaps she would not have tried to go out on the ledge.

[23] [24] The plaintiff must only make a good-faith attempt to provide a fair summary of the expert's opinions in the expert report. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(*l* ); *Palacios,* 46 S.W.3d at 875. A "good-faith" effort requires that the report discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. *Palacios,* 46 S.W.3d at 875. "[T]o avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment

proceeding or at trial." *Id.* at 879. The expert report is not required to prove the defendant's liability, but rather only provide notice of what conduct forms the bases of the plaintiff's complaints. "To constitute a 'good-faith effort,' the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit." *Wright,* 79 S.W.3d at 52 (citing *Palacios,* 46 S.W.3d at 879).

*Palacios* makes it clear that a claimant must present specific evidence in a medical report because "knowing what specific conduct the plaintiff's experts have called into question is critical to both the defendant's ability to prepare for trial and the trial court's ability to evaluate the viability of the plaintiff's claims." *Palacios,* 46 S.W.3d at 877. The Texas Supreme Court stated that "[w]hether a defendant breached **\*342** his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Id.* at 880. In other words, one must be able to determine from the report what the standard of care required to be done. This requires "specific information about what the defendant should have done differently." *Id.* However, the report is not required to use magical words. *Wright,* 79 S.W.3d at 53; *Sutherland,* 107 S.W.3d at 790. It is the substance of the opinions, not the technical words used, that constitutes compliance with the statute. *Sutherland,* 107 S.W.3d at 790.

[25] Dr. Dunn's report states his opinions concerning the standard of care, the breach, and causation relating to the Hospital in these particulars:

**Standard of Care:**

It is the standard of care that windows either be secured with metal screens that only staff can open, or be locked. If the patient has access to the window, a special difficult to break glass or Plexiglass should be used.

**Breach:**

The hospital deviated from the standard of care by placing a patient with potential suicidal ideation and recent suicidal behavior in a fourth floor room with unlocked windows.

**Causation:**

Obviously, if there was no access to an open window, Ms. Russ' injuries would not have occurred.

The expert report clearly provides the standard of care for the Hospital. It provides that the standard of care is that the window should have been locked or secured with metal screens. This is a specific allegation which provides the Hospital with notice of the conduct complained of by Russ. The report then provides that the standard of care was breached by placing a suicidal patient in a fourth floor room with unlocked windows. Again, this statement is specific and informs the Hospital of the conduct of which Russ is complaining. Last, the report states that, if Russ did not have access to an open window, her injuries would not have occurred. It is undisputed that Russ' injuries resulted from falling out of a fourth story window. Obviously, a party cannot fall from a window if one cannot exit through the window. The substance of the report gives fair notice to the Hospital of the negligent conduct on which Russ relies and provides a sufficient basis for the trial court to conclude that the claims have merit.

Dr. Dunn's report states his opinions concerning the standard of care, the breach, and causation relating to Dr. Quiring in these particulars:

**Standard of Care:**

Her numerous episodes of attempting to get out of bed unsupervised, her very unsteady gait, and her history of impulsive, potentially life-threatening behaviors necessitated either one-to-one observation or restraints that were escape-proof.

**Breach:**

He further deviated from the standard of care by failing to order one-to-one observation of Ms. Russ.

**Causation:**

Either one of these interventions [one-to-one observation or escape proof restraints] would have prevented Ms. Russ' injuries.

In contrast to the report in *Palacios,* the expert report here provides the Appellees and the trial court with the specific information **\*343** required. This report states that "[h]er numerous episodes of attempting to get out of bed unsupervised, her very unsteady gait, and her history of impulsive, potentially life-threatening behaviors *necessitated either one-to-one observation or restraints that were escape-proof.*" (Emphasis added.) The term

"necessitated" connotes that the actions which follow should have been done and were essential or vital. The expert stated that either one-to-one observation or escape restraints were necessary. It is clear from the report what the expert believes the physician should have done. Based on this information, the physician knew precisely the complained-of failures. Further, the trial court had information on which to evaluate the viability of Russ' claims. When discussing the actions of the physician, and his care to the patient, stating that a course of treatment is "necessitated" establishes the standard of care and complies with the requirements for a medical report.

[26] [27] Last, our analysis arrives at the conduct of the two remaining nurses, Peggy Burge, R.N., and Rachel Meyers, R.N. The expert report explains in detail the omissions of the nurses which he regarded as a breach of the standard of care. However, the report does not state what conduct was necessary or required and, therefore, gives no assistance to the trial court in attempting to evaluate the conduct of the nurses by the standard of care governing them. A trial court does not abuse its discretion in dismissing a suit in which one is required to infer the standard of care from the allegations in the expert report. *Wright,* 79 S.W.3d at 53. Thus, the trial court did not abuse its discretion in dismissing the suit as to the nurses because the standard of care must be inferred.

The report is a good-faith attempt to give a fair summary of the standard of care, the breach, and the cause of the injuries suffered as a result of that breach concerning the Hospital and Dr. Quiring. Because the report in this case is not conclusory and does not require inferences, the report adequately fulfills the requirements of the statute as it relates to the Hospital and Dr. Quiring.

Last, the Hospital argues in the alternative that the report is inadequate because Dr. Dunn is not a qualified expert and that he did not state whether his standard of care applies to a general hospital. We will briefly address these remaining arguments.

The Hospital contends the expert is not qualified because he has never worked in a general hospital. We disagree. Dr. Dunn meets the definition of an "expert" for the purpose of Section 13.01(r)(5)(A). TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(5)(A) (repealed 2003); *see* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 14.01(a), Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 2, 1995 Tex. Gen. Laws 988, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 884. Dr. Dunn is a board certified psychiatrist who has served as acting clinical director and medical director of the forensic program of Terrell State Hospital since 1995.

[28] [29] The Hospital also argues that the expert report fails to specify whether this standard of care applies to a general hospital or simply to a psychiatric hospital. It is apparent that Dr. Dunn knew the Hospital was a general hospital because he stated Russ was awaiting transfer to a psychiatric hospital. "The standard of care for a hospital is what an ordinarily prudent hospital would do under the same or similar circumstances." *Palacios,* 46 S.W.3d at 880. In addition to serving as the medical director of the forensic program at Terrell State Hospital, Dr. Dunn **\*344** also has a part-time practice in adult and forensic psychiatry. He has treated many patients with suicidal behavior and has had the responsibility to make decisions to prevent suicidal behavior. We have found that he has expressed the proper standard of medical and hospital care. He has training and experience to allow him to offer such opinions. The requirement of an expert report is to inform the opposing party of Russ' claim and to provide the trial court with a basis to conclude that the claim has merit. The report is not required to litigate the claim. *Id.* at 879. We find Dr. Dunn qualified to render such a medical report.

We have carefully examined the Texas Supreme Court's decisions in *Palacios* and *Wright,* and believe that this case is distinguishable. Unlike the reports examined in *Palacios,* the report in question is not conclusory as it pertains to Dr. Quiring and the Hospital. The report contains specific information which informs the Appellees what Russ is contending they should have done. Further, one is not required to infer a standard of care from mere insights provided by the report. Further, *Palacios's* two-part test to determine "good faith" was met concerning Dr. Quiring and the Hospital. Therefore, the trial court had no discretion to conclude that the report as it pertains to Dr. Quiring and the Hospital was not a good-faith effort.

Accordingly, we affirm the judgment of the trial court concerning Peggy Burge, R.N., and Rachel Meyers, R.N.; we reverse the judgment of the trial court concerning Dr. Quiring and the Hospital, and remand the case to the trial court for further proceedings.

Footnotes

1    TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01, Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985–87. This Act was repealed and recodified at TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon 2004) (effective September 1, 2003). Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 884. This action was filed November 30, 2001, before the new Act's September 1, 2003, effective date.

2    *Villa v. Hargrove,* 110 S.W.3d 74, 80 (Tex.App.-San Antonio 2003, pet. denied); *Doades v. Syed,* 94 S.W.3d 664, 673 (Tex.App.-San Antonio 2002, no pet.); *Landry v. Ringer,* 44 S.W.3d 271, 274 (Tex.App.-Houston [14th Dist.] 2001, no pet.); *Pfeiffer v. Jacobs,* 29 S.W.3d 193, 195–97 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *Roberts v. Med. City Dallas Hosp., Inc.,* 988 S.W.2d 398, 402 (Tex.App.-Texarkana 1999, pet. denied).

3    We note Russ also argues that the second motion made the expert report timely. This motion was clearly filed under Section 13.01(g). However, the second motion was not timely filed because it was not filed before the hearing. The second motion for extension was not filed until August 16, 2002, which was more than two weeks after the hearing. Therefore, the second motion for extension is not timely and we will not consider it.

4    We note that the Texas Supreme Court has held that not all mistakes of law are mistakes under the statute; specifically, "a purportedly mistaken belief that the report complied with the statute does not negate a finding of 'intentional or conscious indifference.' " *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003).

5    *See Salazar v. Canales,* 85 S.W.3d 859, 865 (Tex.App.-Corpus Christi 2002, no pet.); *Whitworth v. Blumenthal,* 59 S.W.3d 393, 399 (Tex.App.-Dallas 2001, pet. dism'd by agr.); *Hanzi v. Bailey,* 48 S.W.3d 259, 264 (Tex.App.-San Antonio 2001, pet. denied); *Broom v. MacMaster,* 992 S.W.2d 659, 663 (Tex.App.-Dallas 1999, no pet.); *cf. Horsley–Layman v. Angeles,* 968 S.W.2d 533, 536 (Tex.App.-Texarkana 1998, no pet.).

6    Russ' original motion requested a twenty-five-day extension.

---

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 6938538
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Houston (1st Dist.).

Vasudev SHENOY and Dario Zuniga, Appellant
v.
Penny JEAN, Individually, and as Wrongful Death
Beneficiary of Willie Ann Jean, Deceased, and on
Behalf of the Estate of Willie Ann Jean, Deceased,
and on Behalf of all Wrongful Death Beneficiaries
of Willie Ann Jean, Deceased, Appellee.

No. 01–10–01116–CV. | Dec. 29, 2011.

On Appeal from the 151st District Court, Harris County,
Texas, Trial Court Case No.2010–28302.

**Attorneys and Law Firms**

John G. Myers, Dee L. Dawson, Myers Doyle, Houston,
for Appellant Vasudev Shenoy.

Robert G. Smith, David O. Cluck, Scott B. Novak,
Lorance & Thompson, P.C., Houston, for Appellant Dario
Zuniga.

Monica C. Vaughan, for Penny Jean, Individually, and as
Wrongful Death Beneficiary of Willie Ann Jean,
Deceased, and on Behalf of the Estate of Willie Ann Jean,
Deceased, and on Behalf of all Wrongful Death
Beneficiaries of Willie Ann Jean, Deceased.

Panel consists of Chief Justice RADACK and Justices
SHARP and BROWN.

**MEMORANDUM OPINION**

HARVEY BROWN, Justice.

**\*1** In this interlocutory appeal,[1] Dr. Shenoy and Dr.
Zuniga appeal the trial court's orders denying their
motion to dismiss Penny Jean's healthcare liability claim
for failure to serve an adequate expert report. *See* TEX.
CIV. PRAC. & REM.CODE ANN. § 74.351(a) (West
2011). Penny's mother, Willie Ann Jean, died

approximately three weeks after gallbladder surgery as a
result of hypoxic encephalopathy. Dr. Zuniga performed
the surgery. Dr. Shenoy, a cardiologist, cleared Jean for
the surgery.

In two issues, Shenoy contends that the trial court abused
its discretion in denying his motion to dismiss because
Jean's expert, Dr. Mazzei, an anesthesiologist, is not
qualified to opine on the applicable standard of care for a
cardiologist, breach of that standard or causation, and his
report does not adequately address standard of care,
breach, or causation. In his sole issue, Zuniga contends
that the trial court abused its discretion because (1)
Mazzei is not qualified to offer an opinion on the
applicable standard of care for a surgeon, (2) the report
does not address how Zuniga caused Willie Ann's death
beyond mere conclusions, and (3) it is "impermissibly
cumulative"—that is, it does not adequately identify the
particular breaches of the standard of care or causation
with respect to each separate defendant. We reverse and
render an order dismissing the claims against Shenoy and
Zuniga.

**Background**

Mazzei's expert report provides the background facts in
this case. The medical records are not before us, and we
accept the factual statements for the limited purpose of
this appeal.[2]

Willie Ann Jean, age 57, was taken by ambulance to the
emergency room of Doctor's Hospital on February
15,2008, complaining of abdominal pain, vomiting, chest
pain of three hours' duration, and difficulty breathing. As
part of her admission, Willie Ann gave an extensive
medical history that included diabetes, hypertension,
angina, surgery for a brain aneurysm, coronary artery
disease, chronic obstructive pulmonary disease,
hypercholesterolemia, and a prior myocardial infarction.
Willie Ann reported she had experienced abdominal and
chest pain for years without treatment. Based on a
physical examination and ultrasound, the emergency
room physician, Dr. Mireles, determined that she had
polyps and diagnosed symptomatic gallstones in her
gallbladder. He recommended that she undergo surgery to
remove her gallbladder. He ordered a surgical
consultation and a cardiology consultation.

Shenoy, a cardiologist, saw her that same day, and noted
that Willie Ann had a two- to three-year history of
epigastric and right upper quadrant abdominal pain as

well as a history of a previous myocardial infarction and a cereberovascular accident (i.e., a stroke). Shenoy noted that Willie Ann had suffered chest pain, accompanied by shortness of breath and sweating for four to six hours earlier that day. Willie Ann also had an abnormal electrocardiogram (EKG). Shenoy's diagnosis was that Willie Ann had suffered an acute myocardial infarction, symptomatic gallstones, hypertension, and diabetes.

**\*2** Zuniga, a surgeon, performed the surgical consultation three days after her initial admission, on February 18, 2008. Zuniga confirmed the presence of gallstones, diagnosed inflammation of the gallbladder, and cleared Willie Ann for surgery to remove her gallbladder the next day, February 19, subject to a cardiology assessment. Dr. Shenoy saw Willie Ann again on February 18. A nuclear test was negative for ischemia. Shenoy also ordered an EKG, the results of which are included in Mazzei's report but the significance of which are not explained. Shenoy cleared Willie Ann for the gallbladder surgery.

Dr. Amin–Sankar, an anesthesiologist, performed a preoperative anesthesia assessment on February 19. He noted Willie Ann's past medical history, including her acute myocardial infarction and abnormal EKG. Amin–Sankar cleared Willie Ann for surgery.

On February 19, 2008, Zuniga performed the surgery. The surgery was an "uneventful" procedure. After leaving the post-anesthesia care unit (PACU), Willie Ann was to be sent to the intensive care unit because she had fluctuating oxygen saturation levels, inadequate ventilation, and shallowness of breath. Shortly thereafter, she was transported back to the PACU and was placed on a ventilator. According to Mazzei's report, Amin–Sankar prematurely extubated Willie Ann ten minutes later. Within a few minutes, Willie Ann was in respiratory arrest. She received CPR and medications, and Amin–Sankar reintubated her.

Thirty minutes later, Willie Ann was returned to the ICU. According to Mazzei's report, Jean became "agitated" and had trouble with the ventilator. She extubated herself and suffered a second respiratory arrest. She was re-intubated and given medications. An EEG the following day showed possible hypoxic encephalopathy—brain damage caused by lack of oxygen. A follow-up EEG the next day also indicated hypoxic encephalopathy. Mazzei's report does not discuss whether the EEGs differentiate between any damage caused by the first extubation and arrest and the second extubation and arrest. Willie Ann was unresponsive to stimuli, including painful stimuli. On February 25, Willie Ann was transferred to another facility for long-term care. She died on March 5, 2008 due to the hypoxic encephalopathy.

Penny filed a wrongful death medical malpractice suit against Doctor's Hospital, Mireles, Amin–Sankar, Shenoy, and Zuniga.[3] Penny alleged that Shenoy and Zuniga were negligent in clearing her mother for surgery. Specifically, Penny alleged that there was no emergency or urgent reason to remove her mother's gallbladder and that her mother had experienced abdominal and chest pain for years without treatment. In addition, Willie Ann had suffered an acute myocardial infarction before the gallbladder surgery and had a history of numerous health problems. Although she was stable, her history created additional risks that made her a poor candidate for surgery, and therefore Shenoy and Zuniga negligently cleared Willie Ann for the surgery.

**\*3** Penny timely served an expert report from Mazzei, an anesthesiologist.[4] Mazzei's report focused primarily on the anesthesiologist, Amin–Sankar. Concerning Shenoy and Zuniga, Mazzei stated that if Willie Ann "had not undergone elective surgery on February 19, 2008, she would not have experienced the respiratory arrests that resulted from her extubation and she would have, in all probability, survived."

Concerning Amin–Sankar, Mazzei's report states, "In reasonable medical probability, if Ms. Jean had not been prematurely extubated, she would not have had the increased demands placed on her body which caused her subsequent respiratory arrest, anoxic brain injury and death." He further explained in his general discussion of causation that the anesthesiologist should have been aware of the risks of premature extubation. A fair reading of Mazzei's report is that the premature extubation was the immediate cause of death:

> The time it takes for a patient's anesthesia effect to lessen enough for them to be able to breathe independently varies from patient to patient and is affected by a patient's physiology and underlying disease processes. For a patient like Ms. Jean who had recently suffered a MI, it should have been expected that it would take her a significant period of time before she was capable of being extubated to breathe on her own. This was not taken into account nor was her clinical picture when she was untimely extubated [by the anesthesiologist]. This caused her to suffer a respiratory arrest which further stressed Ms. Jean's ability

to recover from surgery and lead to another respiratory arrest with anoxic encephalopathy and death.... When Ms. Jean extubated herself, the failure to address her increasing respiratory distress resulted in a subsequent respiratory arrest causing the anoxic encephalopathy which lead to her death.

Shenoy and Zuniga moved to dismiss, asserting that the report was inadequate to them. The trial court granted Penny an opportunity to amend the report. After receiving the amended report, Shenoy and Zuniga again moved to dismiss due to inadequacies in the report. The trial court denied the motions to dismiss, and this interlocutory appeal followed.

### Standard of Review

We review a trial court's ruling on a motion to dismiss a healthcare liability lawsuit pursuant to Chapter 74 of the Texas Civil Practice and Remedies Code under an abuse of discretion standard. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001) (reviewing dismissal under predecessor statute, section 13(e) of article 4590i); *Runcie v. Foley,* 274 S.W.3d 232, 233 (Tex.App.-Houston [1st Dist.] 2008, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles or if it clearly fails to analyze or apply the law correctly. *Runcie,* 274 S.W.3d at 232. In reviewing whether an expert report complies with Chapter 74, we evaluate whether the report "represents a good-faith effort" to comply with the statute. *Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216, 221 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). In making this evaluation, we must look only at the information contained within the four corners of the report. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002).

### Adequacy of Dr. Mazzei's report

**\*4** In their respective appeals, Shenoy and Zuniga attack various aspects of the adequacy of Mazzei's report, asserting it fails to meet the requirements of section 74.351 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE § 74.351(a).

### I. Chapter 74 expert report requirements

Pursuant to section 74.351, medical-malpractice plaintiffs must provide each defendant physician and health care provider with an expert report or voluntarily nonsuit the action. *Id.* If a claimant timely furnishes an expert report, a defendant may file a motion challenging the report's adequacy. *Id.* The trial court shall grant the motion only if it appears, after hearing, that the report does not represent a good faith effort to comply with the statutory definition of an expert report. *See id.* § 74.351(*l* ). The statute defines an expert report as a written report by an expert that provides, as to each defendant, a fair summary of the expert's opinions, as of the date of the report, regarding: (1) the applicable standards of care; (2) the manner in which the care provided failed to meet the standards; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See id.* § 74.351(r)(6); *Gray v. CHCA Bayshore, L.P.,* 189 S.W.3d 855, 85859 (Tex.App.-Houston [1st Dist .] 2006, no pet.).

Although the report need not marshal all the plaintiff's proof, it must include the expert's opinions on the three statutory elements—standard of care, breach, and causation. *See Palacios,* 46 S.W.3d at 878; *Gray,* 189 S.W.3d at 859. In detailing these elements, the report must provide enough information to fulfill two purposes if it is to constitute a good faith effort: first, it must inform the defendant of the specific conduct the plaintiff has called into question, and, second, it must provide a basis for the trial court to conclude that the claims have merit. *Scoresby v. Santillan,* 346 S.W.3d 546, 556 (Tex.2011) (citing *Palacios,* 46 S.W.3d at 879). A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these two purposes. *Id.* " '[T]he expert must explain the basis of his statements and link his conclusions to the facts.' " *Wright,* 79 S.W.3d at 52 (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). Furthermore, in assessing the report's sufficiency, the trial court may not draw any inferences, and instead must rely exclusively on the information contained within the report's four corners. *See Scoresby,* 346 S.W.3d at 556 (citing *Palacios,* 46 S.W.3d at 878).

### II. Adequacy of report concerning causation

Within his second issue, Shenoy contends that Mazzei's report does not adequately address causation of Jean's injuries as a result of any negligence by Shenoy. As part of his sole issue, Zuniga similarly argues that the report is inadequate in its statement of causation for his alleged malpractice.

**\*5** An expert report must include a fair summary of the causal relationship between the defendant's failure to meet the appropriate standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). An expert cannot merely state his conclusions or "provide insight" about the plaintiffs' claims, but must instead "explain the basis of his statements to link his conclusions to the facts." *Wright,* 79 S.W.3d at 52.In explaining causation, the report must explain how the physician's conduct caused the plaintiff's injuries. *Id.* at 53.

### A. Assertions in Mazzei's expert report regarding causation

Mazzei's report asserts that the applicable standard of care breached by Shenoy included the responsibility to consider all of Willie Ann's co-morbidities because these conditions placed Willie Ann "at an unacceptably high risk for complications from surgery and anesthesia." The report identifies two risks from the surgery and anesthesia: (1) the stresses placed upon the cardiovascular and respiratory system during surgery and anesthesia and (2) the depression of the central nervous system and the resulting risk of "experiencing cardiovascular and respiratory problems." It also generally states that a patient's medical history may increase these risks. It does not, however, quantify or otherwise describe the magnitude of risk for respiratory problems for a person undergoing this surgery with normal health or compare that risk to the risk for a person with pre-existing medical conditions like Willie Ann's. According to the report, these risks are addressed by intubating the patient "so the anesthesiologist can ventilate the patients while their central nervous system is depressed" and that intubation normally continues "until the patient is able to again breathe on [his] own." The report continues:

> .... Although complications arose as Ms. Jean was extubated following surgery, these complications occurred because of the medical conditions that should have lead Dr. Shenoy to conclude that Ms. Jean was not an appropriate surgical candidate. If Ms. Jean had not undergone elective surgery on February 19, 2008, she would not have experienced the respiratory arrests that resulted from her extubation and she would have, in all probability, survived.

In the "Causation" section, the report further states:

> Ms. Jean was a patient who was still recovering from her MI who never should have undergone elective surgery. By continuing to recommend the gallbladder removal surgery, clearing her for surgery and performing surgery, Ms. Jean's healthcare providers breached and violated the standards of care as set forth above and proximately caused her death.

Finally, Mazzei states for a patient like Willie Ann "it should have been expected that it would take her a significant period of time before she was capable of being extubated to breathe on her own ."

### B. Adequacy of the report concerning Shenoy

**\*6** Mazzei's report states that the medical conditions that rendered Willie Ann unfit for surgery caused the complications that arose when she was extubated ("these complications occurred because of the medical conditions"). What he fails to do is provide a factual underpinning for that conclusion explaining why or how this occurred and whether it was all her medical conditions listed in his report or her myocardial infarction in particular that made the risk unacceptable and caused her respiratory arrest. These omissions make the report conclusory and deficient for purposes of section 74.351.

### 1. Expert reports cannot be conclusory to satisfy section 74.351.

An opinion on causation stated without the underlying facts is conclusory. *Jelinek v. Casas,* 328 S.W.3d 526, 536 (Tex.2010); *Arkoma Basin Exploration Co., Inc. v. FMF Assocs. 1990–A, Ltd.,* 249 S.W.3d 380, 389 n. 32 (Tex.2008). A conclusory opinion is not probative. *City of San Antonio v. Pollock,* 284 S.W.3d 809, 818 (Tex.2009); *see Zamecnik v. Indian Prairie Sch. Dist. No. 204,* 636 F.3d 874, 881 (7th Cir.2011) (stating that mere conclusions are useless to the court).

This rule is not a mere procedural hurdle. Juries—or in the case of expert reports, judges—are often confronted with conflicting expert testimony. One expert may testify that X caused the plaintiff's injuries while a different expert may testify that X did not cause the plaintiff's injuries. The factfinder typically lacks the expertise necessary to form an opinion without expert assistance—

this is why expert testimony is admitted in the first place. *See* TEX.R. EVID. 702. It is the expert's explanation of "how" and "why" causation exists that allows the factfinder to weigh the credibility of the expert's opinion and, when expert opinions conflict, to decide which testimony to disregard. *Cf. In re Christus Spohn Hosp. Kleberg,* 222 S.W.3d 434, 440 (Tex.2007) (detailing reasons why it is essential that the jury have access to the facts and data underlying an expert's testimony in order "to accurately assess the testimony's worth."). With respect to expert reports in healthcare liability claims, the expert's explanation is what allows the trial court to determine whether the claim has merit. *See Jelinek,* 328 S.W.3d at 539; *see also Scoresby,* 346 S.W.3d at 552 (observing that Legislature enacted expert report requirement to elicit expert opinions at an early stage of the litigation to allow the trial court to determine that a basis exists for concluding that the claims have merit). Expert testimony that merely states a final conclusion on an essential element of a cause of action—such as causation—without providing a factual basis for that conclusion does not aid the jury in its role as factfinder but, rather, supplants it. This, an expert may not do. *See Greenberg Traurig of N.Y., P.C.v. Moody,* 161 S.W.3d 56, 97 (Tex.App.-Houston [14th Dist.] 2004, no pet.) ("Expert testimony is admissible to aid the jury in its decision, but it may not supplant the jury's decision."). Similarly, an expert report that merely asserts that a defendant physician's breach caused the plaintiff's injury without providing a factual basis does not provide the trial court with the information necessary to evaluate the merits of the plaintiff's claim. *See Jelinek,* 328 S.W.3d at 529.

**\*7** The requirement that the expert's opinion must not be conclusory applies not only to trial testimony, but to expert reports required by section 74.351(a). *See Jelinek,* 328 S.W.3d at 539–40; *Wright,* 79 S.W.3d at 53.In *Jelinek,* the Texas Supreme Court found the trial court abused its discretion in denying a motion to dismiss because the expert's opinion on causation was conclusory. 328 S.W.3d at 539–40. The expert's report stated that "[the defendant's] breach of the appropriate standard of care in 'reasonable medical probability, resulted in a prolonged hospital course and increased pain and suffering being experienced by [the plaintiff].' " *Id.* at 539. The Court emphasized, "[T]he report says nothing more regarding causation." *Id.* The Court faulted the report for offering no explanation "tying the conclusion to the facts" or of "how and why the breach caused the injury based on the facts presented." *Id.* at 539–40. This is precisely the information missing here: the how and the why.

In *Gray,* this court held that the expert report contained a conclusory statement concerning causation. 189 S.W.3d at 860. The report stated that "[t]he failure to monitor and detect the malpositioned left knee resulted in a dislocated left patella, severe pain and suffering, and subsequent medical treatment." *Id* . at 858. Like the Supreme Court in *Jelinek,* this court faulted the causation opinion for failing to "convincingly tie the alleged departure from the standard of care to specific facts of the case." *Id.* at 860.

### 2. Mazzei's report was conclusory on the issue of causation

Mazzei's causation opinion regarding Shenoy's decision to clear Willie Ann for surgery was conclusory. Although Mazzei's report states that anesthesia depresses the respiratory system and places stress on the heart, the report does not state that Willie Ann's history of heart problems or other conditions somehow made her more likely to suffer respiratory arrest after premature extubation than a person without those medical conditions. It does not state that her risks for the complications that she experienced—respiratory arrest—were enhanced because of her medical conditions. The report does generally discuss why Willie Ann's other conditions affected her suitability for surgery, but does not link her medical conditions to the complication she experienced, respiratory arrest. It recognizes that a depressed central nervous system and the resulting risk of respiratory problems are normal byproducts of anesthesia for even a person with normal health. In other words, Mazzei's report shows that the surgery itself created the risk and does not state how or why Willie Ann's pre-existing conditions changed those risks except in conclusory terms. The report also states that those risks can be addressed by leaving her intubated for "a significant period of time" before extubation. Mazzei's report makes it clear that he believes that the premature extubation was the immediate cause of her death.

**\*8** A report may be sufficient if it states a chain of events that begin with a health care provider's negligence and end in a personal injury. *See Patel v. Williams,* 237 S.W.3d 901, 905 (Tex.App.-Houston [14th Dist.] 2007, no pet.); *see also Engh v. Reardon,* No. 01–09–00017–CV, 2010 WL 4484022, at \*8 (Tex.App.-Houston [1st Dist.] Nov. 10, 2010, no pet.) (mem.op.). But neither case involved an event as remote as that involved here.

In *Patel,* the Fourteenth Court of Appeals held that an expert report sufficiently set forth causation when it presented a chain of events beginning with an allegedly negligent prescription and ending with the patient's death. *Patel,* 237 S.W.3d at 905–06. Patel prescribed Williams

an anti-dementia drug. *Id.* at 903. The report explained that the drug was not FDA-approved for patients with Williams's ailment and that known side-effects of the drug included restlessness or a need to keep moving. *Id.* Williams's family withdrew consent for the drug, but Patel continued to prescribe it. *Id.* Williams was being fed via feeding tube, and allegedly due to the restlessness from the drug, she removed the tube. *Id.* The report identified nurses' notes that described Williams as agitated and stated that she kept pulling at her feeding tube. *Id.* The nursing staff improperly re-inserted the tube, causing a small cut, which became infected because of the contents of the feeding tube entering the cut. *Id.* The cut developed into an abscess requiring multiple surgeries. *Id.* The report concluded that Williams's death was caused by the infection from the improperly re-inserted feeding tube. *Id.* at 904. The Fourteenth Court held that the trial court did not abuse its discretion in determining the report was not conclusory or speculative concerning causation. *Id.* at 905–06.

The report in this case is distinguishable. The report identifies the alleged breach—clearing Willie Ann for surgery with her medical history—as did the report in Patel—prescribing an unapproved drug without consent. *See id.* But there the similarities end. In *Patel,* the report explained that a known side effect of the drug was restlessness, and the restlessness caused Williams to become agitated and remove her feeding tube. *Id* . Willie Ann likewise became agitated and removed her breathing tube. The report, however does not explain any connection between clearing Willie Ann for surgery or her medical history and her agitation. While the report in *Patel* explained each step on the path of causation, the report in this case does not.[5]

There were "many links in the chain of events" that began with the pre-surgical clearance and ended with her death, but Mazzei failed to explain and support each link. While Mazzei explains how Willie Ann's premature extubation prevented her from "maintain[ing] the oxygenation in the blood," increasing her risk for respiratory arrest, he fails to explain what role her pre-existing medical conditions played in her respiratory arrest. It is here that we part company with the trial court and find that it abused its discretion. Mazzei does not link the alleged negligence—clearing Jean for surgery—with the premature extubation except that one occurred before the other. That is not enough; it is only a statement of "but for" causation. If that is all that section 74.351 requires to demonstrate causation, almost any prior action taken by a health care provider could be said to cause the ultimate outcome. For example, the referral by the emergency room physician for the surgical consultation with Dr. Shenoy also was a

cause of Willie Ann's death if all that is necessary is for an event to have preceded the injury.

**\*9** To establish cause in fact, Mazzei had to discuss why the act or omission was a substantial factor in causing the injury and without which the harm would not have occurred. *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 551 (Tex.2005); *see also Transcon. Ins. Co. v. Crump,* 330 S.W.3d 211, 214 (Tex.2010) (stating that plaintiff must prove "cause in fact (or substantial factor)"); *Ford Motor Co. v. Ledesma,* 242 S.W.3d 32, 46 (Tex.2007) (stating that producing cause requires that (1) the cause must be a substantial cause of the event in issue and (2) it must be a but-for cause, namely one without which the event would not have occurred). The report does not do so. Mazzei's report does not link facts from the alleged negligence in clearing her for surgery to Willie Ann's death. Willie Ann did not suffer a cardiac arrest during or after the surgery; she suffered respiratory arrest and only after a premature extubation. Mazzei does not state that Willie Ann suffered any unusual respiratory issue during the surgery itself; the surgical procedure was "uneventful." And based on Mazzei's report, it appears that any patient—healthy or with a history of medical conditions—who is prematurely extubated will not sufficiently "maintain the oxygenation in the blood" and therefore is at risk for respiratory arrest. The mere fact that Willie Ann was cleared for surgery before her death does not mean that the clearance for surgery caused her death. *Jelinek,* 328 S.W.3d at 533 (cautioning against the *post hoc ergo propter hoc* fallacy, that is, reasoning that an earlier event caused a later event simply because it occurred first).

A causal link can be too attenuated to satisfy the causation requirement for an expert report. *See Gonzalez v. Sebile,* No. 09–09–00363–CV, 2009 WL 4668892, at \*4 (Tex.App.-Beaumont Dec. 10, 2009, pet. denied) (mem.op.). In *Gonzalez,* the physician was sued for clearing the patient for surgery without obtaining a cardiologist consultation despite an earlier open heart surgery. 2009 WL 4668892at \*2. According to the plaintiffs, the defendant anesthesiologist fell below the standard of care by failing to disqualify the plaintiff as not fit for surgery in part because of the risks of general anesthesia. *Id.* The court held that the report's statement that the plaintiff would not have been injured if he had not undergone surgery in the first place was "too attenuated to set forth evidence of causation with sufficient specificity to inform" the physician of the alleged misconduct and to allow the trial court to conclude that the plaintiff's claims had merit. *Id* . at \*3. Mazzei's report suffers from the same defect.

While Mazzei's report "provides insight" concerning the claims surrounding Jean's death, it does not link the facts

of the decision to clear her for surgery to the conclusion that Shenoy's alleged breach of the standard of care caused Jean's death. It does not, therefore, provide a basis for the trial court to have concluded that causation was demonstrated for Shenoy's decision to clear Willie Ann for surgery. *See Palaciois,* 46 S.W.3d at 879 (report must provide basis for concluding that claims have merit). We conclude, therefore, that the report is conclusory and inadequate with respect to Shenoy. *See Gray,* 189 S.W.3d at 860; *see also Jelinek,* 328 S.W.3d at 539–40 (finding report inadequate concerning causation because it did not explain "how and why the breach caused the injury based on the facts presented").

**\*10** We sustain this portion of Shenoy's second issue.

**B. Adequacy of the report concerning Zuniga**

Penny has not alleged, and Mazzei's report does not assert, that Zuniga negligently performed surgery; rather, the surgery is described as "uneventful." For the same reasons that the report is inadequate as to causation for Shenoy, we conclude that, with respect to Zuniga, the report fails to explain how and why Zuniga's clearing of Willie Ann for surgery caused her death, fails to demonstrate the causal link necessary to have a meritorious claim, and is conclusory and inadequate. *See Gray,* 189 S.W.3d at 860; *Jelinek,* 328 S.W.3d at 539–40.

We sustain this portion of Zuniga's sole issue.[6]

### Conclusion

We reverse and render an order dismissing the claims against Shenoy and Zuniga.

SHARP, J., dissenting. Dissent to follow.

Footnotes

1    *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (West 2011).

2    *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002) (review of Chapter 74 report is limited to four corners of report).

3    Only Shenoy and Zuniga are parties to this appeal.

4    *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a).

5    The report in this case is similarly distinguishable from the report in *Engh.* In *Engh,* the report identified the alleged breach-placing a surgical clip on the ureter during surgery. 2010 WL 4484022 at \*6. The report also explained the consequences of a clipped ureter. Specifically, the report detailed how damage to and, eventually, loss of the kidney would result from clipped ureter. *Id.* Thus, this court found the report adequate, although Engh saw multiple other doctors and several months passed after his surgery and before he lost his kidney. *Id.* at \*10. The report explained how the alleged breach caused the loss of Engh's kidney, while the report here contains no explanation of how clearing a patient with a history like Willie Ann's causes premature extubation, self-extubation, or the eventual death of the patient.

6    Because we have sustained Shenoy's second issue in part and Zuniga's sole issue in part, we do not address the other arguments raised by the parties. *See* TEX.R.APP. P. 47.1.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

368 S.W.3d 574
Court of Appeals of Texas,
Austin.

Ted SMITH, D.O.; and Austin Regional Clinic,
P.A., Appellants,
v.
Janet Lynn WILSON, Appellee.

No. 03–10–00387–CV. | Jan. 11, 2012. | Rehearing
Overruled May 7, 2012.

**Synopsis**
**Background:** Medical malpractice action was brought against physician and clinic, after patient who had been prescribed anti-depressant committed suicide. The 53rd Judicial District Court, Travis County, Suzanne Covington, J., denied defendants' motion to dismiss due to deficient expert report, and defendants appealed.

**[Holding:]** The Court of Appeals, David Puryear, J., held that expert's medical report was not good faith attempt to comply with medical expert report requirements.

Reversed and remanded.

**Attorneys and Law Firms**

**\*575** Diana L. Faust, R. Brent Cooper, Richard C. Harrist, Cooper & Scully, PC, Dallas, TX, for Appellant.

Dan Ballard, Stacey J. Simmons, Ballard & Simmons, LLP, Austin, TX.

Jay Harvey, Winckler & Harvey, LLP, Austin, TX, for Appellee.

Before Chief Justice JONES, Justices PURYEAR and PEMBERTON.

*OPINION*

DAVID PURYEAR, Justice.

Appellants Ted Smith, D.O., and Austin Regional Clinic ("ARC") appeal from the denial of their motion to dismiss appellee Janet Lynn Wilson's suit for medical malpractice. We reverse the trial court's order and remand for dismissal and determination of attorney's fees.

**Factual and Procedural Background**

On August 6, 2007, Wilson's son, Keith Michael Harris, went to see Dr. Smith, complaining of depression and stress. Harris was twenty-three years old and had recently broken up with his girlfriend. Smith prescribed fluoxetine[1] with twelve refills and did not schedule a follow-up visit. On September 5, 2007, Harris committed suicide.

Wilson sued appellants, alleging that Smith was negligent in prescribing fluoxetine and in not scheduling a follow-up visit with Harris, that ARC was vicariously liable as Smith's employer, and that their negligence was a proximate cause of Harris's death. Wilson timely served an expert report by Dr. John T. Maltsberger. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (West 2011). In his report, Maltsberger stated that the accepted standard of care that should be employed when prescribing fluoxetine required a doctor to obtain a description of the patient's "anxious and depressive symptoms" and a full psychiatric history. He opined that Smith breached that standard of care because he did not "obtain and record" Harris's symptoms of anxiety and depression or his full psychiatric history. Maltsberger stated that there was a generally recognized relationship between fluoxetine and suicide in adolescents and young adults and that "adolescents with psychiatric disorders" had a greater risk of suicidal thoughts and behavior in "the first few months of treatment" when prescribed fluoxetine. Maltsberger **\*576** concluded by stating, "[I]t is my opinion that more likely than not, had Keith Harris not been prescribed fluoxetine, he would not have committed suicide."

Appellants objected to the report, asserting it was deficient because it was conclusory with regard to causation. Appellants also noted that the report did not mention ARC at all, much less level any criticism against it, and argued that it therefore amounted to no expert report at all as to ARC. The trial court found that Maltsberger's report qualified as a report but was inadequate, denied appellants' motion to dismiss, and gave Wilson thirty days to remedy the report's deficiencies. Wilson filed an amended report providing essentially the same opinions, but adding more detail to the causation paragraph.[2] Maltsberger changed his statements about the relationship between fluoxetine and suicidal thinking and behavior to refer only to

adolescents, removing his prior inclusion of "young adults."[3] Maltsberger concluded:

> Based on the information provided to me to date, it is my opinion that Keith Harris was a suicide-vulnerable, depressed young man. As outlined in the studies described above, fluoxetine worsened his depression and agitated this patient, driving him beyond his capacity for endurance. It is my opinion that more likely than not, fluoxetine was a significant cause that worsened the emotional burden of Mr. Harris's illness and that without it he would not have committed suicide.

Appellants filed another motion to dismiss, asserting that the new report was deficient because Maltsberger "never connects the dots and says that based on the history or presentation that existed had Dr. Smith obtained an adequate history, he *should not* have prescribed Prozac." Appellants further asserted:

> [Maltsberger] never states that based on the information available to Dr. Smith at the time that he was treating Mr. Harris, Dr. Smith should have concluded that Mr. Harris was suicide-vulnerable. As an expert, he is supposed to analyze Dr. Smith's actions based on the information that was available to him at the time. His failure to do so renders his opinions conclusory, and therefore, not adequate.

Appellants also reasserted that because Maltsberger's report made no reference to or criticism of ARC, it did not qualify as an expert report on those claims. The trial court denied appellants' motion to dismiss, and appellants filed this appeal. *See id.* § 51.014(a)(9) (West 2008).

## Analysis

[1] Within 120 days of the date a plaintiff files a health-care-liability claim, she must serve each physician or health care provider against whom claims are asserted ("medical defendant") with at least one expert report that summarizes the expert's opinions "regarding applicable standards **\*577** of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(a), (r)(6). After an expert report is filed, a medical defendant may file an objection to the report's sufficiency and a motion to dismiss the plaintiff's liability claims. *See id.* § 74.351(a), (b).

[2] When the adequacy of a report is challenged, the trial court should only sustain the objections if it determines "that the report does not represent an objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(*l* ); *see American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). The trial court should confine its inquiry to the four corners of the report, which must include the expert's opinion on all three statutory elements and " 'must explain the basis of [the expert's] statements to link his conclusions to the facts.' " *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). If the trial court finds a report deficient, the plaintiff's claims against the medical defendant are subject to dismissal unless the court grants "one 30–day extension to the claimant in order to cure the deficiency." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c), (*l* ). If an expert report is not timely served, the trial court *must* dismiss the claims against the medical defendant if the defendant files a motion to dismiss. *Id.* § 74.351(b).

[3] [4] "A report need not marshal all the plaintiff's proof," but to be considered a good-faith effort to satisfy the statute, it must do more than simply provide the expert's conclusions as to standard of care, breach, and causation. *Palacios,* 46 S.W.3d at 878–79. Instead, the report "must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Id.* at 875. We review a trial court's denial of a motion to dismiss under section 74.351 for an abuse of discretion, but if an expert report contains only conclusions about the statutory elements, the trial court has "no discretion but to conclude ... that the report does not represent a good-faith effort" to satisfy the statute. *Id.* at 877, 880.

After appellants objected to the sufficiency of Maltsberger's original report, the trial court gave Wilson the opportunity to provide an amended report. The new report, however, added very little to Maltsberger's statements related to Smith's alleged breach of the standard of care and causation, including only one additional paragraph that stated that Harris was "a suicide-vulnerable, depressed young man" and that fluoxetine worsened his depression and led to his suicide.[4] Wilson asserts that this report "provides, in its four corners, that but for prescribing the medication the patient would not have committed suicide." That may be true, but

despite Maltsberger's opinion that fluoxetine worsened Harris's mental state and "without it he would not have committed suicide," the report does not explain how taking more complete medical records from Harris would have made Smith aware that fluoxetine would put Harris at risk for suicidal thoughts or action and **\*578** would have dissuaded Smith from prescribing fluoxetine. In other words, the report does not show how Smith's alleged breach of the standard of care caused the tragic result. *See Taylor v. Fossett,* 320 S.W.3d 570, 577–78 (Tex.App.-Dallas 2010, no pet.) (report did not provide a factual explanation of how doctor's delay in diagnosis or treatment caused complications); *Estorque v. Schafer,* 302 S.W.3d 19, 28–29 (Tex.App.-Fort Worth 2009, no pet.) (expert report left "gaps by not explaining how or why the physicians' failure to consult a urologist or gynecologist caused worsening or progression of Shirley's listed conditions" and did not explain how plaintiff would not have been injured had defendants obtained consults from specialists); *Johnson v. Willens,* 286 S.W.3d 560, 565 (Tex.App.-Beaumont 2009, pet. denied) (report did not explain what "normal dose" would have been, why prescribed dose was excessive, what patient complained of, or what proper treatment would have been); *see also Wright,* 79 S.W.3d at 53 (affirming trial court's determination that report was insufficient because it lacked "information linking the expert's conclusion ... to Bowie's alleged breach"); *Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 859–60 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (affirming trial court's finding that report was insufficient because it did not provide any specific information about what defendants should have done or "convincingly tie the alleged departure from the standard of care to specific facts of the case").

Maltsberger's report essentially states that (1) the applicable standard of care required Smith to obtain and record a description of Harris's symptoms and a complete psychiatric history, (2) Smith neglected to get a description of the symptoms or a complete psychiatric history in deciding to prescribe fluoxetine, and (3) fluoxetine worsened Harris's emotional state to the point where he committed suicide. Maltsberger does not, however, provide even the roughest summary of the information Smith should have gleaned from Harris's psychiatric past or symptoms that would have stopped Smith from prescribing fluoxetine or whether Harris's symptoms or history actually contained information that would have indicated that fluoxetine was not an appropriate prescription.[5] He does not provide facts to explain the causal link between Smith's alleged breach

and Harris's suicide, one of the required statutory elements of an expert report. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6) (expert report must include "fair summary" of expert's opinion as to "causal relationship" between medical defendant's failure to meet standard of care and injury).

Further, Maltsberger states that studies have shown a relationship between fluoxetine and suicide in adolescents and that fluoxetine increases the risk of suicidal thoughts and behavior in adolescents with psychiatric disorders. He does not, however, state that fluoxetine should never be prescribed to adolescents, nor does he explain whether fluoxetine is always inappropriate **\*579** for all adolescents, whether some adolescents can safely take it, or, more importantly, whether the findings related to adolescents could even be applied to Harris, who at twenty-three was not an adolescent. Without more, Maltsberger's statement that a correlation exists between fluoxetine and suicide in adolescents does not supply a causal link between the prescribing of fluoxetine and Harris's suicide.

To be sure, Maltsberger was not required to provide an exhaustive, lengthy summary of how Smith's omissions caused Harris's suicide or what aspects of Harris's medical records led Maltsberger to conclude that fluoxetine was an inappropriate and dangerous prescription, but he provides literally no summary of such information. We are left with no choice but to conclude that the report does not provide a fair summary of the causal link between Smith's alleged shortcomings and Harris's death. *See Taylor,* 320 S.W.3d at 577–78; *Estorque,* 302 S.W.3d at 28–29; *Johnson,* 286 S.W.3d at 565. Because the report is insufficient as to Smith, it is also insufficient as to ARC, which Wilson sued solely for vicarious liability for Smith's conduct. *See Kettle v. Baylor Med. Ctr.,* 232 S.W.3d 832, 842–43 (Tex.App.-Dallas 2007, pet. denied) (affirming dismissal of suit against professional association due to deficiencies in report about doctor's conduct, stating that whether association was directly or vicariously liable, "liability still depends on conduct" of doctor).

We reverse the trial court's order denying appellants' motion to dismiss. We remand the cause to the trial court for the determination of attorney's fees, *see* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b), and for entry of a final order dismissing Wilson's claims against appellants.

Footnotes

1      Fluoxetine is the generic name for Prozac, an anti-depressant. We will refer to the drug as fluoxetine except when quoting the

record, in which the terms seem to be used interchangeably.

2    The amended report is two and one-half pages long, and the actual summaries of the standard of care, breach, and causation are covered in slightly over one page.

3    This is a noteworthy omission, since Harris, as a twenty-three-year-old man, was not what is generally considered an adolescent. *See Webster's Third New Int'l Dictionary* 28 (2002) (defining adolescence as "the period of life from puberty to maturity terminating legally at the age of majority"); *see also* medical-dictionary.thefreedictionary.com/adolescence (last visited January 5, 2012, citing *Mosby's Med. Dictionary* (2009), *Miller–Keane Encyclopedia & Dictionary of Med., Nursing, & Allied Health* (2003)) (defining adolescence as time between puberty and adulthood, usually running from between eleven and thirteen and between eighteen and twenty).

4    Although Wilson alleged in her petition that Smith breached the standard of care by not scheduling a follow-up visit with Harris, neither of Maltsberger's reports discusses follow-up visits or states whether a follow-up should have been scheduled, when such a visit would have been appropriate, or whether it would have made a difference in this case.

5    Wilson cites to *Bakhtari v. Estate of Dumas,* 317 S.W.3d 486 (Tex.App.-Dallas 2010, no pet.), stating *Bakhtari* is a "strikingly similar case." The expert report in *Bakhtari,* however, provided substantially more information than the report presented here. The *Bakhtari* report explained that the medication in question should only have been prescribed for very short-term use, no refills should have been given, the patient should have been warned of possible side-effects, the doctor should have consulted with or referred the patient to a mental-health professional, and the doctor should have provided or arranged for "on-going assessment and monitoring" of the patient's condition. *Id.* at 496–97 nn. 9, 10. Maltsberger's cursory report bears very little similarity to the specificity and explanations provided in the *Bakhtari* report.

---

**End of Document**                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

110 S.W.3d 216
Court of Appeals of Texas,
Houston (1st Dist.).

Florence M. STROM, Appellant,
v.
MEMORIAL HERMANN HOSPITAL SYSTEM
d/b/a Memorial Hospital Southwest and
Memorial Hospital System, and Dr. Henry Blum,
Individually and d/b/a Sugar Land Orthopedic
Associates, P.A., Appellees.

No. 01–01–00756–CV. | May 29, 2003.

Patient brought health-care liability claims against hospital and doctor. The 164th District Court, Harris County, Martha Hill Jamison, J., dismissed claims. Patient appealed. The Court of Appeals, Tim Taft, J., held that: (1) reports of patient's experts failed to provide a "fair summary" of the experts' opinions as to the elements of standard of care and causation; (2) patient was not entitled to additional time to amend insufficient expert reports; (3) award of $5,000 in attorney fees as a sanction against patient was proper; (4) dismissal of patient's action did not violate constitutional guarantees.

Affirmed.

Mirabal, J., dissented and filed opinion.

**Attorneys and Law Firms**

**\*218** John H. Holloway, Houston, for Appellant.

Sam A. Houston, Cruse, Scott, Henderson & Allen, Solace H. Kirkland, Andrews & Kurth, David W. Hodges, Mayor, Day, Caldwell & Keeton, L.L.P., Houston, for Appellee.
Panel consists of Justices TAFT, HANKS,[*] and MIRABAL.[**]

**\*219 OPINION**

TIM TAFT, Justice.

Appellant, Florence M. Strom, filed health-care liability claims against appellees, Memorial Hermann Hospital System d/b/a Memorial Hospital Southwest and Memorial Hospital System (the hospital) and Dr. Henry Blum,

individually and d/b/a Sugar Land Orthopedic Associates (Dr. Blum). Strom appeals to challenge orders that dismissed those claims, with prejudice, on the grounds that the expert reports she provided to support those claims under section 13.01(d) of article 4590i, the Medial Liability and Insurance Improvement Act, did not comply with section 13.01(r)(6) of that statute.[1] We address (1) whether Strom's expert reports constituted a fair summary of the standard of care required by Dr. Blum and the Hospital, (2) whether the trial court erred by refusing to grant Strom an extension of time to amend her expert reports, (3) whether Dr. Blum waived his challenge to the adequacy of Strom's expert reports by not asserting the challenge until 180 days after Strom filed suit, (4) whether the trial court erred in awarding $5,000 in attorney's fees to the hospital, (5) the constitutionality of article 4590i, section 13.01(d), and (6) whether the trial court erred in dismissing Strom's claims of fraud, intentional and fraudulent misrepresentations, and "unnecessary surgery" against Dr. Blum. We affirm.

**Background**

Strom sued the hospital claiming that hospital surgical nursing staff improperly positioned her in preparation for neck surgery performed at the hospital October 4, 1996, and caused injury to her left knee. Strom also sued Dr. Blum, an orthopedic surgeon who later treated the left knee and performed a total knee replacement, claiming he was negligent and grossly negligent because the surgery was unnecessary. Strom sued the hospital in October 1998 and sued Dr. Blum a year later.

On April 25, 2001, the hospital moved the trial court to either dismiss Strom's case against the hospital or require her to file a cost bond, on the grounds she had missed the 90–day and the 180–day requirements of article 4590i, section 13.01 by not filing expert reports in compliance with that statute. See TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(a), (d), (e)(3) (Vernon Supp.2003). With respect to the 180–day requirement, the hospital acknowledged that Strom had provided expert reports in attempted compliance with section 13.01(d),[2] but argued that the reports were "insufficient as a matter of law" under section 13.01(r)(6) because they did not provide a "fair summary" of the applicable standard of care, how it was breached, or the causal relationship between the alleged breach and Strom's injuries, as required by that section. See TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(d), (r)(6) (Vernon Supp.2003). The hospital also requested attorney's fees, as authorized by

13.01(e)(1). *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(e)(1) (Vernon Supp.2003). After conducting a hearing on May 14, 2001, the trial court dismissed Strom's claims against the hospital, with prejudice, and awarded the hospital $5,000 in attorney's fees and costs.

**\*220** Four days later, on May 18, 2001, Dr. Blum filed a similar motion to dismiss. The trial court granted this motion and dismissed Strom's claims against Dr. Blum in an order signed on August 18, 2001. This order recites that the trial court considered Strom's counsel's sworn testimony, and also reflects the trial court's findings and conclusions in granting relief.

### Standard of Review

[1] The abuse-of-discretion standard governs all article 4590i, section 13.01 rulings. *American Transitional Care Ctrs. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001); *De Leon v. Vela,* 70 S.W.3d 194, 197 (Tex.App.-San Antonio 2001, pet. denied). This standard inquires whether the trial court acted without reference to any guiding rules or principles. *Garcia v. Martinez,* 988 S.W.2d 219, 222 (Tex.1999); *Mueller v. Beamalloy, Inc.,* 994 S.W.2d 855, 858 (Tex.App.-Houston [1st Dist] 1999, no pet.). We may not reverse a discretionary decision simply because we might have reached a different one. *Mueller,* 994 S.W.2d at 858. When resolving factual issues or matters committed to the trial court's discretion, we may not substitute our judgment for that of the trial court. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992).

[2] Dismissals with prejudice for lack of compliance with section 13.01 of article 4590i are sanctions. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(e) (Vernon Supp.2003) ("... [T]he court shall, on the motion of the affected physician or health care provider, enter an order awarding as sanctions...."); *Palacios,* 46 S.W.3d at 877. In contrast to findings entered in support of a judgment after a bench trial under rule 296 of the Rules of Civil Procedure, findings entered in support of a sanction dismissing a cause, as entered here in the order granting Dr. Blum's motion, are not binding on the reviewing court, although they are "helpful" in determining whether the trial court exercised its discretion in a reasonable and principled manner. *See IKB Indus., Ltd. v. Pro–Line Corp.,* 938 S.W.2d 440, 442 (Tex.1997) (appeal from dismissal as a sanction); *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 852 (Tex.1992) (mandamus review of dismissal as a sanction).

### Dismissals with Prejudice for Insufficient Reports

Strom's first four points of error challenge dismissal of her claims against Dr. Blum as an abuse of discretion. In points of error five through seven, Strom challenges the dismissal against the hospital on the same grounds.

All health-care liability claims must comply with section 13.01(d) of article 4590i. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(d) (Vernon Supp.2003). Section 13.01(d) requires that a plaintiff asserting a health-care liability claim must, not later than 180 days after filing suit, either: (1) furnish an expert report, with supporting curriculum vitae, to counsel for each defending physician or health-care provider; or (2) voluntarily nonsuit the claim. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(d) (Vernon Supp.2003). Article 4590i defines "expert report" as a written report that:

> provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(6) (Vernon Supp.2003).

Section 13.01 acknowledges that medical-malpractice cases require expert testimony **\*221** and the statute was enacted to curtail frivolous lawsuits. *See Palacios,* 46 S.W.3d at 877; *Hart v. Wright,* 16 S.W.3d 872, 876 (Tex.App.-Fort Worth 2000, pet. denied). If the plaintiff does not comply with section 13.01(d), and the defendant seeks sanctions pursuant to section 13.01(e), the trial court must grant the relief authorized by that section, as follows: dismiss the claim against that defendant with prejudice; award costs and attorney's fees to that defendant; and require that any bond filed under section 13.01 be forfeited to pay that award. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(e)(1)-(3) (Vernon Supp.2003); *Palacios,* 46 S.W.3d at 877; *see also* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(*l* ) (Vernon Supp.2003) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in Subsection (r)(6) of this section."); *In re Collom & Carney Clinic Ass'n,* 62 S.W.3d 924, 928 (Tex.App.-Texarkana 2001, orig. proceeding) (holding

that, because noncompliance with section 13.01(d) mandates dismissal with prejudice, trial court had no discretion to grant extension of time to comply; granting mandamus relief to compel dismissal).

[3] [4] In assessing an expert report for compliance with sections 13.01(d) and (r)(6) on a defendant's section 13.01(e) motion, the dispositive inquiry is whether the report "represents a good-faith effort" to comply with section 13.01(r)(6). *See Palacios,* 46 S.W.3d at 878 (citing TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(6)). Because section 13.01 focuses on the report, the only information relevant to this inquiry lies within the four corners of the report. *Id.* The trial court may not look beyond the report, therefore, in determining compliance with the statute. *Id.*

[5] [6] [7] [8] The report need not marshal all the plaintiff's proof or meet the requirements for evidence offered to support a summary judgment or at trial. *Palacios,* 46 S.W.3d at 878–79. The report must, however, include the expert's opinion on each of the elements defined by section 13.01(r)(6), specifically, the standards of care, how the defendant breached those standards, and the causal relationship between the breach and the plaintiff's injury. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(6). In setting out these elements, the report must: (1) inform the defendant of the specific conduct called into question by the plaintiff's claims and (2) provide a basis from which the trial court may conclude the claims have merit. *See Palacios,* 46 S.W.3d at 879 (citing *Palacios v. American Transitional Care Ctrs.,* 4 S.W.3d 857, 865 (Tex.App.-Houston [1st Dist.] 1999), *rev'd,* 46 S.W.3d 873 (Tex.2001) (Taft, J., dissenting)). A report that merely states the expert's conclusions about the standard of care, breach, and causation falls short of accomplishing these two purposes. *Palacios,* 46 S.W.3d at 879. When the expert report provided in attempted compliance with sections 13.01(d) and (r)(6) contains conclusory statements that do not alert the trial court or the defendant to the conduct the plaintiff complains of, section 13.01(*l* ) affords the trial court no discretion but to conclude that the report does not represent the "good-faith effort," under section 13.01(*l* ), to provide "a fair summary" of the three elements required by section 13.01(r)(6), and no discretion but to dismiss the cause as a sanction, as provided by section 13.01(e). *Palacios,* 46 S.W.3d at 880.

[9] Strom contends that the requirement of providing a "fair summary" is akin to providing "fair notice" in pleadings pursuant **\*222** to rule 47 of the Texas Rules of Civil Procedure. *See* TEX.R. CIV. P. 47. It is apparent, however, from the cases Strom cites that the *Palacios* standard for making a good-faith effort to provide a fair

summary of the expert's opinions as to the elements of standard of care, breach, and causation is higher than the "fair notice" requirement of rule 47.

[10] [11] Standard of care, the first element required by section 13.01(r)(6) for health-care liability claims, is defined by what an ordinarily prudent health-care provider or physician would have done under the same or similar circumstances. *Palacios,* 46 S.W.3d at 880. Whether a defendant breached the standard of care due a patient cannot be determined without "specific information about what the defendant should have done differently." *See id.* ("While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given.") (quoting from *Palacios,* 4 S.W.3d at 865 (Taft, J., dissenting)).

**A. Standard of Care—Dr. Blum**
Regarding Dr. Blum, Strom relies upon the following excerpts from the reports of Doctors Robert A. Callewart and George W. Sibley:

**Dr. Callewart's Report**

I have reviewed the medical records furnished in the case of Myrna Strom....

In February of 1997, she was seen by Dr. Henry Blum, an orthopedic surgeon, with her chief complaint involving her left knee. X-rays showed degenerative changes with medial joint space narrowing and some calcification in the notch, and his impression of torn medial maniscus and chondromalacia. Again, he reports that she had no prior history of knee related complaints prior to surgery in question [neck surgery when the patient suffered a knee injury due to improper positioning by the operating room nurses]. Dr. Blum performed the manisectomy on February 12, 1997. On March 3, 1997, it is reported that she is doing fantastic after surgery. However, on April 19, 1997, Dr. Blum indicates the patient needs a total knee replacement, and on July 28, 1997, reports that she is scheduled for a total knee replacement on August 1, 1997. The total knee and carpal tunnel release were performed by Dr. Blum on August 1, 1997....

**Based upon the records, it is my expert opinion that the total knee and carpal tunnel release were not medically indicated.** There is no justification or very clear indication in the chart for the surgery. There is some suggestion she had severe arthritis in the knee; however, this is not consistent with what was reported

in the knee at the time of the prior surgery [manisectomy by Dr. Blum] or other evaluations of the knee. If she had severe degenerative joint disease, this could not have occurred in several months time frame from when she had the surgery of the neck or from the time of the February 12, 1997, surgery [manisectomy by Dr. Blum].

**Based upon a reasonable medical probability, the records indicate no medical basis of [sic] reason for the total knee replacement in a woman in her middle 50's who weighs 240 lbs, who had reportedly a normal knee prior to the operative room injury.** *The surgery would therefore violate the standards of care which would be expected to be exercised by a reasonable and prudent orthopedic surgeon under the same or similar circumstances, and gross negligence to submit such a patient to an unnecessary surgery.*

**\*223 Dr. Sibley's Report**

Based upon the medical records, the surgery of 8/1/97 [total knee and carpal tunnel syndrome surgeries] was not indicated medically. **This apparently was unnecessary surgery. The medical records do not contain adequate indications for the surgery performed on 8/1/97. A markedly obese 52–year–old lady with a short right leg is not a candidate one would expect to have a good result from a total knee replacement. The diagnosis of carpal tunnel syndrome seems to be inadequate grounds to justify the surgery of 8/1/97.** *The surgeries of 8/1/97 to the knee and to the wrist were unnecessary.*

(Emphases added by Strom's brief for both reports.)

[12] Examining the two reports for a showing of what an ordinarily prudent physician would have done under the same or similar circumstances, there simply is no statement of the standard of care. *See Palacios,* 46 S.W.3d at 880. To the extent that the reports state what an ordinarily prudent physician would not have done, i.e., what Dr. Blum did, the reports are addressing a breach of the standard of care rather than the applicable standard of care itself. Because the reports fail to provide an adequate statement of the standard of care, it is unnecessary to examine further whether they fulfill the other two requirements for expert reports pursuant to article 4590i, section 13.01(r)(6). *See De Leon v. Vela,* 70 S.W.3d at 199.

Accordingly, we overrule Strom's first four points of error.

**B. Standard of Care—The Hospital**

Regarding the Hospital, Strom relies upon the following excerpts from the reports of Doctors Sibley and Callewart:

**Dr. Sibley's Report**

On 10/4/96, Dr. Berry operated on Florence and decompressed the C7–T1 area. He noted that postoperatively, the patient for the first time complained of her left knee.

On 11/1/96, an MRI of the left knee showed a tear of the posterior horn of the medial meniscus. Dr. Staewen examined her and made the diagnosis of the dislocated patella on the left with mild sprain of the lateral collateral ligament. The medical records suggest that the patient, while being strapped in the prone position for a posterior cervical operative procedure on 10/4/96, was placed in an untoward position. The result was injury of the left knee....

On 2/3/97, Florence saw Dr. Blum complaining of her left knee....

On 2/12/97 Dr. Blum did arthroscopic surgery of the left knee and did a partial medial meniscectomy and chondroplasty of the left knee....

**CONCLUSION: Based upon the medical records, it appears that the patient went into the operation of 10/4/96 without complaints of her left knee and came out of the surgery with complaints of the left knee. It is also noted that the patient had a short right leg and degenerative disease of the left knee prior to the 10/4/96 surgery. Based on the medical records, the patient's left knee was negligently injured while under anesthesia when she was moved from the supine position on the gurney to the prone position on the operating table (a twisting injury) and/or when she was placed on the operating table with the left knee inadequately padded.**

**Dr. Callewart's Report**

On May [2]8, 1996, Dr. Cech performed what is described as inferior L4 and superior L5 hemilaminectomies, bilateral **\*224** L4–5 medial facetectomies and foraminotomies with decompression of the L4/L5 nerve roots and thecal sac. The patient complained of continuing problems post-operatively; however, in a report dated July 8, 1996, she denied any trouble with pain in the lower extremities. Based upon evaluation by MRI, x-ray, and a cervical myelogram in August and September 1996, Dr. John Berry suggested a cervical decompression bilaterally of C7–T1, and

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

possibly re-explore C5–6 bilaterally. This surgery was performed on October 4, 1996, at the Memorial Hospital Southwest in Houston, Texas. **This surgery resulted in the patient sustaining an acute traumatic injury in the patient's left knee/leg; the patient being presumably in a sitting position. The patient suffered immediate pain and swelling of the knee postoperatively, with difficulty in walking.**

On October 23, 1996, it is reported that the patient complains of left knee pain and hobbling on the left knee, which is swollen, with decreased range of motion and tenderness. A MRI of the left knee on November 1, 1996, showed a horizontal tear through the posterior horn of the medial meniscus, extending to the inferior articular surface near the free edge, and a small interior surface tear of the medial meniscus at the junction of the posterior horn and body segment, and a grade I medial collateral ligament sprain.

The knee injuries described in the MRI do not occur when the customary and usual standards of care are exercised in the positioning and strapping a patient on the operative table. However, the injuries can occur when the hospital's operating room personnel fail to take necessary precautions to pad and avoid the placement of the leg/knee in an abnormal position by strapping the patient to prevent movement during surgery. It is my expert opinion, based upon a reasonable medical probability, that the knee injuries suffered by the patient were due to the failure of the operating room personnel to exercise ordinary care, or negligence of the operating room personnel, in placing and maintaining her position on the operating room table. On a follow up of her knee pain January 8, 1997, it was noted that 'apparently during her recent surgery, her knees were taped in an untoward position, resulting in some problems. Difficult to know exactly what, but it is felt that she has some cartilage torn in the left knee.'

(Emphases added by Strom's brief for both reports.)

[13] Although the above reports mention that Strom's knee injury does not normally occur when the usual standards of care are exercised, and even note that the left knee must not have been properly positioned or padded, the reports nevertheless fail to set out the applicable standard of care. *See Palacios,* 46 S.W.3d at 880. Once again, the most that can be said is that the reports address a breach of the standard of care by not properly positioning or padding the leg and knee. Moreover, the reports are conclusory regarding causation, by failing to set out the manner in which a failure to properly pad and position the leg and knee resulted in Strom's knee injury.

Accordingly, we overrule Strom's fifth through seventh points of error.

### Failure to Grant Additional Time to File Complying Expert Report

In points of error eight through ten, Strom contends the trial court abused its discretion by refusing to grant her an additional 30 days to either amend the reports **\*225** of her experts, Drs. Sibley and Callewart, or permit Strom to file their depositions as supplements to their reports. Strom relies on section 13.01(g) of article 4590i, which provides as follows:

> Notwithstanding any other provision of this section, if a claimant has failed to comply with a deadline established by Subsection (d) of this section and after hearing the court finds that the failure of the claimant or the claimant's attorney was not intentional or the result of conscious indifference but was the result of an accident or mistake, the court shall grant a grace period of 30 days to permit the claimant to comply with that subsection. A motion by a claimant for relief under this subsection shall be considered timely if it is filed before any hearing on a motion by a defendant under Subsection (e) of this section.

TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(g) (Vernon Supp.2003).

[14] The record contains two requests by Strom for additional time. The first request appears in the concluding paragraphs of Strom's response to the hospital's motion to dismiss. This request refers to possible secretarial or post-office error and appears to presume that the hospital was contending Strom did not furnish the reports on a timely basis, as well as moving to dismiss pursuant to section 13.01(e)(3) because the reports were insufficient. Citing section 13.01(h) of article 4590i,[3] which authorizes agreements of counsel to extend the deadlines of sections 13.01(a) or (d), Strom's counsel provided an affidavit documenting his and the hospital's February 10, 1999 rule 11 agreement to extend the

deadline to provide an expert report an additional day, to April 1, 1999. The affidavit also documented Strom's counsel's instructions to his support staff in accordance with that agreement. Nothing in the record suggests that the hospital was disputing timeliness of receipt. Rather, the record shows that, in contending Strom had not complied on a timely basis, the hospital had taken the position that Strom had not provided complying expert reports by the 180–day deadline, which had therefore expired. Moreover, in later documents filed with the trial court, Strom's counsel referred to his timely compliance with the agreed, extended deadline as "undisputed." Thus, there was no basis on which to invoke section 13.01(h).

Strom also cited section 13.0 *2* (g) of article 4590i in support of her first request for additional time. Section 13.0 *2* (g) does not pertain, however, to expert reports. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.02(g) (Vernon Supp.2003). Strom may have mistakenly cited section 13.0 *2* (g) instead of section 13.0 *1* (g), on which she relies in her brief to this Court. But the "accident or mistake" documented in the affidavit supporting Strom's first request refers only to Strom's having erroneously presumed, as we have just addressed, that the hospital did not receive Strom's reports by the agreed, extended deadline. The first request does not refer to the "accident or mistake" on which Strom later relied and on which she relies in this appeal.

Strom's second request for additional time appears in her June 15, 2001 motion for rehearing of the trial court's May 24, 2001 order dismissing her case against the hospital, with prejudice. In addition to claiming that her expert reports complied with section 13.01 of article 4590i, Strom alternatively requested that the trial court "extend the time to file or furnish an amended report or the depositions of Dr. Sibley and Dr. Callewart as an amendment **\*226** to the prior reports." Strom again cited section 13.01(h) of article 4590i, governing agreements of counsel to extend preliminary deadlines for filing expert reports. Section 13.01(h) does not apply to relief requested of a court.

Strom again cited "accident or mistake" in her second request, but asserted reasons that differed from her first request. Here, Strom clearly invoked the provisions of section 13.01(g) of article 4590i by asserting that her failure to comply with section 13.01(d) was neither intentional nor the result of conscious indifference, but the result of accident or mistake. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(g). Strom's claim of "accident or mistake" is premised on her attorney's sworn affidavit attesting to his "reasonable belief" that the expert reports he provided complied with article 4590i. Strom reasserts that contention on appeal.

To comply with section 13.01(g), however, Strom had to file her request for additional time before any hearing on a defendant's motion to dismiss under section 13.01(e). *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(g); *see also Jackson v. Reardon,* 14 S.W.3d 816, 819 (Tex.App.-Houston [1st Dist.] 2000, no pet.) (holding that trial court did not abuse its discretion by denying motion, which sought additional time to file section 13.01(d) expert report, but was filed after hearing on section 13.01(e) motion to dismiss). Here, Strom did not request additional time to comply with section 13.01(d) on the grounds she raises in this appeal until after the hearing on the hospital's motion to dismiss. Accordingly, her request was not timely.

Because Strom's request for additional time was not timely, the trial court did not abuse its discretion by refusing to grant relief. We need not address, therefore, whether Strom's counsel's "reasonable belief," that the expert reports provided to support Strom's claims complied with sections 13.01(d) and (r)(6) of article 4590i, constituted "accident or mistake" that warranted granting additional time to comply.

We overrule points of error eight through ten.

### Deadline to Challenge Expert Reports

[15] In point of error 11, Strom contends Dr. Blum waived his right to challenge Strom's expert reports by waiting until 180 days after Strom filed suit. Strom maintains that Dr. Blum had the reports and was aware of their contents, but "sat on his hands" and waited until after the last possible date for Strom to provide a complying expert report. Article 4590i imposes no deadline for challenging an expert report under section 13.01(d). *See Gonzalez v. El Paso Hosp. Dist.,* 68 S.W.3d 712, 717 (Tex.App.-El Paso 2001, no pet.); *Chisholm v. Maron,* 63 S.W.3d 903, 908 (Tex.App.-Amarillo 2001, no pet.); *Hargrove v. Denno,* 40 S.W.3d 714, 716 (Tex.App.-San Antonio 2001, no pet.).

Accordingly, we overrule point of error 11.

### Award of Attorney's Fees to Hospital

[16] In point of error 12, Strom contends that the trial court abused its discretion in awarding the Hospital $5,000 for attorney's fees without evidence to support the claim.

Strom also argues that she was entitled to a jury trial on the issue of reasonable attorney's fees.

Article 4590i, section 13.01(e)(1) provides that the trial court shall award reasonable attorney's fees as a sanction for a plaintiff's failure to comply with the requirements of section 13.01(d). TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(e)(1) (Vernon Supp.2003). By providing that the trial court assess the sanction, the plain language **\*227** of the statute does not contemplate that a jury determine what is reasonable as attorney's fees. Strom does not provide any authority that would permit the jury to determine this issue.

[17] In contending that no evidence supported the trial court's award of attorney's fees, Strom ignores affidavit testimony that $7,500 represented a reasonable award of attorney's fees in this case. This suggested fee was $2,500 more than the amount the trial court actually awarded. In disputing the evidentiary support for the award of attorney's fees, Strom appears to argue that something more than an affidavit is required, but again offers no authority to support that contention.

We hold that the trial court did not err by awarding attorney's fees without convening a jury or requiring testimony beyond proof by affidavit. Accordingly, we overrule point of error 12.

## Constitutional Challenges to Section 13.01

In two points of error 13, Strom contends that (1) the dismissal of her suit with prejudice violates her state and federal constitutional guarantees of due process of law, equal protection of the law, and right to a jury trial; and (2) the trial court abused its discretion in dismissing Strom's claims for fraud, intentional and fraudulent misrepresentations, and "unnecessary surgery" because these causes of action are not issues relating to a "medical standard" under article 4590i.

[18] Strom correctly asserts that article 4590i places a heavy burden on medical malpractice plaintiffs to comply with very specific requirements and that the sanction for failing to comply is severe, but neither violates constitutional guarantees. *See Schorp v. Baptist Mem'l Health Sys.,* 5 S.W.3d 727, 737–38 (Tex.App.-San Antonio 1999, no pet.); *McGlothlin v. Cullington,* 989 S.W.2d 449, 452–53 (Tex.App.-Austin 1999, pet. denied).

[19] As for Strom's contention that her claims exceeded the scope of article 4590i, settled law compels that all claims

for medical negligence be brought under article 4590i. Strom's attempt to recast her claims of negligence in advising her of the necessity of surgery as fraud and intentional and fraudulent misrepresentations regarding unnecessary surgery do not remove those claims from article 4590i. *See Gomez v. Matey,* 55 S.W.3d 732, 735 (Tex.App.-Corpus Christi 2001, no pet.) (holding claims of fraud and misrepresentation regarding unnecessary surgery fell within scope of article 4590i).

Accordingly, we overrule both of Strom's points of error thirteen.

## Conclusion

We affirm the judgment of the trial court. We deny all pending motions.

Justice MARGARET GARNER MIRABAL, dissenting.

MARGARET GARNER MIRABAL, Justice, dissenting.

In my opinion, the timely-filed expert report of Dr. Robert A. Callewart, M.D., represents a good faith effort to comply with the definition of an expert report in Subsection (r)(6) of the Medical Liability and Insurance Improvement Act,[1] and therefore the trial court abused its discretion when it dismissed the plaintiff's claims with prejudice. Accordingly, I respectfully dissent.

I note that this is *not* a case involving the *failure* to file an expert report, and **\*228** this is *not* a case involving the filing of a *late* expert report. Rather, this case involves a timely-filed expert report. The issue is whether the defendants' challenges to the adequacy of the expert report should have been granted, resulting in the dismissal of plaintiff's case with prejudice.

If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion "*only if* it appears to the trial court, after hearing, that the report does not represent a *good faith effort* to comply with the definition of an expert report in Subsection (r)(6) of this section." TEX.REV.CIV. STAT. ANN.. Art. 4590i, § 13.01(*l* ) (Vernon Supp.2003) (emphasis added); *Bowie Memorial Hosp. v. Wright,* 79 S.W.3d 48, 51–52 (Tex.2002). To constitute a "good-faith effort," the report must provide enough information to fulfill two purposes:

(1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Bowie,* 79 S.W.3d at 52. A Court reviews the information contained within the four corners of the report to determine whether it constitutes a "good-faith effort" to provide a fair summary of the expert's opinions about the standard of care, breach, and causal connection between breach and injury. *Id.*

## Claims against the Hospital

Dr. Callewart's report reads, in relevant part:

### A. Injury

Based upon evaluation by MRI, x-ray, and a cervical myelogram in August and September 1996, Dr. John Berry suggested a cervical decompression bilaterally of C7–T1, and possibly re-explore C5–6 bilaterally. This surgery was performed on October 4, 1996, at the Memorial Hospital Southwest in Houston, Texas. This surgery resulted in the patient sustaining an acute traumatic injury in the patient's left knee probably associated with improper positioning of padding of the knee/leg, the patient being presumably in a sitting position. The patient suffered immediate pain and swelling of the knee postoperatively, with difficulty walking.

On October 23, 1996, it is reported that the patient complains of left knee pain and hobbling on the left knee, which is swollen, with decreased range of motion and tenderness. A MRI of the left knee on November 1, 1996, showed a horizontal tear through the posterior horn of the medial meniscus, extending to the inferior articular surface near the free edge, and a small inferior surface tear of the medial meniscus at the junction of the posterior horn and body segment, and a grade I medial collateral ligament sprain.

### B. Standard of Care

The knee injuries described in the MRI do not occur when the customary and usual standards of care are exercised in the positioning and strapping a patient on the operative table. However, the injuries can occur when the hospital's operating room personnel

fail to take necessary precautions to pad and avoid the placement of the leg/knee in an abnormal position by strapping the patient to prevent movement during surgery.

### C. Breach

It is my expert opinion, based upon a reasonable medical probability, that the knee injuries suffered by the patient were due to the failure of the operating room personnel to exercise **\*229** ordinary care, or negligence of the operating room personnel, in placing and maintaining her position on the operating room table.

### D. Causal Connection

The knee injuries described in the MRI do not occur when the customary and usual standards of care are exercised in the positioning and strapping a patient on the operative table. However, the injuries can occur when the hospital's operating room personnel fail to take necessary precautions to pad and avoid the placement of the leg/knee in an abnormal position by strapping the patient to prevent movement during surgery.... On a follow up of her knee pain January 8, 1997, it was noted that 'apparently during her recent surgery, her knees were taped in an untoward position, resulting in some problems. Difficult to know exactly what, but it is felt that she has some cartilage torn in the left knee.'.... It is my expert opinion, based upon a reasonable medical probability, that the knee injuries suffered by the patient were due to the failure of the operating room personnel to exercise ordinary care, or negligence of the operating room personnel, in placing and maintaining her position on the operating table.

**Does Dr. Callewart's report provide enough information to inform the defendant Hospital of the specific conduct the plaintiff has called into question, and to provide a basis for the trial court to conclude that the claims have merit?**

Clearly, Dr. Callewart's report gives notice that the manner in which the hospital personnel strapped the plaintiff to the operating table was called into question. The standard of care requires hospital personnel to take necessary precautions to pad and avoid the placement of the leg/knee in an abnormal position by strapping (**standard of care**); a medical report indicated that plaintiff's knees were taped in an untoward position on the operating table, and based on a reasonable medical

probability, it was Dr. Callewart's expert opinion that the plaintiff's knee injuries were due to the failure of the hospital personnel to properly place and maintain plaintiff's position on the operating table (**breach and causal connection**).

This case is unlike the *Palacios* case. *American Transitional Care Centers v. Palacios,* 46 S.W.3d 873 (Tex.2001). In *Palacios,* the patient fell from his bed, and the expert opined that "precautions to prevent [the patient's] fall were not properly utilized." *Id.* at 880. The supreme court held that this was not a statement of a standard of care because neither the trial court nor the defendant would be able to determine from this statement if the doctor "believes that the standard of care required [defendant] to have monitored Palacios more closely, restrained him more securely, or done something else entirely." *Id.* In contrast, the expert's report in the present case puts the trial court and the defendant on notice of the conduct complained of, *i.e.* that the hospital personnel failed to properly pad and place the leg/knee in a normal position when strapping the plaintiff to the operating table—by taping the leg in an untoward and abnormal position, a tearing injury was caused to the plaintiff's knee.

Under the guiding principles set out in *Bowie* and *Palacios,* Dr. Callewart's report constitutes a good-faith effort to provide a fair summary of the doctor's opinions about the standard of care, breach and causal connection. Accordingly, the trial court abused its discretion when it granted the defendant's motion challenging the adequacy of the report resulting in a dismissal, **\*230** with prejudice, of the plaintiff's claims against the hospital.

### Claims against Dr. Blum

Dr. Callewart's report reads, in relevant part:

#### A. Injury

"I have reviewed the medical records furnished in the case of Myrna Strom...."

In February of 1997, she was seen by Dr. Henry Blum, an orthopedic surgeon, with her chief complaint involving her left knee. X-rays showed degenerative changes with medial joint space narrowing and some calcification in the notch, and his impression of torn medial meniscus and chondromalacia. Again, he

reports that she had no prior history of knee related complaints prior to surgery in question. Dr. Blum performed the meniscectomy on February 12, 1997. **On March 3, 1997, it is reported that she is doing fantastic after surgery.** However, on April 19, 1997, Dr. Blum indicates the patient needs a total knee replacement, and on July 28, 1997, reports that she is scheduled for a total knee replacement on August 1, 1997.

(Emphasis added). Dr. Blum performed the total knee replacement surgery on the plaintiff.

#### B. Standard of Care

The surgery would ... violate the standards of care which would be expected to be exercised by a reasonable and prudent orthopedic surgeon under the same or similar circumstances.

#### C. Breach

Based upon the records, it is my expert opinion that the total knee and carpal tunnel releases were not medically indicated. There is no justification or very clear indication in the chart for the surgery. There is some suggestion she had severe arthritis in the knee; however, this is not consistent with what was reported in the knee at the time of the prior surgery or other evaluations of the knee. If she had severe degenerative joint disease, this could not have occurred in a several months time frame from when she had the surgery of the neck or from the time of February 12, 1997, surgery.

Based upon a reasonable medical probability, the records indicate no medical basis of reason for the total knee replacement in a woman in her middle 50's who weighs 240 lbs, who had reportedly a normal knee prior to the operative room injury. The surgery would therefore violate the standards of care which would be expected to be exercised by a reasonable and prudent orthopedic surgeon under the same or similar circumstances, and gross negligence to submit such a patient to unnecessary surgery.

#### D. Causal Connection

Based upon the records, it is my expert opinion that the total knee and carpal tunnel releases were not medically indicated. There is no justification or very

clear indication in the chart for the surgery.... Based upon a reasonable medical probability, the records indicate no medical basis of reason for the total knee replacement....

**Does Dr. Callewart's report provide enough information to inform the defendant Doctor of the specific conduct the plaintiff has called into question, and to provide a basis for the trial court to conclude that the claims have merit**?

**\*231** It is clear from Dr. Callewart's report that the conduct called into question is the performance of a total knee replacement operation, when such surgery was unnecessary. The report provides a fair summary of Dr. Callewart's opinions about the **standard of care** (that which would be expected to be exercised by a reasonable and prudent orthopedic surgeon under the same or similar circumstances), **breach** (performing "unnecessary" knee replacement surgery, which is "not medically indicated", for which there is "no justification ... in the chart"), and **causal connection** (the breach of the applicable standard of care caused the injury of unnecessary knee replacement surgery).

With regard to standard of care, the Texas Supreme Court stated in *Palacios:*

> The standard of care for a hospital is what an ordinarily prudent hospital would do under the same or similar circumstances. .... Identifying the standard of care is critical: Whether a defendant

breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently.

*Id.* at 880. In the present case, the expert's report identified the standard of care for an orthopedic surgeon, and specifically stated what care was expected, but not given, *i.e.,* a diagnosis and action based on what is medically indicated, not the performance of unnecessary major surgery.

Once again, under the guiding principles set out in *Bowie* and *Palacios,* Dr. Callewart's report constitutes a good-faith effort to provide a fair summary of his opinions about the standard of care, breach, and causal connection. Accordingly, the trial court abused its discretion when it granted the defendant doctor's motion challenging the adequacy of the report resulting in a dismissal, with prejudice, of the plaintiff's claims against the defendant, Dr. Blum.

### CONCLUSION

We should sustain appellant Strom's points of error one through seven, reverse the judgment, and remand the case to the trial court.

Footnotes

*   This case was originally submitted to a panel consisting of Justices Taft, Mirabal, and retired Justice Jackson B. Smith, Jr. Upon Justice Smith's recusal, Justice George C. Hanks, Jr., who was appointed to this Court on December 31, 2002, is participating by assignment.

**   The Honorable Margaret Garner Mirabal, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1   *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(d), (r)(6) (Vernon Supp.2003).

2   Strom provided her experts' reports to counsel for the hospital on April 1, 1999. It is undisputed that the experts' reports were timely by agreement of counsel signed in accordance with rule 11 of the Rules of Civil Procedure and as authorized by section 13.01(h) of article 4590i. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(h) (Vernon Supp.2003); TEX.R. CIV. P. 11.

3   TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(h) (Vernon Supp.2003)

1   TEX.REV.CIV. STAT. ANN.. Art. 4590i, § 13.01(r)(6) (Vernon Supp.2003).

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

320 S.W.3d 570
Court of Appeals of Texas,
Dallas.

Roosevelt TAYLOR, Jr., M.D., Appellant,
v.
LaToya FOSSETT, Appellee.

No. 05−09−01271−CV. | Aug. 25, 2010.

**Synopsis**
**Background:** Patient brought healthcare liability action against physician, arising out of contraction of methicillin resistant staphylococcus aureus (MRSA). The County Court at Law No. 4, Dallas County, William Ken Tapscott, Jr., denied physician's motion to dismiss. Physician appealed.

**[Holding:]** The Court of Appeals, Fillmore, J., held that expert's report failed to adequately establish causation element required in action.

Reversed and remanded with instructions.

**Attorneys and Law Firms**

**\*571** J. Wade Birdwell, D. Michael Wallach, Leslie Ann Dillon Thomas, Wallace, Andrews & Stouffer, P.C., Fort Worth, TX, for Appellant.

Douglas Michael Wood, Law Firm of Douglas Wood, Dallas, TX, for Appellee.

Before Justices MOSELEY, BRIDGES and FILLMORE.

**OPINION**

Opinion By Justice FILLMORE.

This interlocutory appeal follows the trial court's refusal to dismiss LaToya Fossett's health care liability claims against Roosevelt Taylor, Jr., M.D. Dr. Taylor contends the trial court erred by denying his motion to dismiss, which challenged the sufficiency of Fossett's initial and supplemental expert reports, and by denying him attorney's fees and costs. We reverse the trial court's

order and remand to the trial court for the limited purposes of determining Dr. Taylor's reasonable attorney's fees and costs and for entry of a final order dismissing Fossett's claims with prejudice.

**Background**

Given the procedural posture of this case, we draw the facts from the allegations in Fossett's petition. On November 1, 2006, Fossett was admitted under Dr. Taylor's care to Mesquite Community Hospital for induction of labor. There were complications with the delivery and Dr. Taylor performed a cesarean section birth. A few days later, an infection developed in the cesarean section incision. According to Fossett, Dr. Taylor failed to culture the infection and failed to document abdominal fascial integrity during Fossett's hospitalization. Fossett was discharged from the hospital on November 4, 2006. She was seen by Dr. Taylor in his office three days later on November 7, 2006. Dr. Taylor evaluated Fossett's condition and prescribed the oral antibiotic Keflex. According to Fossett, Dr. Taylor failed at that time to culture the incision infection and to document abdominal fascial integrity. On November 9, 2006, Fossett went to the Baylor Hospital Emergency Department. She was diagnosed with cellulitis, hospitalized, and placed on intravenous antibiotics. A bacterial culture showed the infection to be methicillin resistant staphylococcus aureus (MRSA). Fossett was hospitalized for two weeks. While hospitalized, Fossett underwent two surgical procedures relating to wound dehiscence and drainage from the incision. According to Fossett, she continues to suffer bowel and abdominal pain, has permanent scarring and disfigurement of her abdomen, and will require plastic surgery.

Fossett filed suit against Dr. Taylor. Fossett alleges that Dr. Taylor's failure **\*572** following a caesarian section to timely diagnose and treat her for an incision infection, wound dehiscence and cellulitis involving MRSA proximately caused her to suffer injuries and otherwise avoidable surgical intervention. Fossett contends Dr. Taylor was negligent in (1) failing to diagnose incision infection, wound dehiscence and cellulitis; (2) failing to timely communicate with the patient and document cellulitis; and (3) failing to document abdominal fascial integrity, obtain bacterial cultures, evaluate for and administer appropriate medical care, including hospitalization, and treat spreading cellulitis.

Pursuant to section 74.351 of the Texas Civil Practice and Remedies Code, Fossett served Dr. Taylor with an expert report prepared by Dr. Adam S. Levine, a practicing obstetrician and gynecologist, in support of her claims. In his expert report, Dr. Levine asserted that Dr. Taylor deviated from the accepted standard of care for post-operative surgical wound infection and his deviations from the standard of care were the proximate cause of Fossett's complications and injuries. In his report, Dr. Levine stated:

Dr. Taylor provided LaToya Fossett with ante- and post- natal care. Dr. Taylor performed LaToya Fossett's cesarean section, which included making the surgical incision which ultimately became infected. Dr. Taylor breached the standard of care because: 1) neither a weight nor a blood pressure were recorded on the first post-operative visit for LaToya Fossett; 2) aside from a foul odor and draining, no information was recorded with regard to when the pain became worse, when the drainage began, or whether there was any redness or swelling; 3) no documentation was provided with regard to the size or extent of the wound infection and there was no documentation regarding fascial integrity; 4) no bacterial wound cultures were taken; 5) Dr. Taylor prophylactically prescribed the same antibiotics that had no impact earlier in LaToya Fossett's pregnancy; 6) Dr. Taylor failed to order re-evaluation within 24 to 48 hours and instead ordered it for a week later; 7) Dr. Taylor ordered wound compresses but failed to document or instruct LaToya Fossett any (sic) form of wound care, irrigation or cleaning.

Because Dr. Taylor documented a surgical wound infection with "copious pus" and failed to provide LaToya Fossett with treatment in accord with the standard of care, Fossett required admission to Baylor Hospital. Unfortunately, this admission was within 48 hours of Dr. Taylor's evaluation and order to follow-up one week later. At Baylor Hospital, LaToya Fossett was evaluated according to the standard of care and ultimately subjected to two surgical wound explorations, a prolonged hospital stay, a larger incision and scar, and long-standing abdominal pain. Had Dr. Taylor appropriately evaluated and treated LaToya Fossett in a timely fashion according to the standard of care, she might have been admitted to the hospital earlier and required only one, if any, surgical wound explorations (sic). She would most likely not have required two surgeries. Had Dr. Taylor appropriately evaluated and treated LaToya Fossett she would not have required as prolonged a hospital stay because the infection got worse each day and smaller infections are easier to treat than larger infections.

Dr. Taylor's failure to meet to (sic) the applicable standard of care, as described above, in all medical probability, was the proximate cause of the injuries LaToya Fossett suffered. As a result of Dr. Taylor's failure to meet the applicable standard of care LaToya Fossett required: **\*573** 1) At least one surgical wound exploration that might not have been necessary; 2) A hospital stay that was longer than should have been necessary had she been admitted 48 hours sooner; 3) A longer recovery than should have been necessary had she been admitted 48 hours sooner; 4) a larger scar; and 5) continued abdominal pain and discomfort.

Dr. Taylor challenged the legal sufficiency of Dr. Levine's report as failing to comply with the statutory requirements of section 74.351 and moved to dismiss Fossett's health care liability claims with prejudice pursuant to section 74.351(b). *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b) (Vernon Supp. 2009) (if health care liability claimant does not serve expert report as required, the trial court must, upon motion by affected health care provider or physician, dismiss claim with prejudice). He argued the report was legally insufficient to satisfy the statutory requirements because Dr. Levine's opinions regarding the alleged violations of the standard of care and the alleged causal connection between such violations and injuries and damages claimed by Fossett were conclusory. After a hearing, the trial court concluded Dr. Levine's report was insufficient under section 74.351. The trial court, however, granted Fossett a thirty-day extension under section 74.351(c) "to cure a causation deficiency" in her expert's report:

> namely, whether in Dr. Levine's opinion, Dr. Taylor's failure to meet the appropriate standard of care in post-surgical wound care more likely than not or within reasonable medical probability caused LaToya Fossett to have one or more exploratory surgeries. The current language in the report is insufficient regarding the exploratory surgeries.

*See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c) (trial court may grant extension to party that failed to serve expert report because timely served report found to be deficient). The trial court overruled any other objections to the report.

Within the thirty-day extension period, Fossett served a supplemental report prepared by Dr. Levine. Dr. Levine's supplemental report stated:

My original opinions regarding the medical care Dr. Taylor provided LaToya Fossett remain unchanged. Dr. Taylor failed to meet an appropriate standard of care for a post-surgical wound. Specifically, Dr. Taylor failed to timely examine, culture, investigate or treat what was an obvious post-surgical wound complication. Dr. Taylor's failure to examine, culture, investigate or treat LaToya Fossett's surgical wound more likely than not and within a reasonable degree of medical probability caused LaToya Fossett to have one or more exploratory surgeries and debridements. Dr. Taylor should have appropriately examined LaToya Fossett.

Further, Dr. Taylor should have recognized the possibility of MRSA infection because MRSA infections are common iatrogenic infections in hospitals. Had Dr. Taylor examined or cultured LaToya Fossett's surgical wound, Dr. Taylor might have properly diagnosed MRSA and begun treatment with appropriate antibiotic therapy it (sic) is more likely than not that LaToya Fossett would not have required subsequent surgeries which resulted in significant pain and permanent scarring.

Finally, it is my opinion, based on a reasonable degree of medical probability, that Dr. Taylor deviated from the accepted standard of care in this case and that his deviations from the standard of care caused LaToya Fossett's injuries.

**\*574** Dr. Levine's supplemental report added one opinion on causation that was not contained in his original report: "Had Dr. Taylor examined or cultured LaToya Fossett's surgical wound, Dr. Taylor might have properly diagnosed MRSA and begun treatment with appropriate antibiotic therapy it (sic) is more likely than not that LaToya Fossett would not have required subsequent surgeries which resulted in significant pain and permanent scarring."

Dr. Taylor again objected to the report and moved to dismiss Fossett's claims for failure to serve a sufficient expert report under section 74.351. He contended that Dr. Levine's opinions set forth in his original and supplemental reports, whether the reports are considered separately or collectively[1], were conclusory and lack sufficient factual specificity with regard to the violations of the standard of care alleged against Dr. Taylor and the alleged causal connection between any such violations and the injuries and damages claimed by Fossett. He further contended that the supplemental report, like the original report, merely concluded that Dr. Taylor caused Fossett's injuries by breaching the standard of care. After a hearing, the trial court found that the expert report of

Dr. Levine was sufficient and satisfied the requirements of section 74.351. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.351(*l* ), 74.351(r)(6).

The trial court denied Dr. Taylor's motion to dismiss. Pursuant to section 51.014(a)(9) of the civil practice and remedies code, Dr. Taylor brought this interlocutory appeal challenging the trial court's denial of his motion to dismiss. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (Vernon 2008).

### Standard of Review and Applicable Law

[1] [2] Dr. Taylor asserts the trial court abused its discretion when it denied his motion to dismiss because Dr. Levine's original and supplemental expert reports, whether considered separately or collectively, are legally and factually insufficient and conclusory. We review a trial court's order on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Texas v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001); *Nexion Health at Terrell Manor v. Taylor,* 294 S.W.3d 787, 791 (Tex.App.-Dallas 2009, no pet.). A trial court has no discretion in determining what the law is or in applying the law to the facts. *See Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig. **\*575** proceeding). An abuse of discretion occurs if the trial court clearly fails to analyze or apply the law correctly. *Id.*

[3] Under section 74.351 of the civil practice and remedies code, any person who brings suit asserting a health care liability claim must, within 120 days of filing the original petition, provide an expert report for each physician or health care provider against whom a claim is asserted. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a). "Expert report" means a written report that provides a fair summary of the expert's opinions as to the applicable standards of care, the manner in which the care rendered failed to meet those standards, and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6); *see also, Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). An expert report must provide enough information to fulfill two purposes if it is to constitute an objective, good faith effort to comply with the definition of an expert report under section 74.351(r)(6). The report must inform the defendant of the specific conduct the plaintiff has called into question and must provide a basis for the trial judge to conclude the claims have merit. *Leland v. Brandal,* 257 S.W.3d 204, 206–07 (Tex.2008); *Palacios,* 46 S.W.3d at 879.

[4]  [5]  [6]  An expert report need not marshal all the plaintiff's proof. *Wright,* 79 S.W.3d at 52. However, it must do more than merely state the expert's conclusions about the standard of care, breach, and causation; it must explain the basis of the expert's statements and link his conclusions to the facts. *Id.* The report must contain sufficiently specific information to demonstrate causation beyond conjecture. *See, Farishta v. Tenet Healthsystem Hosps. Dallas, Inc.,* 224 S.W.3d 448, 453 (Tex.App.-Fort Worth 2007, no pet.). The report must not be conclusory in its explanation of causation; it must explain the basis of its statements sufficiently to link its conclusions to the facts. *Wright,* 79 S.W.3d at 52; *Quinones v. Pin,* 298 S.W.3d 806, 810 (Tex.App.-Dallas 2009, no pet.); *see also, Arkoma Basin Exploration Co. v. FMF Assocs. 1990–A, Ltd.,* 249 S.W.3d 380, 389 n. 32 (Tex.2008) (quoting BLACK'S LAW DICTIONARY 308 (8th ed. 2004)) (defining conclusory as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based"). Thus, courts have reasoned that an expert report that describes causation in terms of mere possibilities does not accomplish the purpose of providing "a basis for the trial court to conclude that the claims have merit." *Wright,* 79 S.W.3d at 52; *see also Quinones,* 298 S.W.3d at 815–16.

[7]  In determining whether a report complies with the requirements of section 74.351(r)(6), the court may not look beyond the report itself, because all information relevant to the inquiry should be contained within the document's four corners. *Wright,* 79 S.W.3d at 52; *Nexion Health at Terrell Manor,* 294 S.W.3d at 791. A trial court must grant a motion to dismiss a plaintiff's claims for failure to file an adequate expert report only if it appears to the court, after hearing, that the report does not represent an objective good-faith effort to comply with the statutory definition of an expert report. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l* ); *see also, Palacios,* 46 S.W.3d at 878.

## Analysis

[8]  Dr. Levine opined in his original report[2] that Dr. Taylor breached the applicable **\*576** standard of care by failing to order re-examination of Fossett within 24 to 48 hours of her post-operative office visit, causing Fossett to suffer (1) at least one surgical wound exploration that might not have been necessary, along with resulting scarring and continued pain and discomfort and (2) hospitalization and recovery that was more lengthy "than should have been necessary had she been admitted [to the hospital] 48 hours sooner." Dr. Levine's supplemental report added the opinion that had Dr. Taylor examined or cultured Fossett's surgical wound, he might have properly diagnosed MRSA and begun treatment with appropriate antibiotic therapy, thereby avoiding subsequent surgeries, pain, and permanent scarring.

Dr. Levine's supplemental report incorporated his original report. Therefore, in this analysis we collectively refer to the original and supplemental reports as Dr. Levine's "report." Dr. Levine's report emphasized the significance of the 24 to 48 hour period following Fossett's office evaluation by Dr. Taylor:

> Because of the possibility of worsening infection resulting in significant morbidity and mortality, [women with post-operative surgical incision] require both careful and frequent assessment of their surgical wounds every 24 to 48 hours by qualified personnel such as their physician, by wound management personnel, or by home health nursing.
>
> Antibiotics for minor infections may be given by mouth; provided the patient is seen within 24 to 48 hours to assess that the infection is not getting worse.
>
> Dr. Taylor failed to either admit LaToya Fossett to the hospital or to re-evaluate her within 24 to 48 hours [of Fossett's office evaluation by Dr. Taylor].
>
> The standard of care for evaluation and treatment of a post-operative surgical wound infection require[s] ... either admitting the patient to a hospital or arranging for close outpatient follow-up and re-evaluation within 24 to 48 hours....

According to Dr. Levine's report, Fossett was hospitalized "within 48 hours" of her post-operative visit in Dr. Taylor's office. Fossett's arrival at Baylor Hospital occurred within the time frame Dr. Levine determined a re-evaluation to be appropriate and consistent with the applicable standard of care. Had Dr. Taylor scheduled Fossett for re-evaluation 48 hours after her post-operative office visit, consistent with the standard of care articulated by Dr. Levine, the progression of Fossett's infection and wound dehiscence presumably would have been no more advanced or severe than the condition actually treated at Baylor Hospital following Fossett's arrival at the hospital within that same 48–hour period.

Dr. Levine did not assert in his report that had Fossett been re-evaluated by Dr. Taylor within 48 hours of her post-operative office visit, she would have avoided hospitalization and surgical treatment. Rather, Dr. Levine opined that the duration of Fossett's hospitalization and recovery would not have been longer than it "should have been." Dr. Levine provided no facts in his report

concerning the expected duration of Fossett's hospitalization and recovery in the absence of the alleged negligence of Dr. Taylor. Accordingly, Dr. Levine's report presented no factual basis for a conclusion that Dr. Taylor's alleged negligence resulted in a period of hospitalization and recovery that was longer than it would have been in the absence of such alleged negligence.

**\*577** [9] Dr. Levine's report claimed that as a result of Dr. Taylor's failure to meet the applicable standard of care, Fossett required at least one surgical wound exploration that might not have been necessary, sustained a larger scar from additional surgery and suffered continued pain and discomfort. He asserted that if Dr. Taylor had "appropriately evaluated and treated Fossett in a timely fashion according to the standard of care, she *might* have been admitted to the hospital earlier and required only one, if any, surgical wound explorations (sic). She would most likely not have required two surgeries." (Emphasis added.) Again, Dr. Levine's standard of care did not call for wound re-evaluation until up to 48 hours from the time of Fossett's post-operative office visit with Dr. Taylor. Within 48 hours of Fossett's office visit with Dr. Taylor, she was being treated at Baylor Hospital. Accordingly, Dr. Levine's report presented no factual basis for a conclusion that Dr. Taylor's alleged negligence resulted in surgical procedures, scarring, and pain that would not have occurred in the absence of such alleged negligence. Moreover, Dr. Levine's report suggested only that in the absence of the alleged negligence, Fossett *might* have been admitted to the hospital earlier and required only one, if any, surgical wound exploration. A description of only a possibility of causation is not sufficient to satisfy requirements concerning the necessary content of an expert report. *See Wright,* 79 S.W.3d at 53.

Dr. Levine's report claimed that had Dr. Taylor examined or cultured Fossett's surgical wound, he *might* have properly diagnosed MRSA and begun treatment with appropriate antibiotic therapy, thereby avoiding subsequent surgeries, pain, and permanent scarring. This attempt to establish causation also suffers from the infirmity that it presents only a possibility of causation. *See id.* Dr. Levine's report presented no factual basis for a conclusion that had Dr. Taylor examined or cultured Fossett's surgical wound, properly diagnosed MRSA, and begun treatment with appropriate antibiotic therapy, the subsequent surgical procedures, pain, and permanent scarring would have been avoided.

Dr. Levine's report omitted any factual explanation of how any act or omission by Dr. Taylor in delaying diagnosis and treatment of Fossett's condition for no more than 48 hours proximately caused additional

complications or surgical interventions. Dr. Levine explained neither the impact of the alleged 48–hour delay in re-evaluation of Fossett on the nature and severity of the underlying infection nor in what manner the infection developed or changed in that period of time necessitating surgery that otherwise would not have been required. Dr. Levine's report left the trial court to infer that the alleged delay in diagnosis and treatment proximately caused the additional surgery, pain and scarring without actually providing a factual basis for the trial court to so infer. *Cf. Mosely v. Mundine,* 249 S.W.3d 775, 780 (Tex.App.-Dallas 2008, no pet.) (comparative description of nodule and growth of mass after two-year delay in diagnosis provided factual basis for conclusion that failure to identify nodule led to invasive and aggressive treatment claimant underwent).

Dr. Levine's report failed to articulate a causal connection between Dr. Taylor's care of Fossett and the injuries that allegedly resulted. Dr. Levine's statements concerning causation are conclusory, suggest only the possibility of causation, and are unsupported by a factual basis within the four corners of the report. Considering the report and applicable law, we conclude the report constitutes a factually and legally insufficient basis for the trial court to determine whether Fossett's claims have merit. *See* **\*578** *Leland,* 257 S.W.3d at 206–07. We conclude the trial court abused its discretion in denying Dr. Taylor's motion to dismiss based on an inadequate expert report.

[10] Dr. Taylor asserts the trial court abused its discretion in failing to award him attorney's fees and costs. Section 74.351(b) requires that if an expert report has not been served within the statutorily required period of time, upon the motion of the affected physician or health care provider, the trial court shall enter an order awarding reasonable attorney's fees and costs and dismiss the claim with prejudice. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b); *see also, Hernandez v. Ebrom,* 289 S.W.3d 316, 318 (Tex.2009) ( "If a timely and sufficient report is not served, the trial court must award the provider its attorney's fees and costs and dismiss the case with prejudice."). Having concluded that the trial court should have granted Dr. Taylor's motion to dismiss as to Fossett's claims, under section 74.351(b) of the civil practice and remedies code, the trial court erred in denying Dr. Taylor's request for reasonable attorney's fees and costs of court. Accordingly, we sustain Dr. Taylor's assertion of entitlement to his reasonable attorney's fees and costs under section 74.351(b).

**Conclusion**

We reverse the trial court's order denying Dr. Taylor's motion to dismiss. We remand this case to the trial court for the limited purposes of determining and awarding Dr. Taylor reasonable attorney's fees and costs and for entry of a final order dismissing Fossett's claims against Dr. Taylor with prejudice.

Footnotes

1  Dr. Levine expressly incorporated the opinions he expressed in his original expert report in his supplemental expert report. On appeal, Fossett contends that "taken together," Dr. Levine's original and supplemental reports comply with the statutory requirements of section 74.351. Reports may be considered together in determining whether a claimant provided a report meeting the statutory requirements. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(i); *see also, Packard v. Guerra,* 252 S.W.3d 511, 527 (Tex.App.-Houston [14th Dist.] 2008, pet. denied) ("If a plaintiff can rely on more than one report to satisfy the standard of care, breach, and causation, we see no violation of section 74.351(i) just because a plaintiff attempted to cure an insufficient report with supplemental reports and refiled expert reports some of which initially were found to be insufficient.").
   We disagree with Fossett's argument on appeal that Dr. Taylor is precluded from raising objections to Dr. Levine's initial report because Dr. Taylor did not seek relief from this Court at the time of the trial court's order regarding that report. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(9) (Vernon 2008) (no appeal may be taken from trial court's order granting extension under section 74.351(c)); *see also, Ogletree v. Matthews,* 262 S.W.3d 316, 321 (Tex.2007) (in cases where report that implicated health care provider's conduct was served and trial court granted extension under section 74.351(c), appellate courts are without jurisdiction to reach merits of motion to dismiss).

2  Dr. Levine's original report contains numerous purported breaches of the standard of care by Dr. Taylor. Here, the analysis is dedicated to Dr. Levine's opinions concerning alleged breaches of the standard of care that he asserts caused injury or damage.

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

388 S.W.3d 314
Court of Appeals of Texas,
Texarkana.

TEXARKANA NURSING & HEALTHCARE
CENTER, LLC, Appellant
v.
Susan LYLE, Independent Guardian of Betty Ruth
Vest, Appellee.

No. 06–12–00067–CV. | Submitted: Nov. 20, 2012.
| Decided: Dec. 14, 2012.

**Synopsis**
**Background:** Resident's daughter brought action against nursing home, alleging negligent hiring, supervision, and failure to provide a safe environment, as well as vicarious liability for assault of resident by home's employee. The 202nd Judicial District Court, Bowie County, Leon F. Pesek Jr., J., trial court denied nursing home's motion to dismiss. Nursing home appealed.

**Holdings:** The Court of Appeals, Carter, J., held that:

[1] expert report provided by daughter was deficient with respect to her direct liability claim;

[2] remand was required to allow trial court to consider whether to grant extension to allow expert to cure the deficiency;

[3] expert report was also deficient with respect to daughter's vicarious liability claims; and

[4] the deficiency with respect to the vicarious liability claims was not curable.

Remanded.

**Attorneys and Law Firms**

**\*315** David W. Frost, Kent, Anderson & Bush, PC, Tyler, TX, for appellant.

J.T. Borah, Dawn W. Smith, Curtis E. Clinesmith, The Clinesmith Firm, Dallas, TX, for appellee.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

**OPINION**

Opinion by Justice CARTER.

**I. Background**
Betty Ruth Vest was a resident of Texarkana Nursing & Healthcare Center, L.L.C. (Texarkana Nursing) from 2003 until September 2011, when she passed **\*316** away.[1] From the time of her admission, Vest was dependent on the nursing home staff for all of her care. It is alleged that on July 31, 2009, while under the care of the Texarkana Nursing staff and while receiving hospice care, Vest was assaulted by Mary Bean, an L.V.N. employed by Texarkana Nursing. The assault allegedly left scratches on Vest's forehead, cuts on her left leg, knots on the sides of her head, and caused bruising and swelling of her left eye. Vest recovered from the assault.[2] Bean was arrested and charged with assault.

In July 2011, Susan Lyle, Vest's daughter and independent guardian, sued Texarkana Nursing[3] alleging Vest was assaulted by Bean in July 2009 and was injured as a result. Lyle pleads that the claims "by Plaintiff against Defendants fall within the scope of Chapter 74 of the Texas Civil Practice and Remedies Code." This assertion is incorporated into each theory of liability thereafter set forth in the petition. Lyle claims Texarkana Nursing is vicariously liable for the alleged negligence of its employees. Lyle further alleges Texarkana Nursing was directly responsible for the assault due to negligent supervision, negligent hiring, failure to hire and provide sufficient staff, and failure to allocate sufficient financial resources to the facility. The petition also alleges a direct negligence claim against Texarkana Nursing based on the failure to provide a safe environment for its residents.

Lyle provided an expert report from Milton D. Shaw, M.D., C.M.D.[4] In response, Texarkana Nursing filed a motion to dismiss for failure to provide an adequate expert report in accordance with Section 74.351(a) and (b) of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a), (b) (West 2011). The trial court denied the motion to dismiss. On appeal of this interlocutory order, Texarkana Nursing alleges that (1) the trial court erred in denying its motion to dismiss Lyle's direct liability claims, and (2) the trial court erred in denying its motion to dismiss Lyle's vicarious liability claims.

## II. Applicable Law and Standard of Review

[1] [2] [3] Chapter 74 of the Texas Civil Practice and Remedies Code requires a health care liability claimant to serve on each party one or more expert reports, together with a curriculum vitae of each expert, no later than 120 days after the original petition is filed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a). An expert report is

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the **\*317** causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) (West 2011). A motion to dismiss is properly granted if it appears that the report does not represent a good-faith effort to comply with subsection (r)(6) or is not sufficiently specific "to provide a basis for the trial court to conclude that the claims have merit." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001); *see* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). A report that merely states the expert's conclusions regarding the standard of care, breach, and causation is deficient. *See Palacios,* 46 S.W.3d at 879. "[T]he expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (per curiam). A motion challenging the adequacy of an expert report shall be granted if the report "does not represent an objective good faith effort to comply" with the statutory definition of an expert report. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(l ) (West 2011). A "good faith effort" is one that (1) provides information sufficient to inform the defendant of the specific conduct called into question and (2) enables the trial court to conclude the claims have merit. *Wright,* 79 S.W.3d at 52.

[4] [5] We review a trial court's ruling on a motion to dismiss for an abuse of discretion. *Id.; Goforth v. Bradshaw,* 296 S.W.3d 849, 851 (Tex.App.-Texarkana 2009, no pet.). A trial court abuses its discretion when it acts arbitrarily or unreasonably or without reference to any guiding rules or principles. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003). A trial court has no discretion, however, in correctly analyzing and applying the law. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

## III. Analysis

### A. Shaw's Report is Deficient, but Not Silent, with Respect to Direct Liability Claims

Texarkana Nursing argues that Shaw's report is silent with respect to the pled claims of direct liability. Texarkana Nursing characterizes the categories of direct negligence listed in the petition as negligence in hiring, staffing levels, supervision of personnel, provision of financial resources, and failing to comply with the Code of Federal Regulations.[5]

Shaw's report states that Vest "was assaulted by Mary Ann Bean, an L.V.N. at the nursing facility, resulting in injuries to Mrs. Vest, including a 1 inch scratch to the forehead, bilateral contusions with swelling to the forehead, left periorbital ecchymosis, **\*318** and contusion with ecchymosis to the left lower leg."[6]

The report includes one paragraph addressing the standard of care, as follows:

> The standard of care for a long term care facility and its staff requires that the facility in question provide that level of care and treatment that a reasonable, prudent, similar facility would provide under the same or similar circumstances. The facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial wellbeing possible. To do so also requires that the nursing facility provide a safe environment for its residents, insofar as it is possible.

Shaw further opines:

> In the case of Ms. Vest, Texarkana Nursing and Healthcare Center clearly did not provide a safe and secure environment for its residents, allowing the documented assault of Ms. Vest by one of its own employees. In this regard, Texarkana Nursing and Healthcare Center breached its responsibility to Ms. Vest and her family, resulting in injury to the resident.

Shaw concludes that "Texarkana Nursing and Healthcare Center failed to provide a safe environment for Ms. Vest, resulting in her assault and injury at the hands of an employee of the facility."

### (1) Standard of Care and Breach

Even though our analysis is confined to the four corners of the report, the report must be read in conjunction with the pleadings to determine if it provides a basis for Lyle's claims. *See Palacios,* 46 S.W.3d at 878. The report states that the applicable standard of care requires Texarkana Nursing to "provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial wellbeing possible." This standard includes, insofar as it is possible, the duty to "provide a safe environment for ... residents." Shaw opines that Texarkana Nursing breached the standard of care by allowing the "documented assault on Ms. Vest by one of its own employees." The resulting injuries are listed in the report.

Texarkana Nursing initially takes issue with Shaw's opinion addressing the need to provide Vest with a "safe environment" because it is not a pled claim. Even though not pled in this precise language, the petition alleges a breach of the nondelegable duty to assist Vest in attaining and maintaining "the highest practicable level of physical, mental, and psychosocial well being." As Shaw opines, the provision of a safe environment is required in order to fulfill this duty. *See Harris Methodist Fort Worth v. Ollie,* 342 S.W.3d 525, 527 (Tex.2011) (per curiam) ("services a [health care provider] provides its patients necessarily include those services required to meet the patients' fundamental needs such as ... safety").

Texarkana Nursing further complains of the inadequacy of the stated standard of care, because it does not indicate what Texarkana Nursing should have done differently, citing *Russ v. Titus Hospital District,* 128 S.W.3d 332, 341–42 (Tex.App.-Texarkana 2004, pet. denied) ("[w]hether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently") (quoting *Palacios,* 46 S.W.3d at 880).[7] In other words, one must be able to determine from the report what was required by the standard of care. This requires "specific information about what the defendant should have done differently." *Palacios,* 46 S.W.3d at 880. Here, we have a generic statement that the nursing facility must provide a safe environment. Texarkana Nursing maintains this is insufficient.

Conversely, Lyle contends that the report meets the criteria set out in Chapter 74. According to Lyle, the report sets forth the standard of care, requiring the facility to provide the level of care and services necessary for Vest to maintain and attain the highest level of well-being possible, thus necessitating the provision of an environment safe for residents. Lyle defends the breach and causation sections of the report in reliance on *UHS of Timberlawn, Inc. v. S.B. ex rel. A.B.,* 281 S.W.3d 207 (Tex.App.-Dallas 2009, pet. denied). In that case, a thirteen-year-old patient at Timberlawn's psychiatric treatment facility was placed in a ward with male patients, where one of them allegedly raped her. The patient claimed her injuries were proximately caused by the negligence of Timberlawn's employees and submitted an expert report in support of her claims. Timberlawn claimed the report was inadequate and conclusory on the issue of causation. This complaint was based on the premise that the expert did not opine that the patient was actually raped, and, thus, could not identify the alleged causal relationship between Timberlawn's alleged negligence and the patient's injury. In rejecting this premise, the court distinguished health care liability claims in which "the 'injury, harm, or damages claimed' flow from the existence of a medical condition that itself resulted from the breach of the applicable standard of care." *Id.* at 212. In such a case,

> [I]dentifying the causal relationship between the alleged breach of the standard of care and the resulting harm involves not only an explanation as to how the standard of care was breached, but also how the breach gave rise to the new, deleterious medical condition. Similarly, other healthcare liability claims may allege that a breach of the applicable standard of care exacerbated a pre-existing medical condition, or hindered or prevented the effective treatment of such a condition. Identifying the "breach/injury" causal relationship in these cases may well require an expert to opine as to the existence, extent, and prognosis of the pre-existing medical condition, as well as how the alleged breach of the standard of care aggravated such a condition, impeded or prohibited its treatment, and otherwise affected the patient's prognosis.

However, S.B.'s claim is different. S.B. alleges that, as a result of Timberlawn's failure to meet the applicable standards of care relevant to its treatment of her, she was raped. Rape is not a medical condition. It is an assault. Moreover, rape may—or may not—be accompanied by medically ascertainable evidence of physical trauma, or even physical evidence that it occurred.

**\*320** *Id.* The court, therefore, declined to hold that the causation element of the report was required to include an opinion that the patient was in fact raped. *Id.*

This case is different from *Timberlawn* inasmuch as Texarkana Nursing is not claiming that the report fails to state that Vest was, in fact, assaulted. There is no dispute that Vest was assaulted; the assault was photographically documented.[8] Instead, Texarkana Nursing claims the mere statement that it failed to provide a safe environment is an insufficient statement of the breach of the standard of care, because it does not indicate what should have been done differently. In contrast, the *Timberlawn* report stated that housing the patient

> in the male unit exposed [the patient] to harm which resulted in her self reported rape. Had [S.B.] been housed in a safe and appropriate manner, given her propensity for sexual victimization, she would not have been placed in a male unit. By being housed in a male unit it was foreseeable that [S.B.] would be exposed to and was at higher risk for the exact self reported harm which she suffered....
> *Id.* at 214. The report made clear the specific conduct called into question and provided a sufficient basis for the trial court to conclude that the claim had merit. *Id.* at 215.

In this case, however, the report indicates that Texarkana Nursing failed to provide "a safe and secure environment for its residents, allowing the documented assault of Ms. Vest by one if its own employees." In other words, the assault itself is the breach of the standard of care, which requires the provision of a safe and secure environment for nursing home residents. This statement does not, however, advise Texarkana Nursing of what should have been done in order to prevent its employee from assaulting Vest.

The question boils down to one of how much detail is needed in order for an expert report to withstand Chapter 74 scrutiny when the harm alleged arises from assaultive conduct. Lyle points to *Christus Spohn Health System Corp. v. Sanchez,* 299 S.W.3d 868 (Tex.App.-Corpus Christi 2009, pet. denied), in support of her contention that the report is sufficient. *Sanchez* involved an action against a hospital and hospital employees in their individual capacities for assault and intentional infliction of emotional distress. Sanchez was an I.C.U. patient when a registered nurse and a certified nurse's assistant allegedly entered her room and made unwanted sexual advances toward her. Sanchez alleged that one of the men undressed her and exposed her body for the other to see. She further claimed that they turned her over using their hands instead of a turning pad and, while they were

moving her from the bed to a chair in her room, they danced with her. Sanchez alleged that during these physical contacts, the nurse and nurse's assistant made sexual overtures and comments and that the improper conduct continued until she was discharged from the hospital a few days later. *Id.* at 872.

**\*321** Sanchez sued the hospital for negligent hiring, supervision, training, and retention of its employees and vicarious liability for the conduct of its employees. Relevant to this case, Sanchez's expert report was attacked on the basis that it did not adequately set forth the standard of care and/or safety and breach because the report was alleged to be conclusive and speculative. *Id.* at 877. Spohn further argued that the report failed to provide specific information about what it should have done differently. The report stated, in relevant part, that the "standard of care requires that the hospital and its nursing staff provide adequate supervision to their certified nursing assistants and licensed nursing personnel." The report further stated that the "standard of care requires that the hospital and its nursing staff protect their patients from sexual harassment and abuse." *Id.*

The court concluded that the report identified the care that was expected, but not rendered under the applicable standard of care, because it states the hospital "[f]ailed to provide adequate supervision to the [certified nurse's assistant] and the [registered nurse]," "[f]ailed to protect Ms. Sanchez from sexual harassment and sexual abuse," and "[f]ailed to provide safety to Ms. Sanchez in her immediate post operative [sic] when the [certified nurse's assistant] lifted Ms. Sanchez up and began dancing with her." *Id.* The court found that this report put the hospital on notice of the specific, complained-of conduct. *Id.*

In this case, unlike *Sanchez,* the report simply states that Texarkana Nursing failed to provide a safe and secure environment for Vest. In *Sanchez,* however, the report stated that the hospital was required to provide adequate supervision of its certified nursing assistants and licensed nursing personnel, to protect its patient from sexual harassment and abuse, and to keep the patient safe. Granted, this is not much more detail than we have in this case, but *Sanchez* may be close to the line of what is permissible.

For example, *Baylor All Saints Medical Center v. Martin,* 340 S.W.3d 529 (Tex.App.-Fort Worth 2011, no pet.), involved an alleged sexual assault on a patient in her hospital room.[9] The hospital objected to the sufficiency of the patient's expert report. The report in question articulates the standard of care as follows:

A hospital such as Baylor All Saints Medical [C]enter is expected to adhere to specific standards of care in regard to all of its patients. A bedrock principal [sic] in providing care to its patients is the understanding that all of a hospital's patients by nature of their disease or injury are potentially vulnerable and necessarily need to receive treatment in a safe and secure environment. The Joint Commission on Accreditation of Health Care Organizations (JCAHO) has established in its Hospital Standards that all healthcare organizations must have in place policies which safeguard patients from assault by hospital staff and by strangers that enter the hospital. The JCAHO requires that hospitals adequately implement these standards, and monitor this implementation. The JCAHO patient security and safety expectations would require at a minimum that hospitals should employ a sufficient number of security personal [sic] to insure that no unauthorized persons enter patients ['] rooms and physically assault their patients. Additionally, the JCAHO standards would expect that all hospital staff should be trained to identify **\*322** persons that are not authorized to enter patients['] rooms and should monitor and prevent unauthorized persons from having access to patients receiving treatment at the hospital.

*Id.* at 533–34. The court determined this to be an insufficient statement of the standard of care. For example, the report stated that there must be policies in place to safeguard patients from assault, including employing a sufficient number of security personnel. The court wrote that this statement failed to indicate what specific policies and safeguards should have been in place. Further, the " 'policies in place to safeguard patients' are not identified." *Id.* at 534. The number of security personnel needed and the training the staff should have received is not described. *Id.* This report failed in light of the required standard, i.e., "what an ordinary prudent hospital would do under the same or similar circumstances," and "even a fair summary must set out what care was expected." *Id.* (citing *Palacios,* 46 S.W.3d at 880).[10]

*Kingwood Pines Hospital, LLC v. Gomez,* 362 S.W.3d 740 (Tex.App.-Houston [14th Dist.] 2011, no pet.), further illustrates the need for detail when an expert offers opinions regarding patient safety. In that case, a patient of Kingwood Pines Hospital was sexually assaulted by another patient. Gomez offered an expert report indicating a failure "to ensure that there were appropriately trained and adequate staffing and millieu structure such that a young girl ... would not be sexually molested." The report stated that the standard of care was breached when the physician failed to insure her patient's safety using "any of the number of measures available," by failing to "provide additional supervision" and not affording the patient "the most basic supervision." *Id.* at 750. The

report further indicated that (the physician) was required "to insure her patients are being treated in a safe and secure environment by being aware of the environment, patient population, and safety measures taken by the hospital." *Id.* at 749. In concluding the report was conclusory, the court noted that it did not provide information about how the physician was to insure that the hospital was adequately staffed and that staff members were appropriately trained or what measures were available to insure the patient's safety. Further, the report did not indicate what kind of supervision by the hospital was sufficient to provide a secure environment for the patient. *Id.* at 750.

[6] In this case, the only direct negligence claim addressed in Shaw's report is that of failing to provide Vest with a safe and secure environment. Because the report fails to articulate what Texarkana Nursing should have done differently to prevent the assault, it is deficient with respect to articulation of the standard of care and its breach.

### (2) Causation

Texarkana Nursing further contends that Shaw's report is deficient in that it **\*323** fails to set forth the causal relationship between Texarkana Nursing's alleged deviations from the standard of care and Vest's injuries. The report does, however, indicate that Texarkana Nursing breached its responsibility to Vest in allowing the documented assault of Vest by one of its own employees, resulting in injury to Vest. The resulting injuries are described. Lyle maintains that this is a sufficient statement of causation under *Timberlawn.* After all, assault is not a medical condition. Conversely, if the report is not sufficiently detailed in its statement of the standard of care and breach, and, thus, fails to advise Texarkana Nursing of what it should have done differently to provide a safe and secure environment for Vest, then it logically follows that causation should be described in terms of the specific shortcomings that created a situation in which assault could occur.

### B. Deficiencies Regarding Direct Liability Are Curable

[7] Texarkana Nursing contends that because the report does not address the pleaded cause of action, it does not constitute a good-faith effort to comply with the statutory requirements and should, therefore, be dismissed in reliance on *Windsor v. Maxwell,* 121 S.W.3d 42, 51

(Tex.App.-Fort Worth 2003, pet. denied) (to inform defendant of specific conduct plaintiff has called into question, report must support cause of action alleged by plaintiff in its pleadings). Here, as previously discussed, the report does address the claim that Texarkana Nursing had a duty to assist Vest in attaining and maintaining "the highest practicable level of physical, mental, and psychosocial well being." Implicit in this duty is the provision of a safe and secure environment. *See Harris Methodist Fort Worth,* 342 S.W.3d at 527. The report, albeit in a conclusory manner, addresses this claim.

Because the report is deficient with respect to Lyle's direct liability claim regarding the failure to provide a safe and secure environment for Vest, the trial court should be permitted the opportunity to consider whether to grant a thirty-day extension to cure the deficiencies. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c) (West 2011);[11] *Leland v. Brandal,* 257 S.W.3d 204, 207 (Tex.2008); *Longino v. Crosswhite,* 183 S.W.3d 913, 918 n. 2 (Tex.App.-Texarkana 2006, no pet.); *see also Scoresby v. Santillan,* 346 S.W.3d 546, 549 (Tex.2011) (trial court should err on side of granting additional time and must grant it if deficiencies are curable).[12] Because at least three of Lyle's direct liability claims necessarily relate to the provision of a safe environment, they are not completely unaddressed, and we decline to find that such claims should be dismissed.[13] *See* **\*324** *Querry v. Sanders,* No. 06–08–00099–CV, 2009 WL 1097904, at \*7 (Tex.App.-Texarkana Apr. 24, 2009, no pet.) (mem. op.) (report which wholly failed to address alleged negligence in failing to properly identify and isolate main bile duct before initiating main procedure not curable deficiency).

## C. Shaw's Report Fails to Address Vicarious Liability Claims

[8] Lyle's petition alleges that Texarkana Nursing has "vicarious liability for the acts and omissions of all persons or entities under their control, either directly or indirectly, including employees, agents, consultants, and independent contractors, whether in-house or outside entities, individuals, agencies, or pools causing or contributing to the injuries of BETTY RUTH VEST." "When a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient." *Gardner v. U.S. Imaging, Inc.,* 274 S.W.3d 669, 671–72 (Tex.2008) (per curiam). Thus, if the report identifies conduct by Texarkana Nursing's employee, Texarkana Nursing is implicated. As long as the report adequately addresses the standard of care applicable to the employee, how the employee breached the standard of care, and that the breach caused the plaintiff's injury, it is sufficient as

against Texarkana Nursing to satisfy the expert report requirement for the vicarious liability claims. *See RGV Healthcare Assocs., Inc. v. Estevis,* 294 S.W.3d 264, 273 (Tex.App.-Corpus Christi 2009, pet. denied).

Lyle pled that the staff of Texarkana Nursing did not provide Vest with timely and accurate care assessments and necessary supervision; failed to use reasonable care in treating residents with the degree of skill and learning ordinarily possessed and used by nursing home facilities in the same or similar locality; failed to assist residents (including Vest) in attaining and maintaining the highest practicable level of physical, mental, and psychosocial well-being; failed to meet the applicable standards of care; violated their duty of care to Vest through mistreatment, abuse and neglect; and violated Section 22.04 of the Texas Penal Code (injury to elderly individual). Shaw's report is silent with respect to each of these claims, with the exception of assaultive conduct and mistreatment. The report identifies conduct by Texarkana Nursing's employee—the alleged assault on Vest. The report fails, however, to identify the standard of care, breach of the standard of care, or causation.

[9] The only statement regarding the standard of care in the entire report regarding the staff is: "The standard of care for a long term care facility *and its staff* requires that the facility in question provide that level of care and treatment that a reasonable, prudent, similar facility would provide under the same or similar circumstances." (Emphasis added.) The report says nothing regarding the breach of the standard of care by the staff or how that breach caused Vest's injuries. While the underlying nature of the vicarious liability claim rests in the intentional acts of Bean, which appear to be unrelated to the rendition of health care, Lyle's pleading alleges her claims fall within the purview of Chapter 74.[14] We must, therefore, analyze **\*326** them as such. *See Giron v. Baylor Univ. Med. Ctr.,* No. 05–09–00825–CV, 2011 WL 149981, at \*2 (Tex.App.-Dallas Jan. 19, 2011, pet. denied) (mem. op.) (when Giron chose to proceed under Chapter 74 and plead her cause of action as health care liability claim, she bound herself to statutory requirements).

[10] The lone statement regarding the standard of care applicable to the staff of Texarkana Nursing fails to specify what is required of a reasonable and prudent staff under the same or similar circumstances. This statement is not a fair summary of Shaw's opinions regarding the standard of care for the Texarkana Nursing staff. The mere recitation of a legal standard, in the absence of specific facts applicable to this case, is not a good-faith effort to articulate the standard of care. *See Lira v. Cerna,* No. 08–01–00250–CV, 2002 WL 1767569, at \*6

(Tex.App.-El Paso Aug. 1, 2002, no pet.) (not designated for publication) (The statement that "[t]he standard of care requires that a physician provide that level of care which a reasonable prudent physician would provide in the same or similar circumstances" does not demonstrate good-faith effort to provide fair summary of expert's opinions and does not identify standard of care.); *see also Hood v. Phillips,* 554 S.W.2d 160, 165 (Tex.1977) (holding that legal standard for medical profession is "reasonable and prudent" physician "under the same or similar circumstances"). Moreover, the report is silent regarding the breach of the standard of care and causation. Because the standard of care applicable to the staff is not identified, and because breach and causation are not addressed, these deficiencies are not curable. Lyle's vicarious liability claims should, therefore, have been dismissed by the trial court.

## IV. Conclusion

Because the report is deficient with respect to Lyle's direct liability claim regarding the failure to provide a safe and secure environment for Vest, we remand this claim to the trial court to consider whether to grant a thirty-day extension to cure these deficiencies.

Shaw's report is silent with respect to the standard of care, breach, and causation regarding her vicarious liability claims. Because these deficiencies are not curable, Lyle's vicarious liability claims are dismissed.

Footnotes

[1] Lyle died in September 2011, after the petition was filed in July 2011.

[2] While Lyle does not claim Vest died as a result of the assault, the prayer for relief is phrased in terms of the "wrongful death beneficiaries of BETTY RUTH VEST."

[3] Ann Yeager Ellisor (the nursing home administrator) was also a named defendant in the lawsuit. The claim against Ellisor was nonsuited.

[4] Shaw is board certified in internal medicine and is certified by the American Medical Directors Association as a medical director. Shaw is the medical director of the geriatrics and extended care program at the Veterans Administration (VA) Hospital in Kerrville and is assistant clinical professor of medicine at the University of Texas Medical School at San Antonio. Shaw is the medical director of two private community nursing homes in Kerrville, separate from his VA practice.

[5] The allegations fall variously under the categories listed in the petition as "Negligence," "Negligence Resulting in Health Care Liability Claims," "Negligence Per Se," and "Violation of Penal Code § 22.04." Pled claims include: the failure to allocate sufficient financial resources to Texarkana Nursing for residents' needs to be met, resulting in the mistreatment, abuse, and neglect of Vest; the failure to use reasonable care in treating residents with the degree of skill and learning ordinarily possessed and used by nursing home facilities in the same or similar locality; the failure to assist all residents, including Vest, in attaining and maintaining the highest practicable level of physical, mental, and psychosocial well-being; the failure to properly supervise nurses and aides; the failure to provide sufficient nurses and aides; the failure to ensure that Vest received timely and accurate care assessments and necessary supervision; various violations of the Code of Federal Regulations; and violation of Section 22.04 of the Texas Penal Code (injury to elderly individual). TEX. PENAL CODE ANN. § 22.04 (West Supp.2012).

[6] Ecchymosis is "[t]he passage of blood from ruptured blood vessels into subcutaneous tissue, marked by a purple discoloration of the skin." *Ecchymosis Definition,* TheFreeDictionary.com, http://www.thefreedictionary.com/ecchymosis (last visited Dec. 10, 2012).

[7] *Russ* involved an allegedly deficient report regarding a hospital's duty to keep a suicidal patient from injuring herself. In that case, the patient sustained injuries from a fall out of a hospital window. This Court held that the statement "that windows [must] either be secured with metal screens that only staff can open, or be locked" or, "[i]f the patient has access to the window, a special difficult to break glass or Plexiglass should be used" was sufficient to apprise the hospital of what it should have done differently in light of the fact that the hospital placed the patient in a fourth-floor room with unlocked windows. *Russ,* 128 S.W.3d at 342.

[8] Shaw's report indicates he reviewed the following records in conjunction with issuing his report:
1) Nursing Home Records from Texarkana Nursing and Healthcare Center
2) Affidavit from the Texas Board of Nursing
3) Offense Report by Officer Steven G. Womack
4) Pictures of Mrs. Vest taken by her daughter

5) Arrest Report of Mary Elliott Bean.

9    The *Martin* opinion does not indicate whether the assault was committed by a hospital employee, another patient, or some other third party.

10   The court also addressed Martin's claim that the report was all that could be done at the time in light of the fact that Section 74.351(s) only allows discovery of medical records and billing records, which do not contain the circumstances surrounding the assault and hence provide no discovery as to whether security standards were met. The court wrote that this was a misreading of the discovery allowed under Section 74.351(s). Because assaults in health care settings are covered by Section 74.351, said the court (*Martin,* 340 S.W.3d at 534 (citing *Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 851 (Tex.2005))), logically, discovery of the hospital's policies and procedures regarding the protection of patients from assault must be covered by Section 74.351(s). *Martin,* 340 S.W.3d at 534.

11   Section 74.351 of the Texas Civil Practice and Remedies Code states, "If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the Court may grant one 30–day extension to the claimant in order to cure the deficiency." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c).

12   *Scoresby* involved a letter report that failed to state the standard of care but implied that it was inconsistent with the physicians' conduct. Even so, the report contained the opinion of an individual with expertise that the claim had merit and implicated the defendants' conduct. This minimal standard is met here as well. The report is written by an individual with expertise, implicates the conduct of Texarkana Nursing, and indicates that the claim has merit. *Scoresby,* 346 S.W.3d at 557.

13   Lyle alleges that Texarkana Nursing was negligent in terms of hiring, staffing levels, supervision of personnel, provision of financial resources, and in failing to comply with the Code of Federal Regulations.

14   Recently, the Texas Supreme Court decided *Loaisiga v. Cerda,* 379 S.W.3d 248 (Tex.2012). *Loaisiga* was not decided until after the appellant's brief was filed here and well after the hearing in the trial court. In *Loaisiga,* two female patients sued a medical doctor, the professional association bearing his name, and a clinic alleging the doctor assaulted them by groping their breasts while examining them for sinus and flu symptoms. *Id.* at 253. The patients served the doctor and professional association with reports from a physician who, based on the assumption that the allegations in the plaintiffs' pleadings were true, opined that the doctor's alleged actions did not fall within any appropriate standard of care. The defendants argued that the claims were health care liability claims and moved for dismissal on the basis that the reports were deficient. The trial court denied the motions. The court of appeals held that the claims were not health care liability claims and that expert reports were not required and affirmed the trial court's order without considering the report's adequacy. *Id.* at 254. The high court recognized a presumption:

The breadth of the statute's text essentially creates a presumption that a claim is an HCLC if it is against a physician or health care provider and is based on facts implicating the defendant's conduct during the course of a patient's care, treatment, or confinement. *See [Marks v. St. Luke's Episcopal Hosp.,* 319 S.W.3d 658, 662 (Tex.2010) ]. But the presumption is necessarily rebuttable. In some instances the only possible relationship between the conduct underlying a claim and the rendition of medical services or healthcare will be the healthcare setting (i.e., the physical location of the conduct in a health care facility), the defendant's status as a doctor or health care provider, or both.

*Id.* at 256. Following a discussion of the statute's requirement that claimants in health care liability claims file expert reports, the high court wrote:

[W]e fail to see how the Legislature could have intended the requirement of an expert report to apply under circumstances where the conduct of which a plaintiff complains is wholly and conclusively inconsistent with, and thus separable from, the rendition of "medical care, or health care, or safety or professional or administrative services directly related to health care" even though the conduct occurred in a health care context. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(13); *see also* TEX. GOV'T CODE ANN. § 311.021 ("In enacting a statute, it is presumed that ... a just and reasonable result is intended....").

*Id.* at 257.

The court then listed three factors that must be reflected in the record in order for an assault claim against a medical or health care provider *not* to be considered a health care liability claim:

[A] claim against a medical or health care provider for assault is not an HCLC if the record conclusively shows that (1) there is no complaint about any act of the provider related to medical or health care services other than the alleged offensive contact, (2) the alleged offensive contact was not pursuant to actual or implied consent by the plaintiff, and (3) the only possible relationship between the alleged offensive contact and the rendition of medical services or healthcare was the setting in which the act took place.

*Id.*

In determining whether a claim is subject to the Texas Medical Liability Act's (TMLA) expert report requirements, the trial court is not limited to the four corners of the expert report; instead, the trial court should consider the entire record, including pleadings, motions and responses, and relevant evidence properly admitted. *Id.* at 258. In *Loaisiga,* the court noted a lack of

information to give context to the physician's actions during the examinations, such as medical records, reports, and other information regarding the plaintiffs' symptoms and complaints to the physician. This lack of information prevented the plaintiffs from conclusively showing that "the only relationship between the alleged touching of their breasts and Dr. Loaisiga's rendition of medical services was the physical location of the examination...." *Id.* at 259. The court went on to say that

> because we are clarifying the standard for whether claims are subject to the TMLA's expert report requirements and the plaintiffs maintain that theirs are not, we conclude it is appropriate to remand the case to the trial court for further proceedings regarding that issue. *See Low v. Henry,* 221 S.W.3d 609, 621 (Tex.2007) (remanding "to allow the parties to present evidence responsive to our guidelines").

*Id.* at 260.

In light of *Loaisiga,* this Court questioned whether to remand the case to the trial court for a determination of whether or not Lyle's claim is, in fact, a health care liability claim. However, in *Loaisiga,* the plaintiffs maintained that their claims were not health care liability claims. Here, Lyle has represented to this Court that her claims are health care liability claims, and, in oral argument, Lyle's counsel stated it was not her wish to remand the case to the trial court for a determination of whether her claims are subject to the TMLA's expert report requirements.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

371 S.W.3d 171
Supreme Court of Texas.

TEXAS WEST OAKS HOSPITAL, LP and Texas
Hospital Holdings, LLC, Petitioners,
v.
Frederick WILLIAMS, Respondent.

No. 10–0603. | Argued Nov. 8, 2011. | Decided June
29, 2012.

**Synopsis**
**Background:** Estate of psychiatric patient brought health
care liability claim (HCLC) against hospital and
hospital's employee who was involved in physical
altercation with patient that resulted in patient's death and
injuries to employee. Employee brought cross-claim of
negligence against hospital, which was a nonsubscriber to
workers' compensation scheme. The 234th District Court,
Harris County, Reese Rondon, J., denied hospital's
motion to dismiss employee's cross-claim as an HCLC
subject to expert-report requirements. Hospital brought
interlocutory appeal. The Court of Appeals, 322 S.W.3d
349, Leslie B. Yates, J., affirmed. Hospital filed petition
for review.

**Holdings:** The Supreme Court, Wainwright, J., held that:

[1] employee was a "claimant" under the Texas Medical
Liability Act (TMLA);

[2] negligence claim was based on alleged departures from
accepted standards of health care and of safety and was
therefore an HCLC;

[3] if expert medical or health care testimony is necessary
to prove or refute the merits of claim against a physician
or health care provider, claim is an HCLC;

[4] to qualify as an HCLC, a claim that is based on
departures from accepted standards of safety need not be
directly related to health care, abrogating *St. David's
Healthcare P'ship, L.P. v. Esparza,* 315 S.W.3d 601;
*Appell v. Muguerza,* 329 S.W.3d 104;

[5] interpreting hospital employee's action as an HCLC did
not conflict with exclusive-remedy provisions of Texas
Workers' Compensation Act (TWCA), as hospital was a
nonsubscriber to workers' compensation insurance; and

[6] aside from claims alleging negligent medical care or
health care, a claim need not involve a patient-physician
relationship for it to be an HCLC.

Judgment of Court of Appeals reversed; case remanded
with instructions.

Lehrmann, J., filed a dissenting opinion, in which Medina
and Willett, JJ., joined.

**Attorneys and Law Firms**

**\*174** Ryan Lee Clement, Wesson H. Tribble, Tribble,
Ross & Wagner, Houston, TX, for Texas West Oaks
Hospital, LP.

Charles M. Hessel, Marks Balette & Giessel, P.C., Robert
Steven Kwok, William Wade Hoke, Robert Kwok &
Associates, Leah Rush Easterby, Houston, TX, for
Frederick Williams.

**Opinion**

Justice WAINWRIGHT delivered the opinion of the
Court, in which Chief Justice JEFFERSON, Justice
HECHT, Justice GREEN, Justice JOHNSON, and Justice
GUZMAN joined.

At issue in this interlocutory appeal is whether the claims
of an employee against his employer, both of whom are
health care providers, alleging injuries arising out of
inadequate training, supervision, risk-mitigation, and
safety in a mental health facility, constitute health care
liability claims (HCLCs) under the Texas Medical
Liability Act (TMLA or Act). *See* TEX. CIV. PRAC. &
REM.CODE ch. 74 *et seq.* We conclude that the TMLA
does not require that the claimant be a patient of the
health care provider for his claims to fall under the Act, so
long as the Act's other requirements are met. We hold
that the employee here is properly characterized as a
"claimant" under the Act and his allegations against his
nonsubscribing employer are health care and safety
claims under the TMLA's definition of HCLCs, requiring
an expert report to maintain his lawsuit. We further hold
that the Act does not conflict with the Texas Workers'
Compensation Act (TWCA). We therefore reverse the
judgment of the court of appeals.

**I. Background**

Texas West Oaks Hospital, LP and Texas Hospital Holdings, LLC operate Texas West Oaks Hospital (West Oaks), a state-licensed, private mental health hospital located in Houston, Texas. Frederick **\*175** Williams, a psychiatric technician and professional caregiver at West Oaks, was injured on the job while supervising a patient, Mario Vidaurre. Vidaurre was admitted to West Oaks on June 11, 2007. Due to his history of paranoid schizophrenia, including manic outbursts and violent behavior directed at family members and professional staff, Vidaurre was placed by his admitting physician on one-to-one observation, an elevated level of supervised care in the psychiatric unit. Vidaurre was also put on "unit restriction," meaning he could only be taken out of the psychiatric unit by direct order of a physician. A few days after Vidaurre's admission, while Williams was supervising him, Vidaurre became agitated. To calm him, Williams took Vidaurre to an outdoor enclosed smoking area, in violation of the unit-restriction policy. The door to the enclosure locked behind them and the unsupervised area contained no cameras, audio supervision, mirrors, or other monitoring apparatus. Although Williams previously had taken Vidaurre to the smoking area without incident, a physical altercation occurred on this occasion, resulting in Vidaurre's death and injuries to Williams.

Vidaurre's estate sued West Oaks, and later Williams, asserting HCLCs under the TMLA, codified in Chapter 74 of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM.CODE §§ 74.001–74.507. Williams later asserted cross claims of negligence against West Oaks pursuant to section 406.033 of the Texas Labor Code, a statutory provision governing employee common law claims against employers not subscribed to workers' compensation. See TEX. LAB.CODE § 406.033. West Oaks' status as a nonsubscriber to workers' compensation is uncontroverted, and therefore, Williams' claims against his employer are not barred by the Texas Workers' Compensation Act. See id.; Port Elevator–Brownsville, L.L.C. v. Casados, 358 S.W.3d 238, 241 (Tex.2012) (discussing the "exclusive remedy" doctrine).

Williams alleged that West Oaks was negligent in:

> (a) Failing to properly train Williams to work at West Oaks' premises, including warning him of the inherent dangers of working with patients with the conditions and tendencies that Mario Vidaurre possessed; (b) Failing to adequately supervise West Oaks' employees, including Williams, while working with patients with conditions and tendencies that Mario Vidaurre possessed; (c) Failing to provide adequate protocol to avoid and/or decrease the severity of altercations between its employees, such as Williams, and patients; (d) Failing to provide its employees, including Williams, with adequate emergency notification devices to alert other employees of altercations in which assistance is needed; (e) Failing to warn Williams of the dangers that West Oaks knew or should have known were associated with working with patients such as Mr. Vidaurre; and (f) Failing to provide a safe workplace for its employees, including Williams.

West Oaks filed a motion to dismiss on the grounds that Williams' claims constituted HCLCs under the TMLA and that Williams had not served an expert report on West Oaks, as required under the Act. See TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13) (defining health care liability claims), and § 74.351(a), (b) (requiring a trial court to dismiss a health care liability claim if an expert report is not served within 120 days of filing suit).[1] Williams **\*176** responded that his claims sound in ordinary negligence rather than health care liability. Following a hearing, the trial court denied West Oaks' motion. West Oaks then filed this interlocutory appeal. See id. § 51.014(a)(9).

The court of appeals affirmed the trial court's order. 322 S.W.3d 349, 354. The court analyzed Williams' claims as breaches of West Oaks' duty of safety to its employee. Id. at 352. The court of appeals began its analysis from the premise that the phrase "directly related to health care" in section 74.001(a)(13) modifies not only "professional or administrative services," but also the term "safety." Id. It concluded that a safety claim "must be directly related to and inseparable from health care." Id. It is not disputed here that Vidaurre's claims against West Oaks are HCLCs, but Williams argues his claims against West Oaks are not. The court of appeals noted the related nature of the two parties' cases but concluded, based in part on our withdrawn opinion in Marks v. St. Luke's Episcopal Hospital, 52 Tex.Sup.Ct.J. 1184, withdrawn and superseded on rehearing, 319 S.W.3d 658 (Tex.2010), that Williams' claims against West Oaks are separable from health care and are not HCLCs. 322 S.W.3d at 353. Reasoning that the source of West Oaks' duty to Williams is the employer-employee relationship and that the nature of Vidaurre's relationship with West Oaks—patient to health care provider—is different from

Williams', the court of appeals concluded that the safety claims "flow from the employment relationship" between Williams and West Oaks and are not "directly related" to health care, as required by the statute. 322 S.W.3d at 352–53; TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). West Oaks filed a petition for review in this Court.

## II. Discussion

[1] In seeking to distinguish ordinary negligence claims from HCLCs, the heart of these cases lies in the nature of the acts or omissions causing claimants' injuries and whether the events are within the ambit of the legislated scope of the TMLA. Causes of action that are HCLCs cannot be transmuted to avoid the strictures of the medical liability statute. *Omaha Healthcare Ctr., LLC v. Johnson,* 344 S.W.3d 392, 394 (Tex.2011); *Diversicare Gen. Ptr., Inc. v. Rubio,* 185 S.W.3d 842, 851 (Tex.2005). We recognize that the Legislature intended the Texas Medical Liability Insurance Improvement Act (TMLIIA), the TMLA's predecessor, to be broad, and it broadened that scope further in 2003 with its repeal and amendments resulting in the TMLA. Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(6), 1977 Tex. Gen. Laws 2039, 2040 (former TEX.REV.CIV. STAT. art. 4590i, § 1.02(6)), *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. After the 2003 amendments, the breadth of HCLCs include causes of action against physicians and health care providers for negligence in the provision of "medical care, or health care, or safety or professional or administrative services directly related to health care." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13).

West Oaks argues that Williams' claims, mirroring the same facts as Vidaurre's HCLCs, are HCLCs and therefore implicate the requirement to serve an expert report. Such a conclusion would mandate **\*177** a dismissal because Williams did not serve a report on West Oaks. TEX. CIV. PRAC. & REM.CODE § 74.351(a), (b). West Oaks also urges that Williams' status as a health care provider at the hospital—as opposed to a patient—does not remove Williams from the requirement that he pursue his allegations as HCLCs. On the other hand, Williams characterizes his allegations as ordinary negligence claims against a nonsubscriber to the workers' compensation scheme. Williams contends that the court of appeals was correct in concluding that his claims fall outside the HCLC definition and therefore an expert report is not required for his suit to proceed. *See* 322 S.W.3d 349, 353–54. Williams also echoes the court of appeals in asserting that West Oaks' alleged safety and

security breaches do not require expert medical testimony and are interchangeable with safety and security issues arising in non-medical settings such as corrections facilities. *See id.* at 353 (opining that Williams' safety and security claims involve issues also "aris[ing] in other settings, such as jails and prisons"). In essence, Williams argues that the hospital is the mere situs of his claims, that his role as psychiatric technician overseeing a mental patient has no bearing on the character of his claims, and the fact that his claims arose in a mental health facility has little or no bearing on their character.

### A. Standard of Review

[2] [3] West Oaks' and Williams' arguments both implicate the scope of claims reached by the TMLA. The nature of the claims the Legislature intended to include under the TMLA's umbrella is a matter of statutory construction, a legal question we review de novo. *Marks,* 319 S.W.3d at 663 (interpreting the TMLIIA); *see also MCI Sales & Serv., Inc. v. Hinton,* 329 S.W.3d 475, 500 (Tex.2010) (observing that questions of statutory construction are generally reviewed de novo). In construing a statute, our aim " 'is to determine and give effect to the Legislature's intent,' " and we begin with the " 'plain and common meaning of the statute's words.' " *McIntyre v. Ramirez,* 109 S.W.3d 741, 745 (Tex.2003) (quoting *Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 318 (Tex.2002); *State Dep't of Highways & Pub. Transp. v. Gonzalez,* 82 S.W.3d 322, 327 (Tex.2002) (further citations omitted)).

### B. Relationship Between the Parties Under the Act

Williams argues that the lack of a patient-physician or patient-health-care-provider relationship between him and West Oaks is a clear barrier to inclusion of his claims within the Legislature's definition of HCLCs. He asserts that such a relationship is necessary to HCLCs. At one point in the past, Williams may have had a good argument. However, modifications over time to the TMLA and its predecessor indicate a different scope for HCLCs under current law.

The TMLIIA was enacted in 1977 to relieve a medical "crisis [having] a material adverse effect on the delivery of medical and health care in Texas." Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(6), 1977 Tex. Gen. Laws 2039, 2040 (repealed 2003). In 2003, facing another "medical malpractice insurance crisis" and a corresponding "inordinate[ ]" increase in the frequency of HCLCs filed since 1995, the Legislature repealed the TMLIIA, amending parts of the previous article 4590i and recodifying it as Chapter 74 of the Texas Civil Practice

and Remedies Code. Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(a), 2003 Tex. Gen. Laws 847, 884.

The 2003 legislation featured a significant modification to the existing law; it changed the HCLC definition:

> *178 'Health care liability claim' means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death *of a claimant,* whether the *claimant's claim or cause of action* sounds in tort or contract.

TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13)(emphases added). The Legislature replaced the term "patient" with "claimant" in the definition of an HCLC.[2] *Compare* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13), *with* TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4) (repealed 2003). The Legislature also defined the new term in the Act:

> 'Claimant' means a person, including a decedent's estate, seeking or who has sought recovery of damages in a health care liability claim. All persons claiming to have sustained damages as the result of the bodily injury or death of a single person are considered a single claimant.
> TEX. CIV. PRAC. & REM.CODE § 74.001(a)(2). "Person" is not defined in the TMLA and therefore must be given its common law meaning. *Id.* § 74.001(b). Changing the term "patient" to "claimant" and defining "claimant" as a "person" expands the breadth of HCLCs beyond the patient population. This in turn necessarily widened the reach of the expert report requirement, unless otherwise limited by other statutory provisions.

However, "health care" and "medical care" HCLCs are separately defined in the Act and reference treatment furnished "for, to, or on behalf of a patient." *Id.* § 74.001(a)(10), (a)(19).[3] As discussed more fully below, "medical care" and "health care" HCLCs require that the claimant be a patient. *See* Part II.D.1, *infra.*

[4] With the exception of medical care and health care claims, our focus in determining whether claims come under the TMLA is not the status of the claimant, but the gravamen of the claim or claims against the health care provider. *See Diversicare,* 185 S.W.3d at 854.

### C. Williams' Status as a "Claimant" Under the Act

[5] We next examine whether Williams is a "claimant" under the TMLA. Only claimants are obligated to serve expert reports on physicians or health care providers. TEX. CIV. PRAC. & REM.CODE § 74.351(a), (b). West Oaks argues that the language and structure of the definition of "claimant" in the current statute, especially when compared to its predecessor, indicate that the term includes not only patients, but other persons as well. Williams asserts that he is not a "claimant" because his claims are not HCLCs, as they do not involve the exercise of professional medical judgment. Williams also argues that the Legislature's substitution of "patient" with "claimant" is meant only to include derivative claims by the relatives and representatives of deceased patients, *179 not employees of health care provider defendants.

As observed above, a "claimant" is broadly defined as a "person," including the estate of a person, bringing an HCLC. TEX. CIV. PRAC. & REM.CODE § 74.001(a)(2). A claimant is a person seeking damages for an HCLC. *See id.* § 74.001(a)(2), (13). As noted above, the TMLIIA, by contrast, featured an HCLC definition predicated on injury to a "patient." TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4) (repealed 2003). Neither "person" nor "patient" is a defined term in the TMLA and therefore possesses such meaning as is consistent with the common law. TEX. CIV. PRAC. & REM.CODE § 74.001(b).

Although he likely would not have been a "patient" under the TMLIIA, Williams is a "claimant" and a "person" under the textual change to the definition of HCLCs in the TMLA. Not only is the term "patient" not included within the definition of "claimant," the Legislature used the term "including" to precede the reference to a decedent's estate. This renders any components of the definition nonexclusive. TEX. GOV'T CODE § 311.005(13); *Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 440–41 (Tex.2009) (noting that the term "including" is a term of enlargement and cautioning against "circumventing Legislative intent" by misapplying non-exhaustive lists in statutes); *see also In re Allcat Claims Serv., L.P.,* 356 S.W.3d 455, 468 (Tex.2011) (observing that the term "including" in that case was an explanatory term of enlargement).

The dissent argues that the 2003 amendment substituting "claimant" in lieu of "patient" in the HCLC definition merely clarifies that a patient's estate or others acting in a representative capacity may bring an HCLC. 371 S.W.3d

at 194 (Lehrmann, J., dissenting). But further belying the contention that a "claimant" may be only a patient or her estate is the Act's definition of "representative." The term "representative," used in the Act's medical-records-disclosure provision, is defined as the "agent of the patient *or* claimant," indicating that patient and claimant do not necessarily refer to the same category of persons. TEX. CIV. PRAC. & REM.CODE § 74.001(a)(25) (emphasis added), 74.052; *Wilson N. Jones Mem'l Hosp. v. Ammons,* 266 S.W.3d 51, 61–62 (Tex.App.—Dallas 2008, pet. denied) (also drawing the distinction). Neither the language of the TMLA nor the logic of the amendments can support a narrow reading of the term "claimant."

## D. Character of Williams' Claims

In defining the types of claims against health care providers constituting HCLCs, the question we face is not whether it seems that a claimed injury really arose from treatment commonly understood to be some type of medical or health care; nor do we address whether the incident causing the injury would have been a common law negligence claim. Instead, the issue posed is whether the umbrella fashioned by the Legislature's promulgation of the TMLA includes the cause of action brought by a claimant against physicians or health care providers.

The foundations of our analysis are well established. As in *Diversicare* and *Marks,* we determine whether the relevant allegations are negligence claims or are properly characterized as HCLCs under the Act. *Marks,* 319 S.W.3d at 662 (construing the TMLIIA); *Diversicare,* 185 S.W.3d at 847.

[6] An HCLC contains three basic elements:[4] (1) a physician or health care **\*180** provider must be a defendant; (2) the claim or claims at issue must concern treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's act or omission complained of must proximately cause the injury to the claimant. *See* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13); *Marks,* 319 S.W.3d at 662 (construing the similar definition found in the TMLIIA).

The second element is at issue in this case: whether Williams' claims alleging West Oaks' failure to properly train the facility's staff, warn of risks associated with violent psychiatric patients, provide adequate protocols and equipment to limit such risks, and provide a safe work environment under such circumstances implicate one or more of the standards listed in the HCLC

definition. There are several types of HCLCs set out in the TMLA: in addition to claims involving treatment and lack of treatment, the Act contemplates claims for alleged "departure[s] from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). All of these categories of claims, except safety, are defined terms in the Act. *See, e.g., id.* § 74.001(a)(10), (a)(19), and (a)(24) (defining "health care," "medical care," and "professional or administrative services"). West Oaks asserts that Williams' claims allege departures from accepted standards of either "health care" or "safety." Williams argues that neither of these categories of claims applies to his allegations, removing him from the Act's reach.

## 1. Claimed Departures from Accepted Standards of Health Care

We examine whether Williams' complaints are "claimed departure[s] from accepted standards of ... health care." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). In *Diversicare,* we held that a claim alleges a departure from accepted standards of health care if the act or omission complained of is an inseparable or integral part of the rendition of health care. 185 S.W.3d at 848, 850. "[T]raining and staffing policies and supervision and protection of [patients] ... are integral components of a [health care facility's] rendition of health care services...." *Id.* at 850. Williams' claims are similar to the health care claims at issue in *Diversicare.* However, our analysis of health care claims in that case involved claims by a patient against a health care provider, not, as in this case, claims brought by a non-patient employee against his employer.

The definition for "health care" suggests that claims brought under this prong of the HCLC definition must involve a patient-physician relationship. *See id.* § 74.001(a)(10). "Health care" is:

> ... *any act* or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a *patient* during the *patient's* medical care, treatment, or confinement.

*Id.* § 74.001(a)(10)(emphases added); *see also, e.g., Omaha Healthcare Ctr.,* 344 S.W.3d at 395 (pointing to the "any act" language in the "health care" definition as necessarily implicating more than acts of **\*181** physical care and medical diagnosis and treatment);

185 S.W.3d at 847 (noting the "broad[ ]" nature of the "health care" definition). While the "any act" language of the "health care" definition is certainly expansive, it is limited by the requirement that health care be rendered "for, to, or on behalf of a *patient* during the *patient's* medical care, treatment, or confinement." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10) (emphases added). Because a claim under the health care prong of section 74.001(a)(13) incorporates the definition of "health care," such a claim must involve a patient-physician relationship.

[7] The requirement that a claim arising under the health care prong of section 74.001(a)(13) involve a patient-physician relationship could be viewed as in tension with the term "claimant," defined in terms of a person. *See id.* § 74.001(a)(2). We consider all the relevant provisions of the TMLA together and follow the rule that specific statutory provisions prevail over more general provisions. *See Jackson v. State Office of Admin. Hearings,* 351 S.W.3d 290, 297 (Tex.2011) (reiterating the rule that "a specific statutory provision prevails as an exception over a conflicting general provision") (citing *Tex. Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 637 (Tex.2010)); *see also* TEX. GOV'T CODE § 311.026(b) (same). However, the specific wording of the "health care" definition, that health care be an act involving treatment rendered for, to or on behalf of a patient, acts as a limitation on the general provision that an HCLC need only be pursued by a "claimant." While other categories of HCLCs need only be pursued by claimants, by specific statutory directive health care claims must involve a patient-physician relationship.

[8] Claims based on departures from accepted standards of health care therefore involve a nexus between the standard departed from and the alleged injury. Such a nexus exists in this case. Williams, a health care provider for Vidaurre, was assaulted by Vidaurre, who was a West Oaks patient. *See* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(12) (defining "health care provider" to include employees of facilities licensed to provide health care). Williams was acting on orders to provide one-on-one supervision for Vidaurre. That directive was made by a West Oaks physician exercising professional judgment about the schizophrenic patient's care and treatment, including, specifically, heightened supervision in light of recent aggressive and violent behavior. Additional professional judgments about the safety protocols for such patients were put in place by West Oaks to care for its mental patients. Williams alleges that these judgments, concerning his training and psychiatric institutional protocols, departed from accepted standards of care and caused his injury. We previously reasoned in *Diversicare* that the health care facility's "training and staffing

policies and supervision and protection of [a patient] and other residents are integral components of [the facility's] rendition of health care services." 185 S.W.3d at 850. Williams' similar allegations constitute HCLCs based on claimed departures from accepted standards of health care.

Texas mental health statutes and regulations bolster this conclusion. West Oaks is a state-licensed, private mental health facility. The law requires that an inpatient mental health facility "provide adequate medical and psychiatric care and treatment to every patient in accordance with the highest standards accepted in *medical practice.*" TEXAS HEALTH AND SAFETY CODE § 576.022(a)(emphasis added). Mental health hospitals may not operate in Texas **\*182** unless licensed by the Texas Department of Health and operated in accordance with the rules and standards of the Texas Board of Mental Health and Mental Retardation to ensure the proper care and treatment of patients. *Id.* § 577.001(a), 577.005(b), 577.010(a).

[9] The necessity of expert testimony to support or refute the allegations at issue is a factor in assessing the nature of a claim against a health care provider or physician. *Diversicare,* 185 S.W.3d at 848. Here, the court of appeals considered the need for expert testimony in Williams' case and concluded that "even if medical expert testimony is necessary to establish Williams' claims, the need for expert testimony is not dispositive as to whether a claim is a health care liability claim." 322 S.W.3d at 353. We have indicated that even when expert medical testimony is not necessary, the claim may still be an HCLC. *Murphy v. Russell,* 167 S.W.3d 835, 838 (Tex.2005) ("The fact that in the final analysis, expert testimony may not be necessary to support a verdict does not mean the claim is not a health care liability claim."). We have not previously addressed the court of appeals' reasoning, and we now hold that if expert medical or health care testimony is necessary to prove or refute the merits of the claim against a physician or health care provider, the claim is a health care liability claim.

[10] Expert testimony in the health care field is necessary to support Williams' claims. Those claims require evidence on proper training, supervision, and protocols to prevent, control, and defuse aggressive behavior and altercations in a mental hospital between psychiatric patients and employed professional counselors who treat and supervise them. The provision of emergency notification devices, warning of dangers associated with psychiatric patients, providing a safe workplace, and properly training the caregiver at a psychiatric facility are integral to the patient's care and confinement. Acts or treatment that are integral to a "patient's medical care, treatment, or confinement" constitute "health care." TEX.

CIV. PRAC. & REM.CODE § 74.001(a)(10). Claims for injuries arising from departures from proper "treatment performed or furnished, or that should have been performed or furnished" are health care claims. *Id.* § 74.001(a)(10). Contrary to Williams' argument, this dispute concerns more than simply determining whether a person should be protected from a known aggressive person. The dispute between Williams and West Oaks is, at its core, over the appropriate standards of care owed to this mental health professional in treating and supervising a psychiatric patient at the mental hospital, what services, protocols, supervision, monitoring and equipment were necessary to satisfy the standard, and whether such specialized standards were breached. *See Diversicare,* 185 S.W.3d at 850. The allegedly missing or insufficient protocols and standards were for a mental patient in a mental hospital. It would blink reality to conclude that no professional mental health judgment is required to decide what those should be, and whether they were in place at the time of Williams' injury.[5]

**\*183** Williams' argument that any security officer could have performed the oversight and supervision of a psychiatric patient at the mental health hospital is overly simplistic. Perhaps a security officer could have protected Williams, and Vidaurre himself, from harm, or lessened the severity of the injuries suffered, but security is only one aspect of the matter. Williams' position at West Oaks involved professional, health-care-related judgments different from the tasks typically associated with a law enforcement officer, security guard, or bouncer. Treatment of a mental patient subject to psychotic and aggressive outbursts requires health care, not simply protection from bodily harm, to control, defuse, or prevent mental processes leading to aggression, and professional techniques to do so. Patients at West Oaks are there not merely for shelter, but also for care and treatment. *See Charrin v. Methodist Hosp.,* 432 S.W.2d 572, 574 (Tex.Civ.App.—Houston [1st Dist.] 1968, no writ) (holding that the hospital-patient relationship is different from that of a landlord-tenant). Williams' self-described role at West Oaks was that of a "counselor" and "caregiver," not a security guard. One of Vidaurre's experts characterizes psychiatric technicians as a "valuable and indispensable part of psychiatric hospital care." Vidaurre's expert also notes that the role of psychiatric technician involves appropriately observing and evaluating potentially assaultive mentally ill patients and assessing the potential for violent eruptions. Thus, the very deficiencies in training and protocols Williams complains of underscore the health-related nature of his role.

[11] We do not conclude, as West Oaks would have us, that Williams' claims should be considered HCLCs on the bare basis that they mirror those of the patient and stem from the same fact pattern. Williams and the patient stand as separate claimants. We analyze the applicability of the TMLA and its attendant procedural requirements on the gist of the claimant's allegations. *See Diversicare,* 185 S.W.3d at 847–48.

**2. Claimed Departures from Accepted Standards of Safety**

[12] We also examine whether Williams' claims may be characterized as HCLCs under the definition's "safety" prong. We have not decided whether safety claims must be "directly related to health care." The TMLA's HCLC definition includes, among the different types of covered claims, "claimed departure[s] from accepted standards of ... safety...." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13).

Williams was injured during an altercation with Vidaurre in a smoking area at the hospital, and he contends his injuries would have been avoided if West Oaks had instituted proper safety protocols and monitoring devices. Williams' claims, predicated upon the monitoring and restraint **\*184** of violent, schizophrenic patients, implicate the safety, as commonly understood, of employees and patients. Safety is not defined in the TMLA. This Court has construed the term, under principles of statutory construction, according to its commonly understood meaning as the condition of being "untouched by danger; not exposed to danger; secure from danger, harm or loss." *Diversicare,* 185 S.W.3d at 855 (quoting the definition of "safe" in Black's Law Dictionary (6th ed.1990) to construe the meaning of "safety" under predecessor statute). Logically, the inclusion of safety "expand[ed] the scope of the statute beyond what it would be if it only covered medical and health care" and included the claims in that case, and it was not necessary to define the precise boundaries of the safety prong. *Diversicare,* 185 S.W.3d at 855; *see also Marks,* 319 S.W.3d at 662–63.

[13] In 2003, the Legislature modified the definition of HCLCs. It changed "patient" to "claimant," and also added the italicized phrase to the relevant portion of the pre–2003 definition: HCLC means a cause of action for a "claimed departure from accepted standards of medical care, or health care, or safety *or professional or administrative services directly related to health care,* which proximately results in injury to or death of a claimant...." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13)(emphasis added). The dissent argues that the 2003 amendment was intended to narrow the existing scope of the safety prong of HCLCs by requiring that

safety be "directly related to health care."[6] *See id.* We disagree for several reasons.

Safety was in the Act prior to the 2003 amendments and this Court construed it according to its common meaning as being secure from danger, harm or loss. *Diversicare,* 185 S.W.3d at 855. The phrase "directly related to health care" was added to the definition of HCLCs in 2003 to modify "professional or administrative services." *Compare* TEX.REV.CIV. STAT. art 4590i, § 1.03(a)(4) (repealed 2003), *with* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 865.

[14] Scrutinizing grammar in interpreting statutes, we are cognizant of the rule that "[m]odifiers should come, if possible, next to the words they modify." William Strunk, Jr. & E.B. White, THE ELEMENTS OF STYLE R. 30 (4th ed. 2000); *see also* Bryan A. Garner, GARNER'S MODERN AMERICAN USAGE 523 (2003) (noting that "[w]hen modifying words are separated **\*185** from the words they modify, readers have a hard time processing the information," and adding that "the true referent should generally be the closest appropriate word."). This rule is related to the last antecedent doctrine of statutory interpretation commonly applied to ambiguous legislative texts. 82 C.J.S. STATUTES § 443 (2011) (footnotes omitted). Under that tenet, a qualifying phrase should be applied only to the portion of the sentence "immediately preceding it." *City of Dallas v. Stewart,* 361 S.W.3d 562, 571 n. 14 (Tex.2012) (applying the doctrine); *Spradlin v. Jim Walter Homes, Inc.,* 34 S.W.3d 578, 580 (Tex.2000) (same). Accordingly, the phrase "directly related to health care" modifies the terms immediately before it— "professional or administrative services." Under the dissent's logic, the phrase "directly related to health care" should be applied to modify each term in the HCLC definition, including professional or administrative services, safety, health care, and medical care. This construction is nonsensical, as it would be entirely redundant as to health care and medical care, unsupported by the text in the attempted application to safety, and render safety largely repetitive of health care. *See Marks,* 319 S.W.3d at 673 (Johnson, J., concurring) (pointing out that safety and health care are separate). We explained in *Diversicare,* a patient-assault case also involving training and staffing policies and monitoring and protection of patients, that "[p]rofessional supervision, monitoring, and protection of the patient population necessarily implicate the accepted standards of safety." *Diversicare,* 185 S.W.3d at 855. Williams' similar complaints here concerning his protection from danger at the hands of a mental patient also implicate safety.[7]

Moreover, a majority of the members of this Court have opined in written opinions or joined written opinions

reasoning that safety is not constricted by the subsequent addition to the statute of the phrase "professional or administrative services directly related to health care." Concurring and dissenting in *Diversicare,* Chief Justice Jefferson wrote that safety, undefined in the statute, is commonly understood to mean protection from danger and that the "specific source of that danger ... is without limitation." 185 S.W.3d at 860–61 (Jefferson, C.J., concurring and dissenting) (also noting that "[i]n defining health care liability claims as it did, the Legislature created a statute with a broad scope. Complaints about the breadth of [the TMLIIA] should be directed to the Legislature, not to this Court, for the courts must 'take statutes as they find them.' " (citation omitted)). Concurring in *Marks,* Justice Johnson agreed with Chief Justice Jefferson's analysis of safety in his concurrence and dissent in *Diversicare.* Justice Johnson reasoned that making safety contingent on a direct connection between it **\*186** and health care would "effectively read [ ] safety out of the statute instead of properly giving it meaning as an additional category of claims." *Marks,* 319 S.W.3d at 673 (Johnson, J., concurring, joined by Justice Willett, Justice Hecht, and Justice Wainwright).[8] Chief Justice Jefferson wrote again in *Marks,* quoting his concurrence and dissent in *Diversicare,* noting that a reasonable construction of "safety" is to give the term its "common meaning," which could therefore encompass premises liability claims. *Id.* at 674 (Jefferson, C.J., concurring and dissenting, joined by Justices Green, Guzman and Lehrmann).

We agree with West Oaks that Williams' claims are indeed for departures from accepted standards of safety. We conclude that the safety component of HCLCs need not be directly related to the provision of health care and that Williams' claims against West Oaks implicate this prong of HCLCs.

## E. Relationship with the Texas Workers' Compensation Act

[15] Williams also contends that interpreting the TMLA to encompass his claims will conflict with the procedural and substantive litigation rights granted to employee plaintiffs under the TWCA. *See* TEX. LAB.CODE § 406.001 *et seq.* He argues that his personal injury claims against his employer should not be characterized as HCLCs because the Legislature did not intend for employee claims against a health care provider employer to fall under the rubric of the Act. Williams also contends that an employee's personal injury claim against his employer would not have constituted a medical malpractice claim prior to the enactment of the medical liability statutes in 1977.

We see no conflict between the TMLA and the TWCA, whether the claim at issue is asserted against an employer subscribing to workers' compensation insurance or, as here, against a nonsubscriber. The TWCA is unique in permitting private Texas employers to elect to subscribe to workers' compensation insurance. *Id.* § 406.002(a); *Lawrence v. CDB Servs., Inc.,* 44 S.W.3d 544, 552 (Tex.2001); *see also Casados,* 358 S.W.3d at 241. If they so elect, and their employees do not opt out of the workers' compensation coverage, then their employees are generally precluded from filing suit against them and must instead pursue their claims through an administrative agency against the employer's insurance carrier for benefits provided for in the TWCA. *See* TEX. LAB.CODE § 406.031(a) (noting that an employer's insurance carrier is liable for compensation of an employee's injury if the employee is subject to the Act and the injury arises out of the course and scope of the employment). But employees need not prove the employer's negligence for workers' compensation recovery, just that they were injured in the course and scope of employment. *See id.* ("An insurance carrier is liable for compensation for an employee's injury without regard to fault or negligence...."); *id.* § 406.002(b) (stating that a subscribing employer is subject to the TWCA). As part of the legislated policy trade-off underlying the workers' compensation system, employees are also limited in their recovery to indemnity and medical expenses, absent intentional conduct. *See id.* § 408.001(a) ("Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage...."); *but see id.* § 408.001(b) (allowing recovery of exemplary damages for **\*187** death caused by an intentional act or omission or the employer's gross negligence).

However, if an employer forgoes workers' compensation coverage, and is a nonsubscriber to the workers' compensation system, it is subject to suits at common law for damages. With the exception of certain employer defenses abrogated by the statute, a suit by an employee of a nonsubscribing employer is largely outside the limitations imposed by the TWCA. *See id.* § 406.033(a), (d) (discussing limited defenses and employee burden of proof in establishing negligence). Employees of a nonsubscriber, injured on the job, must prove the elements of a common law negligence claim, absent intentional misconduct. *Id.* § 406.033(d). An employee may also elect to waive workers' compensation coverage and "retain the common-law right of action to recover damages for personal injuries or death" if certain notification requirements are met. *Id.* § 406.034(a), (b).

[16] Thus, the workers' compensation construct contemplates two systems, one in which covered employees may recover relatively quickly and without litigation from subscribing employers and the other in which nonsubscribing employers, or the employers of employees who have opted not to accept workers' compensation coverage, are subject to suit by injured employees to recover for their on-the-job injuries. "In providing the worker a form of prompt remuneration for loss of earning capacity, the statutory [workers' compensation] scheme is in lieu of common law liability based on negligence." *Paradissis v. Royal Indem. Co.,* 507 S.W.2d 526, 529 (Tex.1974); *see also Reed Tool Co. v. Copelin,* 689 S.W.2d 404, 407 (Tex.1985) ("The system balances the advantage to employers of immunity from negligence and potentially larger recovery in common law actions against the advantage to employees of relatively swift and certain compensation without proof of fault.").

Just as the workers' compensation system treats employees of subscribing versus nonsubscribing employees differently, the treatment of those two differently situated employees under the TMLA for on-the-job injuries is also distinct. The employee of a subscriber that is a health care provider must pursue an administrative remedy under the TWCA for on-the-job injuries. However, the employee of a nonsubscribing employer that is a health care provider must file suit against the nonsubscriber and follow the rules that govern that suit. In this case, the governing rules include the TMLA's requirements for a claimant suing a health care provider. Other proceedings to recover against nonsubscribing employers would similarly be governed by applicable statutes and rules, e.g., proof of negligence and causation, notice requirements under the Texas Tort Claims Act, or the common pleading and service requirements in the Texas Rules of Civil Procedure for all lawsuits.

Williams invites us to read into the TMLA an exception for claimants happening to be employees of nonsubscriber health care provider employers who sue their employers for claims that come under the TMLA umbrella. Williams' case is against a nonsubscriber, outside of the workers' compensation system, yet he implores the Court to except him from the TMLA's requirements without any express statutory exception. He seeks a common law exemption from the TMLA's mandate that we are not willing to create.

As explained, the TWCA and the TMLA do not conflict in this case. But even if they did, the Legislature has already designated the victor—the TMLA would prevail. Section 74.002(a) of the TMLA states:

*188 In the event of a conflict between this chapter and another law, including a rule of procedure or evidence or court rule, this chapter controls to the extent of a conflict.

TEX. CIV. PRAC. & REM.CODE § 74.002(a). This provision was added as part of the 2003 amendments and replaced an earlier, more cabined conflicts provision. *See* TEX.REV.CIV. STAT. art. 4590i, § 11.05 (repealed) (entitled "Subchapter's Application Prevails Over Certain Other Laws" and stating that "[t]he provisions of this subchapter shall apply notwithstanding the provisions contained in Article 4671, Revised Civil Statutes of Texas, 1925, as amended, and the provisions of Article 5525, Revised Civil Statutes of Texas, 1925, as amended" (pertaining to injuries resulting in death and survival of cause of action, respectively)).[9]

Here, Williams must establish the medical negligence of West Oaks to recover under the TMLA. The statute requires expert reports to support his claims.

### III. Response to Dissent

At base, the dissent's position is that, notwithstanding the Legislature's substitution of the term "claimant" for "patient" in the TMLA's HCLC definition, HCLCs are only those in which the defendant has a patient-physician or "patient-health-care-provider" relationship with the plaintiff. In spite of the Act's words, the dissent proffers that the Court strays from the language of the Act and undermines its purpose. *See* 371 S.W.3d at 199–200 (Lehrmann, J., dissenting). The chart below vividly illustrates the Legislature's broad intention and refutes the dissent's position.

| TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4) (repealed 2003) (emphases added) | TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13) (amended 2003) (emphases added) |
|---|---|
| "Health care liability claim" means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury to or death *of the patient*, whether the *patient's claim or cause of action* sounds in tort or contract. | "Health care liability claim" means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death *of a claimant*, whether the *claimant's claim or cause of action* sounds in tort or contract. |

As explained in Parts II.B and C above, in 2003 the Legislature modified the scope of HCLCs when it deleted "patient" and inserted the broader term "claimant" in the definition. *Compare* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13), *with* TEX.REV.CIV. STAT. art. 4590i, §

1.03(a)(4) (repealed 2003). A claimant need not be the patient in all HCLCs.

As discussed above, two of the different types of HCLCs have specific definitions. The "medical care" and "health care" definitions both refer to services rendered for, to, or

on behalf of a *patient* during the *patient's* care,[10] treatment, or confinement. **\*189** TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10), (a)(19); *see id.* at § 74.001(a)(13). Although HCLCs, as defined, include causes of action against health care providers brought by "claimants," the specific incorporation of the patient relationship for health care and medical care claims governs the HCLC for departures from accepted standards of medical care and health care. *See Jackson,* 351 S.W.3d at 297 (holding that specific statutory provisions override general provisions). However, that limitation does not apply to claims of safety, which is not defined with reference to a patient.[11] TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). Contending that only patients' claims may be considered HCLCs, the dissent argues, in essence, that the 2003 amendment is a nullity and seeks to have the Court rewrite section 74.001(a)(13). We decline to do so.

[17] This is a statutory construction case. Our role "is to determine and give effect to the Legislature's [expressed] intent." *McIntyre,* 109 S.W.3d at 745. Such cases may offer the temptation to shoehorn a desired legislative result. But the Legislature changed "patient" to "claimant," and "claimant" is broader than "patient." Aside from claims alleging negligent medical care or health care, a claim need not involve a patient-physician relationship for it to be an HCLC.

The dissent argues several other points which we address briefly. The dissent contends that other provisions of the TMLA should trump the definition of HCLCs.

[18] (1) *Notice of suit and medical records release provisions.* The dissent similarly notes that inclusion of non-patients as claimants would render the notice of suit to health care providers, and accompanying medical-records releases, to health care providers, questionable. 371 S.W.3d at 195 (Lehrmann, J., dissenting) (citing TEX. CIV. PRAC. & REM.CODE §§ 74.051, .052). The Act requires "any person" asserting an HCLC to provide notice to the defendant physician or health care provider. TEX. CIV. PRAC. & REM.CODE § 74.051(a). This notice must be accompanied by the medical-records release form detailed in section 74.052. *Id.* § 74.052; *Jose Carreras, M.D., P.A. v. Marroquin,* 339 S.W.3d 68, 73 (Tex.2011). Further, all parties are entitled to "complete and unaltered copies of the patient's medical records." TEX. CIV. PRAC. & REM.CODE § 74.051(d). The form of notice provides a release including the name of the "patient." *Id.* § 74.052(c)(A), (B). As the dissent correctly observes, the Legislature's purpose for the notice and disclosure requirements was to encourage the parties to negotiate and settle disputes prior to suit. 371 S.W.3d at 195 (Lehrmann, J., dissenting); *Carreras,* 339 S.W.3d at 73 (citing *Garcia v. Gomez,* 319 S.W.3d 638, 643

(Tex.2010)). However, nothing in the language of the notice and disclosure provisions or in their purpose of encouraging pre-suit negotiation and settlement indicates a legislative intent that in all cases a claimant must be a patient or her representative.

The dissent contends that the parties' right to medical records cannot be applied against a third-party patient, such as Vidaurre. Specifically, the dissent points out that medical-privacy laws may prevent the parties from compelling a person such as Vidaurre, who is not a party to this case **\*190** pursuing a claim under the TMLA, from supplying his medical records. 371 S.W.3d at 195 (Lehrmann, J., dissenting). JUSTICE LEHRMANN'S point is well taken, but not in this case. Williams is the claimant in this case and these requirements should be applied to him. For purposes of his own medical records, Williams would be the "patient" referenced in the authorization form. *See* TEX. CIV. PRAC. & REM.CODE § 74.052(c)(A). In alignment with the broadly defined "claimant," the notice provision makes clear at the outset that it applies to "any person" asserting an HCLC, as opposed to a "patient" or representative. *Id.* §§ 74.001(a)(2), .051(a). In turn, the disclosure requirements allow not only for the release of records of a patient-plaintiff, but also the pre- and post-injury records of non-patient plaintiffs seeking recovery for her post-injury damages. *See id.* § 74.052 (predicating the disclosure requirements on the applicability of section 74.051(a)). Such records would bear directly in assessing the extent of damages and would streamline settlement negotiations, regardless of whether the claimant was a patient of the health care provider being sued.

(2) *Expert report provisions.* The dissent similarly asserts that the Act's definition of "expert report" and discussion of expert qualifications means that HCLCs must be based on a patient-physician relationship because those provisions contain references to departures from accepted standards by physicians or health care providers and knowledge of accepted standards for diagnosing, caring, or treating the illness, injury, or condition at issue in the claim. 371 S.W.3d at 195–96 (Lehrmann, J., dissenting) (discussing TEX. CIV. PRAC. & REM.CODE §§ 74.351(r)(6), .401(a)(2), .402(a)(2)). The fact that experts submitting reports have knowledge of the alleged standards at issue does not logically lead to a conclusion that only a patient's suit against a health care provider can constitute an HCLC, especially when such a conclusion conflicts with the Legislature's substitution of "claimant" for "patient" in the TMLA's definition of HCLCs. Similarly, the dissent's point that the "expert report" definition calls for a discussion of the manner in which the care rendered by the physician or health care provider failed to meet standards does not lead to the conclusion

that only the patient at the receiving end of that care can be a "claimant" under the Act. *Id.* § 74.351(r)(6); *see also id.* § 74.001(a)(2). An expert report detailing the departure from standards would still be relevant in a case, such as this, where a non-patient alleges that the health care provider's deviations from accepted standards led to his injury. As explained, expert testimony is necessary to specify the departure from accepted standards leading to the injury. *Id.* § 74.351(r)(6). The Act's requirement that an expert be qualified to give an opinion on the standards at issue does not, as the dissent contends, indicate that the condition at issue must be sustained by a patient. The expert report requirement is intended to effectuate the TMLA's objective that only meritorious causes of action proceed, not define the scope of HCLCs. *See Samlowski v. Wooten,* 332 S.W.3d 404, 416 (Tex.2011) (Wainwright, J., dissenting in part).

(3) *Jury instructions.* The dissent observes that one of the jury instructions required by the Act in jury trials includes a caution that a finding of negligence may not be based solely on evidence of a "bad result" to the claimant, but a bad result may be considered in determining negligence. 371 S.W.3d at 196 (Lehrmann, J., dissenting) (citing TEX. CIV. PRAC. & REM.CODE § 74.303(e)(2)). Drifting again from the statutory text directly at issue, the dissent argues that this instruction "only **\*191** makes sense" in the context of a patient dissatisfied with medical or health care services delivered by a health care provider. We fail to see the logic in this argument. "Bad result" is not defined, making it difficult to limit its meaning exclusively to health care or medical care, as the dissent would do. The Act indicates that a "bad result" is merely a fact that may be considered in a negligence finding. To conclude from this provision that the Legislature intended to include only patients under the Act, when it expressly broadened the HCLC definition, is not logical and would render the revisions to the more relevant HCLC definition meaningless.

(4) *Re-interpretation of Diversicare.* Our opinion today is consistent with our earlier construction of the HCLC definition in *Diversicare,* 185 S.W.3d at 847 (noting that "we examine the underlying nature of the claim and are not bound by the form of the pleading"). The dissent contends that we stray from *Diversicare* and its progeny by centering our analysis on the nature of the claims at issue. 371 S.W.3d at 196–97 (Lehrmann, J., dissenting). The dissent erroneously argues that *Diversicare* requires courts to place equivalent emphasis on the relationship between the parties. Specifically, the dissent contends that in *Diversicare* we attached "equal" importance to the "claimant's status as a patient" at a health care facility. *Id.; see Diversicare,* 185 S.W.3d at 850. However, in *Diversicare* we discussed that relationship, not because it

was determinative in the scope of HCLCs generally, but because those were the facts of the case we were deciding. *Diversicare,* 185 S.W.3d at 850. The standards for the conduct at issue, rather than the form of pleadings or identity of parties, are paramount in classifying HCLCs. *See Yamada v. Friend,* 335 S.W.3d 192, 196 (Tex.2010) ( "Artful pleading does not alter [the nature of the underlying claim]."); *Omaha Healthcare,* 344 S.W.3d at 394 (similar).

(5) *Importance of the 2003 amendments.* Incredibly, the dissent contends that the Court places "undue importance" on the Legislature's modification of the HCLC definition in 2003, substituting the broader term "claimant" for "patient" in identifying who may bring a claim. 371 S.W.3d at 193–94 (Lehrmann, J., dissenting); TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). The dissent would interpret that modification as referring to the estate or direct representatives of a patient-plaintiff, parties that have always been permitted to make a claim, even prior to the 2003 amendment. *See* 371 S.W.3d at 197 (Lehrmann, J., dissenting); *see also* TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(9), 4.01 (repealed 2003). First, focusing on the language of the statutory definition at the center of this case does not give it "undue importance." Second, the dissent's construction is contrary to established rules of statutory construction. As we note in Parts II. B and C, "claimant" is defined as "a person, including a decedent's estate, seeking or who has sought recovery of damages in a health care liability claim." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(2). Thus, aside from claims involving health care or medical care and claims based on treatment, a direct healthcare-provider-to-patient relationship is not required for claims to constitute HCLCs.

(6) *Construction of "safety."* The dissent argues that this issue has not been properly raised. 371 S.W.3d at 198 (Lehrmann, J., dissenting). However, West Oaks presents the safety-related nature of its claims in its briefing, and the court of appeals analyzed Williams' claims as safety claims. 322 S.W.3d 349, 352. Contrary to the dissent's assertions, our construction of "safety" is based not only on established canons of textual construction, **\*192** but also on our interpretation of safety based on its commonly understood meaning. *See Diversicare,* 185 S.W.3d at 855. Further, following principles of statutory construction, our construction of "safety" prevents the term from becoming meaningless surplusage, subsumed into claims based on departures from accepted standards of "health care." *See* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13).

(7) *Balance between the TMLA and TWCA.* Contending that our assessment of Williams' claims as HCLCs "forc[es]" them into the HCLC "mold" and "significantly

disrupts the delicate balance between employee and employer interests" motivating the TWCA, the dissent argues that our reasoning alters the incentive structure in the TWCA intended to penalize nonsubscribing employers. 371 S.W.3d at 199 (Lehrmann, J., dissenting). However, contrary to the implication of the dissent, the TWCA does not create an especially punitive litigation regime for nonsubscribing employers. Rather, as noted above, nonsubscribing employers are divested of several common law defenses. *See* TEX. LAB.CODE § 406.033(a); *see also Kroger Co. v. Keng,* 23 S.W.3d 347, 349–50 (Tex.2000) (describing the limitation of defenses of nonsubscribers as a "penalty" meant as an incentive for employers to subscribe to workers' compensation insurance). However, the plaintiff must prove the negligence of the nonsubscribing employer or the employer's agent. TEX. LAB.CODE § 406.033(d). As part of the negligence claim against a health care provider employer, an employee asserting a claim that is otherwise an HCLC must adhere to the expert report requirements of the TMLA. The dissent also argues that our reasoning will discourage small claims and implies that fewer employers will subscribe to workers' compensation insurance. 371 S.W.3d at 199 (Lehrmann, J., dissenting). However, because no information concerning workers' compensation policies is in the record before us, the dissent's concerns are speculative at best. As described above, while we see no conflict between the TMLA and TWCA, the Legislature signaled its intent that the TMLA should control over contradictory statutory provisions. *See* TEX. CIV. PRAC. & REM.CODE § 74.002(a).

(8) *Legislative purpose of the TMLA.* Noting that one of the stated purposes of the Act is to reduce the frequency and cost of medical malpractice claims, the dissent concludes that our holding will result in a larger number of total HCLC claims, contrary to the Legislature's purpose. 371 S.W.3d at 199–200 (Lehrmann, J., dissenting). Given the number of claims filed against health care providers, many will be HCLCs and some may not be. The dissent would shift the balance so that many more are not HCLCs, which is contrary to the Legislature's change of "patient" to "claimant." We refuse to trump explicit statutory language with the dissent's view of the TMLA's purpose.

Finally, our conclusion that the Act covers claims by non-patients against health care providers is not new territory. The Fifth Court of Appeals has concluded that a non-patient hospital visitor's personal injury claim resulting from an on-premises patient assault was an HCLC. *Ammons,* 266 S.W.3d at 64. The court, citing *Diversicare,* concluded that the supervision and restraint of patients was at issue and constituted health care under the facts of that case. *Id.* The *Ammons* court correctly reasoned that

no language in the Act required that a "claimant" also necessarily be a "patient." *Id.* at 60–62.

## IV. Conclusion

Williams claims that West Oaks failed to properly train, warn and supervise him to **\*193** work with potentially violent psychiatric patients and, as a result, failed to provide a safe workplace. In 2003, the Legislature broadened the definition of health care liability claims under the Texas Medical Liability Act by adding new types of claims under the HCLC definition and expanding the scope of persons included within the Act's purview. *Compare* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13), *with* TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4) (repealed 2003). We conclude that Williams' claims against West Oaks are properly characterized as health care liability claims based on claimed departures from accepted standards of health care and safety. Williams failed to provide an expert report in accordance with section 74.351(a). TEX. CIV. PRAC. & REM.CODE § 74.351(a). We therefore reverse the judgment of the court of appeals affirming the trial court's order denying West Oaks' motion to dismiss all of Williams' claims. Because West Oaks requested its attorney's fees and costs in the trial court pursuant to Texas Civil Practice and Remedies Code section 74.35 1(b)(1), we remand to that court with instructions to dismiss Williams' claims against West Oaks and consider West Oaks' request for attorney's fees and costs.

Justice LEHRMANN filed a dissenting opinion, in which Justice MEDINA and Justice WILLETT joined.

Justice LEHRMANN, joined by Justice MEDINA and Justice WILLETT, dissenting.

"A whole new world [of health care liability claims], hinted by opinions in the last few years, is here." *In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 470 (Tex.2008) (Wainwright, J. dissenting). Interpreting a law designed to *reduce* the number of medical malpractice suits, the Court holds that an employee's claims against his employer for providing an unsafe workplace and inadequate training are health care liability claims. The Court's strained reading of the statute runs counter to express statutory language, the Legislature's stated purposes in enacting the current version of chapter 74, and common sense. Further, the Court's decision undermines the balance struck by the

Legislature to encourage employers to become subscribers under the Workers Compensation Act. For these reasons, I am compelled to respectfully express my dissent.

### I. The Medical Liability Act Contemplates a Patient/Physician Relationship Between the Parties

**A. The Act's plain language indicates that it applies to claims alleging a breach of a health care provider's duty to a patient.**

Our primary objective in construing a statute "is to ascertain and give effect to the Legislature's intent by first looking at the statute's plain and common meaning." *Tex. Natural Res. Conservation Comm'n v. Lakeshore Util. Co.,* 164 S.W.3d 368, 378 (Tex.2005). We divine that intent by reading the statute as a whole, and we interpret the legislation to give effect to the entire act. *Id.* (citing *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25 (Tex.2003)). Furthermore, we may look to the statutory context to determine a term's meaning. *City of Boerne,* 111 S.W.3d at 25. All of those tools lead to the conclusion that Williams's claims are not health care liability claims.

Under the Medical Liability Act, § 74.001 *et seq.,* a health care liability claim is

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional **\*194** or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). The Court concludes that Williams's suit against his employer for providing an unsafe workplace and inadequate training alleges health care liability claims, despite the lack of any physician-patient relationship between the health care provider and the claimant. 371 S.W.3d at 174. The Court first determines that Williams's claims are for a departure from health care standards because they "involve a patient-physician relationship." 371 S.W.3d at 181. Although that determination is more than enough to

decide the case, the Court then reaches out to further expand the Act's scope by deciding that a claim under the "safety" prong of the health care liability claim definition need not be directly related to health care—even though Williams's claim *is,* in the Court's view—directly related to health care. Both conclusions are inconsistent with plain statutory language and sound statutory construction. The Act is replete with provisions indicating that a health care liability claim must be founded on a health care provider's alleged breach of a professional duty towards a patient. *See Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 851, 854 (Tex.2005). The Court's interpretation renders some of those provisions meaningless or nonsensical.

**1. Williams's claims are not "health care" claims, as the Court concludes.**

The Act defines "health care" as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider *for, to, or on behalf* of a patient *during the patient's medical care, treatment, or confinement.*" TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10) (emphasis added). Plainly, the Legislature contemplated that a health care liability claim based upon a departure from standards of health care would stem from medical treatment directed toward a particular patient—"the patient" whose care, treatment, or confinement is the subject of the lawsuit.

Based largely on the Legislature's use of the term "claimant" rather than "patient" in the health care liability claim definition, the Court determines that a claim falls under the health care prong of the definition even absent a physician-patient relationship so long as a physician-patient relationship is "involved." 371 S.W.3d at 189. As set out in section I.B. below, the Court's analysis of the significance of the Legislature's use of "claimant" in the definition flows from an erroneous premise and is deeply flawed; the Court's reliance on the change ignores the fact that the Legislature used the term throughout the Act's predecessor, including in its statement of legislative purpose. More importantly, the Legislature did not say that a health care claim must "involve" a patient. Indeed, the word is found nowhere in the definition of health care or health care liability claim. Instead, health care claims arise from "act[s] or treatment furnished or that should have been furnished for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10) (emphasis added). Williams's claims allege that West Oaks failed to provide *him,* not the patient, adequate training and a safe work place.

Section 74.051 of the Act highlights the Court's error in concluding that the mere peripheral involvement of a patient transforms an ordinary negligence claim into a health care claim. That section requires health care liability claimants to provide **\*195** notice by certified mail to any health care provider against whom the claim is asserted sixty days before the claim is filed. TEX. CIV. PRAC. & REM.CODE § 74.051(a). The notice must be accompanied by a form authorizing the release of the medical records of "*the patient*" whose treatment is the subject of the claim. *Id.* §§ 74.051(d)( "All parties shall be entitled to obtain complete and unaltered copies of the patient's medical records...."); 74.052(c)A, B. Under the Court's reading of the statute, Williams would be required to authorize or obtain authorization for the release of Vidaurre's medical records to pursue his suit against his employer. Obviously, medical privacy laws prevent Williams from authorizing the release of Vidaurre's medical records. 45 C.F.R. § 164.502(f) (providing that Health Insurance Privacy and Portability Act restrictions apply to deceased individuals). While the Legislature sought to reduce frivolous claims against health care providers, it sought to do so without unduly restricting claims with merit. It is inconceivable that the Legislature intended to require health care claimants with meritorious claims to be blocked by the refusal of third parties (the patients "involved") to authorize release of their medical records.

Moreover, even if Williams were somehow able to obtain authorization from Vidaurre's estate, the records would not serve the purpose sections 74.051 and 74.052 were designed to serve: to " 'provide[ ] an opportunity for health care providers to investigate claims and possibly settle those with merit at an early stage.' " *Jose Carreras, M.D., P.A. v. Marroquin,* 339 S.W.3d 68, 73 (Tex.2011) (quoting *In re Collins,* 286 S.W.3d 911, 916–17 (Tex.2009)). Vidaurre's psychiatric diagnosis and violent tendencies are undisputed, and the records would have no bearing on the merits of Williams's claims against West Oaks for allegedly providing an unsafe workplace and inadequate training.

The Court discounts the import of these sections, finding no language to suggest that employee/employer disputes like this case are not health care liability claims. But section 74.052, which describes the statutory authorization form that must accompany the statutory notice provides:

> (c) The medical authorization required by this section shall be in the following form[ ]:

> (A) I, _____ (name of *patient* [*not* claimant] or authorized representative), hereby authorize _____ (name of physician or other health care provider to whom the notice of health care claim is directed) to obtain and disclose ... the protected health information described below....

Other provisions of the Act, which provide the relevant statutory context, *see City of Boerne,* 111 S.W.3d at 25, shore up the conclusion that health care liability claims arise from a health care provider's breach of a duty toward a particular patient. I examine several below.

**2. The Court's interpretation is inconsistent with provisions governing the expert reports and the qualifications of experts.**

The Court reverses the court of appeals' judgment and remands to the trial court, instructing it to dismiss because Williams failed to comply with the expert report requirement of section 74.351. But the very definition of "expert report" belies the Court's conclusion that Williams's allegations state claims for health care liability. An "expert report" is defined as

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, **\*196** *the manner in which the care rendered by the physician or health care provider failed to meet the standards,* and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM.CODE § 74.351(r)(6)(emphasis added). The emphasized language clearly contemplates that the defendant health care provider has delivered health care services to a patient, who has allegedly been injured by the provider's departure from applicable standards. The Court minimizes the definition's significance by noting that "[t]he fact that experts submitting reports have knowledge of the alleged standards deviated from does not logically lead to a conclusion that only a patient's suit against a health care provider can constitute an HCLC...." 371 S.W.3d at 190. That suggestion, however, overlooks the provision's reference to the health care provider's rendition of care.

The sections of the Act governing the qualifications of experts who may author reports similarly show that a health care liability claim arises only from a patient/health care provider relationship. Section 74.041 establishes the necessary qualifications for an expert in a suit against a physician. Among other qualifications, the expert must "ha[ve] knowledge of accepted standards of medical care for the *diagnosis, care, or treatment of the illness, injury, or condition involved in the claim.*" TEX. CIV. PRAC. & REM.CODE § 74.401(a)(2)(emphasis added). The definitions thus contemplates that the lawsuit will center on a physician's treatment of a patient's illness, injury, or condition, not on the adequacy of a workplace or the training provided to an employee.

**3. The jury instruction mandated by the Legislature contemplates that the claim arises from a health care provider's treatment of a patient.**

In section 74.303(e) of the Act, the Legislature mandated the inclusion of two express jury instructions "[i]n any action on a health care liability claim that is tried by a jury in any court in this state." The second of those is:

> A finding of negligence may not be based solely on *evidence of a bad result* to the claimant in question, but *a bad result may be considered* by you, along with other evidence, in determining the issue of negligence. You are the sole judges of the weight, if any, to be given to this kind of evidence.

*Id.* § 74.303(e)(2). This instruction reflects the long-recognized principle that a physician who exercises ordinary care, within his school or specialty, is not liable to a patient for a bad outcome. *See Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949). Clearly, the instruction only makes sense where a patient or the patient's proxy is dissatisfied by health care services delivered by a health care provider. In the context of the present case, in which the health care provider acted as an employer, the instruction becomes nonsensical.

**B. The Court's Interpretation Is Contrary to Our Prior Interpretations and Attaches Undue Importance to the Alteration of the Definition of "Health Care Liability Claim."**

Noting that "our focus ... is not the status of the claimant," 371 S.W.3d at 178, the Court rejects out of hand Williams's contention that the lack of a patient-physician relationship between him and West Oaks places his suit outside of the Act. It is true, as the Court asserts, that in *Diversicare* we placed great importance upon the essence of the claims, "the alleged wrongful conduct and the duties allegedly breached." 185 S.W.3d at 851. But in **\*197** rejecting Rubio's contention that her claim for a sexual assault by another patient should be treated as an ordinary premises liability claim, we attached equal importance to the claimant's status as a patient between the parties: "There is an important distinction in the relationship between premises owners and invitees on one hand and health care facilities and their patients on the other. The latter involves health care." *Id.* at 850. And we emphasized that, were we to agree with Rubio's position, "our decision would have the effect of lowering the standard from professional to ordinary care." *Id.* at 854. The presence of a doctor-patient relationship was undeniably important to our determination that Rubio's allegations amounted to health care liability claims.

The Court attaches much significance to the Legislature's alteration in 2003 of the definition of "health care liability claim." The Act's predecessor, the Medical Liability and Insurance Improvement Act, former article 4590i, defined the term as

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury or death of the *patient,* whether the *patient's* claim or cause of action sounds in tort or contract.

Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.03(a)(4), 1997 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09 2003 Tex. Gen. Laws 847, 884 (emphasis added). In 2003, the Legislature replaced the word "patient" with the term "claimant." TEX. CIV. PRAC. & REM.CODE § 74.001(13). Without regard to the abundant indicia to the contrary throughout the Act, the Court concludes that this change contemplated health care liability claims that do not arise from the physician-patient relationship.

While claimant is a new term in the definition of health care liability claim, the word was used throughout the TMLIIA before the Legislature made that change. In fact, the Legislature used the term in describing the Act's very

purpose: to alleviate a perceived health care crisis "in a manner that will not unduly restrict a *claimant's* rights any more than necessary to deal with the crisis." Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(13)(3), 1977 Tex. Gen. Laws 2039, 2040, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch 204, § 10.09 2003 Tex. Gen. Laws 847, 884 The term was also used and defined in section 13 of article 4590i. That section, the precursor of sections 74.351 and 74.352 of the current act, among other things, required a claimant in a health care liability claim to file an expert report within 180 days. Act of May 1, 1995, 74th Leg., R.S., ch. 971, § 1, sec. 13.01(d), (e), 1995 Tex. Gen. Laws 985, 985–986, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. "Claimant" was defined as

> a party who files a pleading asserting a claim. All plaintiffs claiming to have sustained damages as the result of the bodily injury or death of a single person are considered to be a single claimant.

Act of May 1, 1995, 74th Leg., R.S., ch. 971, § 1, sec. 13.01(d), (e), 1995 Tex. Gen Laws 985, 985–986, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch 204, § 10.09 2003 Tex. Gen. Laws 847, 884. Accordingly, even though "health care liability claim" referred to injury to or the death of a patient, the statute contemplated that others could pursue claims under article 4590i. And what parties could claim to have damages as the result of the injury or death of a patient but spouses or relatives with their own claims for loss of support or **\*198** consortium or mental anguish, or others acting in a representative capacity, such as an estate or next friend? In light of that history, it seems fairly obvious that the Legislature broadened the definition of "health care liability claim" in 2003 to harmonize the definition with its previous recognition that parties other than patients might suffer injuries as the result of a health care provider's departure from accepted standards in rendering health care services to a patient.[1]

## II. Safety Under the Act

Although its holding that Williams has asserted a claim for breach of a health care standard is dispositive, the Court reaches out to decide an issue that isn't even presented: whether a claim for safety under the Act must be directly related to health care. That issue isn't presented because, at least in the Court's view, Williams's claim *is* directly related to health care. West Oaks itself argued that Willams's claims "are inextricably interwoven with the rendition of health care services." Even if the question were properly before us, though, I would reach a different conclusion than the Court. I would hold that a claim for safety under the Health Care Liability Act must arise from a breach of a health care provider's duty to adequately ensure a patient's safety in providing health care services.

The Court's conclusion that a health care liability claim for breach of a safety standard depends entirely on the last antecedent doctrine, 371 S.W.3d at 182, or the notion that " '[m]odifiers should come, if possible, next to the words they modify.' " 371 S.W.3d at 184 (quoting William Strunk, Jr. & E.B. White, THE ELEMENTS OF STYLE R. 20 (4th ed. 2000)). In the Court's view, then, the Legislature would have had to frame the definition as "a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of ... safety *directly related to health care* or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract. Neither Strunk and White's instructions nor the last antecedent doctrine are so absolute as to require such redundancy. *See City of Dallas v. Stewart,* 361 S.W.3d 562, 571 n. 14 (Tex.2012). Instead, we should read the word in harmony with the other provisions I have discussed, and in conjunction with the words surrounding "safety," which all clearly implicate claims arising from a health care provider's delivery of medical care to a patient. *See City of Boerne,* 111 S.W.3d at 29 (citing *Cty. of Harris v. Eaton,* 573 S.W.2d 177, 179 (Tex.1978)).

The Court's reading of the term "safety"—"untouched by danger, not exposed to danger; secure from danger, harm or loss"—is so broad that almost any claim against a health care provider can now be deemed a health care liability claim. If a hospital cook leaves an unlit gas burner on and causes an explosion, claims for any resulting injuries might be health care liability **\*199** claims. If a nurse's deranged spouse arrives at a clinic and shoots her, her claim that the facility provided inadequate security will also fall under the statute. Surely the Legislature did not intend to make professional liability insurers responsible for such claims in order to solve an insurance availability crisis.

## III. The Court's Holding Undermines the Balance Struck by the Legislature in the Workers Compensation Act

I dissent also because, by forcing an employee's negligence suit against his employer for on-the-job injuries into the health-care-liability-claim mold, the Court significantly disrupts the delicate balance between employee and employer interests the Legislature sought to implement when it enacted the Texas Workers Compensation Act (TWCA). The TWCA permits an employee to bring a negligence action against a nonsubscriber like West Oaks. *See* TEX. LAB.CODE § 406.033. By making the common law defenses of assumption of the risk, negligence of a fellow employee, and contributory negligence unavailable to a nonsubscribing employer under the TWCA, *id.* at § 406.033(a), it is clear that the Legislature intended to "penalize[ ] nonsubscribers" and make it easier for their employees to recover. *Kroger Co. v. Keng,* 23 S.W.3d 347, 349, 352 (Tex.2000) (noting that "[t]o encourage employers to obtain workers' compensation insurance, [the TWCA] penalizes nonsubscribers by precluding them from asserting certain common-law defenses in their employees' personal injury actions" and that the "Legislature intended that an employee's fault would neither defeat nor diminish his or her recovery"). Under the Court's holding, employees of nonsubscribing healthcare providers will encounter procedural hurdles, such as the Act's notice and expert report requirements, that the TWCA does not contemplate. *See* TEX. CIV. PRAC. & REM.CODE §§ 74.051, 74.351. Failure to comply with these special requirements can result in harsh consequences, including dismissal of a claim with prejudice and assessment of attorneys fees against the plaintiff. *Id.* § 74.351(b). Rather than the health care provider being penalized for not subscribing to workers' compensation insurance, the Court's decision increases the burden and cost of pursuing negligence claims against nonsubscribers for employees of health care institutions. This will likely discourage healthcare workers from bringing smaller claims.

More importantly, the Act places strict limits on damages that may be recovered from health care providers. TEX. CIV. PRAC. & REM CODE §§ 74.301–.303. By conferring the benefit of the Act's statutory damages cap on nonsubscribing health care providers, the Court gives health care provider nonsubscribers a benefit that is at odds with the measures the Legislature implemented to penalize employers who opt not to participate in the workers compensation system. "In enacting section 406.033 and its predecessors, the Legislature intended to delineate explicitly the structure of an employee's personal-injury action against his or her nonsubscribing employer." *Kroger v. Keng,* 23 S.W.3d at 350–351. Today's decision redraws that delineation.

## IV. The Court's Holding Undermines the Legislature's Stated Purposes

In enacting chapter 74, the Legislature found that "the number of health care liability claims [had] increased since 1995 inordinately[,] caus[ing] a serious public problem in availability and affordability of adequate medical professional liability insurance." Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(a)(1), (4), 2003 Tex. Gen. Laws 847, 884. It adopted the Act to reduce the frequency and decrease the **\*200** costs of those claims. *Id.* at § 10.11(b)(1), (2). By sweeping a whole new class of claims—negligence claims of employees of health care institutions—into chapter 74, the Court *increases* the number of health care liability claims and thwarts that purpose. Mystifyingly, the Court proclaims that its decision is "in harmony" with the Act's purposes because this new class of health care claimants will be required to file expert reports. 371 S.W.3d at 182–83, n. 5. To be sure, Williams's claim will be dismissed in the wake of today's decision—one claim will go away. But, in the future, employees in Williams's position will be forewarned that they must provide an expert report and undoubtedly will do so. The upshot of the Court's decision is that medical professional liability insurers will be responsible for claims that normally would have fallen under a health care employer's workers compensation or comprehensive liability coverage.

The Court has previously declined to construe provisions of the Act in a way that would lead to absurd results. *Jose Carreras, M.D., P.A. v. Marroquin,* 339 S.W.3d 68, 72–73 (Tex.2011). It should do so here.

## V. Conclusion

The Court's conclusion that Williams's claim against his employer for providing inadequate training and an unsafe workplace is a health care liability claim is not only counterintuitive, it is inconsistent with the Act's express language and its underlying purposes. Furthermore, it alters the contours of employees' claims against nonsubscribing health care providers established in the Workers Compensation Act. For these reasons, I respectfully dissent.

## Parallel Citations

55 Tex. Sup. Ct. J. 1033

Footnotes

1     The HCLC definition was amended after Williams' cause of action accrued, and the prior law is applicable to his claims. Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, *amended by* Act of July 19, 2011, 82nd Leg., 1st C.S., ch. 7, § 4.02, 2011 Tex. Gen. Laws 5445 (amending section 74.001(a), adding subsection (a)(12)(A)(viii) (including a health care collaborative as a "health care provider") and making nonsubstantive changes).

2     The Legislature also broadened the subject-matter scope of the activities constituting HCLCs through the addition to the definition of "professional or administrative services directly related to health care." *Id.* § 74.001(a)(24).

3     This conclusion is in harmony with the Legislature's stated intent to "reduce [the] excessive frequency ... of health care liability claims through reasonable improvements and modifications in the Texas insurance, tort, and medical malpractice systems...." Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(b)(1), 2003 Tex. Gen. Laws 847, 884.

4     " 'Health care liability claim' means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13).

5     As we discussed in *Diversicare,* a number of other states also recognize that providing supervision and a safe environment at a health care facility are matters of professional health care judgment. 185 S.W.3d at 852–54 (citing *Dorris v. Detroit Osteopathic Hosp.,* 460 Mich. 26, 594 N.W.2d 455, 466 (1999) (concluding that claims for assault in a psychiatric hospital implicated medical or health care under Michigan's medical malpractice statute and noting that "[t]he ordinary layman does not know the type of supervision or monitoring that is required for psychiatric patients in a psychiatric ward."); *Smith v. Four Corners Mental Health Ctr.,* 70 P.3d 904, 914 (Utah 2003) (holding that an assaulted child's lawsuit against the outpatient mental health care provider was a health care malpractice claim because the plaintiff's "allegations arise out of the fact that [a health care provider] provided mental health services directly to him...."); *see also D.P. v. Wrangell Gen. Hosp.,* 5 P.3d 225, 229 n. 17 (Alaska 2000) ("[I]n so far as [plaintiff] intends to argue issues that involve specialized medical decisions—such as the appropriate level of physical restraints or medication—she can do so only through expert testimony."); *Bell v. Sharp Cabrillo Hosp.,* 212 Cal.App.3d 1034, 260 Cal.Rptr. 886, 896 (1989) ("[T]he competent selection and review of medical staff is precisely the type of professional service a hospital is licensed and expected to provide, for it is in the business of providing medical care to patients and protecting them from an unreasonable risk of harm while receiving medical treatment.... [T]he competent performance of this responsibility is 'inextricably interwoven' with delivering competent quality medical care to hospital patients.").

6     Texas appellate courts construing the TMLA have diverged on whether "directly related" applies to safety claims or only to other claims in the definition's list of departures from accepted standards. *Compare St. David's Healthcare P'ship, L.P. v. Esparza,* 315 S.W.3d 601, 604 (Tex.App.—Austin 2010), *rev'd on other grounds,* 348 S.W.3d 904 (Tex.2011) ("directly related to health care" modifies "safety"); *Appell v. Muguerza,* 329 S.W.3d 104, 115 (Tex.App.—Houston [14th Dist.] 2010, pet. filed) (same); *Dual D Healthcare Operations, Inc. v. Kenyon,* 291 S.W.3d 486, 489–90 (Tex.App.—Dallas 2009, no pet.) (same); *Omaha Healthcare Ctr., L.L.C. v. Johnson,* 246 S.W.3d 278, 284 (Tex.App.—Texarkana 2008), *rev'd on other grounds,* 344 S.W.3d 392 (Tex.2011) (same); *Harris Methodist Ft. Worth v. Ollie,* 270 S.W.3d 720, 723 (Tex.App.—Fort Worth 2008), *rev'd on other grounds,* 342 S.W.3d 525 (Tex.2011) (same); *Christus Health v. Beal,* 240 S.W.3d 282, 289 (Tex.App.—Houston [1st Dist.] 2007, no pet.) (same); *Valley Baptist Med. Ctr. v. Stradley,* 210 S.W.3d 770, 774–75 (Tex.App.—Corpus Christi 2006, pet. denied) (same), *with Holguin v. Laredo Reg'l Med. Ctr., L.P.,* 256 S.W.3d 349, 354–55 (Tex.App.—San Antonio 2008, no pet.) (safety claim need not be directly related to health care); *Emeritus Corp. v. Highsmith,* 211 S.W.3d 321, 328 (Tex.App.—San Antonio 2006, pet. denied) ("[A] claim may be a 'health care liability claim' under the safety definition even if it does not 'directly relate[ ] to healthcare.' ").

7     We explained in *Diversicare* that the claimant's allegations of deficient monitoring and training are distinct from hypothetical claims for injuries arising out of an intruder assaulting a claimant due to an unlocked window or a claimant falling from a rickety staircase. 185 S.W.3d at 854. These examples, however, did not concern our analysis of HCLCs that were alleged departures from accepted standards of safety. They were instead provided as examples of claims that would be separable from health care under the health care prong of the HCLC definition. *Id.* (construing the TMLIIA). *Diversicare* 's only holding as to the scope of claims based on alleged departures from accepted standards of safety was that inclusion of the term safety in the HCLC definition expanded the reach of the statute and that it was broad enough to include the claimants' claim in that case. *Marks v. St. Luke's Episcopal Hosp.,* No. 07–0783, 52 Tex.Sup.Ct.J. 1184, 2009 WL 2667801, 2009 Lexis 636, at *39 (Tex. August 28, 2009) (Wainwright, J., dissenting), *opinion withdrawn and substituted on rehearing,* 319 S.W.3d 658 (Tex.2010).

8     Justices Hecht and Wainwright joined Justice Johnson's concurrence in *Marks,* except for the discussion of "safety." 319 S.W.3d at 667.

9      Articles 4671 and 5525 were both repealed prior to the 2003 amendments as part of the Legislature's 1985 adoption of the Texas Civil Practice and Remedies Code. TEX.REV.CIV. STAT. arts. 4671 and 5525, repealed by Act of June 16, 1985, 69th Leg., R.S., ch. 959, § 9(1), 1985 Tex. Gen. Laws 3242, 3322.

10      There is a slight variance between the definitions for "health care" and "medical care." The "health care" definition features the word "medical" between the words "patient's" and "care." The "medical care" definition does not feature this word. TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10), (a)(19).

11      The scope of claims for "professional or administrative services directly related to health care" in the HCLC definition is not at issue in this case.

1      The Court also makes much of the Act's definition of "representative," a term used in the Act's medical records disclosure provision. TEX. CIV. PRAC. & REM.CODE §§ 74.001(a)(25), .052. "Representative" is defined as the "agent of the patient *or* claimant." The Court concludes this "indicat[es] that patient and claimant do not necessarily refer to the same category of persons." I agree, but my conclusion that "claimant" refers to parties with claims derived from a health care provider's breach of a duty toward a particular patient, such as guardians, executors, survivors, and next friends, is far more consistent with other provisions of the Act than the Court's.

---

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**2014 WL 1691362**

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND
SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Amarillo.

**W.B.M. MANAGEMENT COMPANY** d/b/a
**Vivians Nursing Home**, Appellant
v.
Mary FLORES, Appellee.

No. 07–14–00008–CV. | April 25, 2014.

On Appeal from the 108th District Court, Potter County,
Texas, Trial Court No. 101179–E, Honorable Douglas
Woodburn, Presiding.

**Attorneys and Law Firms**

Arlene C. Matthews, W.C. Bratcher, for W.B.M.
Management Company.

Lorren L. Lucero, for Mary Flores.

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

**MEMORANDUM OPINION**

JAMES T. CAMPBELL, Justice.

**\*1** This is an interlocutory appeal in a health care liability
suit.[1] Appellant W.B.M. Management Company D/B/A
Vivians Nursing Home ("the Home") appeals the trial
court's order overruling its objections to an expert's
report and denying its motion to dismiss the suit. We will
reverse the trial court's order and remand the cause to the
trial court for dismissal.

**Background**

Appellee Mary Flores filed suit against the Home after the
death of her mother Dionisia Dominguez Gomez, alleging
the Home was negligent in its care and treatment of her
mother. Flores' amended pleadings alleged in particular
the Home's employees negligently failed to diagnose

timely and treat her mother's urinary tract infection,
leading eventually to her mother's death.

In May 2013, Flores served the Home with the report and
curriculum vitae of James E. Moulsdale, M.D., F.A.C.S.[2]
The Home timely objected to the report. After Flores
responded, the trial court heard the Home's objections in
September 2013. The trial court found the report
deficient, and granted a 30–day extension to address the
identified deficiencies.

The amended report was filed in late October 2013. The
Home again filed objections and moved to dismiss Flores'
claims pursuant to section 74.351(b) of the Civil Practice
& Remedies Code. TEX. CIV. PRAC. & REM.CODE
ANN. § 74.351(b) (West 2013). The trial court heard
argument at a hearing in December 2013, overruled the
objections to the amended report and denied the Home's
motion to dismiss. The Home has brought this
interlocutory appeal.

**Analysis**

Through one issue, the Home challenges the sufficiency
of Moulsdale's amended expert report, contending the
report was "impermissibly speculative and conclusory" in
its attempt to describe the "causal relationship between
the alleged breach of the standard of care by [the Home]
and the death of Dionisia Dominguez Gomez." The
Home's issue also contends the amended report
inadequately described the applicable standard of care and
its alleged breach.

We review a trial court's decision on a motion to dismiss
a health care liability claim for abuse of discretion. *Am.
Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46
S.W.3d 873, 875 (Tex.2001); *Gray v. CHCA Bayshore
L.P.,* 189 S.W.3d 855, 858 (Tex.App.-Houston [1st Dist.]
2006, no pet.). A trial court abuses its discretion if it acts
in an arbitrary or unreasonable manner without reference
to guiding rules or principles. *Jelinek v. Casas,* 328
S.W.3d 526, 539 (Tex.2010). When reviewing matters
committed to the trial court's discretion, we may not
substitute our own judgment for that of the trial court.
*Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52
(Tex.2002). A trial court does not abuse its discretion
merely because it decides a discretionary matter
differently than an appellate court would in a similar
circumstance. *Harris Cnty. Hosp. Dist. v. Garrett,* 232
S.W.3d 170, 176 (Tex.App.-Houston [1st Dist.] 2007, no
pet.). However, an incorrect construction of the law or a

misapplication of the law to undisputed facts is an abuse of discretion. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig.proceeding) ("A trial court has no 'discretion' in determining what the law is or applying the law to the facts"); *see Perry Homes v. Cull,* 258 S.W.3d 580, 598 n. 102 (Tex.2008) (quoting *Walker* ).

**\*2** A health care liability claimant must timely provide each defendant health care provider with an expert report. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351; *Gray,* 189 S.W.3d at 858. The expert report must provide a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6).

If a defendant files a motion challenging the adequacy of the claimant's expert report, the trial court shall grant the motion to dismiss only if it appears to the court, after a hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(l). Making that inquiry, the court considers only the information contained within the four corners of the report. *Palacios,* 46 S.W.3d at 878. Although the claimant need not marshal all her proof in the report, the report must include the expert's opinion on each of the elements identified in the statute. *Palacios,* 46 S.W.3d at 878–79; *Gray,* 189 S.W.3d at 859.

To constitute a good faith effort, in setting out the expert's opinions on the standard of care, the breach of the standard and the causative relationship between the breach and the injury, harm or damages claimed, the report must provide enough information to fulfill two purposes. *Palacios,* 46 S.W.3d at 879. First, the report must inform the defendant of the specific conduct the claimant has called into question. *Id.* Second, the report must provide a basis for the trial court to conclude that the claim has merit. *Id.* A report that merely states the expert's conclusions does not fulfill these two purposes. *Id.* "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie,* 79 S.W.3d at 52 (*quoting Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). But a claimant need not present evidence in the report as if she were actually litigating the merits. *Palacios,* 46 S.W.3d at 879. Furthermore, the report may be informal in that the information in the report need not meet the same requirements as the evidence offered in a summary-judgment proceeding or trial. *Id.*

In Moulsdale's October 2013 report, he stated:

I have been asked to review the care rendered to the above-captioned individual in January, 2011. She was, at that time, a resident of Vivians Nursing Home. Historically, the patient had had a CVA in the remote past, leaving her extremely debilitated and unable to care for herself, necessitating nursing home placement. I reviewed the records from Vivian's Nursing Home for the period of August, 2010 through January, 2011. On January 10, 2011, the patient was found to have increasing mental confusion and a probable urinary tract infection. She was subsequently taken by ambulance to Baptist St. Anthony Hospital in Amarillo, Texas, where she was found to have a severe urinary tract infection and probable urosepsis. She was treated aggressively and appeared to recover but was later sent to hospice care and expired there.

**\*3** The standard of care applicable to this type of patient is careful monitoring, especially since she was unable to communicate any problems she might be experiencing. Careful monitoring would include taking her vital signs (i.e. blood pressure, pulse rate, body temperature, and respiratory rate) at a minimum of once per day in order to detect any changes in her condition. Especially in a debilitated patient, it is essential to monitor vital signs in order to detect changes in the patient's condition, such as urinary tract infection, since the patient is not able to alert the staff on his/her own.

In reviewing the nursing home records, I found notes stating that Ms. Gomez's vital signs should be taken only once per week. The nursing home records further indicate that Ms. Gomez's vital signs were, in fact, only taken once per week. Had her vital signs been taken more frequently, at a minimum of once per day, it is much more likely that this condition would have been found earlier and might have been treated in the nursing home without the necessity of hospitalization. More likely than not, the vital signs would have shown an increase in body temperature, an increased heart rate, an increased respiratory rate, a decrease in blood pressure, or any combination of the above, indicating a change in the patient's medical condition which required further investigation. Because of the fact that her urinary infection was not discovered in a timely fashion, she required hospitalization and treatment in an intensive care unit. Because this is a life threatening illness, delay in diagnosis is a serious breach of the standard of care.

I believe that this claim does have merit because of the delay in the diagnosis of the urinary tract infection. In my training and experience as a urologist, it is more

likely than not that an undiagnosed urinary tract infection might develop into urosepsis, especially in a debilitated patient who is unable to communicate any symptoms or changes in their medical condition. I believe that this was the case in the care rendered to Ms. Gomez. Furthermore, it is documented in the death certificate that the cause of death was sepsis secondary to urinary tract infection.[3]

The Home's objections asserted that the amended report failed to adequately address the standard of care applicable to the Home and how the standard of care was allegedly breached by the Home or its employees. The Home also asserted the amended report failed to address the causal relationship between the alleged breach and the injury, harm or damages claimed by Flores, and asserted the amended report contained only global and conclusory statements concerning the causal connection.

Standard of care is defined by what an ordinarily prudent health care provider or physician would have done under the same or similar circumstances. *Palacios,* 46 S.W.3d at 880; *Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216, 222 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). Whether a defendant breached a duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Palacios,* 46 S.W.3d at 880.

**\*4** According to Moulsdale's report, the applicable standard of care for treatment of a debilitated patient like Ms. Gomez required that the Home monitor her carefully, taking her vital signs, defined as blood pressure, pulse rate, body temperature and respiratory rate, at least once per day to detect changes in her condition. Addressing the Home's breach of the standard of care, Moulsdale's report states that his review of the nursing home records reveals notes that Ms. Gomez's vital signs were to be taken only once per week and records further indicating that her vital signs were indeed taken once per week.

Moulsdale further explains that because the vital signs were not taken daily, Ms. Gomez's urinary tract infection went undetected long enough to develop into sepsis, a life-threatening condition requiring hospitalization. He states "[m]ore likely than not, the vital signs would have shown an increase in body temperature, an increased heart rate, an increased respiratory rate, a decrease in blood pressure, or any combination of the above, indicating a change in the patient's medical condition which required further investigation."

Our discussion will focus on causation because we readily conclude that in its discussion of that element, Moulsdale's amended report does not constitute a good faith effort toward compliance with the statutory requirements.

Reiterated, an expert report that merely states the expert's conclusions does not provide enough information to fulfill the purposes of the report. *Bowie,* 79 S.W.3d at 52 (*citing Palacios,* 46 S.W.3d at 879). The report must explain the basis of the expert's statements to link his conclusions to the facts. *Bowie,* 79 S.W.3d at 52. Otherwise, the report neither informs the defendant of the specific conduct the claimant calls into question nor provides a basis for the trial court to conclude the claim has merit. *Id.*

A case Flores cites is helpful to demonstrate the inadequacies of Moulsdale's report. *Mosely v. Mundine,* 249 S.W.3d 775 (Tex.App.-Dallas 2008, no pet.), dealt with a claim a physician failed to detect an early stage of cancer. The physician moved to dismiss the claim, asserting the expert report expressed only conclusory statements as to the causative relationship between the failure to detect and the harm to the patient. *Id.* at 780–81. The expert report there, as relevant to causation, stated:

> In the case of Mrs. Mundine, Dr. Mosley [sic] failed to identify a 1cm nodule on the chest x-ray during the ER visit in 5/2004. Approximately 21 months later this nodule had developed into a 6cm mass extending into the lung tissue with undetermined metastasis. Mrs. Mundine has a poor prognosis given the extent of the tumor growth and required lung resection, chemotherapy [,] and radiation. Had this cancer been detected in 2004[,] the likelihood of survival for Mrs. Mundine would have been significantly greater with a much less invasive treatment protocol. Dr. Mosley [sic] breached the standard of care by failing to detect the early stage of the cancer in May 2004.
>
> **\*5** \* \* \*
>
> .... Dr. Mosely failed to identify the early cancer nodule in Mrs. Mundine in 2004. This failure resulted in delayed diagnosis of lung cancer, required invasive and aggressive treatment and in all medically probability significant reduction in the life expectancy of Mrs. Mundine.

249 S.W.3d at 780.

The appeals court affirmed the trial court's denial of the physician's motion. It held the trial court could have concluded the report "established a causal relationship" between the physician's departure from the standard of care and the patient's injury. In so concluding, the court found the expert's report linked the physician's failure to identify the one-centimeter nodule in 2004 to the patient's

injury from the developed six-centimeter mass some 21 months later. *Id.* at 781.

The report in *Mosely* gave the trial court a factual basis to understand the change in the patient's condition between the breach of the standard, occurring on a known occasion on which the patient had a one-centimeter nodule, and the later condition when the nodule had become a six-centimeter mass. 249 S.W.3d at 780. By contrast with that report found adequate as to causation, Moulsdale's report contains the facts that on January 10, 2011, Ms. Gomez, a debilitated patient, "was found to have increasing mental confusion and a probable urinary tract infection," and was subsequently taken by ambulance to the hospital, where she was diagnosed with a severe urinary tract infection and probable urosepsis. The report speaks in conclusory fashion of a "delay in diagnosis," but contains no facts on which one may base a conclusion that there occurred a delay in diagnosing her infection or that any such delay was attributable to a failure of the Home to check her vital signs daily. The report's statement that "more likely than not, the vital signs would have shown an increase in body temperature, an increased heart rate, an increased respiratory rate, a decrease in blood pressure, or any combination of the above, indicating a change in the patient's medical condition which required further investigation"[4] is not factual, but merely a more detailed statement of Moulsdale's opinion. The report contains no factual statement describing when, relative to January 10, the Home's employees last checked Ms. Gomez's vital signs. Nor does it contain statements of what any of Ms. Gomez's vital signs were at any point in time, before, during or after her diagnosis, or how any of her vital signs had changed from any point in time to another.

With regard to her hospital care, Moulsdale's report adds only the facts that Ms. Gomez was treated aggressively and appeared to recover but later died under hospice care. The report concludes with the statement that, according to her death certificate, the cause of Ms. Gomez's death was "sepsis secondary to urinary tract infection." But the report contains nothing to link that fact with his conclusion the Home's failure to check her vital signs daily in the days before her hospitalization led to her septic condition or her death some two weeks later. And we cannot engage in inferences to supply information not present within the four corners of the report. *See Bowie,* 79 S.W.3d at 53.

**\*6** Moulsdale's report may also be compared with the expert report considered in *Craig v. Dearbonne,* 259 S.W.3d 308 (Tex.App.-Beaumont 2008, no pet.). Mrs. Dearbonne was admitted to a hospital on January 25 with admitting diagnoses that included "respiratory distress/shortness of breath" and pneumonia. Over the

next four days, her condition deteriorated and she was transferred to another facility where she died a few days later. The expert report addressed what it described as breaches of the standard of care by a physician during her four-day hospital stay. Reversing the trial court's denial of challenges to the expert report, the appellate court held the report was conclusory as to causation. The court summarized the expert report's discussion of causation as follows:

> [Expert's] report explains that the standard of care required [the physician] to examine and assess [the patient] on a daily basis, and that daily chest x-rays should have been performed. In addition, the report states that if [the physician] had examined [the patient's] lungs, then "more likely than not" she would have found that [the patient's] pneumonia and congestive heart failure had worsened, and those conditions "could have been effectively treated more likely than not." The report also concludes that if [the physician] had performed "proper assessment and treatment" on January 26, 27, or 28, "then more likely than not, [the patient] could have been successfully treated and would not have died when she did." [Expert] further concludes in the report that [physician's] negligence proximately caused [patient's] death, and if [physician] had not been negligent, [patient] "would not have died when she did."

259 S.W.3d at 312. The court found the expert's statements conclusory because they were not linked to the facts and did not explain how the physician's alleged negligence caused the patient's death. *Id.* at 313 (citing, *inter alia, Gonzales v. Graves,* No. 07–03–00268–CV, 2004 Tex.App. LEXIS 2403, 2004 WL 510898 (Tex.App.-Amarillo Mar. 16, 2004, no pet.) (mem.op.)).

Moulsdale's report contains even fewer facts than the report in *Craig.* 259 S.W.3d at 312. That report at least described Mrs. Dearbonne's condition on her admission to the hospital, giving the trial court some means to understand the factual consequences of a failure to order daily x-rays. *See Craig,* 259 S.W.3d at 313–14 (Gaultney, J., dissenting). As noted, Moulsdale's report gives no facts regarding Ms. Gomez's vital signs on any day, providing no basis for evaluation of the effects of a failure to check her vital signs daily. *See also Foster v. Richardson,* 303 S.W.3d 833, 842 (Tex.App.-Fort Worth 2009, no pet.) (holding expert report "does not explain beyond mere conjecture" how condition of patient's ankle worsened from June to July so that physician's failure to give correct diagnosis in June caused the requirement of further treatment in July).

Moulsdale's report expresses his opinion that the Home's failure to take Ms. Gomez's vital signs at least daily caused a failure to find and timely treat her urinary tract infection. It further expresses his opinion that because the infection was left untreated, it developed into sepsis, a life-threatening condition, ultimately leading to her death. But the report does not explain the basis of Moulsdale's statements to link his conclusions to the facts, *Bowie,* 79 S.W.3d at 52, with the result that it also does not provide a basis for the trial court to conclude the claim has merit. *Id.* Ultimately, it states only Moulsdale's opinions on causation. Accordingly, the report does not set forth a "good faith effort" to provide a fair summary of the causation element as described in the statute. When it overruled the Home's objections to the report's causation element discussion and denied its motion to dismiss, the trial court misapplied the "good faith effort" standard. Our conclusion the report is inadequate in its discussion of causation makes it unnecessary for us to consider the adequacy of its discussion of the standard of care and breach.

## Conclusion

**\*7** We sustain the Home's sole issue. We reverse the trial court's order and remand the cause to the trial court for the limited purposes of determining the Home's reasonably incurred attorney's fees and costs and entry of an order dismissing with prejudice Flores' claims against the Home. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b).

PIRTLE, J., dissenting.

## DISSENTING OPINION

PATRICK A. PIRTLE, Justice.

**\*7** Respectfully disagreeing with my colleagues concerning the application of the law to the undisputed facts of this case, I dissent. By its opinion, the majority finds the trial court misapplied the law concerning the application of the "objective good faith" standard to the evaluation of an expert report under section 74.351(l) of the Texas Civil Practices and Remedies Code, resulting in a finding of abuse of discretion and the concomitant judgment to reverse and remand. Because I find the trial court did not act in an arbitrary or unreasonable manner without reference to guiding rules or principles and did not, therefore, misapply the law to the undisputed facts of this case, or otherwise abuse its discretion, I respectfully dissent.

As the majority opinion correctly sets out, this is an interlocutory appeal in a health care liability suit, wherein Appellant, W.B.M. Management Company, d/b/a Vivians Nursing Home, seeks to overturn the decision of the trial court to deny Appellant's motion to dismiss the claims of Appellee, Mary Flores, pursuant to section 74.351(l). TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(l) (West 2012). The majority concludes the trial court erred because the report of Dr. James E. Moulsdale does not constitute an objective good faith effort to describe a causal relationship between Appellant's failure to follow an appropriate standard of medical care and Appellee's claimed damages. Because the majority accurately sets forth the law applicable to a case such as this, I will not restate the principles of law governing an appellate court's analysis of the sufficiency of an expert report as statutorily defined. *Id.* at § 74.351(r)(6).

Reduced to its essence, Appellee claims Appellant's employees failed to provide medical care within an applicable standard of care, and their failure to do so resulted in the death of her mother, Dionisia Dominguez Gomez. In support of her claim, Appellee provided the expert report of Dr. James E. Moulsdale,[1] which opines, in part, as follows:

> In reviewing the nursing home records, I found notes stating that Ms. Gomez's vital signs should be taken only once per week. The nursing home records further indicate that Ms. Gomez's vital signs were, in fact, only taken once per week. Had her vital signs been taken more frequently, at a minimum of once per day, it is much more likely that this condition would have been found earlier and might have been treated in the nursing home without the necessity of hospitalization. More likely than not, the vital signs would have shown an increase in body temperature, an increased heart rate, an increased respiratory rate, a decrease in blood pressure, or any combination of the above, indicating a change in the patient's medical condition which required further investigation. Because of the fact that her urinary infection was not discovered in a timely fashion, she required hospitalization and treatment in an intensive care unit. Because this is a life threatening illness, delay in diagnosis is a serious breach of the standard of care.

> **\*8** I believe that this claim does have merit because of the delay in the diagnosis of the urinary tract

infection. In my training and experience as a urologist, it is more likely than not that an undiagnosed urinary tract infection might develop into urosepsis, especially in a debilitated patient who is unable to communicate any symptoms or changes in their medical condition. I believe that this was the case in the care rendered to Ms. Gomez. Furthermore, it is documented in the death certificate that the cause of death was sepsis secondary to urinary tract infection.

In the context of a claim based on a failure to timely diagnose Ms. Gomez's medical condition, the report (1) provides a summary of the expert's opinions regarding applicable standards of care, (2) relates the manner in which the care rendered failed to meet those standards, and (3) opines as to the causal connection between that failure and the injury, harm, or damages claimed. As such, the report meets the statutory purpose of an expert report because it (1) informs Appellant of the specific conduct Appellee has called into question and (2) provides a basis for the trial court to conclude the claim has merit. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001).

Appellant contends, and the majority agrees, the expert report was "impermissibly speculative and conclusory" in its attempt to describe, within the four corners of the report, the "causal relationship between the alleged breach ... and the death of [Ms. Gomez]." The majority then analyzes relevant case law to reach the conclusion that this particular report does not "link" Dr. Moulsdale's conclusions to the facts of this case.

So, just what are the "facts" of this case? From the four corners of the report, we know that Ms. Gomez was "extremely debilitated," that she was "unable to care for herself," that Appellant was aware of the fact that she had a "probable urinary tract infection," and that in light of that knowledge, Appellant chose to take her vital signs only once per week. We also know the standard of care applicable to this type of patient called for "careful monitoring," which would specifically include taking her vital signs "a minimum of once per day," and that the purpose of that frequency of monitoring was "to detect *any* changes in her condition." We also know this monitoring was "especially" called for in a debilitated patient, like Ms. Gomez, because the patient was not otherwise able to alert the staff on her own. Finally, we know that within reasonable medical probability, "had her vital signs been taken more frequently ... it was much more likely that [her] condition would have been found earlier" and she might not have required hospitalization. The fact that more careful monitoring would have alerted the medical care providers to provide earlier, more aggressive treatment, establishes a causal relationship between the failure to closely monitor any change in her condition and harm suffered as a result of her declining medical health.

**\*9** Drawing insight from *Mosely v. Mundine,* 249 S.W.3d 775 (Tex.App.-Dallas 2008, no pet.), the majority opines that the expert report in that case was found to be sufficient because it gave the trial court a "factual basis to understand the change in the patient's condition"—in that case a change from a 1 cm nodule to a 6 cm mass over a 21 month period. Here, Dr. Moulsdale's report is really no different in that it places the emphasis on the differential diagnosis of Ms. Gomez's condition *from day to day* (as opposed to from week to week). The majority criticizes Dr. Moulsdale's report for failing to contain a statement concerning Ms. Gomez's vital signs at any specific point in time. In reaching this conclusion the majority completely overlooks the fact that it doesn't matter what her vital signs were at any particular moment because the medical significance is the *change,* not the difference. Dr. Moulsdale's report indicates that it was the daily *change* that would have, in all probability, alerted the Appellants to the imminent need for more aggressive treatment of her failing condition.

In another misinterpretation of Appellee's cause of action and the purpose of an expert report, the majority opines that the "report contains nothing to link [Dr. Moulsdale's opinion that Ms. Gomez's death was 'sepsis secondary to urinary tract infection'] with his conclusion the [Appellant's] failure to check her vital signs daily in the days before her hospitalization *led* to her septic condition or her death some two weeks later." (Emphasis in the original.) Appellee does not contend that the failure to timely diagnose *led* to Ms. Gomez's septic condition. Rather, Appellee contends her worsening septic condition (which would have been reflected in her daily vital signs and could have been treated earlier but for the delay in diagnosing Ms. Gomez's infection) led to injury, harm, or other damages because it was not timely diagnosed and treated. Simply put, Dr. Moulsdale's report establishes that Ms. Gomez was harmed by Appellant's breach of the appropriate standard of care.

Contrary to the conclusion reached by the majority, I find the facts of this case clearly provide a basis upon which the trial judge could reasonably have concluded that there was merit to the Appellee's claim. Accordingly, I would affirm the decision of the trial court.

**Parallel Citations**

Med & Med GD (CCH) P 304,923

Footnotes

1       *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (West 2012).

2       Dr. Moulsdale is a board-certified urologist who has practiced in the field for over 34 years. He holds accreditation in a number of urological fields, and has published several articles. The Home does not challenge Moulsdale's qualifications on appeal.

3       The date of Ms. Gomez's death is not stated in Moulsdale's report, but Flores' brief states she died on January 24, 2011.

4       The statement is one of those added by the amended report.

1       Dr. Moulsdale is a board-certified urologist who has practiced in the field of urology for over 34 years. Dr. Moulsdale's qualifications as an expert in this field are not challenged.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**988 S.W.2d 829
Court of Appeals of Texas,
San Antonio.**

Neale WOOD, Appellant,
v.
Diane TICE, D.D.S.; Barry Solomon, D.D.S.; and
Dental Centers of America, L.L.C., also doing
business as Windsor Dental Center, Appellees.

No. 04–98–00392–CV. | Feb. 17, 1999.

Patient sued dentists and dental clinic for malpractice. The 57th Judicial District Court, Bexar County, Peter Michael Curry, J., dismissed action, and patient appealed. The Court of Appeals, Green, J., held that: (1) patient's failure to timely provide dental clinic with copy of deposition warranted dismissal of clinic; (2) deposition testimony of one of dentists being sued failed to satisfy the Medical Liability Act's requirement of an expert report; (3) finding that patient was not entitled to 30–day grace period in which to file expert report was supported by evidence; and (4) patient was not entitled to new trial in order to file expert report.

Affirmed.

**\*829** From the 57th Judicial District Court, Bexar County, Texas Trial **\*830** Court No. 98–CI–03977 Honorable Peter Michael Curry, Judge Presiding.[1]

**Attorneys and Law Firms**

Randy Gathany, David W. Rogers, Law Offices of Dave Rogers, Inc., San Antonio, for Appellant.

Todd A. Prins, Stanley E. Faye, Edward C. Mainz, Jr., Robert B. Biechlin, Jr., Thornton, Summers, Biechlin, Dunham & Brown, L.C., San Antonio, for Appellee.

Before CATHERINE STONE, Justice, PAUL W. GREEN, Justice, KAREN ANGELINI, Justice.

**OPINION**

PAUL W. GREEN, Justice.

Neale Wood appeals an order dismissing his suit for failing to file an expert report under the Medical Liability and Insurance Improvement Act. Wood contends he satisfied the statute with an expert's deposition transcript. Alternatively, Wood maintains the trial court abused its discretion by denying him an extension of time to file an expert report. Finding no error, we affirm.

**Background**

On November 1, 1996, Wood sued Diane Tice, Andre Smith, Barry Solomon, and Dental Centers of America, L.L.C. for negligent treatment of a chipped tooth. In March 1997, Wood took Dr. Smith's deposition, which was transcribed and distributed to Drs. Tice, Smith, and Solomon on April 17, 1997. Dental Centers did not receive a copy of the deposition.

In January 1998, the defendants moved to dismiss the case based on Wood's failure to provide an expert's report. See TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(d–e) (Vernon Supp.1998) ("Medical Liability Act"). In response, Wood filed a motion for extension of time to file an expert report, which included an affidavit indicating his belief that Dr. Smith's deposition satisfied the statute. On January 16, the trial court orally granted a dismissal with prejudice. Its order, however, was not signed until March 10.

On April 23, Wood moved for a new trial, arguing he did not learn about the signed order until April 15. See TEX.R.APP. P. 304a(4–5). He also urged the court to grant him an extension of time to file an expert report. The trial court denied the motion for new trial, finding it had no jurisdiction. The court also denied Wood's motion to reconsider.[2] Despite Wood's lack of notice, he timely perfected this appeal.

**Compliance with the Medical Liability Act**

Wood claims he satisfied the Medical Liability Act with a copy of Dr. Smith's deposition. In contrast, the defendants contend the deposition is too "generalized and speculative" to satisfy the statute's requirement of an expert report. We agree with the defendants.

We review the trial court's dismissal order with the abuse of discretion standard. See *Pony Express Courier Corp. v. Morris,* 921 S.W.2d 817, 820 (Tex.App.—San Antonio 1996, no writ). In applying this standard, we defer to the trial court's factual determinations but review questions of law de novo. *Id.; see also Johnson v. City of Fort*

*Worth,* 774 S.W.2d 653, 656 (Tex.1989) (describing statutory construction as question of law).

[1] The legislature enacted the Medical Liability Act to curtail frivolous claims against physicians and other health care providers. *Horsley–Layman v. Angeles,* 968 S.W.2d 533, 537 (Tex.App.—Texarkana 1998, no pet.). To that end, section 13.01 requires a plaintiff to provide each defendant with one or more expert reports relating to liability and causation. *See* TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(i–j) (Vernon Supp.1998); HOUSE COMM. ON CIVIL PRACTICES, BILL ANALYSIS, Tex. H.B. 971, 74th Leg., R.S. (1995). The expert report must be "furnish[ed]," together with a curriculum vitae, no later than 180 days after suit is filed. TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(d) (Vernon Supp.1998). If the plaintiff fails to timely provide the report, the trial court "shall, on **\*831** the motion of the affected physician or health care provider, enter an order" dismissing the suit with prejudice. *Id.* § 13.01(e).[3]

[2] The statute defines "expert report" as a "written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 13.01(r)(6). The report must specifically refer to the defendant and discuss how that defendant breached the applicable standard of care. *See Horsley–Layman,* 968 S.W.2d at 535; *cf.* TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(*l* ) (Vernon Supp.1998) (requiring good faith effort to comply with the definition of expert report).

[3] Wood filed suit on November 1, 1996. His expert's report was due April 30, 1997. On April 17, the individual defendants received copies of Dr. Smith's deposition, but Wood neither provided Dental Centers with a copy nor did he indicate he would rely on the deposition as an expert report. Because Dental Centers is a health care provider entitled to receive a report, the trial court did not abuse its discretion in dismissing Wood's claim against that defendant. *See* TEX.REV.CIV. STAT. ANN. art. 4590i, § 1.03(a)(3) (Vernon Supp.1998) (defining health care provider as a professional association providing dental services); *see also id.* § 13.01(d–e).

[4] To determine whether the trial court properly dismissed the remaining defendants, we must evaluate whether Dr. Smith's deposition satisfies the definition of an "expert report." At the dismissal hearing, Wood argued the following excerpt satisfied the definition by establishing the liability of Dr. Tice:

Q. So when a patient comes in with any type of a complaint, you should take an x-ray, no matter what?

A. Yes.

Q. Okay. And would it be below the minimum accepted standard of care to fail to take that x-ray?

A. Yes.

...

Q. If it turns out that there was an x-ray that was taken, and for some reason was not shown in here, and that this x-ray appeared somewhere in the future and it showed that there had been an infection in it, would it have been—infection in Tooth No. 12, would it have been below the minimum standard of care to put this miracle mix on there anyway? ...

A. Yes, sir.

The deposition also includes the following information about Dr. Tice's potential liability:

Q. Would you, going back to the reference to the reasonably prudent dentist, would you consider that it would be below a minimum standard of care for a dentist to start a root canal that soon after the procedures that are described for November 5th of 1994?

...

A. I don't think any reasonable and prudent dentist would.

At the dismissal hearing, Wood claimed the following excerpt discussed Dr. Solomon's liability:

Q. When you—so what type of guidelines were established with them for the means whereby you did various procedures?

A. There were really no guidelines except for self-imposed guidelines.

Q. So if a dentist chose to on an individual basis, was there anybody overseeing that dentist [sic]—the quality of that dentist's work?

A. No, sir.

The deposition testimony fails to mention the defendants by name, fails to specify how **\*832** the defendants breached the standard of care, and fails to demonstrate causation and damages. Furthermore, there is no

indication the deposition included a copy of Dr. Smith's curriculum vitae. Therefore, as a matter of law, Dr. Smith's deposition does not satisfy the Medical Liability Act's requirement of an expert report. Accordingly, the trial court did not abuse its discretion in dismissing Wood's claims against the remaining defendants.

### Grace Period

[5] Wood argues the trial court erred by denying him a thirty-day grace period under section 13.01(g) of the Medical Liability Act. We disagree.[4]

We review the trial court's decision with the abuse of discretion standard. *Estrello,* 965 S.W.2d at 758. We further note the trial court does not abuse its discretion when it bases its decision on conflicting evidence. *Id.*

[6] Section 13.01(g) provides:

> Notwithstanding any other provision of this section, if a claimant has failed to comply with a deadline established by Subsection (d) of this section and after hearing the court finds that *the failure of the claimant or the claimant's attorney was not intentional or the result of conscious indifference but was the result of an accident or mistake,* the court shall grant a grace period of 30 days to permit the claimant to comply with that subsection. A motion by a claimant for relief under this subsection shall be considered timely if it is filed before any hearing on a motion by a defendant under Subsection (e) of this section.

TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(g) (Vernon Supp.1998) (emphasis added). Proof of accident or mistake must establish "some" excuse, not necessarily a "good" excuse. *McClure v. Landis,* 959 S.W.2d 679, 681 (Tex.App.—Austin 1997, pet. denied) (applying

*Craddock v. Sunshine Bus Lines,* 134 Tex. 388, 133 S.W.2d 124, 126 (1939)).

Wood filed his motion for extension of time on the day the trial court heard the defendants' motion to dismiss. In his motion, Wood alleged "he had a good faith belief that the deposition constituted an expert report." Responding to this assertion during the hearing, counsel David Coates said he discussed the absence of an expert report with plaintiff's counsel, Randy Gathany, in December 1997. According to Coates, Gathany never indicated reliance on Dr. Smith's deposition until the day of the hearing. In contrast, Gathany said he "believe[d]" he "mentioned the deposition."[5] Because the evidence of Wood's reliance was conflicting, we cannot say the trial court abused its discretion in denying Wood an extension of time. *See Estrello,* 965 S.W.2d at 758 (finding no abuse of discretion when evidence conflicted). *Contra Horsley–Layman,* 968 S.W.2d at 536–37 (finding that statement of belief was not controverted).

[7] In his motion for new trial, Wood also requested an extension of time to file an expert report. He contends the trial court erred in finding it had no jurisdiction over the motion. The trial court's ruling, however, is irrelevant because the motion for new trial was unnecessary in light of Wood's previous request for an extension of time. *Cf.* TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(g) (Vernon Supp.1998) (noting section 13.01(g) may be invoked before dismissal under section 13.01(e)); *McClure,* 959 S.W.2d at 682 (demonstrating section 13.01(g) may be invoked after dismissal under section 13.01(e)). Additionally, Wood's motion for new trial offered no new evidence regarding his lack of intentional or conscious indifference. Instead, it was limited to new allegations that **\*833** he did not timely receive notice of the dismissal order.[6] Despite this lack of notice, Wood timely perfected his appeal. Thus, Wood's complaint is without merit.

### Conclusion

We affirm the trial court's dismissal order.

Footnotes

1  The Honorable Peter Michael Curry signed the appealable order, but the Honorable Martha Tanner presided at the hearing.

2  Technically, the motions should have been dismissed for lack of jurisdiction.

3    The Medical Liability Act also permits dismissal if the plaintiff fails to "file" either a cash deposit, cost bond, or expert report 90 days after suit is filed. TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(a–b) (Vernon Supp.1998). This provision was not raised by the defendants in the trial court.

4    This case does not involve any other extensions of time permitted by the Medical Liability Act. *See, e.g.,* TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(h) (Vernon Supp.1998) (extending 180–day period by agreement); *id.* § 13.01(f) (extending 180–day period by court order); *cf. Estrello v. Elboar,* 965 S.W.2d 754, 758 (Tex.App.—Fort Worth 1998, no pet.) (suggesting a § 13.01(f) extension must be requested by the plaintiff and granted by the court within 30 days of the date the 180–day period ends).

5    Neither attorney objected to the unsworn testimony. *See Banda v. Garcia,* 955 S.W.2d 270, 272 (Tex.1997) (finding unsworn attorney testimony to be evidence in the absence of an objection).

6    In contrast, the defendants offered additional evidence that Gathany told Coates in their December conversation that "the courts never dismiss a case for failing to file an expert's report."

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.